Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------------X
     SIGALIT YEHUDA, ET AL.,
 4
                                    PLAINTIFFS,
 5
             -against-              Docket No.:
 6                                  1:21-cv-08921
 7
     JOSSEF KAHLON, ET AL.,
 8
                                    DEFENDANTS.
 9   ------------------------------------------X
10
11                        DATE: September 19, 2022
12                        TIME: 9:30 A.M.
13
14
15        EXAMINATION BEFORE TRIAL of the
16   Plaintiff, SIGALIT YEHUDA, taken by the
17   Defendant, pursuant to a Notice, held at the
18   offices of Naidich, Wurman, Birnbaum &
19   Maday, LLP, 111 Great Neck Road, Suite 214,
20   Great Neck, New York 11021, before Karyne
21   Federbush, a Notary Public of the State of
22   New York.
23
24
25
```

Page 2

```
 1
 2     A P P E A R A N C E S:
 3
       GORDON & HAFFNER, LLP
 4          Attorneys for the Plaintiffs
            SIGALIT YEHUDA, ET AL.
 5          480 Mamaroneck Road
            Harrison, New York 10528
 6          BY: STEVEN HAFFNER, ESQ.
 7
       NAIDICH, WURMAN, BIRNBAUM & MADAY, LLP
 8          Attorneys for the Defendants
            JOSSEF KAHLON, ET AL.
 9          111 Great Neck Road, Suite 214
            Great Neck, New York 11021
10          BY: RICHARD NAIDICH, ESQ.
11
12     ALSO PRESENT:
13     RUTH KOHN - COURTSIDE INTERPRETING
14
                    *       *       *
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1

2      F E D E R A L   S T I P U L A T I O N S

3

4          IT IS HEREBY STIPULATED AND AGREED by

5      and between the counsel for the respective

6      parties herein that the sealing, filing and

7      certification of the within deposition be

8      waived; that the original of the deposition

9      may be signed and sworn to by the witness

10     before anyone authorized to administer an

11     oath, with the same effect as if signed

12     before a Judge of the Court; that an

13     unsigned copy of the deposition may be used

14     with the same force and effect as if signed

15     by the witness, 30 days after service of the

16     original & 1 copy of same upon counsel for

17     the witness.

18

19         IT IS FURTHER STIPULATED AND AGREED

20     that all objections except as to form, are

21     reserved to the time of trial.

22

23              *       *       *       *

24

25

1               S. YEHUDA
2    R U T H    K O H N,  a Hebrew interpreter,
3    duly sworn to interpret the questions from
4    English into Hebrew and the answers from
5    Hebrew into English.
6    S I G A L I T    Y E H U D A, called as a
7    witness, having been duly sworn, through an
8    interpreter, by a Notary Public, was
9    examined and testified through the
10   interpreter as follows:
11   EXAMINATION BY:
12   MR. NAIDICH:
13        Q.    Please state your name for the
14   record.
15        A.    Sigalit Yehuda.
16        Q.    Where do you reside?
17        A.    18 Re'ven Rubin, Tel Aviv.
18        Q.    Ms. Yehuda, my name is Richard
19   Naidich and I represent Mr. Kahlon in
20   connection with the lawsuit that you
21   brought.  Present with me is Robert Johnson,
22   who is a lawyer in our firm and Mr. Kahlon,
23   the defendant in this case, as well as the
24   court reporter and the translator.  Is
25   anybody other than yourself present in the

1                    S. YEHUDA

2    room?

3         A.   Yes.

4         Q.   Who else is present with you?

5         A.   My husband.

6         Q.   Do you understand that I will be

7    questioning you and that I am expecting your

8    answers and that while he's in the room with

9    you, he is not to answer or prompt you to

10   answer, at all, but to be silent?

11        A.   Yes.

12        Q.   What is your country of

13   citizenship?

14        A.   Israel.

15        Q.   What is your marital status?

16        A.   Married.

17        Q.   When were you married?

18        A.   1992.

19        Q.   What is the name of your husband?

20        A.   Avi.

21        Q.   Where do you presently reside?

22        A.   In Israel.

23        Q.   You live together with your

24   husband?

25        A.   Yes.

1                    S. YEHUDA

2        Q.    Have you ever resided in the

3   United States?

4        A.    Yes.

5        Q.    When did you reside in the United

6   States?

7        A.    In 1996, it seems to me.

8        Q.    Is that when you first came to

9   live in the United States?

10       A.    Yes.

11       Q.    How long did you remain in the

12  United States?

13       A.    Four years.

14       Q.    Where did you reside when you

15  resided in the States?

16       A.    In Queens.

17       Q.    Did you enter the United States

18  under a visitor visa?

19       A.    Yes.

20       Q.    What caused you to enter the

21  United States to reside here?

22       A.    We were young and we thought it

23  would be nice, to be fun, to live somewhere

24  else for a few years.

25       Q.    When you resided in the United

1                    S. YEHUDA

2  States, you resided here with your husband?

3      A.   Yes.

4      Q.   What --

5           MR. NAIDICH:   Withdrawn.

6      Q.   After residing in the United

7  States, did you return to Israel?

8      A.   Yes.

9      Q.   Why did you do that?

10     A.   Why?  Because I didn't want to

11 live in the United States any longer.

12     Q.   Did you have the legal right to

13 stay in the United States at that time?

14     A.   During the last two years.  Later

15 on, I understood that I did not.

16     Q.   Do you know the Defendant Josef

17 Kahlon?

18     A.   Yes.

19     Q.   When did you first meet

20 Mr. Kahlon?

21     A.   I don't remember.  Sometime in the

22 United States.

23     Q.   You did meet him for the first

24 time in Israel?

25     A.   For the first time, no.

1                    S. YEHUDA

2         Q.    Do you remember the circumstances

3    under which you first met Mr. Kahlon?

4         A.    No, it was a long time ago.

5         Q.    Did you meet with him the first

6    time together with your husband?

7         A.    Yes.

8         Q.    During the period of time you were

9    United States, how often did you meet with

10   Mr. Kahlon?

11        A.    I don't remember.

12        Q.    Was it at least once a month?

13        A.    No.

14        Q.    Was it less than once a month?

15        A.    I don't remember.

16        Q.    Do you remember approximately how

17   many times you met with Mr. Kahlon when you

18   in the United States?

19        A.    No, I don't remember.

20        Q.    Would you describe the nature of

21   your relationship while you were in the

22   United States with Mr. Kahlon?

23             INTERPRETER:  Plural or singular,

24        you, your relationship?

25             MR. NAIDICH:  Her.

1                    S. YEHUDA

2        A.    He was my husband's friend.

3        Q.    Do you know whether your husband

4    met with Mr. Kahlon in the United States

5    without you being present?

6        A.    Possibly.

7        Q.    When you say that he was a friend

8    of your husband, what do you mean by a

9    friend?

10       A.    A friend only.

11       Q.    Subsequent to your return to

12   Israel, did you ever meet with Mr. Kahlon?

13       A.    Yes, I met with him in Israel.

14       Q.    How often did you meet with him in

15   Israel?

16       A.    I don't remember.

17       Q.    When was the last time you met

18   with Mr. Kahlon?

19       A.    I don't remember.  Lots of times.

20   A long time.

21       Q.    A long time ago?

22       A.    A long time ago.  Several years.

23   I don't remember how long it was.

24       Q.    What is your best recollection of

25   the year in which you last met with

Page 10

```
 1                    S. YEHUDA
 2   Mr. Kahlon?
 3       A.   I can't tell you the year.  I
 4   don't remember.
 5       Q.   When you did meet with Mr. Kahlon,
 6   were there any conversations regarding any
 7   of his business interest?
 8            INTERPRETER:  The interpreter
 9       would like you to rephrase business
10       interest.  It doesn't translate very
11       well.
12            MR. NAIDICH:  Okay.  That's fine.
13       Q.   Did you speak to --
14            MR. NAIDICH:  Withdrawn.
15       Q.   When you met with Mr. Kahlon, what
16   was discussed between you?
17       A.   Social things.
18       Q.   Any business?
19       A.   Not me, no.
20       Q.   Were you present when your husband
21   discussed any business with Mr. Kahlon?
22       A.   No.
23       Q.   Do you speak English, at all?
24       A.   I speak a little.
25       Q.   Did you learn English in school in
```

1                    S. YEHUDA
2    Israel?
3         A.    Yes.
4         Q.    Do you understand English in any
5    respect?
6         A.    I understand a little.
7         Q.    Do you read English?
8         A.    I do read, yes.
9         Q.    Did you learn to read English in
10   school?
11        A.    Yes.
12        Q.    What schooling did you have in
13   Israel?
14        A.    High school.
15        Q.    Did you graduate from high school?
16        A.    Yes.
17        Q.    Subsequent to high school, did you
18   take any further education?
19        A.    No.
20        Q.    Are you employed?
21        A.    Yes.
22        Q.    What is the nature of that
23   employment?
24        A.    M-A-C-C-A-B-I Health Services.
25        Q.    What do you do for them?

Page 12

                        S. YEHUDA

1

2      A.    A medical secretary.

3      Q.    How long have you worked for them?

4      A.    Several months.

5      Q.    Prior to that, were you employed?

6      A.    No.

7      Q.    Is it your testimony that, other

8    than that employment, you have never had

9    other employment?

10     A.    Yes.

11     Q.    Yes, you have never employed by

12   any other company?

13     A.    Correct.

14     Q.    Are you aware of the lawsuit that

15   you have brought against Mr. Kahlon?

16     A.    Yes.

17     Q.    Please describe your understanding

18   of that lawsuit?

19          MR. HAFFNER:   Objection.   You can

20      answer.

21          INTERPRETER:   Interpreter just

22      asked her to say it in short sentences

23      so she can get everything.

24     A.    Again, please repeat the question.

25   What would you like to know?

Page 13

                      S. YEHUDA

1
2        Q.    I'd like to know your
3    understanding of this lawsuit?
4              MR. HAFFNER:  I'll repeat the
5         objection.
6         A.    It's regarding bookkeeping.
7         Q.    Anything else?
8         A.    What I know is, regarding
9    bookkeeping, that's in general.  We asked
10   for bookkeeping or accounting of the company
11   over there.  That's in general what I know.
12        Q.    Do you know anything else about
13   this lawsuit?
14             MR. HAFFNER:  Objection.
15             THE WITNESS:  Should I answer?
16             MR. HAFFNER:  Yes, you may answer,
17        yes.
18        A.    I know that part of the lawsuit is
19   that there was a piece of land that Kahlon
20   sold that belonged to us as well.
21        Q.    How did you become aware of the
22   claims that you are making in the lawsuit?
23        A.    I don't understand how did I
24   became aware of what?
25        Q.    Prior to bringing this lawsuit,

Page 14

                        S. YEHUDA

1

2    did you do any independent investigation of

3    the facts or circumstances in this

4    litigation?

5         A.    No.

6              MR. NAIDICH:  Could we mark this

7         as an exhibit?

8              (Whereupon, Document was marked as

9         Defendant's Exhibit 1 for

10        identification as of this date by the

11        Reporter.)

12             MR. NAIDICH:  Counsel, what I'm

13        marking is the Complaint in this case

14        and I am --

15             MR. HAFFNER:  Could I get that on

16        the screen?  Is that possible?  Because

17        I'm a little compromised here.  One of

18        my computers is out and I'm on another

19        computer.

20             MR. NAIDICH:  I don't know whether

21        we have that ability, but we provided

22        you with the documents prior to the

23        deposition, which I believe was one of

24        those documents and it was also, I

25        believe your production of documents as

1                    S. YEHUDA

2        well.

3              MR. HAFFNER:  Rich, I'm not

4        suggesting otherwise.  All I'm saying

5        is that I'm in the middle of a move and

6        I neglected to bring to my computer

7        power cord.  I'm on an Apple and I'm

8        very unfamiliar with it and I can't

9        pull up the complaint --

10             MR. NAIDICH:  I would be happy to

11       do so if we could and I don't know

12       whether if we hold it up to the camera,

13       would that help?

14             MR. HAFFNER:  Sure.  I would

15       appreciate that or if it's been

16       scanned, I'm pretty sure Zoom has that

17       facility, I just don't know -- we have

18       to ask the court reporter.

19             COURT REPORTER:  I don't know.

20             MR. NAIDICH:  She says she doesn't

21       know.

22             MR. HAFFNER:  Okay, we can hold it

23       up to the camera.  That should be okay

24       or, you know just read the allegation.

25             MR. NAIDICH:  I would do that.

Page 16

1                     S. YEHUDA
2              MR. HAFFNER:   Okay.
3              MR. NAIDICH:   I will read anything
4        I question about, I will read and we
5        will do so faithfully.
6              MR. HAFFNER:   Thank you very much.
7        Q.    Ms. Yehuda, have you ever, prior
8    to today, seen the complaint in this case?
9        A.    Yes.
10       Q.    When for the first time did you
11   see that complaint?
12       A.    My husband showed it to me.
13       Q.    When?
14       A.    Maybe a month ago.
15       Q.    Prior to a month ago, had you ever
16   seen this complaint?
17       A.    I don't remember when I saw it.
18             MR. HAFFNER:   Richard, for
19       clarification, I believe your
20       question -- her answer was, many months
21       ago, plural.
22             INTERPRETER:   A month ago.  A
23       month ago.
24             MR. NAIDICH:   That's not what she
25       said.  I don't know if you speak

Page 17

S. YEHUDA

2    Hebrew, sir, but the interpreter does.

3    She said a month ago.

4            INTERPRETER:  The interpreter

5    heard a month ago.

6        Q.    Did you read the complaint when

7    you saw it?

8        A.    Yes.

9        Q.    Did you understand the words in

10   the complaint?

11       A.    What do you mean by, words, as far

12   as the English is concerned?

13       Q.    Yes, did you understand the words

14   in the complaint?  Did you understand what

15   it was?

16            MR. HAFFNER:  Objection.  You can

17       answer.

18       A.    In the end, I understood it.

19       Q.    Did you provide to your attorney

20   the information in the complaint?

21       A.    My husband did.

22       Q.    Is your answer that you did not

23   but that your husband did?

24       A.    Yes.

25       Q.    There is a section of the

```
 1                    S. YEHUDA
 2   complaint which has got a title, which says
 3   Facts Applicable to Relief Requested.  Are
 4   you aware of that?
 5        A.   I don't know what section you're
 6   talking about.
 7        Q.   Are you aware that there are facts
 8   alleged in the complaint?
 9        A.   Yes.
10        Q.   You believe those facts to be
11   accurate?
12        A.   Yes.
13        Q.   In Paragraph Six of the complaint,
14   it refers to a written assignment dated
15   November 14th, 2004.  Are you aware of that?
16             INTERPRETER:  The interpreter
17        needs to clarify.  Assignment in
18        English can have several meanings.
19             MR. NAIDICH:  Well, that's the
20        word.
21             INTERPRETER:  Well, assignment can
22        be an assignment of a job that you have
23        to do, assignment shares to somebody.
24             MR. NAIDICH:  Let me go back.
25        Q.   In Paragraph Six of the Complaint,
```

Page 19

1                    S. YEHUDA
2    you refer to a writing called an assignment,
3    by which Kahlon, who was then the sole owner
4    of T.J. Management assigned or transferred a
5    fifty percent interest to you; is that
6    correct?
7         A.    Yes.
8         Q.    Were you present when this
9    assignment was executed?
10             INTERPRETER:  By interpreter,
11        executed means?
12             MR. NAIDICH:  Signed.
13        A.    No.
14        Q.    I'm referring to the attachment to
15   the complaint, which is titled, Assignment
16   of Membership Interest and signed by Jossef
17   Kahlon.  When for the first time did you see
18   this assignment?
19        A.    I don't remember.
20        Q.    Did you see it in November of 2004
21   when it is dated?
22        A.    I don't remember.
23        Q.    Was a --
24             MR. NAIDICH:  Withdrawn.
25        Q.    Was the assignment ever delivered

```
 1                    S. YEHUDA
 2    to you by Mr. Kahlon?
 3              MR. HAFFNER:  Objection.  Do you
 4         mean directly?
 5         Q.   Yes.  Did Mr. Kahlon ever deliver
 6    this assignment to you?
 7         A.   He delivered it to my house.
 8         Q.   Were you present when that
 9    happened?
10         A.   No.
11         Q.   In 2004, where were you living?
12         A.   In Israel.
13         Q.   Do you know whether Mr. Kahlon
14    delivered this to your husband in person or
15    whether it was given to him by mail or
16    otherwise?
17         A.   I don't know.
18         Q.   Describe the circumstances under
19    which you understand Mr. Kahlon conveyed to
20    you a fifty percent membership interest in
21    T.J. Management Group?
22         A.   I cannot describe it, because my
23    husband dealt with it.  I don't know.
24         Q.   Do you know why Mr. Kahlon would
25    have conveyed a fifty percent membership
```

Page 21

```
 1                    S. YEHUDA
 2    interest in T.J. to you?
 3         A.   As far as I know it was investment
 4    in his company.
 5         Q.   Was that investment by you or your
 6    husband?
 7         A.   Probably both of us.  But he was
 8    the one that did everything.
 9         Q.   Do you know how much was invested,
10    initially, by your husband in T.J.
11    Management?
12              MR. HAFFNER:  Objection.  The
13         witness testified, both of us.
14         Q.   Do you know how much was invested
15    in T.J. Management by either you or your
16    husband?
17              INTERPRETER:  Initially?
18              MR. NAIDICH:  Initially.
19         A.   To the best of my recollection, it
20    was $350,000.00.
21         Q.   Did that money come from you or
22    from your husband?
23         A.   It's both of our money.
24              INTERPRETER:  Or let's say it's
25         the money of both of us.
```

Page 22

1                    S. YEHUDA

2        Q.    Who determined that the assignment

3   would be made to you, rather than either to

4   your husband or to the two of you?

5        A.    The truth is that, I don't

6   remember.  I don't remember what transpired

7   at that time.

8        Q.    Was it your understanding that

9   your interest in T.J. Management was an

10  interest for both you and your husband?

11       A.    Yes.

12       Q.    Did you know in 2004 what the

13  business of T.J. Management Group was at

14  that time?

15       A.    No, I did not know.

16       Q.    At some later time, did you become

17  aware of the business of T.J. Management?

18       A.    No, my husband was on -- in the

19  business aspect.  I did not know.

20       Q.    Do you know whether T.J.

21  Management made any loans to third parties?

22       A.    I don't know.  I know that one

23  time there was something.

24       Q.    Do you know whether T.J.

25  Management bought and/or sold any stock in

Page 23

```
1                    S. YEHUDA
2   the public companies?
3        A.   I don't know.
4        Q.   Do you know whether Mr. Kahlon
5   communicated with your husband as to the
6   business of T.J. Management?
7        A.   No, I don't know.
8        Q.   Did you ever request that Mr.
9   Kahlon provide you with any information
10  regarding the business of T.J. Management?
11       A.   No.
12       Q.   Do you know whether your husband
13  ever represented to anyone that he had an
14  ownership of T.J. Management?
15       A.   No.
16            MR. NAIDICH:  I'd like to have
17       this document marked.
18            (Whereupon, Document was marked as
19       Defendant's Exhibit 2 for
20       identification as of this date by the
21       Reporter.)
22            MR. NAIDICH:  Mr. Haffner, Hello?
23       I'm going to refer to your letter of
24       April 23, 2020, which -- a copy of
25       which we have previously sent to you
```

Page 24

```
 1                  S.  YEHUDA
 2      was a document I questioned the witness
 3      about and I'm only going to read a
 4      small portion of that.
 5           MR.  HAFFNER:   I'd like to just
 6      note for the record, there were two
 7      letters.   That letter was corrected.   I
 8      guess we can explore that further in
 9      discovery.
10           MR.  NAIDICH:   We can.   This letter
11      was addressed to Jordan Weiss, Esq.,
12      W-E-I-S-S, in regard to Zuchaer and
13      Zuchaer, LLC, Z-U-C-H-A-E-R, and to
14      Project Verte, V-E-R-T-E, Inc., and I'm
15      going to read to you, Ms. Yehuda, a
16      portion of the that letter.
17           Q.   I will read now from the third
18  paragraph.   It says in pertinent part that
19  T.J. Management Group, LLC, is a company
20  which Mr. Yehuda has a fifty percent
21  interest.   Are you aware of that?
22           A.   I don't know.
23           Q.   Mr. Haffner, who wrote this letter
24  is your attorney presently, is he not?
25           A.   Yes.
```

Page 25

                        S. YEHUDA

1        Q.   Do you know why he in this letter

2   had indicated that your husband was a fifty

3   percept owner of T.J.?

4        A.   No, I don't know why.

5        Q.   Do you know if your husband had

6   spoken to --

7             MR. NAIDICH:  Withdrawn.

8        Q.   Going back to Mr. Haffner's letter

9   of April 23, 2020, the same letter are you

10  aware that in that letter the following

11  language appears and I'll read it: "The

12  third tract Project Verte may believe it

13  acquired, known as 3450 East Ledbetter

14  Drive, Dallas, Texas, is owned by T.J.

15  Management"?

16       A.   I don't understand.

17       Q.   Ms. Yehuda, it appears from this

18  letter that your lawyer, the same lawyer

19  that has brought this lawsuit for you

20  against Mr. Kahlon, was acknowledging in

21  this letter that the property in Dallas,

22  Texas, was not sold to Project Verte, but

23  continued to be owned by T.J.  Are you aware

24  of that?

Page 26

```
 1              S.  YEHUDA
 2          MR.  HAFFNER:   Objection.
 3     A.   Should I answer?
 4          MR.  NAIDICH:   Yes.
 5     A.   No, I don't know about it.
 6     Q.   Do you know why your attorney
 7  would claim in the letter that T.J.
 8  Management continued to own the property,
 9  that it was not sold to Project Verte, that
10  while in this lawsuit it is claimed that
11  Sigalit learned Kahlon had sold the property
12  to Project Verte?  Can you explain the
13  difference?
14          INTERPRETER:   The interpreter does
15      not understand this question.
16     Q.   Okay.  We'll start again.  Let me
17  break it up.  In Mr. Haffner's letter he
18  plainly indicates that Project Verte did not
19  purchase 3450 Ledbetter; do you understand
20  that?
21          MR.  HAFFNER:   Objection.  Asked
22      and answered and argumentative.  Also,
23      I would like Mr. Naidich to actually
24      read the language that he's
25      characterizing and, in my opinion,
```

                    S. YEHUDA

1
2      mischaracterizing.
3          MR. NAIDICH:  I'll read it again,
4      and then I'll give it to you, so you
5      can read it.
6          Q.    Flowerdale owns two, not three,
7      tracts of land in Dallas County.  Namely,
8      two tracts of land known as 3200 Stag Road.
9      The third tract, Project Verte may believe
10     it acquired, known as 3450 East Ledbetter
11     Drive, Dallas, Texas, is owned by T.J.
12     Management Group, LLC, a company which Mr.
13     Yehuda has a fifty percent membership
14     interest in.  As an equal co-owner of that
15     company, any conveyance to a third party
16     would require Mr. Yehuda's written consent,
17     which has not beengiven.
18          INTERPRETER:  Let me ask the
19      witness whether she understood.
20          THE WITNESS:  Yes.
21          Q.    You understand that in this letter
22     Mr. Haffner states that the property known
23     as 3450 East Ledbetter Drive, was not sold
24     by T.J. to Project Verte.  Do you understand
25     that?

Page 28

1                    S. YEHUDA

2           MR. HAFFNER:  Objection.

3      Q.    You understand that?

4      A.    Should I answer?  Should I answer?

5           MR. HAFFNER:  Yes, you can answer.

6      A.    No.

7      Q.    Do you know why Mr. Haffner would

8   have in his letter indicated that the

9   property at 3450 Ledbetter Drive, Dallas,

10   was not sold to Project Verte but remained

11   in T.J. Management?

12           MR. HAFFNER:  Objection.  Again,

13        the question mischaracterizes what was

14        stated in the letter and I'll let her

15        answer one more time, but this should

16        be the end of this line of questioning.

17      A.    No, I don't know.

18      Q.    In Paragraph 9 of the Complaint,

19   it is stated.  "About eighteen months ago,

20   Sigalit learned Kahlon had sold the property

21   to Project Verte, referring to the property

22   known as 3450 Ledbetter Drive, Dallas,

23   Texas.  Are you aware that claim is made in

24   the complaint?

25      A.    Yes.

Page 29

S. YEHUDA

1

2    Q.    Do you know whether the property
3    on Ledbetter was or was not sold to Project
4    Verte?
5    A.    Yes.
6    Q.    Do you know whether the property
7    on Ledbetter was or was not sold to Project
8    Verte?
9         INTERPRETER:  Do you know whether
10    --
11         MR. NAIDICH:  Whether it was or
12    not sold?
13    A.    No, I don't know.
14    Q.    Did you ever request of your
15    attorney advices to whether that had
16    happened?
17    A.    Yes.
18    Q.    What was the basis for your belief
19    that the property on Ledbetter was sold to
20    Project Verte?
21    A.    My husband heard about it from
22    Amir's, A-M-I-R-S, complaint.
23    Q.    From Amir Shalutz (phonetic)?  Is
24    that what she said?
25    A.    Yes.

Page 30

1                      S. YEHUDA

2        Q.    Did Mr. Shalutz speak to your

3   husband, to your knowledge?

4        A.    I don't know.

5        Q.    Do you know Mr. Shalutz?

6        A.    No.

7        Q.    Have you ever spoken to

8   Mr. Shalutz?

9        A.    I did not.  I have not.

10        Q.    Do you know if your husband has

11   ever spoken to Mr. Shalutz?

12        A.    I don't know.

13        Q.    In the next paragraph of the

14   Complaint, Paragraph 10, I will read it to

15   you and then the translator will read it to

16   you separately.  It says on information and

17   belief, Kahlon, through his corporation T&J

18   Holdings, Inc., received for the property

19   consideration in the amount of the

20   $10,000,000.00.  Are you aware of that

21   allegation in the complaint?

22        A.    Yes.

23        Q.    What information were you relying

24   on in making that allegation?

25        A.    From Amir's lawsuit.

Page 31

```
                           S. YEHUDA
 1
 2        Q.    Well, in --
 3              MR. NAIDICH:   Withdrawn.
 4        Q.    In Amir's lawsuit, it's his
 5   position on behalf of Project Verte that
 6   they never obtained the property at 3450; is
 7   that not correct?
 8              MR. HAFFNER:   Objection.  You can
 9        answer.
10        A.    I don't know.
11        Q.    Would you agree that if -- if the
12   property at 3450 Ledbetter was not sold to
13   Project Verte that whatever money Kahlon did
14   or did not get would be money due to T.J
15   Management?
16              MR. HAFFNER:   Objection.  Calls
17        for a legal conclusion and the claims
18        in this suit are broader than 3450
19        Ledbetter.  You can answer.
20        A.    Can you repeat the question?
21        Q.    Yes, let me rephrase it.  It's
22   your claim, is it not, in Paragraph 10 that
23   T.J. Management is entitled to money that
24   you understand to have been the result of
25   the sale of Ledbetter to Project Verte?
```

```
 1                    S. YEHUDA
 2       A.   Yes.
 3       Q.   So, if the --
 4            MR. NAIDICH:   Withdrawn.
 5       Q.   So, if the property was not sold
 6  to Project Verte, you would not to be
 7  entitled to any money as a result of that?
 8       A.   I don't know.
 9       Q.   Well, if the $10,000,000.00 was
10  not paid by Project Verte for the property
11  on Ledbetter, then how would you be entitled
12  to any portion of that money?
13            MR. HAFFNER:   Objection.   Calls
14       for legal conclusion.   You can answer.
15       A.   I don't know.
16       Q.   Do you claim that Mr. Kahlon owes
17  either you or your husband any money,
18  whatsoever?
19       A.   Yes.
20       Q.   What money?
21       A.   As far as I know from my husband,
22  there were profits from over the years.
23  There was money left that has not been
24  distributed and that's it.
25       Q.   I want to go back to whether or
```

Page 33

```
 1                    S.  YEHUDA
 2    not your husband has represented to any
 3    third party that he is an owner of T.J.
 4    Management.  I have had marked a letter from
 5    Irving Strauss, an accountant.  A copy of
 6    this letter has been provided in advance of
 7    this deposition to your attorney.  The
 8    letter is dated November 2, 2018.  It
 9    references Avraham Yehuda and T.J.
10    Management.  I will quote from the letter.
11    It says I have been the accountant for T.J.
12    Management from the time the company was
13    founded to present.  It also says I am a
14    personal accountant of Jossef Kahlon and was
15    the accountant for Avraham Yehuda in the
16    U.S. in the years 2008, 2009, 2010.  It also
17    says Avraham Yehuda has been a partner in
18    T.J. Management since 2008.  Do you know
19    Mr. Strauss?
20         A.    No.
21         Q.    Do you know why he would have
22    indicated in his letter that your husband
23    was a partner in T.J. Management?
24         A.    No.
25              MR. NAIDICH:  Just give me a
```

Page 34

```
                              S. YEHUDA
 1
 2        moment, please.
 3        Q.    Are you aware that your attorney
 4   has provided our office with various
 5   documents responsive to our request in a
 6   Notice to Produce?
 7        A.    Yes.
 8             MR. NAIDICH:  Mr. Haffner, I'm
 9        going to question the witness -- off
10        the record.
11             (Whereupon, an off-the-record
12        discussion was held.)
13             (Whereupon, Document was marked as
14        Defendant's Exhibit 3 for
15        identification as of this date by the
16        Reporter.)
17             (Whereupon, Response was marked as
18        Defendant's Exhibit 4 for
19        identification as of this date by the
20        Reporter.)
21        Q.    Ms. Yehuda, are you aware that
22   your husband maintained an account at Credit
23   Suisse in December of 2006?
24        A.    Yes.
25        Q.    Your attorney has provided us with
```

Page 35

                         S.  YEHUDA

1

2   a copy of a statement of that account, dated

3   31-12-2006, and I'm referring to a document

4   Bates-stamped P000117.  I note that certain

5   of the information on that document has been

6   blacked out.  Do you know why?

7        A.    It's not connected with the case.

8        Q.    Who made that determination?

9        A.    Maybe we blacked out personal

10  items.

11       Q.    Did you make that decision or

12  someone else?

13       A.    My husband handled all financial

14  matters.

15       Q.    I note that one entry indicates

16  that on 2-11-06 --

17            MR.  NAIDICH:  Off the record.

18            (Whereupon, an off-the-record

19       discussion was held.)

20            MR.  NAIDICH:  Withdrawn.

21       Q.    I note an entry on November 2,

22  2006, which indicates T.J. Management paid

23  to your husband's account $441,000.  Do you

24  know what that money was paid for?

25       A.    Profits from T.J. Management.

Page 36

S. YEHUDA

1
2    Q.    Do you know whether or not at or
3  around the time of this payment that
4  Mr. Kahlon advised your husband the source
5  of those monies?
6    A.    No, I don't know.
7    Q.    Do you know whether Mr. Kahlon
8  e-mailed your husband with regard to this
9  payment explaining what it was for?
10   A.    I don't know.
11   Q.    Do you know why this payment was
12  made to your husband rather than to you?
13   A.    I learned later on that, since I
14  didn't have a visa, I didn't have a tax ID
15  and that's why we did it under my husband's
16  name.
17   Q.    Do you know whether Mr. Kahlon
18  regularly advised your husband of the
19  activities of T.J. Management?
20   A.    I don't know.
21   Q.    Do you believe that on receipt of
22  these monies that your husband had no
23  conversation or had --
24         MR. NAIDICH:  Withdrawn.
25   Q.    Do you believe that your husband

1                S. YEHUDA

2   had any conversation or information from

3   Mr. Kahlon regarding this $441,000.00 money?

4        A.    I don't know.

5        Q.    I see that on November 13, 2006,

6   an additional payment was made by T.J. to

7   your husband's account for $574,000.00.  Do

8   you know what they payment was made for?

9            MR. HAFFNER:  Objection.  Assumes

10       facts not in evidence.  Has it been

11       established that this account is solely

12       in the name of Avi Yehuda?

13           MR. NAIDICH:  So, it says on the

14       top the statement, sir.  It says the

15       account holder is Avraham Yehuda.

16           MR. HAFFNER:  Okay.

17           MR. NAIDICH:  You provided the

18       statement to our office.

19           MR. HAFFNER:  I withdraw the

20       objection.  Richard, as you know I'm in

21       --

22           MR. NAIDICH:  No problem.  I

23       represent that I'm reading accurately

24       from the exhibit, which was provided by

25       your office.

1              S. YEHUDA

2         MR. HAFFNER:  Yes, you are.  But

3    you didn't read and I didn't expect you

4    to read the top line indicating who the

5    account holder was.

6         MR. NAIDICH:  I am representing

7    that the account holder is Avraham

8    Yehuda.

9         MR. HAFFNER:  Okay, fine.

10   Objection withdrawn.

11        MR. NAIDICH:  I don't know if

12   there was an open question, so I'll ask

13   again or do you want to read it back?

14        MR. HAFFNER:  Was there an open

15   question?

16        INTERPRETER:  Interpreter

17   remembers the payment November 13,

18   2006, additional payment of $574,000.

19   What was it for?

20        COURT REPORTER:  Do you know what

21   that payment was made for.

22   A.    I assume these are profits from

23 T.J. Management.

24   Q.    Do you understand that your

25 husband spoke to Mr. Kahlon regarding these

Page 39

1                    S. YEHUDA
2    monies?
3              MR. HAFFNER:  Objection.  Is the
4         question, do you know?
5              MR. NAIDICH:  Yes.
6              MR. HAFFNER:  It's a little vague.
7              MR. NAIDICH:  I'm sorry.  I'll
8         withdraw it.
9         Q.   Were you aware of these funds
10   being paid to your husband's account when
11   they were received?
12        A.   I don't remember, at that time.  I
13   don't remember.
14        Q.   Ms. Yehuda, these were large sums
15   of money, were they not?
16        A.   Yes.
17        Q.   To the best of your recollection,
18   when these monies were received, the
19   $441,000 on the 2nd of November and another
20   $564,000 on the 13th of November, did your
21   husband tell you those monies had been
22   received?
23        A.   In general, I knew.  I don't
24   remember when he told me.
25        Q.   Is it your best recollection that

Page 40

S. YEHUDA

2  he told you at or about the time the money

3  was received?

4      A.   I don't remember.  It was a long

5  time ago.

6      Q.   Well, did your husband share this

7  money with you?

8      A.   Yes.

9      Q.   How did he do that?

10     A.   He transferred these monies to our

11 joint account in Israel.

12     Q.   In what bank was your joint

13 account maintained?

14     A.   Bank Leumi, L-E-U-M-I.  Our joint

15 accounts.

16     Q.   Is that account in Israel or the

17 United States?

18     A.   In Israel.

19     Q.   Do you know the address of the

20 branch that that account was maintained in?

21     A.   I don't know the precise address,

22 no.

23     Q.   An additional $490,000.00 was paid

24 by T.J. Management to your husband's account

25 at Credit Suisse on December 22, 2006.  Do

Page 41

S. YEHUDA

1
2     you know the source of those payments?
3          A.    I assumed, those were profits from
4     T.J. Management.
5          Q.    Do you know anything specific
6     about transactions of T.J. Management that
7     would have resulted in the profits that were
8     paid to your husband's account in 2006?
9          A.    No.
10         Q.    Is it your belief that these
11    monies paid in 2006 were without information
12    supplied to your husband as to the source of
13    these funds?
14         A.    I don't know.
15         Q.    Did you ever ask your husband
16    where --
17              MR. NAIDICH:   Withdrawn.
18         Q.    Did you ever speak to your husband
19    about what transactions that T.J. Management
20    was involved in that would have resulted in
21    these profits?
22         A.    No.
23         Q.    You had invested $350,000.00 to
24    obtain an interest in T.J. Management; is
25    that right?

1                    S. YEHUDA

2        A.    Yes.

3        Q.    What was your reaction to these

4   large sums of money in 2006 that came to

5   your husband's account?  Again, $441,000,

6   $574,000 and then another $490,000.  Those

7   were all the result of your investments of

8   $350,000.00; is that your testimony?

9        A.    Yes, my husband handles the

10  financial matters and that's what I know

11  yes.

12       Q.    Did you ever have any active role,

13  yourself, in T.J. in performing any services

14  for the company?

15       A.    No.

16       Q.    Do you know what if any services

17  to T.J. your husband provided?

18       A.    No.

19       Q.    Do you know whether your husband

20  had any involvement in investment decisions

21  by T.J. Management?

22       A.    No.

23       Q.    I think I asked this question

24  before.  But were you aware that, at some

25  point in time, T.J. Management was buying

Page 43

1                    S.  YEHUDA

2    and selling shares in public companies in

3    the United States?

4         A.    Yes.

5         Q.    Did you understand that the monies

6    that I've described thus far in 2006 were

7    the profits from those purchases and sales

8    of stocks?

9         A.    Yes.

10        Q.    I now refer to a statement from

11   June 30, 2007, on the same account at Credit

12   Suisse in the name of your husband and the

13   Bates stamp is P000118.  Going back to the

14   prior statement, it's your testimony that

15   the monies that were received from T.J. to

16   the Credit Suisse account of your husband

17   were subsequently transferred to a joint

18   account; is that right?

19        A.    Yes.

20        Q.    Do you know whether any of the

21   blacked-out portions of the statement would

22   reflect the transfer of any of these monies

23   to the joint account that you testified to?

24        A.    Possibly.

25        Q.    Do you know where the statements

Page 44

                          S.  YEHUDA

1

2     of  the  joint  account  are  at  this  time?   Do

3     you  have  copies?

4          A.   Yes.

5          Q.   Where  are  those  copies?

6          A.   At  the  bank.

7          Q.   No,  do  you  have,  possession  of

8     copies  at  your  personal  residence  or

9     anywhere  else?

10         A.   No.

11         Q.   You  could  obtain  them  from  the

12    bank;  is  that  your  testimony?

13         A.   I  can  try,  yes.

14         Q.   I  now  refer  to  Bates  stamp  P000118

15    and  it's  indicated  on  that  statement  that

16    T.J.  Management  paid  to  your  husband's

17    account  on  May  --  I'm  sorry,  January  5,

18    2007,  $630,000.00.   Were  you  aware  of  that

19    payment  when  it  was  received?

20              INTERPRETER:   Can  you  please

21         repeat  the  amount?

22         Q.   $630,000.00.   Were  you  aware  of

23    that  amount  received?

24         A.   I  don't  recall,  specifically.

25         Q.   Well,  would  your  husband  have

Page 45

1                      S. YEHUDA

2     received that amount of money and not let

3     you know about it?

4          A.     It's possible that he told me.

5     But it was a long, long time ago and I don't

6     remember.  He handles the money and I trust

7     him.  I rely upon him.

8          Q.     Well, you were the owner of fifty

9     percent of T.J. Management, were you not?

10         A.     Yes.

11         Q.     So, when T.J. Management paid

12    630,000.00 in May of 2007 --

13                INTERPRETER:  January of 2007.

14         Q.     I'm sorry, January of 2007, would

15    you not be entitled to know about that?

16         A.     My husband handles money matters.

17    We both agreed to it and it belongs to both

18    of us.  I trust him.

19         Q.     Do you know if this money was ever

20    transferred to a joint account?

21         A.     I don't know specifically.  But I

22    believe the money was transferred to our

23    joint account.  All the money was

24    transferred to our joint account.  I don't

25    know or actually, more accurately, I don't

Page 46

                    S. YEHUDA

1

2      remember.

3           Q.    Do you know why the money would

4      have been transferred to this account solely

5      in your husband's name rather than the joint

6      account immediately?

7                MR. HAFFNER:    Objection.    Asked

8           and answered.    You can answer, Sigalit.

9                INTERPRETER:    Interpreter will

10          repeat the question.

11          A.    I don't remember.    No, I don't

12     remember why.

13          Q.    What is your understanding of why

14     this $630,000 was paid by T.J. to your

15     husband?

16          A.    From what I know these were

17     profits of T.J. Management.

18          Q.    Is it your understanding those

19     profits were the result of stock trades?

20          A.    I don't exactly know what was the

21     nature of the profits.

22          Q.    Did you ever ask either your

23     husband or Mr. Kahlon what transactions

24     resulted in these payments?

25          A.    No.

Page 47

```
 1                    S. YEHUDA
 2        Q.    I now refer to your statement
 3    dated December 31, 2007.  It's on the same
 4    account at Credit Suisse and it's another
 5    transfer or payment by T.J., this time in
 6    the amount of $560,000.00.  Do you know what
 7    the source of these funds were?
 8        A.    As far as I know these were
 9    profits from T.J. Management.
10        Q.    Did you have any interest in what
11    activities of T.J. Management would produce
12    these large sums of money?
13           MR. HAFFNER:  Richard, could you
14        repeat the question in English only for
15        me?  I'm sorry.  I was distracted.
16           MR. NAIDICH:  Could you repeat the
17        question?
18           (Whereupon, the referred-to
19        question was read back by the
20        reporter.)
21           INTERPRETER:  Interpreter asked if
22        the witness remembered the question and
23        the witness said no.  So, the
24        interpreter will repeat that it.
25        A.    I knew it, in general.  I never
```

Page 48

1                    S. YEHUDA

2    asked, specifically.

3         Q.    What did you know in general?

4         A.    I knew it was about the shares.

5    Beyond that, I didn't know anything.

6         Q.    In this action that's now pending

7    between you and Mr. Kahlon, among other

8    things, you're asking for an accounting of

9    the activities of T.J. Management; is that

10   right?

11        A.    Yes.

12        Q.    During the years 2006, 2007 and

13   those years further back for which there are

14   bank statements, do you have any reason to

15   believe that Mr. Kahlon did not provide any

16   and all information you or your husband may

17   have asked for?

18            MR. HAFFNER:    Objection.    You can

19        answer.

20        A.    I'm not sure.    That's why I

21   requested it.

22        Q.    When, for the first time, did you

23   seek an accounting or information from

24   Mr. Kahlon regarding the profits of the T.J.

25   Management?

```
 1                    S. YEHUDA
 2        A.    I don't remember.
 3        Q.    Well, did you ask for any
 4   information in 2006 regarding these large
 5   monies being paid to your husband as to the
 6   source of those monies or seek an accounting
 7   regarding those monies?
 8              MR. HAFFNER:  Objection.  Compound
 9        question.  Asked and answered.  You can
10        answer.
11        A.    I don't know because, at that
12   time, my husband handled all the financial
13   matters and I don't know what transpired.
14        Q.    Is it fair to say you don't know
15   what information Mr. Kahlon gave to your
16   husband regarding these payments?
17        A.    Yes.
18        Q.    You have no reason to know that
19   Mr. Kahlon failed to give any information
20   your husband may have requested?
21        A.    I don't know.
22        Q.    You do not know whether Mr. Kahlon
23   detailed to your husband or informed him,
24   rather, of the transactions that caused
25   these payments to be made?
```

Page 50

                        S. YEHUDA

1

2       A.    I don't know it, because my

3   husband handled the financial matters.   So,

4   I don't know.

5       Q.    In seeking an accounting in this

6   case --

7            MR. NAIDICH:   Withdrawn.

8       Q.    What is the reason you're seeking

9   accounting in this case?

10      A.    Because, we don't believe that all

11  the money has been distributed.   Because

12  there were monies that remained in the

13  covers of the company and not all the money

14  was divided fifty-fifty.

15      Q.    What is the basis of that belief?

16      A.    I know it from my husband.

17      Q.    What years are you seeking an

18  accounting for?

19      A.    For all the years when they were

20  working together.

21      Q.    What years were those?

22      A.    2004 to 2012.

23      Q.    When was the last time that you

24  worked together, that is, your husband and

25  Mr. Kahlon?

```
                        S. YEHUDA
1
2        A.    I don't remember.
3        Q.    Are you aware that the SEC --
4              MR. NAIDICH:   Withdrawn.
5        Q.    Are you aware of an entity called,
6   The Securities Exchange Commission?
7        A.    No.
8        Q.    Are you aware that an action or
9   proceeding was brought against T.J.
10  Management and Kahlon to recover profits
11  from the sale of securities by T.J.
12  Management?
13             MR. NAIDICH:   You want me to
14       repeat that?
15             INTERPRETER:   Is there a question?
16             (Whereupon, the referred-to
17       question was read back by the
18       reporter.)
19             INTERPRETER:   I'm sorry.   The
20       interpreter --
21             MR. NAIDICH:   Okay.   Let me
22       withdraw it.
23       Q.    Are you aware of any lawsuit
24  against T.J. Management seeking to recover
25  profits from the sale of securities by T.J.?
```

Page 52

1                    S. YEHUDA

2        A.    I heard something from my husband.

3    I don't know.

4        Q.    Do you know whether or not a

5    judgment was entered by T.J. in the amount

6    of profits that it obtained from the sale of

7    securities?

8            MR. HAFFNER:    Objection.    Some

9        profits or all profits?

10            MR. NAIDICH:    All.

11            MR. HAFFNER:    You can answer.

12        A.    I don't know.

13        Q.    There are additional bank

14    statements, which I want to question you

15    about.    All of these statements are from

16    Credit Suisse.    All of them are accounts in

17    the name of your husband and they are for

18    the following dates.    Statement dated

19    December 31, 2008, which is Bates-stamped

20    P000129.    Statement dated March 31, 2009,

21    Bates-stamped P000121.    Statement dated

22    December 31, 2009, Bates-stamped P000122.

23    Statement dated June 30, 2010, Bates-stamped

24    000123.    Statement dated December 31, 2010,

25    Bates-stamped 000124 and statement dated

1              S. YEHUDA

2    December 31, 2010, which, I guess, is the

3    second page of that statement P000125.

4              THE WITNESS:  May I have a short

5         break?

6              MR. NAIDICH:  Absolutely.  How

7         long would you like to take?  How much

8         time would you like?

9              THE WITNESS:  Ten minutes is fine.

10             MR. NAIDICH:  Would fifteen be

11        better for you?

12             THE WITNESS:  Okay, fifteen (in

13        English).

14             (Whereupon, a short recess was

15        taken.)

16        Q.   The last of the Credit Suisse

17   statements that have been provided to me is

18   dated December 3, 2010.  Are you aware of

19   any other monies received by either yourself

20   or your husband since 2010?

21        A.   I don't know.

22        Q.   Does that mean there may have been

23   additional monies that was received that are

24   not represented in these statements?

25        A.   I don't think so.  But I don't

Page 54

```
 1                    S. YEHUDA
 2   know. I'm not sure.
 3        Q.    Do you know when T.J. Management
 4   stopped making profits from the sale or
 5   purchase of stock?
 6        A.    No.
 7        Q.    Well, do you know that it was
 8   years ago that it stopped?
 9        A.    I don't know.
10        Q.    Are you aware, that the property
11   in Texas is vacant and not improved?
12        A.    I don't know.
13        Q.    Do you know of any source of
14   income to T.J. from anything other than the
15   sale of stock?
16        A.    No, because my husband handed all
17   of those things.  So, I don't know.
18        Q.    Was there any agreement between
19   you and Mr. Kahlon regarding the division of
20   any profits to be made by T.J. Management?
21        A.    I don't understand the question.
22        Q.    What portion of the profits to be
23   made by T.J. Management do you believe you
24   were entitled to?
25        A.    Fifty percent.
```

Page 55

S. YEHUDA

1

2      Q.    What was the basis for that

3  understanding?

4      A.    According to the agreement of T.J.

5  Management.

6      Q.    What agreement are you referring

7  to?

8      A.    The 2004 agreement on which Jossef

9  Kahlon signed.

10     Q.    Are you saying your understanding

11 is with you alone or with your husband owned

12 a fifty percent interest in T.J. Management

13 that that meant you are entitled to fifty

14 percent of the profits?

15     A.    Yes.

16     Q.    Was there any written agreement

17 besides that assignment to you which set

18 forth the understanding between you and

19 Mr. Kahlon as to the division of profits?

20     A.    Not that I'm aware of.

21     Q.    What is your understanding of

22 profits made by T.J. Management?

23     A.    Not much.  My husband did

24 everything.  He managed the profits at T.J.

25 Management.  I don't know.

Page 56

                              S. YEHUDA

1

2        Q.    Do you understand that profits are

3   income less expenses?

4            MR. HAFFNER:   Objection.   You can

5        answer.

6        A.    No.

7        Q.    Do you believe you are entitled to

8   fifty percent of money earned by T.J.

9   Management without consideration of

10  expenses?

11           MR. HAFFNER:   Objection.   I think

12       you're referring to revenue rather than

13       earnings.   Earnings might overlap --

14           MR. NAIDICH:   Let me rephrase it.

15       Q.    In determining profits, do you not

16  agree that profits are revenue received by

17  the company less expenses?

18       A.    I don't understand these things.

19  I'm not an accountant.

20       Q.    Do you understand as an owner of

21  T.J. Management, that you were responsible

22  of fifty percent of his expenses?

23           MR. HAFFNER:   Objection.   You can

24       answer.

25       A.    I don't know.

Page 57

1                    S. YEHUDA

2        Q.    If T.J. Management required money

3    to be able to pay its expenses, did you

4    understand that you would be responsible to

5    put in an equal amount as did Kahlon?

6        A.    The company paid.  Not I.

7        Q.    If the company did not have

8    sufficient funds to pay expenses, what was

9    your understanding of what your

10   responsibility would be to put in your share

11   of those expenses?

12       A.    I don't know.

13       Q.    If the company lost money, would

14   you share in those losses?

15       A.    I'm not a businesswoman.  I don't

16   know.  My husband handled it and I don't

17   know.

18       Q.    Attached to the production by your

19   attorney is a document which is entitled,

20   T.J. Management Group, LLC, operating

21   agreement.  Have you ever seen that

22   document?

23       A.    Possibly.  I don't remember.

24       Q.    The copy provided by your attorney

25   indicates that it does not have your

```
 1                    S. YEHUDA
 2   signature on it.  Are you aware of that
 3   document bearing your signature?
 4        A.    What document?
 5        Q.    It's the operating agreement for
 6   T.J. Management.  A copy of which has been
 7   provided by your attorney.  But that
 8   document does not have your signature.  Are
 9   you aware of the existence of that document
10   bearing your signature?
11        A.    I don't quite understand the
12   question.
13            MR. NAIDICH:  It's a two-page
14        document.  Can you please show it to
15        the witness?
16            THE WITNESS:  It's not for me to
17        say what it says but I see it.
18            MR. HAFFNER:  A little further
19        away from the camera.  Sorry.
20            MR. NAIDICH:  Mr. Haffner, did you
21        not provide the witness with a copy of
22        the documents you sent us?
23            MR. HAFFNER:  Yes, I did.  But I
24        assumed that you were going to show the
25        witness a document that the court
```

```
                    S.  YEHUDA
 1
 2      reporter would be able to have a
 3      scanned copy.
 4           MR. NAIDICH:  Well, can we
 5      stipulate that the document that you
 6      sent to us does not have your client's
 7      signature on it?
 8           MR. HAFFNER:  Can you put the
 9      document up in front of the camera
10      again and go to the second page?
11      Yes -- I'm willing to stipulate to
12      that.  I recall that the copy that I
13      produce did not have Sigalit's
14      signature.  I could be mistaken,
15      although I doubt it.  Maybe, if you
16      permit it, Sigalit, is Avi still in the
17      room?
18           THE WITNESS:  Yes.
19           MR. HAFFNER:  Avi, is the one we
20      produced, was it signed by Sigalit?  I
21      don't think it was.
22           MR. YEHUDA:  No, I don't think so.
23           MR. HAFFNER:  Okay, well then I'll
24      stipulate to that then.
25           MR. NAIDICH:  Mr. Haffner, would
```

Page 60

```
 1              S. YEHUDA
 2        you agree that if you can locate a copy
 3        that is signed that you would produce
 4        it?
 5             MR. HAFFNER:  If we find one,
 6        then, yes, we will.
 7        Q.    To the best of your ability, do
 8   you recollect, Ms. Yehuda, that you ever
 9   signed such a document?
10        A.    I don't recall.
11        Q.    Did Mr. Kahlon ever tell you that
12   you would be entitled to fifty percent of
13   the profits of T.J. Management?
14             MR. HAFFNER:  Objection.  Is that
15        verbally?
16             MR. NAIDICH:  Yes.
17             MR. HAFFNER:  I'll withdraw the
18        objection.  Go ahead, Sigalit.
19        A.    Not me.  Maybe my husband.
20        Q.    Before you filed this lawsuit, did
21   either you or your husband approach
22   Mr. Kahlon and seek to resolve this matter?
23        A.    From what I know from my husband
24   probably, yes.  Not I, but he probably did,
25   as far as I recall.
```

Page 61

```
1                        S. YEHUDA
2        Q.    What, if anything, do you recall
3    about his approaching Mr. Kahlon to resolve
4    this dispute?
5              MR. HAFFNER:  I'll object.  Those
6         are settlement discussions.  But with
7         that caveat on the record, if you know
8         something, Sigalit, you can answer.
9              INTERPRETER:  By interpreter,
10        there was an answer, I don't know.
11       Q.    Are you familiar with someone
12   named Moisha Zuchaer?
13       A.    I heard about.
14       Q.    Have you ever met him?
15       A.    It's possible that -- it's
16   possible that I met him once many, many,
17   years ago.
18       Q.    Do you know that Mr. Zuchaer is
19   involved with a company known as Zuchaer and
20   Zuchaer?
21       A.    No.
22       Q.    Do you know that Zuchaer and
23   Zuchaer was the entity that sold property in
24   Texas to Project Verte?
25       A.    I heard probably my husband knows
```

```
 1                    S. YEHUDA
 2   about it.  Because I heard things
 3   prefatorily.  I don't know.  I'm not
 4   involved in it.
 5        Q.    Do you know whether your husband
 6   was to receive any money from the sale of
 7   the Texas property to Project Verte?
 8             MR. HAFFNER:   Objection.   Which
 9        property?  Which Texas property?
10             MR. NAIDICH:   Any Texas property.
11        A.    It seems to me it was.
12             MR. NAIDICH:   It seems to me?
13             INTERPRETER:   It seems to me it
14        was.   There was supposed to be.
15        Q.    There was a sale of Texas property
16   to Project Verte in exchange for a note in
17   the amount of $4,000,000.00.   Are you aware
18   of that?
19        A.    I heard something about it.
20        Q.    Was your husband supposed to get a
21   portion of that $4,000,000.00 when that note
22   was paid?
23        A.    I don't know.
24        Q.    Do you know if your husband is
25   involved in any litigation involving a sale
```

Page 63

1                              S. YEHUDA
2    of a Texas property to Project Verte?
3          A.    Yes, I know something.
4          Q.    Therefore, would he not know --
5                MR. NAIDICH:  Withdrawn.
6          Q.    In that litigation, Project Verte
7    claims that the property, which is
8    designated as the property referred to in
9    your lawsuit, was not conveyed to them?
10   That is, it was never sold to them?
11               MR. HAFFNER:  Objection.  I don't
12          understand that question.  But if the
13          witness does, go ahead.
14         A.    I don't understand the question.
15         Q.    Yeah, that's okay.  Neither do I.
16   Do you understand that Project Verte has
17   refused to pay for the property it purchased
18   in Texas because it did not obtain title to
19   the property which had been owned by T.J.?
20               MR. HAFFNER:  Objection.  Same as
21          before, Richard.  Are you --
22         Q.    What do you know about the dispute
23   between Project Verte and Zuchaer and
24   Zuchaer or Flowerdale, whoever was the
25   seller?

Page 64

1                    S. YEHUDA
2            INTERPRETER:  Flowerdale?
3            MR. NAIDICH:  Yes.
4        A.    I don't know.
5        Q.    There is a document, a copy of
6    which we've given to your attorney, referred
7    to, as an Assignment of Interest in
8    Flowerdale, LLC, and we indicated to your
9    attorney that we may question you regarding
10   this document.  Have you ever seen that
11   document?
12       A.    What document is that?
13       Q.    A document entitled, Assignment of
14   interest in Flowerdale, LLC?
15       A.    Apparently, I am not familiar with
16   all the documents.
17       Q.    Did your attorney provide you in
18   advance of this deposition copies of
19   documents that we may question you about?
20       A.    Yes, whatever I had here.  The
21   lawsuit, maybe complaint and the agreement
22   that I had with Kahlon in 2004.  I have it
23   in front of me.
24       Q.    What about other documents which
25   we had previously provided to your attorney,

Page 65

1                    S. YEHUDA
2    indicating that we would question you about?
3              MR. HAFFNER:  Either off the
4         record or on the record, it doesn't
5         matter.  This is Steven Haffner.  I
6         don't believe I forwarded all of those
7         documents to the witness.
8              MR. NAIDICH:  Okay.
9         Q.   Well, let me refer to this
10   document and, again, I'm going to make a
11   representation that whatever I read from the
12   document is accurate as to what I'm reading.
13             MR. HAFFNER:  Sure.
14        Q.   Ms. Yehuda, this assignment is a
15   transfer of a membership interest or
16   interests in Flowerdale, LLC, from Zuchaer
17   and Zuchaer Consulting, LLC, to Project
18   Verte and in this document the assignor,
19   which is Zuchaer and Zuchaer, indicates that
20   the property being transferred is 3200 Stag
21   Road and 3450 Ledbetter in exchange for
22   $4,000,000.00 represented by a note.
23             MR. HAFFNER:  Objection.  At this
24        point, I'm going to generally object to
25        questions about this other lawsuit.  I

Page 66

1                    S. YEHUDA
2        don't believe they're relevant.  I'm
3        not going to instruct the witness not
4        to answer, but I would like to limit
5        this line of inquiry.
6            MR. NAIDICH:  I'd like to respond
7        to that.  I think it's very relevant
8        that your client has brought an action
9        against Mr. Kahlon claiming a sale by
10       T.J. Management of property designated
11       as 3450 East Ledbetter Road with full
12       knowledge by her husband, who she
13       relies upon, that T.J. Management did
14       not sell that property, was not a
15       signatory to the agreement or the
16       assignment agreement and so that this
17       lawsuit brought against my client would
18       appear to be contrary to facts both
19       yourself, Mr. Haffner and your client,
20       Avi Yehuda, well know are false and
21       that's upsetting.
22           MR. HAFFNER:  I'm not going to
23       argue an oral motion.  I'll save your
24       transcript costs.  You have your
25       position, I have mine.  Sigalit, do you

1                    S. YEHUDA

2        understand it?  Can you answer?

3              INTERPRETER:  There's no question.

4              MR. NAIDICH:  There's no question.

5        I wanted to inform her that the

6        purported sale of property in Texas was

7        not signed by T.J. Management. Was not

8        a party to that and therefore, there

9        was no transfer or sale by T.J. of the

10       property located on Ledbetter Drive in

11       Texas and it's still owned to this day

12       by T.J.  Is she aware of that?

13             MR. HAFFNER:  I'll say one thing

14       here.  Your position is implying that

15       3450 Ledbetter is not owned by T.J.,

16       but by Zuchaer and Zuchaer --

17             MR. NAIDICH:  No, I'm saying it's

18       owned by T.J.  Just as the litigation

19       indicated that your client Avi Yehuda

20       is involved with that in that lawsuit,

21       Mr. Yehuda well understands that the

22       whole source of that controversy is

23       that T.J. Management never sold the

24       property owned by T.J. to Project

25       Verte.  He knows it, you know it, I

Page 68

```
1                  S. YEHUDA
2        don't understand why you would allege
3        otherwise in the complaint.
4              MR. HAFFNER:  Am I being charged
5        with assisting a frivolous complaint?
6        Let's not go any further with this.
7        Just ask questions.  You know look, at
8        some point, I may instruct her not to
9        answer.  I maintain that lawsuit is not
10       relevant.  But you can ask some
11       questions.  Let's see where it goes.
12       Q.   Do you know whether you or your
13   husband did any research to determine who
14   the owner of Ledbetter is?
15       A.   I don't know.
16       Q.   Do you know whether Ledbetter is
17   presently owned by T.J. Management?
18       A.   I don't know.
19       Q.   Do you know whether your husband
20   was encouraged to bring this lawsuit by
21   Mr. Shaloose?
22       A.   No, I don't know.
23       Q.   Are you familiar with a company
24   named Flowerdale?
25       A.   I think it's a company that held
```

```
1                    S.  YEHUDA
2    land in Texas.
3         Q.    Do you know if Flowerdale ever
4    conveyed, sold or conveyed or transferred
5    any property to T.J. Management?
6         A.    Yes.
7         Q.    What do you know about that?
8         A.    I don't know very much.  Whatever
9    I know I know from my husband.  He knows the
10   details because he dealt with these things.
11        Q.    Do you know that the property
12   originally owned by Flowerdale consisted of
13   three separate parcels?
14        A.    No, I don't.
15        Q.    Do you know that only one of those
16   three tracts of property was transferred
17   from Flowerdale to T.J.?
18        A.    I don't know.
19             MR. NAIDICH:  Let me take a break.
20        I think we're close to the end.
21             (Whereupon, a short recess was
22        taken.)
23        Q.    Ms. Yehuda, are you aware that
24   there is a counterclaim made in this case by
25   Mr. Kahlon against yourself and your
```

Page 70

```
 1                    S.  YEHUDA
 2    husband?
 3         A.    Yes.
 4         Q.    What do you know about that
 5    counterclaim?
 6         A.    I don't know any details.
 7         Q.    Well, Mr. Kahlon is suing you and
 8    your husband.  Do you have any understanding
 9    of what he's suing for?
10         A.    No, my husband handles it.   I
11    don't know.
12         Q.    Did you ever see the counterclaim,
13    the document called a counterclaim?
14         A.    No.
15         Q.    Do you understand that, as a
16    result of a judgment against, amongst
17    others, T.J. Management, that T.J.
18    Management had to and did return to the SEC
19    the money it had made from the profits of
20    the purchase and sales of stocks?  Somewhere
21    between six and ten million dollars?
22         A.    No.
23         Q.    You understand that Mr. Kahlon put
24    money into T.J. so that it could pay that
25    judgment?
```

1                     S. YEHUDA

2         A.    No.

3         Q.    That Mr. Kahlon is seeking from

4    you the money back that you've received

5    and/or your husband received from those

6    stock sales?

7         A.    No.

8         Q.    Is there some reason you believe

9    that Mr. Kahlon should have put money into

10   T.J. to pay a judgment against it without

11   your equally putting back the money?

12        A.    I don't know.

13        Q.    If the profits from sales of

14   stocks by T.J., those profits, were

15   determined to be returned to the government,

16   to SEC, should you not be responsible for

17   paying whatever profits you got back just as

18   Mr. Kahlon did through T.J.?

19             INTERPRETER:  They were determined

20        -- can you read back --

21             MR. NAIDICH:  Let me withdraw

22        that.

23        Q.    Do you understand that all of the

24   profits that T.J. made from the sale of

25   stock had to be returned to the government?

Page 72

                    S. YEHUDA

1

2          MR. HAFFNER:  Objection.

3     A.    No.

4          MR. HAFFNER:  Objection.  You can

5     answer.

6     A.    No.

7     Q.    Well, you understand that if

8  Mr. Kahlon's counterclaim prevails, you're

9  going to owe a substantial amount of money

10 to him; do you understand that?

11    A.    I don't know.

12    Q.    If he prevails in that

13 counterclaim, it's a counterclaim against

14 you, personally, as well as your husband

15 personally.  Do you understand that?

16         MR. HAFFNER:  I'm going to object.

17    What is the --

18         MR. NAIDICH:  I just want to make

19    sure she understands the nature of the

20    counterclaim --

21         MR. HAFFNER:  Let me finish.

22    Other than to intimidate the witness

23    when she's not --

24         MR. NAIDICH:  Mr. Haffner, your

25    client has indicated that she doesn't

Page 73

```
 1                    S. YEHUDA
 2       know much about the lawsuit.  Really,
 3       it's her husband that knows about it.
 4       Doesn't know much about why millions of
 5       dollars were paid by T.J. to her
 6       husband.  Her husband knows the facts.
 7       That with respect to the complaint, she
 8       appears to have relied on whatever
 9       information was supplied by her
10       husband.  I think it's only fair that
11       she know that there is a counterclaim
12       and that counterclaim, if it prevailed,
13       would result in a significant judgment
14       against her.  I think she ought to be
15       informed of that because it appears --
16            MR. HAFFNER:  Mr. Naidich, I
17       appreciate your generosity in sharing
18       information with her --
19            MR. NAIDICH:  Well, somebody
20       should.
21            MR. HAFFNER:  That's really not
22       your obligation and I view this as
23       harassment and I'm going to direct the
24       witness not to answer.
25       Q.   That's fine.  To the extent that
```

Page 74

S. YEHUDA

1                   S. YEHUDA

2  federal court has determined that all

3  profits from the sale of stock must be

4  returned, to the extent that you or your

5  husband has received a share of those

6  profits, should you not be required to

7  return them as well?

8         MR. HAFFNER:  Objection.  That

9      calls for a legal conclusion.

10         INTERPRETER:  Answer not --

11     Q.  Would it be fair for you to keep

12  fifty percent of the profits from the sale

13  of stock, whereas either Mr. Kahlon or T.J.

14  had to repay their share of the profits?

15         MR. HAFFNER:  Objection.  I don't

16      see, at all, how the witnesses --

17      whatever the witnesses conception

18      fairness is, is relevant to any claim

19      or defense in this action.

20      Furthermore, the witness already

21      testified she doesn't know the

22      circumstances of the SEC's complaint or

23      the settlement.  Even if she -- it were

24      appropriate for her to give an opinion

25      about what is "fair", whatever that

Page 75

```
1              S. YEHUDA
2      means.  She doesn't have the
3      information necessary.  But I'll let
4      her answer it.  Go ahead.
5          A.   I don't exactly know what
6  transpired and that's why I can't tell you
7  what's fair and what's not.
8              MR. HAFFNER:  I have one question
9          for the witness in the unlikely case
10         she's unable to testify in any trial.
11 EXAMINATION BY
12 MR. HAFFNER:
13         Q.   Ms. Yehuda, of course, you know
14 who I am.  I'm going to ask you one
15 question.  I believe it's called a redirect,
16 but it doesn't matter.  During your
17 testimony today, Mr. Naidich asked for what
18 period you were seeking an accounting and, I
19 believe you testified 2004 to 2012; was that
20 accurate?
21         A.   It seems to me I made a mistake.
22 I think it should be until this day, 2022.
23             MR. HAFFNER:  That's all I have.
24 EXAMINATION BY
25 MR. NAIDICH:
```

Page 76

```
 1                    S.  YEHUDA
 2        Q.    Do you know of any transactions by
 3   T.J. subsequent to 2012?
 4        A.    I'm not aware.
 5             MR.  HAFFNER:   Court Reporter, can
 6        you read back in English Mr. Naidich's
 7        last question and the witness's answer?
 8        I have a connection issue here.
 9             (Whereupon, the referred-to
10        question and answer were read back by
11        the reporter.)
12        Q.    Are you aware of any monies paid
13   to T.J. since 2012?
14        A.    Paid to T.J.?
15        Q.    Yes.
16        A.    I only know about the land in
17   Texas.   That's what I know.
18             MR. NAIDICH:   Thank you.
19             (Whereupon, at 12:58 P.M.,
20        the Examination of this witness was
21        concluded.)
22
23
24
25
```

1                    S. YEHUDA
2              D E C L A R A T I O N
3
4       I hereby certify that having been first
5  duly sworn to testify to the truth, I gave
6  the above testimony.
7
8       I FURTHER CERTIFY that the foregoing
9  transcript is a true and correct transcript
10 of the testimony given by me at the time and
11 place specified hereinbefore.
12
13
14

        _____
15              SIGALIT YEHUDA
16
17
18 Subscribed and sworn to before me
19 this _____ day of _____ 20____.
20
21

    _____
22      NOTARY PUBLIC
23
24
25

Page 78

1                          S. YEHUDA

2                    E X H I B I T S

3

4   DEFENDANT'S EXHIBITS:

5

6   EXHIBIT      EXHIBIT

7   LETTER       DESCRIPTION                        PAGE

8   1            Complaint                          14

9   2            Letter                             23

10  3            Document                           34

11  4            Response                           34

12

13       (Exhibits retained by Counsel.)

14

15                    I N D E X

16

17  EXAMINATION BY                                 PAGE

18  MR. NAIDICH                                    4, 76

19  MR. HAFFNER                                      75

20

21

22       INFORMATION AND/OR DOCUMENTS REQUESTED

23  INFORMATION AND/OR DOCUMENTS              PAGE

24  (None)

25

Page 79

```
 1                    S. YEHUDA
 2             C E R T I F I C A T E
 3
 4    STATE OF NEW YORK            )
                                    :  SS.:
 5    COUNTY OF SUFFOLK            )
 6
 7         I, KARYNE FEDERBUSH, a Notary Public
 8    for and within the State of New York, do
 9    hereby certify:
10         That the witness whose examination is
11    hereinbefore set forth was duly sworn and
12    that such examination is a true record of
13    the testimony given by that witness.
14         I further certify that I am not related
15    to any of the parties to this action by
16    blood or by marriage and that I am in no way
17    interested in the outcome of this matter.
18         IN WITNESS WHEREOF, I have hereunto set
19    my hand this 3rd day of October, 2022.
20
21
22    _____
              KARYNE FEDERBUSH
23
24
25
```

Page 80

1                          ERRATA SHEET
                  VERITEXT/NEW YORK REPORTING, LLC
2

      CASE NAME: Sigalit, Yehuda, Et Al.   v. Kahlon, Jossef, Et Al.
3     DATE OF DEPOSITION: 9/19/2022
      WITNESSES' NAME: Sigalit Yehuda
4
5      PAGE    LINE (S)          CHANGE                  REASON
      ____|_____|_____|_____
6
      ____|_____|_____|_____
7
      ____|_____|_____|_____
8
      ____|_____|_____|_____
9
      ____|_____|_____|_____
10
      ____|_____|_____|_____
11
      ____|_____|_____|_____
12
      ____|_____|_____|_____
13
      ____|_____|_____|_____
14
      ____|_____|_____|_____
15
      ____|_____|_____|_____
16
      ____|_____|_____|_____
17
      ____|_____|_____|_____
18
      ____|_____|_____|_____
19
      ____|_____|_____|_____
20
21                                      _____
                                        Sigalit Yehuda
22     SUBSCRIBED AND SWORN TO BEFORE ME
       THIS ____ DAY OF _____, 20__.
23
24
       _____        _____
25     (NOTARY PUBLIC)             MY COMMISSION EXPIRES:

**[& - acquired]**                                                                                Page 1

| & | | | |
|---|---|---|---|

**&**  1:18 2:3,7
3:16

| 0 |
|---|

**000123**  52:24
**000124**  52:25
**08921**  1:6

| 1 |
|---|

**1**  3:16 14:9 78:8
**10**  30:14 31:22
**10,000,000.00**
32:9
**10,000,000.**
30:20
**10528**  2:5
**11021**  1:20 2:9
**111**  1:19 2:9
**12:58**  76:19
**13**  37:5 38:17
**13th**  39:20
**14**  78:8
**14th**  18:15
**18**  4:17
**19**  1:11
**1992**  5:18
**1996**  6:7
**1:21**  1:6

| 2 |
|---|

**2**  23:19 33:8
35:21 78:9
**2-11-06**  35:16
**20**  77:19 80:22
**2004**  18:15 19:20
20:11 22:12
50:22 55:8
64:22 75:19

**2006**  34:23 35:22
37:5 38:18
40:25 41:8,11
42:4 43:6 48:12
49:4
**2007**  43:11 44:18
45:12,13,14 47:3
48:12
**2008**  33:16,18
52:19
**2009**  33:16 52:20
52:22
**2010**  33:16 52:23
52:24 53:2,18,20
**2012**  50:22 75:19
76:3,13
**2018**  33:8
**2020**  23:24 25:10
**2022**  1:11 75:22
79:19
**214**  1:19 2:9
**22**  40:25
**23**  23:24 25:10
78:9
**24629**  79:21
**2nd**  39:19

| 3 |
|---|

**3**  34:14 53:18
78:10
**30**  3:15 43:11
52:23
**31**  47:3 52:19,20
52:22,24 53:2
**31-12-2006**  35:3
**3200**  27:8 65:20
**34**  78:10,11

**3450**  25:14 26:19
27:10,23 28:9,22
31:6,12,18 65:21
66:11 67:15
**350,000.00**  41:23
42:8
**350,000.**
21:20
**3rd**  79:19

| 4 |
|---|

**4**  34:18 78:11,18
**4,000,000.00**
62:21 65:22
**4,000,000.**
62:17
**441,000**  35:23
39:19 42:5
**441,000.00**  37:3
**480**  2:5
**490,000**  42:6
**490,000.00**  40:23

| 5 |
|---|

**5**  44:17
**560,000.**  47:6
**564,000**  39:20
**574,000**  38:18
42:6
**574,000.**  37:7

| 6 |
|---|

**630,000**  46:14
**630,000.00**  45:12
**630,000.**
44:18,22

| 7 |
|---|

**75**  78:19

**76**  78:18

| 9 |
|---|

**9**  28:18
**9/19/2022**  80:3
**9:30**  1:12

| a |
|---|

**a.m.**  1:12
**ability**  14:21
60:7
**able**  57:3 59:2
**absolutely**  53:6
**account**  34:22
35:2,23 37:7,11
37:15 38:5,7
39:10 40:11,13
40:16,20,24 41:8
42:5 43:11,16,18
43:23 44:2,17
45:20,23,24 46:4
46:6 47:4
**accountant**  33:5
33:11,14,15
56:19
**accounting**
13:10 48:8,23
49:6 50:5,9,18
75:18
**accounts**  40:15
52:16
**accurate**  18:11
65:12 75:20
**accurately**  37:23
45:25
**acknowledging**
25:21
**acquired**  25:14
27:10

[action - bates]    Page 2

**action**  48:6 51:8
  66:8 74:19
  79:15
**active**  42:12
**activities**  36:19
  47:11 48:9
**additional**  37:6
  38:18 40:23
  52:13 53:23
**address**  40:19,21
**addressed**  24:11
**administer**  3:10
**advance**  33:6
  64:18
**advices**  29:15
**advised**  36:4,18
**ago**  8:4 9:21,22
  16:14,15,21,22
  16:23 17:3,5
  28:19 40:5 45:5
  54:8 61:17
**agree**  31:11
  56:16 60:2
**agreed**  3:4,19
  45:17
**agreement**  54:18
  55:4,6,8,16
  57:21 58:5
  64:21 66:15,16
**ahead**  60:18
  63:13 75:4
**al**  1:3,7 2:4,8
  80:2,2
**allegation**  15:24
  30:21,24
**allege**  68:2
**alleged**  18:8

**amir**  29:23
**amir's**  29:22
  30:25 31:4
**amount**  30:19
  44:21,23 45:2
  47:6 52:5 57:5
  62:17 72:9
**answer**  5:9,10
  12:20 13:15,16
  16:20 17:17,22
  26:3 28:4,4,5,15
  31:9,19 32:14
  46:8 48:19
  49:10 52:11
  56:5,24 61:8,10
  66:4 67:2 68:9
  72:5 73:24
  74:10 75:4 76:7
  76:10
**answered**  26:22
  46:8 49:9
**answers**  4:4 5:8
**anybody**  4:25
**apparently**
  64:15
**appear**  66:18
**appears**  25:12
  25:18 73:8,15
**apple**  15:7
**applicable**  18:3
**appreciate**  15:15
  73:17
**approach**  60:21
**approaching**
  61:3
**appropriate**
  74:24

**approximately**
  8:16
**april**  23:24
  25:10
**argue**  66:23
**argumentative**
  26:22
**asked**  12:22 13:9
  26:21 42:23
  46:7 47:21 48:2
  48:17 49:9
  75:17
**asking**  48:8
**aspect**  22:19
**assigned**  19:4
**assignment**
  18:14,17,21,22
  18:23 19:2,9,15
  19:18,25 20:6
  22:2 55:17 64:7
  64:13 65:14
  66:16
**assignor**  65:18
**assisting**  68:5
**assume**  38:22
**assumed**  41:3
  58:24
**assumes**  37:9
**attached**  57:18
**attachment**
  19:14
**attorney**  17:19
  24:24 26:6
  29:15 33:7 34:3
  34:25 57:19,24
  58:7 64:6,9,17
  64:25

**attorneys**  2:4,8
**authorized**  3:10
**avi**  5:20 37:12
  59:16,19 66:20
  67:19
**aviv**  4:17
**avraham**  33:9
  33:15,17 37:15
  38:7
**aware**  12:14
  13:21,24 18:4,7
  18:15 22:17
  24:21 25:11,24
  28:23 30:20
  34:3,21 39:9
  42:24 44:18,22
  51:3,5,8,23
  53:18 54:10
  55:20 58:2,9
  62:17 67:12
  69:23 76:4,12

**b**
**b**  11:24 78:2
**back**  18:24 25:9
  32:25 38:13
  43:13 47:19
  48:13 51:17
  71:4,11,17,20
  76:6,10
**bank**  40:12,14
  44:6,12 48:14
  52:13
**basis**  29:18
  50:15 55:2
**bates**  35:4 43:13
  44:14 52:19,21
  52:22,23,25

[bearing - copy]                                                    Page 3

**bearing** 58:3,10
**beengiven** 27:17
**behalf** 31:5
**belief** 29:18
  30:17 41:10
  50:15
**believe** 14:23,25
  16:19 18:10
  25:13 27:9
  36:21,25 45:22
  48:15 50:10
  54:23 56:7 65:6
  66:2 71:8 75:15
  75:19
**belonged** 13:20
**belongs** 45:17
**best** 9:24 21:19
  39:17,25 60:7
**better** 53:11
**beyond** 48:5
**birnbaum** 1:18
  2:7
**blacked** 35:6,9
  43:21
**blood** 79:16
**bookkeeping**
  13:6,9,10
**bought** 22:25
**branch** 40:20
**break** 26:17 53:5
  69:19
**bring** 15:6 68:20
**bringing** 13:25
**broader** 31:18
**brought** 4:21
  12:15 25:20
  51:9 66:8,17

**business** 10:7,9
  10:18,21 22:13
  22:17,19 23:6,10
**businesswoman**
  57:15
**buying** 42:25

**c**

**c** 2:2 11:24,24
  24:13 77:2 79:2
  79:2
**called** 4:6 19:2
  51:5 70:13
  75:15
**calls** 31:16 32:13
  74:9
**camera** 15:12,23
  58:19 59:9
**case** 4:23 14:13
  16:8 35:7 50:6,9
  69:24 75:9 80:2
**caused** 6:20
  49:24
**caveat** 61:7
**certain** 35:4
**certification** 3:7
**certify** 77:4,8
  79:9,14
**change** 80:5
**characterizing**
  26:25
**charged** 68:4
**circumstances**
  8:2 14:3 20:18
  74:22
**citizenship** 5:13
**claim** 26:7 28:23
  31:22 32:16

74:18
**claimed** 26:10
**claiming** 66:9
**claims** 13:22
  31:17 63:7
**clarification**
  16:19
**clarify** 18:17
**client** 66:8,17,19
  67:19 72:25
**client's** 59:6
**close** 69:20
**come** 21:21
**commission** 51:6
  80:25
**communicated**
  23:5
**companies** 23:2
  43:2
**company** 12:12
  13:10 21:4
  24:19 27:12,15
  33:12 42:14
  50:13 56:17
  57:6,7,13 61:19
  68:23,25
**complaint** 14:13
  15:9 16:8,11,16
  17:6,10,14,20
  18:2,8,13,25
  19:15 28:18,24
  29:22 30:14,21
  64:21 68:3,5
  73:7 74:22 78:8
**compound** 49:8
**compromised**
  14:17

**computer** 14:19
  15:6
**computers** 14:18
**conception**
  74:17
**concerned** 17:12
**concluded** 76:21
**conclusion** 31:17
  32:14 74:9
**connected** 35:7
**connection** 4:20
  76:8
**consent** 27:16
**consideration**
  30:19 56:9
**consisted** 69:12
**consulting** 65:17
**continued** 25:24
  26:8
**contrary** 66:18
**controversy**
  67:22
**conversation**
  36:23 37:2
**conversations**
  10:6
**conveyance**
  27:15
**conveyed** 20:19
  20:25 63:9 69:4
  69:4
**copies** 44:3,5,8
  64:18
**copy** 3:13,16
  23:24 33:5 35:2
  57:24 58:6,21
  59:3,12 60:2
  64:5

[cord - encouraged]                                                    Page 4

| | | | |
|---|---|---|---|
| **cord** 15:7 | 47:3 52:18,20,21 | **details** 69:10 | **documents** |
| **corporation** | 52:23,24,25 | 70:6 | 14:22,24,25 34:5 |
| 30:17 | 53:18 | **determination** | 58:22 64:16,19 |
| **correct** 12:13 | **dates** 52:18 | 35:8 | 64:24 65:7 |
| 19:6 31:7 77:9 | **day** 67:11 75:22 | **determine** 68:13 | 78:22,23 |
| **corrected** 24:7 | 77:19 79:19 | **determined** 22:2 | **dollars** 70:21 |
| **costs** 66:24 | 80:22 | 71:15,19 74:2 | 73:5 |
| **counsel** 3:5,16 | **days** 3:15 | **determining** | **doubt** 59:15 |
| 14:12 78:13 | **dealt** 20:23 | 56:15 | **drive** 25:15 |
| **counterclaim** | 69:10 | **difference** 26:13 | 27:11,23 28:9,22 |
| 69:24 70:5,12,13 | **december** 34:23 | **direct** 73:23 | 67:10 |
| 72:8,13,13,20 | 40:25 47:3 | **directly** 20:4 | **due** 31:14 |
| 73:11,12 | 52:19,22,24 53:2 | **discovery** 24:9 | **duly** 4:3,7 77:5 |
| **country** 5:12 | 53:18 | **discussed** 10:16 | 79:11 |
| **county** 27:7 79:5 | **decision** 35:11 | 10:21 | **e** |
| **course** 75:13 | **decisions** 42:20 | **discussion** 34:12 | |
| **court** 1:2 3:12 | **defendant** 1:17 | 35:19 | **e** 2:2,3 3:2,2 4:6 |
| 4:24 15:18,19 | 4:23 7:16 | **discussions** 61:6 | 24:12,13,14,14 |
| 38:20 58:25 | **defendant's** 14:9 | **dispute** 61:4 | 36:8 40:14 77:2 |
| 74:2 76:5 | 23:19 34:14,18 | 63:22 | 78:2,15 79:2,2 |
| **courtside** 2:13 | 78:4 | **distracted** 47:15 | **earned** 56:8 |
| **covers** 50:13 | **defendants** 1:8 | **distributed** | **earnings** 56:13 |
| **credit** 34:22 | 2:8 | 32:24 50:11 | 56:13 |
| 40:25 43:11,16 | **defense** 74:19 | **district** 1:2,2 | **east** 25:14 27:10 |
| 47:4 52:16 | **deliver** 20:5 | **divided** 50:14 | 27:23 66:11 |
| 53:16 | **delivered** 19:25 | **division** 54:19 | **education** 11:18 |
| **cv** 1:6 | 20:7,14 | 55:19 | **effect** 3:11,14 |
| **d** | **deposition** 3:7,8 | **docket** 1:5 | **eighteen** 28:19 |
| | 3:13 14:23 33:7 | **document** 14:8 | **either** 21:15 22:3 |
| **d** 3:2 4:6 77:2 | 64:18 80:3 | 23:17,18 24:2 | 32:17 46:22 |
| 78:15 | **describe** 8:20 | 34:13 35:3,5 | 53:19 60:21 |
| **dallas** 25:15,22 | 12:17 20:18,22 | 57:19,22 58:3,4 | 65:3 74:13 |
| 27:7,11 28:9,22 | **described** 43:6 | 58:8,9,14,25 | **employed** 11:20 |
| **date** 1:11 14:10 | **description** 78:7 | 59:5,9 60:9 64:5 | 12:5,11 |
| 23:20 34:15,19 | **designated** 63:8 | 64:10,11,12,13 | **employment** |
| 80:3 | 66:10 | 65:10,12,18 | 11:23 12:8,9 |
| **dated** 18:14 | **detailed** 49:23 | 70:13 78:10 | **encouraged** |
| 19:21 33:8 35:2 | | | 68:20 |

english  4:4,5
10:23,25 11:4,7
11:9 17:12
18:18 47:14
53:13 76:6
enter  6:17,20
entered  52:5
entitled  31:23
32:7,11 45:15
54:24 55:13
56:7 57:19
60:12 64:13
entity  51:5 61:23
entry  35:15,21
equal  27:14 57:5
equally  71:11
errata  80:1
esq  2:6,10 24:11
established
37:11
et  1:3,7 2:4,8
80:2,2
evidence  37:10
exactly  46:20
75:5
examination
1:15 4:11 75:11
75:24 76:20
78:17 79:10,12
examined  4:9
exchange  51:6
62:16 65:21
executed  19:9,11
exhibit  14:7,9
23:19 34:14,18
37:24 78:6,6
exhibits  78:4,13

existence  58:9
expect  38:3
expecting  5:7
expenses  56:3,10
56:17,22 57:3,8
57:11
expires  80:25
explain  26:12
explaining  36:9
explore  24:8
extent  73:25
74:4

**f**

f  3:2 79:2
facility  15:17
facts  14:3 18:3,7
18:10 37:10
66:18 73:6
failed  49:19
fair  49:14 73:10
74:11,25 75:7
fairness  74:18
faithfully  16:5
false  66:20
familiar  61:11
64:15 68:23
far  17:11 21:3
32:21 43:6 47:8
60:25
federal  74:2
federbush  1:21
79:7,22
fifteen  53:10,12
fifty  19:5 20:20
20:25 24:20
25:3 27:13 45:8
50:14,14 54:25

55:12,13 56:8,22
60:12 74:12
filed  60:20
filing  3:6
financial  35:13
42:10 49:12
50:3
find  60:5
fine  10:12 38:9
53:9 73:25
finish  72:21
firm  4:22
first  6:8 7:19,23
7:25 8:3,5 16:10
19:17 48:22
77:4
flowerdale  27:6
63:24 64:2,8,14
65:16 68:24
69:3,12,17
following  25:11
52:18
follows  4:10
force  3:14
foregoing  77:8
form  3:20
forth  55:18
79:11
forwarded  65:6
founded  33:13
four  6:13
friend  9:2,7,9,10
frivolous  68:5
front  59:9 64:23
full  66:11
fun  6:23
funds  39:9 41:13
47:7 57:8

further  3:19
11:18 24:8
48:13 58:18
68:6 77:8 79:14
furthermore
74:20

**g**

g  4:6
general  13:9,11
39:23 47:25
48:3
generally  65:24
generosity  73:17
give  27:4 33:25
49:19 74:24
given  20:15 64:6
77:10 79:13
go  18:24 32:25
59:10 60:18
63:13 68:6 75:4
goes  68:11
going  23:23 24:3
24:15 25:9 34:9
43:13 58:24
65:10,24 66:3,22
72:9,16 73:23
75:14
gordon  2:3
government
71:15,25
graduate  11:15
great  1:19,20 2:9
2:9
group  20:21
22:13 24:19
27:12 57:20

| | | | |
|---|---|---|---|
| **guess** 24:8 53:2 | handles 42:9 | 36:25 38:25 | 67:19 72:25 |
| **h** | 45:6,16 70:10 | 39:21 40:6 | **indicates** 26:18 |
| **h** 4:2,2,6 24:13 | happened 20:9 | 41:12,15,18 42:9 | 35:15,22 57:25 |
| 78:2 | 29:16 | 42:17,19 43:12 | 65:19 |
| **haffner** 2:3,6 | happy 15:10 | 43:16 44:25 | **indicating** 38:4 |
| 12:19 13:4,14,16 | harassment | 45:16 46:15,23 | 65:2 |
| 14:15 15:3,14,22 | 73:23 | 48:16 49:5,12,16 | **inform** 67:5 |
| 16:2,6,18 17:16 | harrison 2:5 | 49:20,23 50:3,16 | **information** |
| 20:3 21:12 | health 11:24 | 50:24 52:2,17 | 17:20 23:9 |
| 23:22 24:5,23 | heard 17:5 29:21 | 53:20 54:16 | 30:16,23 35:5 |
| 26:2,21 27:22 | 52:2 61:13,25 | 55:11,23 57:16 | 37:2 41:11 |
| 28:2,5,7,12 31:8 | 62:2,19 | 60:19,21,23 | 48:16,23 49:4,15 |
| 31:16 32:13 | hebrew 4:2,4,5 | 61:25 62:5,20,24 | 49:19 73:9,18 |
| 34:8 37:9,16,19 | 17:2 | 66:12 68:13,19 | 75:3 78:22,23 |
| 38:2,9,14 39:3,6 | held 1:17 34:12 | 69:9 70:2,8,10 | **informed** 49:23 |
| 46:7 47:13 | 35:19 68:25 | 71:5 72:14 73:3 | 73:15 |
| 48:18 49:8 52:8 | hello 23:22 | 73:6,6,10 74:5 | **initially** 21:10,17 |
| 52:11 56:4,11,23 | help 15:13 | **husband's** 9:2 | 21:18 |
| 58:18,20,23 59:8 | hereinbefore | 35:23 36:15 | **inquiry** 66:5 |
| 59:19,23,25 60:5 | 77:11 79:11 | 37:7 39:10 | **instruct** 66:3 |
| 60:14,17 61:5 | hereunto 79:18 | 40:24 41:8 42:5 | 68:8 |
| 62:8 63:11,20 | high 11:14,15,17 | 44:16 46:5 | **interest** 10:7,10 |
| 65:3,5,13,23 | hold 15:12,22 | **i** | 19:5,16 20:20 |
| 66:19,22 67:13 | holder 37:15 | | 21:2 22:9,10 |
| 68:4 72:2,4,16 | 38:5,7 | **identification** | 24:21 27:14 |
| 72:21,24 73:16 | holdings 30:18 | 14:10 23:20 | 41:24 47:10 |
| 73:21 74:8,15 | house 20:7 | 34:15,19 | 55:12 64:7,14 |
| 75:8,12,23 76:5 | husband 5:5,19 | **immediately** | 65:15 |
| 78:19 | 5:24 7:2 8:6 9:3 | 46:6 | **interested** 79:17 |
| **haffner's** 25:9 | 9:8 10:20 16:12 | **implying** 67:14 | **interests** 65:16 |
| 26:17 | 17:21,23 20:14 | **improved** 54:11 | **interpret** 4:3 |
| **hand** 79:19 | 20:23 21:6,10,16 | **income** 54:14 | **interpreter** 4:2,8 |
| **handed** 54:16 | 21:22 22:4,10,18 | 56:3 | 4:10 8:23 10:8,8 |
| **handled** 35:13 | 23:5,12 25:3,6 | **independent** | 12:21,21 16:22 |
| 49:12 50:3 | 29:21 30:3,10 | 14:2 | 17:2,4,4 18:16 |
| 57:16 | 32:17,21 33:2,22 | **indicated** 25:3 | 18:16,21 19:10 |
| | 34:22 35:13 | 28:8 33:22 | 19:10 21:17,24 |
| | 36:4,8,12,18,22 | 44:15 64:8 | 26:14,14 27:18 |

29:9 38:16,16
44:20 45:13
46:9,9 47:21,21
47:24 51:15,19
51:20 61:9,9
62:13 64:2 67:3
71:19 74:10
**interpreting**
2:13
**intimidate**  72:22
**invested**  21:9,14
41:23
**investigation**
14:2
**investment**  21:3
21:5 42:20
**investments**  42:7
**involved**  41:20
61:19 62:4,25
67:20
**involvement**
42:20
**involving**  62:25
**irving**  33:5
**israel**  5:14,22
7:7,24 9:12,13
9:15 11:2,13
20:12 40:11,16
40:18
**issue**  76:8
**items**  35:10

**j**

**january**  44:17
45:13,14
**job**  18:22
**johnson**  4:21

**joint**  40:11,12,14
43:17,23 44:2
45:20,23,24 46:5
**jordan**  24:11
**josef**  7:16
**jossef**  1:7 2:8
19:16 33:14
55:8 80:2
**judge**  3:12
**judgment**  52:5
70:16,25 71:10
73:13
**june**  43:11 52:23

**k**

**k**  4:2
**kahlon**  1:7 2:8
4:19,22 7:17,20
8:3,10,17,22 9:4
9:12,18 10:2,5
10:15,21 12:15
13:19 19:3,17
20:2,5,13,19,24
23:4,9 25:21
26:11 28:20
30:17 31:13
32:16 33:14
36:4,7,17 37:3
38:25 46:23
48:7,15,24 49:15
49:19,22 50:25
51:10 54:19
55:9,19 57:5
60:11,22 61:3
64:22 66:9
69:25 70:7,23
71:3,9,18 74:13
80:2

**kahlon's**  72:8
**karyne**  1:20 79:7
79:22
**keep**  74:11
**knew**  39:23
47:25 48:4
**know**  7:16 9:3
12:25 13:2,8,11
13:12,18 14:20
15:11,17,19,21
15:24 16:25
18:5 20:13,17,23
20:24 21:3,9,14
22:12,15,19,20
22:22,22,24 23:3
23:4,7,12 24:22
25:2,5,6 26:5,6
28:7,17 29:2,6,9
29:13 30:4,5,10
30:12 31:10
32:8,15,21 33:18
33:21 35:6,24
36:2,6,7,10,11
36:17,20 37:4,8
37:20 38:11,20
39:4 40:19,21
41:2,5,14 42:10
42:16,19 43:20
43:25 45:3,15,19
45:21,25 46:3,16
46:20 47:6,8
48:3,5 49:11,13
49:14,18,21,22
50:2,4,16 52:3,4
52:12 53:21
54:2,3,7,9,12,13
54:17 55:25
56:25 57:12,16

57:17 60:23
61:7,10,18,22
62:3,5,23,24
63:3,4,22 64:4
66:20 67:25
68:7,12,15,16,18
68:19,22 69:3,7
69:8,9,9,11,15
69:18 70:4,6,11
71:12 72:11
73:2,4,11 74:21
75:5,13 76:2,16
76:17
**knowledge**  30:3
66:12
**known**  25:14
27:8,10,22 28:22
61:19
**knows**  61:25
67:25 69:9 73:3
73:6
**kohn**  2:13

**l**

**l**  3:2,2 4:6 40:14
77:2
**land**  13:19 27:7
27:8 69:2 76:16
**language**  25:12
26:24
**large**  39:14 42:4
47:12 49:4
**lawsuit**  4:20
12:14,18 13:3,13
13:18,22,25
25:20 26:10
30:25 31:4
51:23 60:20

[lawsuit - monies]    Page 8

63:9 64:21 65:25 66:17 67:20 68:9,20 73:2
**lawyer** 4:22 25:19,19
**learn** 10:25 11:9
**learned** 26:11 28:20 36:13
**ledbetter** 25:14 26:19 27:10,23 28:9,22 29:3,7 29:19 31:12,19 31:25 32:11 65:21 66:11 67:10,15 68:14 68:16
**left** 32:23
**legal** 7:12 31:17 32:14 74:9
**letter** 23:23 24:7 24:10,16,23 25:2 25:9,10,11,19,22 26:7,17 27:21 28:8,14 33:4,6,8 33:10,22 78:7,9
**letters** 24:7
**leumi** 40:14
**limit** 66:4
**line** 28:16 38:4 66:5 80:5
**litigation** 14:4 62:25 63:6 67:18
**little** 10:24 11:6 14:17 39:6 58:18

**live** 5:23 6:9,23 7:11
**living** 20:11
**llc** 24:13,19 27:12 57:20 64:8,14 65:16,17 80:1
**llp** 1:19 2:3,7
**loans** 22:21
**locate** 60:2
**located** 67:10
**long** 6:11 8:4 9:20,21,22,23 12:3 40:4 45:5,5 53:7
**longer** 7:11
**look** 68:7
**losses** 57:14
**lost** 57:13
**lots** 9:19

### m

**m** 11:24 29:22 40:14
**maday** 1:19 2:7
**mail** 20:15
**mailed** 36:8
**maintain** 68:9
**maintained** 34:22 40:13,20
**making** 13:22 30:24 54:4
**mamaroneck** 2:5
**managed** 55:24
**management** 19:4 20:21 21:11,15 22:9,13 22:17,21,25 23:6

23:10,14 24:19 25:16 26:8 27:12 28:11 31:15,23 33:4,10 33:12,18,23 35:22,25 36:19 38:23 40:24 41:4,6,19,24 42:21,25 44:16 45:9,11 46:17 47:9,11 48:9,25 51:10,12,24 54:3 54:20,23 55:5,12 55:22,25 56:9,21 57:2,20 58:6 60:13 66:10,13 67:7,23 68:17 69:5 70:17,18
**march** 52:20
**marital** 5:15
**mark** 14:6
**marked** 14:8 23:17,18 33:4 34:13,17
**marking** 14:13
**marriage** 79:16
**married** 5:16,17
**matter** 60:22 65:5 75:16 79:17
**matters** 35:14 42:10 45:16 49:13 50:3
**mean** 9:8 17:11 20:4 53:22
**meanings** 18:18
**means** 19:11 75:2

**meant** 55:13
**medical** 12:2
**meet** 7:19,23 8:5 8:9 9:12,14 10:5
**membership** 19:16 20:20,25 27:13 65:15
**met** 8:3,17 9:4 9:13,17,25 10:15 61:14,16
**middle** 15:5
**million** 70:21
**millions** 73:4
**mine** 66:25
**minutes** 53:9
**mischaracterizes** 28:13
**mischaracteriz...** 27:2
**mistake** 75:21
**mistaken** 59:14
**moisha** 61:12
**moment** 34:2
**money** 21:21,23 21:25 31:13,14 31:23 32:7,12,17 32:20,23 35:24 37:3 39:15 40:2 40:7 42:4 45:2,6 45:16,19,22,23 46:3 47:12 50:11,13 56:8 57:2,13 62:6 70:19,24 71:4,9 71:11 72:9
**monies** 36:5,22 39:2,18,21 40:10 41:11 43:5,15,22

[monies - paid]

49:5,6,7 50:12
53:19,23 76:12
**month**  8:12,14
16:14,15,22,23
17:3,5
**months**  12:4
16:20 28:19
**motion**  66:23
**move**  15:5

**n**

**n**  2:2 3:2 4:2
77:2 78:15
**naidich**  1:18 2:7
2:10 4:12,19 7:5
8:25 10:12,14
14:6,12,20 15:10
15:20,25 16:3,24
18:19,24 19:12
19:24 21:18
23:16,22 24:10
25:8 26:4,23
27:3 29:11 31:3
32:4 33:25 34:8
35:17,20 36:24
37:13,17,22 38:6
38:11 39:5,7
41:17 47:16
50:7 51:4,13,21
52:10 53:6,10
56:14 58:13,20
59:4,25 60:16
62:10,12 63:5
64:3 65:8 66:6
67:4,17 69:19
71:21 72:18,24
73:16,19 75:17
75:25 76:18

78:18
**naidich's**  76:6
**name**  4:13,18
5:19 36:16
37:12 43:12
46:5 52:17 80:2
80:3
**named**  61:12
68:24
**nature**  8:20
11:22 46:21
72:19
**necessary**  75:3
**neck**  1:19,20 2:9
2:9
**needs**  18:17
**neglected**  15:6
**neither**  63:15
**never**  12:8,11
31:6 47:25
63:10 67:23
**new**  1:2,20,22
2:5,9 79:4,8
80:1
**nice**  6:23
**notary**  1:21 4:8
77:22 79:7
80:25
**note**  24:6 35:4
35:15,21 62:16
62:21 65:22
**notice**  1:17 34:6
**november**  18:15
19:20 33:8
35:21 37:5
38:17 39:19,20

**o**

**o**  3:2 4:2 77:2
**oath**  3:11
**object**  61:5
65:24 72:16
**objection**  12:19
13:5,14 17:16
20:3 21:12 26:2
26:21 28:2,12
31:8,16 32:13
37:9,20 38:10
39:3 46:7 48:18
49:8 52:8 56:4
56:11,23 60:14
60:18 62:8
63:11,20 65:23
72:2,4 74:8,15
**objections**  3:20
**obligation**  73:22
**obtain**  41:24
44:11 63:18
**obtained**  31:6
52:6
**october**  79:19
**office**  34:4 37:18
37:25
**offices**  1:18
**okay**  10:12
15:22,23 16:2
26:16 37:16
38:9 51:21
53:12 59:23
63:15 65:8
**once**  8:12,14
61:16
**open**  38:12,14
**operating**  57:20
58:5

**opinion**  26:25
74:24
**oral**  66:23
**original**  3:8,16
**originally**  69:12
**ought**  73:14
**outcome**  79:17
**overlap**  56:13
**owe**  72:9
**owes**  32:16
**owned**  25:15,24
27:11 55:11
63:19 67:11,15
67:18,24 68:17
69:12
**owner**  19:3 25:4
27:14 33:3 45:8
56:20 68:14
**ownership**  23:14
**owns**  27:6

**p**

**p**  2:2,2 3:2
**p.m.**  76:19
**p000117**  35:4
**p000118**  43:13
44:14
**p000121**  52:21
**p000122**  52:22
**p000125**  53:3
**p000129**  52:20
**page**  53:3 58:13
59:10 78:7,17,23
80:5
**paid**  32:10 35:22
35:24 39:10
40:23 41:8,11
44:16 45:11

[paid - question]

46:14 49:5 57:6
62:22 73:5
76:12,14
**paragraph**  18:13
18:25 24:18
28:18 30:13,14
31:22
**parcels**  69:13
**part**  13:18 24:18
**parties**  3:6 22:21
79:15
**partner**  33:17,23
**party**  27:15 33:3
67:8
**pay**  57:3,8 63:17
70:24 71:10
**paying**  71:17
**payment**  36:3,9
36:11 37:6,8
38:17,18,21
44:19 47:5
**payments**  41:2
46:24 49:16,25
**pending**  48:6
**percent**  19:5
20:20,25 24:20
27:13 45:9
54:25 55:12,14
56:8,22 60:12
74:12
**percept**  25:4
**performing**
42:13
**period**  8:8 75:18
**permit**  59:16
**person**  20:14
**personal**  33:14
35:9 44:8

**personally**  72:14
72:15
**pertinent**  24:18
**phonetic**  29:23
**piece**  13:19
**place**  77:11
**plainly**  26:18
**plaintiff**  1:16
**plaintiffs**  1:4 2:4
**please**  4:13
12:17,24 34:2
44:20 58:14
**plural**  8:23
16:21
**point**  42:25
65:24 68:8
**portion**  24:4,16
32:12 54:22
62:21
**portions**  43:21
**position**  31:5
66:25 67:14
**possession**  44:7
**possible**  14:16
45:4 61:15,16
**possibly**  9:6
43:24 57:23
**power**  15:7
**precise**  40:21
**prefatorily**  62:3
**present**  2:12
4:21,25 5:4 9:5
10:20 19:8 20:8
33:13
**presently**  5:21
24:24 68:17
**pretty**  15:16

**prevailed**  73:12
**prevails**  72:8,12
**previously**  23:25
64:25
**prior**  12:5 13:25
14:22 16:7,15
43:14
**probably**  21:7
60:24,24 61:25
**problem**  37:22
**proceeding**  51:9
**produce**  34:6
47:11 59:13
60:3
**produced**  59:20
**production**
14:25 57:18
**profits**  32:22
35:25 38:22
41:3,7,21 43:7
46:17,19,21 47:9
48:24 51:10,25
52:6,9,9 54:4,20
54:22 55:14,19
55:22,24 56:2,15
56:16 60:13
70:19 71:13,14
71:17,24 74:3,6
74:12,14
**project**  24:14
25:13,23 26:9,12
26:18 27:9,24
28:10,21 29:3,7
29:20 31:5,13,25
32:6,10 61:24
62:7,16 63:2,6
63:16,23 65:17
67:24

**prompt**  5:9
**property**  25:22
26:8,11 27:22
28:9,20,21 29:2
29:6,19 30:18
31:6,12 32:5,10
54:10 61:23
62:7,9,9,10,15
63:2,7,8,17,19
65:20 66:10,14
67:6,10,24 69:5
69:11,16
**provide**  17:19
23:9 48:15
58:21 64:17
**provided**  14:21
33:6 34:4,25
37:17,24 42:17
53:17 57:24
58:7 64:25
**public**  1:21 4:8
23:2 43:2 77:22
79:7 80:25
**pull**  15:9
**purchase**  26:19
54:5 70:20
**purchased**  63:17
**purchases**  43:7
**purported**  67:6
**pursuant**  1:17
**put**  57:5,10 59:8
70:23 71:9
**putting**  71:11

**q**

**queens**  6:16
**question**  12:24
16:4,20 26:15

[question - respect]                                                    Page 11

28:13 31:20
34:9 38:12,15
39:4 42:23
46:10 47:14,17
47:19,22 49:9
51:15,17 52:14
54:21 58:12
63:12,14 64:9,19
65:2 67:3,4 75:8
75:15 76:7,10
**questioned** 24:2
**questioning** 5:7
28:16
**questions** 4:3
65:25 68:7,11
**quite** 58:11
**quote** 33:10

**r**

**r** 2:2 3:2 4:2
24:13,14 29:22
77:2 79:2
**re'ven** 4:17
**reaction** 42:3
**read** 11:7,8,9
15:24 16:3,4
17:6 24:3,15,17
25:12 26:24
27:3,5 30:14,15
38:3,4,13 47:19
51:17 65:11
71:20 76:6,10
**reading** 37:23
65:12
**really** 73:2,21
**reason** 48:14
49:18 50:8 71:8
80:5

**recall** 44:24
59:12 60:10,25
61:2
**receipt** 36:21
**receive** 62:6
**received** 30:18
39:11,18,22 40:3
43:15 44:19,23
45:2 53:19,23
56:16 71:4,5
74:5
**recess** 53:14
69:21
**recollect** 60:8
**recollection** 9:24
21:19 39:17,25
**record** 4:14 24:6
34:10,11 35:17
35:18 61:7 65:4
65:4 79:12
**recover** 51:10,24
**redirect** 75:15
**refer** 19:2 23:23
43:10 44:14
47:2 65:9
**references** 33:9
**referred** 47:18
51:16 63:8 64:6
76:9
**referring** 19:14
28:21 35:3 55:6
56:12
**refers** 18:14
**reflect** 43:22
**refused** 63:17
**regard** 24:12
36:8

**regarding** 10:6
13:6,8 23:10
37:3 38:25
48:24 49:4,7,16
54:19 64:9
**regularly** 36:18
**related** 79:14
**relationship**
8:21,24
**relevant** 66:2,7
68:10 74:18
**relied** 73:8
**relief** 18:3
**relies** 66:13
**rely** 45:7
**relying** 30:23
**remain** 6:11
**remained** 28:10
50:12
**remember** 7:21
8:2,11,15,16,19
9:16,19,23 10:4
16:17 19:19,22
22:6,6 39:12,13
39:24 40:4 45:6
46:2,11,12 49:2
51:2 57:23
**remembered**
47:22
**remembers**
38:17
**repay** 74:14
**repeat** 12:24
13:4 31:20
44:21 46:10
47:14,16,24
51:14

**rephrase** 10:9
31:21 56:14
**reporter** 4:24
14:11 15:18,19
23:21 34:16,20
38:20 47:20
51:18 59:2 76:5
76:11
**reporting** 80:1
**represent** 4:19
37:23
**representation**
65:11
**represented**
23:13 33:2
53:24 65:22
**representing**
38:6
**request** 23:8
29:14 34:5
**requested** 18:3
48:21 49:20
78:22
**require** 27:16
**required** 57:2
74:6
**research** 68:13
**reserved** 3:21
**reside** 4:16 5:21
6:5,14,21
**resided** 6:2,15
6:25 7:2
**residence** 44:8
**residing** 7:6
**resolve** 60:22
61:3
**respect** 11:5
73:7

[respective - signature]                                                        Page 12

**respective** 3:5
**respond** 66:6
**response** 34:17
  78:11
**responsibility**
  57:10
**responsible**
  56:21 57:4
  71:16
**responsive** 34:5
**result** 31:24 32:7
  42:7 46:19
  70:16 73:13
**resulted** 41:7,20
  46:24
**retained** 78:13
**return** 7:7 9:11
  70:18 74:7
**returned** 71:15
  71:25 74:4
**revenue** 56:12
  56:16
**rich** 15:3
**richard** 2:10
  4:18 16:18
  37:20 47:13
  63:21
**right** 7:12 41:25
  43:18 48:10
**road** 1:19 2:5,9
  27:8 65:21
  66:11
**robert** 4:21
**role** 42:12
**room** 5:2,8 59:17
**rubin** 4:17
**ruth** 2:13

**s**

**s** 2:2 3:2,2 4:1,6
  5:1 6:1 7:1 8:1
  9:1 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1,12,12 25:1
  26:1 27:1 28:1
  29:1,22 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1
  58:1 59:1 60:1
  61:1 62:1 63:1
  64:1 65:1 66:1
  67:1 68:1 69:1
  70:1 71:1 72:1
  73:1 74:1 75:1
  76:1 77:1 78:1,2
  79:1 80:5
**sale** 31:25 51:11
  51:25 52:6 54:4
  54:15 62:6,15,25
  66:9 67:6,9
  71:24 74:3,12
**sales** 43:7 70:20
  71:6,13
**save** 66:23
**saw** 16:17 17:7

**saying** 15:4
  55:10 67:17
**says** 15:20 18:2
  24:18 30:16
  33:11,13,17
  37:13,14 58:17
**scanned** 15:16
  59:3
**school** 10:25
  11:10,14,15,17
**schooling** 11:12
**screen** 14:16
**sealing** 3:6
**sec** 51:3 70:18
  71:16
**sec's** 74:22
**second** 53:3
  59:10
**secretary** 12:2
**section** 17:25
  18:5
**securities** 51:6
  51:11,25 52:7
**see** 16:11 19:17
  19:20 37:5
  58:17 68:11
  70:12 74:16
**seek** 48:23 49:6
  60:22
**seeking** 50:5,8
  50:17 51:24
  71:3 75:18
**seen** 16:8,16
  57:21 64:10
**sell** 66:14
**seller** 63:25
**selling** 43:2

**sent** 23:25 58:22
  59:6
**sentences** 12:22
**separate** 69:13
**separately** 30:16
**september** 1:11
**service** 3:15
**services** 11:24
  42:13,16
**set** 55:17 79:11
  79:18
**settlement** 61:6
  74:23
**shaloose** 68:21
**shalutz** 29:23
  30:2,5,8,11
**share** 40:6 57:10
  57:14 74:5,14
**shares** 18:23
  43:2 48:4
**sharing** 73:17
**sheet** 80:1
**short** 12:22 53:4
  53:14 69:21
**show** 58:14,24
**showed** 16:12
**sigalit** 1:3,16 2:4
  4:15 26:11
  28:20 46:8
  59:16,20 60:18
  61:8 66:25
  77:15 80:2,3,21
**sigalit's** 59:13
**signatory** 66:15
**signature** 58:2,3
  58:8,10 59:7,14
  79:21

signed 3:9,11,14
19:12,16 55:9
59:20 60:3,9
67:7
significant 73:13
silent 5:10
singular 8:23
sir 17:2 37:14
six 18:13,25
70:21
small 24:4
social 10:17
sold 13:20 22:25
25:23 26:9,11
27:23 28:10,20
29:3,7,12,19
31:12 32:5
61:23 63:10
67:23 69:4
sole 19:3
solely 37:11 46:4
somebody 18:23
73:19
sorry 39:7 44:17
45:14 47:15
51:19 58:19
source 36:4 41:2
41:12 47:7 49:6
54:13 67:22
southern 1:2
speak 10:13,23
10:24 16:25
30:2 41:18
specific 41:5
specifically
44:24 45:21
48:2

specified 77:11
spoke 38:25
spoken 25:7 30:7
30:11
ss 79:4
stag 27:8 65:20
stamp 43:13
44:14
stamped 35:4
52:19,21,22,23
52:25
start 26:16
state 1:21 4:13
79:4,8
stated 28:14,19
statement 35:2
37:14,18 43:10
43:14,21 44:15
47:2 52:18,20,21
52:23,24,25 53:3
statements 43:25
48:14 52:14,15
53:17,24
states 1:2 6:3,6,9
6:12,15,17,21
7:2,7,11,13,22
8:9,18,22 9:4
27:22 40:17
43:3
status 5:15
stay 7:13
steven 2:6 65:5
stipulate 59:5,11
59:24
stipulated 3:4,19
stock 22:25
46:19 54:5,15
71:6,25 74:3,13

stocks 43:8
70:20 71:14
stopped 54:4,8
strauss 33:5,19
subscribed
77:18 80:22
subsequent 9:11
11:17 76:3
subsequently
43:17
substantial 72:9
sufficient 57:8
suffolk 79:5
suggesting 15:4
suing 70:7,9
suisse 34:23
40:25 43:12,16
47:4 52:16
53:16
suit 31:18
suite 1:19 2:9
sums 39:14 42:4
47:12
supplied 41:12
73:9
supposed 62:14
62:20
sure 15:14,16
48:20 54:2
65:13 72:19
sworn 3:9 4:3,7
77:5,18 79:11
80:22

**t**

t 3:2,2 4:2,6
24:14 77:2 78:2
79:2,2

t&j 30:17
t.j 31:14
t.j. 19:4 20:21
21:2,10,15 22:9
22:13,17,20,24
23:6,10,14 24:19
25:4,15,24 26:7
27:11,24 28:11
31:23 33:3,9,11
33:18,23 35:22
35:25 36:19
37:6 38:23
40:24 41:4,6,19
41:24 42:13,17
42:21,25 43:15
44:16 45:9,11
46:14,17 47:5,9
47:11 48:9,24
51:9,11,24,25
52:5 54:3,14,20
54:23 55:4,12,22
55:24 56:8,21
57:2,20 58:6
60:13 63:19
66:10,13 67:7,9
67:12,15,18,23
67:24 68:17
69:5,17 70:17,17
70:24 71:10,14
71:18,24 73:5
74:13 76:3,13,14
take 11:18 53:7
69:19
taken 1:16 53:15
69:22
talking 18:6
tax 36:14

[tel - weiss]                                                         Page 14

| | | | |
|---|---|---|---|
| tel  4:17 | 8:8 9:17,20,21 | trial  1:15 3:21 | united  1:2 6:3,5 |
| tell  10:3 39:21 | 9:22 16:10 | 75:10 | 6:9,12,17,21,25 |
| 60:11 75:6 | 19:17 22:7,14,16 | true  77:9 79:12 | 7:6,11,13,22 8:9 |
| ten  53:9 70:21 | 22:23 28:15 | trust  45:6,18 | 8:18,22 9:4 |
| testified  4:9 | 33:12 36:3 | truth  22:5 77:5 | 40:17 43:3 |
| 21:13 43:23 | 39:12 40:2,5 | try  44:13 | unsigned  3:13 |
| 74:21 75:19 | 42:25 44:2 45:5 | two  7:14 22:4 | upsetting  66:21 |
| testify  75:10 | 47:5 48:22 | 24:6 27:6,8 | |
| 77:5 | 49:12 50:23 | 58:13 | **v** |
| testimony  12:7 | 53:8 77:10 | | v  24:14 80:2 |
| 42:8 43:14 | times  8:17 9:19 | **u** | vacant  54:11 |
| 44:12 75:17 | title  18:2 63:18 | u  3:2 4:2,6 24:13 | vague  39:6 |
| 77:6,10 79:13 | titled  19:15 | 40:14 | various  34:4 |
| texas  25:15,23 | today  16:8 75:17 | u.s.  33:16 | verbally  60:15 |
| 27:11 28:23 | told  39:24 40:2 | unable  75:10 | veritext  80:1 |
| 54:11 61:24 | 45:4 | understand  5:6 | verte  24:14 |
| 62:7,9,10,15 | top  37:14 38:4 | 11:4,6 13:23 | 25:13,23 26:9,12 |
| 63:2,18 67:6,11 | tract  25:13 27:9 | 17:9,13,14 20:19 | 26:18 27:9,24 |
| 69:2 76:17 | tracts  27:7,8 | 25:17 26:15,19 | 28:10,21 29:4,8 |
| thank  16:6 76:18 | 69:16 | 27:21,24 28:3 | 29:20 31:5,13,25 |
| thing  67:13 | trades  46:19 | 31:24 38:24 | 32:6,10 61:24 |
| things  10:17 | transactions | 43:5 54:21 56:2 | 62:7,16 63:2,6 |
| 48:8 54:17 | 41:6,19 46:23 | 56:18,20 57:4 | 63:16,23 65:18 |
| 56:18 62:2 | 49:24 76:2 | 58:11 63:12,14 | 67:25 |
| 69:10 | transcript  66:24 | 63:16 67:2 68:2 | view  73:22 |
| think  42:23 | 77:9,9 | 70:15,23 71:23 | visa  6:18 36:14 |
| 53:25 56:11 | transfer  43:22 | 72:7,10,15 | visitor  6:18 |
| 59:21,22 66:7 | 47:5 65:15 67:9 | understanding | |
| 68:25 69:20 | transferred  19:4 | 12:17 13:3 22:8 | **w** |
| 73:10,14 75:22 | 40:10 43:17 | 46:13,18 55:3,10 | w  24:12 |
| third  22:21 | 45:20,22,24 46:4 | 55:18,21 57:9 | waived  3:8 |
| 24:17 25:13 | 65:20 69:4,16 | 70:8 | want  7:10 32:25 |
| 27:9,15 33:3 | translate  10:10 | understands | 38:13 51:13 |
| thought  6:22 | translator  4:24 | 67:21 72:19 | 52:14 72:18 |
| three  27:6 69:13 | 30:15 | understood  7:15 | wanted  67:5 |
| 69:16 | transpired  22:6 | 17:18 27:19 | way  79:16 |
| time  1:12 3:21 | 49:13 75:6 | unfamiliar  15:8 | we've  64:6 |
| 7:13,24,25 8:4,6 | | | weiss  24:11 |

**whatsoever**
  32:18
**whereof**  79:18
**willing**  59:11
**withdraw**  37:19
  39:8 51:22
  60:17 71:21
**withdrawn**  7:5
  10:14 19:24
  25:8 31:3 32:4
  35:20 36:24
  38:10 41:17
  50:7 51:4 63:5
**witness**  3:9,15
  3:17 4:7 13:15
  21:13 24:2
  27:19,20 34:9
  47:22,23 53:4,9
  53:12 58:15,16
  58:21,25 59:18
  63:13 65:7 66:3
  72:22 73:24
  74:20 75:9
  76:20 79:10,13
  79:18
**witness's**  76:7
**witnesses**  74:16
  74:17
**witnesses'**  80:3
**word**  18:20
**words**  17:9,11
  17:13
**worked**  12:3
  50:24
**working**  50:20
**writing**  19:2
**written**  18:14
  27:16 55:16

**wrote**  24:23
**wurman**  1:18
  2:7

**x**

**x**  1:3,9 78:2,15

**y**

**y**  4:6
**yeah**  63:15
**year**  9:25 10:3
**years**  6:13,24
  7:14 9:22 32:22
  33:16 48:12,13
  50:17,19,21 54:8
  61:17
**yehuda**  1:3,16
  2:4 4:1,15,18
  5:1 6:1 7:1 8:1
  9:1 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1,7 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1,15,20 25:1
  25:18 26:1 27:1
  27:13 28:1 29:1
  30:1 31:1 32:1
  33:1,9,15,17
  34:1,21 35:1
  36:1 37:1,12,15
  38:1,8 39:1,14
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1
  58:1 59:1,22

  60:1,8 61:1 62:1
  63:1 64:1 65:1
  65:14 66:1,20
  67:1,19,21 68:1
  69:1,23 70:1
  71:1 72:1 73:1
  74:1 75:1,13
  76:1 77:1,15
  78:1 79:1 80:2,3
  80:21
**yehuda's**  27:16
**york**  1:2,20,22
  2:5,9 79:4,8
  80:1
**young**  6:22

**z**

**z**  24:13
**zoom**  15:16
**zuchaer**  24:12
  24:13 61:12,18
  61:19,20,22,23
  63:23,24 65:16
  65:17,19,19
  67:16,16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.