Page 1

1

2      UNITED STATES DISTRICT COURT

       SOUTHERN DISTRICT OF NEW YORK

3      --------------------------------------------X

       SIGALIT YEHUDA, ET AL,

4

                                        PLAINTIFF,

5

              -against-              Case No.:

6                                    1:21-cv-08921

7      JOSSEF KAHLON, ET AL,

8                                       DEFENDANT.

       --------------------------------------------X

9

10                          DATE: November 2, 2022

11                          TIME: 10:00 A.M.

12

13

14          VIRTUAL DEPOSITION of the Non-Party

15     Witness, AVRAHAM YEHUDA, taken by the

16     Defendant, pursuant to a Notice and to the

17     Federal Rules of Civil Procedure, held at

18     the offices of Naidich, Wurman, Birnbaum &

19     Maday, LLP., 111 Great Neck Road, Suite 214,

20     Great Neck, New York 11021, before Karyne

21     Federbush, a Notary Public of the State of

22     New York.

23

24

25

Page 2

```
 1
 2     A P P E A R A N C E S:
 3

       GORDON & HAFFNER, LLP
 4          Attorneys for the Plaintiff
            AVRAHAM YEHUDA
 5          480 Mamaroneck Road
            Harrison, New York 10528
 6          BY: STEVEN HAFFNER, ESQ.
 7

       NAIDICH, WURMAN, BIRNBAUM & MADAY, LLP
 8          Attorneys for the Defendant
            JOSSEF KAHLON, ET AL
 9          111 Great Neck Road, Suite 214
            Great Neck, New York 11021
10          BY: RICHARD NAIDICH, ESQ.
11

12     ALSO PRESENT:
       JOSSEF KAHLON
13     MIRIAM KAPLAN-COURTSIDE
       INTERPRETING
14
15
              *       *       *
16
17
18
19
20
21
22
23
24
25
```

Page 3

1

2      F E D E R A L    S T I P U L A T I O N S

3

4         IT IS HEREBY STIPULATED AND AGREED by

5   and between the counsel for the respective

6   parties herein that the sealing, filing and

7   certification of the within deposition be

8   waived; that the original of the deposition

9   may be signed and sworn to by the witness

10  before anyone authorized to administer an

11  oath, with the same effect as if signed

12  before a Judge of the Court; that an

13  unsigned copy of the deposition may be used

14  with the same force and effect as if signed

15  by the witness, 30 days after service of the

16  original & 1 copy of same upon counsel for

17  the witness.

18

19         IT IS FURTHER STIPULATED AND AGREED

20  that all objections except as to form, are

21  reserved to the time of trial.

22

23              *       *       *       *

24

25

1            A. YEHUDA

2    M I R I A M   K A P L A N,  was duly sworn

3    to interpret the questions from English into

4    Hebrew, and the answers from Hebrew into

5    English.

6    A V R A H A M   Y E H U D A, called as a

7    witness, having been duly sworn by a Notary

8    Public, was examined and testified through

9    the interpreter as follows:

10   EXAMINATION BY

11   MR. NAIDICH:

12        Q.    Please state your name for the

13   record.

14        A.    Avraham Yehuda.

15        Q.    Where do you reside?

16        A.    18 Reuven Rubin, Tel-Aviv

17   69412653.

18        Q.    My name is Richard Naidich.  I

19   represent Mr. Kahlon in this litigation.  I

20   am going to ask you questions.  You

21   recognize that you are under oath and you

22   are required to answer them truthfully.

23        A.    Yes.

24        Q.    Do you speak any English?

25        A.    Yes.

1              A. YEHUDA

2       Q.    Describe your abilities to speak

3  English, please?

4       A.    I was speaking better when I was

5  living in New York.  So, now I don't speak a

6  lot.  So, my ability to talk has

7  deteriorated.

8              INTERPRETER:  I'd like to pause

9        for a minute to tell him not to speak

10        in five or seven sentences.  I just

11        told him, to break his sentences if his

12        are long to make sure I translate --

13        interpret them verbatim.

14       Q.    Mr. Yehuda, do you read English?

15       A.    Yes, I read.  I read on a good

16  level.

17       Q.    Are you today under any drugs or

18  physical or mental impairment that will make

19  it difficult or impossible for you to

20  testify truthfully?

21       A.    No.

22       Q.    Please describe all of your

23  education through the end of high school

24  onward?

25       A.    High school.

1                    A. YEHUDA

2        Q.    You have no formal education after

3    high school?

4        A.    No.

5        Q.    Are you presently employed?

6        A.    No.

7        Q.    Starting from high school, please

8    describe your various employments?

9        A.    After high school, I went to the

10   Army.

11       Q.    After that?

12       A.    After that, I started working

13   selling watches.

14       Q.    Wristwatches?

15       A.    Yes, watches.

16       Q.    For what period of time, were you

17   employed selling watches?

18       A.    About a year.

19       Q.    Thereafter, what employment did

20   you have?

21       A.    After that, I went to study

22   construction.

23       Q.    What do you mean by, study

24   construction?

25       A.    To learn how to install stairs in

1                       A.  YEHUDA

2    buildings.

3          Q.    Did you ultimately engage in that

4    activity?

5          A.    Yes.

6          Q.    When did you start doing that?

7          A.    1991, more or less, 1992.

8          Q.    How long did you continue in that

9    employment?

10         A.    More or less, two years.

11         Q.    What did you do thereafter?

12         A.    After that, I opened a clothing

13   store.

14         Q.    What year was that?

15         A.    It was 1994.

16         Q.    Were you the owner of the store?

17         A.    The owner of the store.  Not the

18   owner of the building.  The owner of the

19   business.

20         Q.    How long were you in that

21   business?

22         A.    Also, two years.  About two years.

23         Q.    What year did you end your

24   ownership of that business?

25         A.    1996.

Page 8

A. YEHUDA

1

2      Q.    What did you do thereafter?

3      A.    I came to the United States.

4      Q.    What year did you come to the

5   United States?

6      A.    1996.

7      Q.    Were you employed while in the

8   United States?

9            INTERPRETER:  Oh, I'm sorry.  I

10      forgot to turn that off.

11      Q.    Could you repeat your answer?  The

12   interpreter forgot to turn off her phone.

13      A.    I worked at my brother-in-law.

14      Q.    Doing what?

15      A.    I made a collection for video

16   machines that he operated.

17      Q.    How long were you in the United

18   States?

19      A.    For a year.

20      Q.    Thereafter, you returned to

21   Israel?

22      A.    Yes.

23      Q.    When you returned to Israel, were

24   you gainfully employed?

25      A.    Self-employed.  I was not working

```
 1              A. YEHUDA
 2  under anybody.  I was making deals.
 3      Q.   What type of deals?
 4      A.   Real estate from time to time.
 5  Diamonds.
 6           MR. NAIDICH:  Diamonds?
 7           INTERPRETER:  Yes, diamonds.
 8      Q.   Anything else?
 9      A.   That more or less.
10      Q.   Would it be fair to say, you were
11  in those businesses as an investor?
12      A.   Yes.
13      Q.   Are you familiar with Mr. Kahlon?
14           INTERPRETER:  Do you mean, Kalone
15      (sic)?
16           MR. NAIDICH:  Kahlon, Joseph
17      Kahlon.
18           INTERPRETER:  In Hebrew, we call
19      it that.
20      A.   Yes.
21      Q.   When for the first time did you
22  meet Mr. Kahlon?
23      A.   When I came to New York.
24      Q.   How did you come to meet with him?
25      A.   Through mutual friend, who later
```

Page 10

```
 1                    A. YEHUDA
 2   on become my brother-in-law.  But he was in
 3   the beginning, a friend.
 4          Q.    What was that person's name?
 5          A.    Danny O-R-I or O-R-Y, D-A-N-N-Y.
 6          Q.    Do you remember where you met
 7   Mr. Kahlon in New York?
 8          A.    No.
 9          Q.    Was the first meeting social or
10   for business purposes?
11          A.    Social.
12          Q.    Did you continue to meet with him
13   during the time that you were in the United
14   States?
15          A.    Throughout the whole time I was in
16   the United States?
17          Q.    Yes.
18          A.    Yes.
19          Q.    Approximately, how many times
20   during that period that you were in the
21   United States, did you meet with Mr. Kahlon?
22          A.    I can't put a number to it.  But
23   we met many times.  Quite a lot.
24          Q.    Did there come a time where you
25   discussed any business arrangements with
```

Page 11

```
1                   A. YEHUDA
2   Mr. Kahlon?
3        A.   At that time?
4        Q.   Yes.
5        A.   We were only friends in the
6   beginning.
7        Q.   Did there come a time when you
8   first discussed any business with
9   Mr. Kahlon?
10        A.   I don't remember.
11        Q.   Do you know what business
12   Mr. Kahlon was in at the time that you were
13   interacting with him?
14        A.   Yes.
15        Q.   Did there come a time, when you
16   and Mr. Kahlon discussed --
17             MR. NAIDICH:   Withdrawn.
18        Q.   What business did you understand
19   that Mr. Kahlon was in at that time?
20        A.   When I was in the United States he
21   said he was, I believe, a used car dealer.
22        Q.   During the time you were in the
23   United States, did Mr. Kahlon ever discuss
24   with you the business of T.J. Management?
25        A.   No.
```

1                    A. YEHUDA

2          Q.    Are you aware of the document

3     attached to the Complaint, which appears to

4     be an Assignment of Membership Interest from

5     Joseph Kahlon and T.J. Management Group, LLC

6     to your wife, Sigalit Yehuda?

7          A.    Yes, (in English).

8          Q.    Can you explain the circumstance

9     which gave rise to this Assignment of

10    Membership Interest?

11         A.    After I left the United States in

12    the year of 2000, I would sometimes -- once

13    a year, once, twice a year to the U.S and

14    one of the times, he offered me to go into

15    business with him in a business involved in

16    stocks.   In the financial market.

17         Q.    Is it your testimony that

18    Mr. Kahlon offered the opportunity to you or

19    did you seek that opportunity from him?

20         A.    No, he offered.

21         Q.    What did he tell you at that time

22    about the business of T.J. Management?

23         A.    He didn't tell me about the

24    business.   I didn't know if it already

25    started engaging in it, working in it.   He

Page 13

```
 1                    A. YEHUDA
 2   only said that there is an opportunity to
 3   have a business, to finance for companies
 4   against a location of stocks.
 5        Q.   Did you do any investigation to
 6   see what monies or profits that T.J.
 7   Management had made up to that time?
 8        A.   No.
 9        Q.   Did you discuss what percentage of
10   T.J. Management was offered by Mr. Kahlon to
11   you?
12             INTERPRETER:  Can you reread it?
13        I'm sorry.
14             (Whereupon, the referred-to
15        question was read back by the
16        reporter.)
17        A.   No, at that meeting, no.
18        Q.   Was there any discussion of you
19   paying anything for an interest in T.J.
20   Management?
21        A.   It was not a payment.  It was an
22   investment.
23        Q.   Is it correct that --
24             MR. NAIDICH:  Withdrawn.
25        Q.   Did you understand from
```

1              A. YEHUDA

2    Mr. Kahlon, that he was offering a

3    percentage of the ownership of T.J.

4    Management in exchange for some dollar

5    amount to be paid by you?

6         A.    Yes.

7         Q.    Did there come a time when you

8    discussed with him what amount he wanted for

9    an interest in T.J. Management?

10        A.    Yes.

11        Q.    How much was he seeking at that

12   time?

13        A.    In the beginning, we talked about

14   $200,000 for 50 percent (in English).

15        Q.    Did that amount change at some

16   later date?

17        A.    Yes.

18        Q.    When was that?

19        A.    It was a few months after we

20   signed the agreement.

21        Q.    What was the amount that was then

22   agreed upon?

23        A.    There was a deal to be made of a

24   $150,000 was needed.  So, in total, I've

25   invested in the company $350,000.

```
 1                    A. YEHUDA
 2         Q.    Was your wife Sigalit involved in
 3    any of the discussions with Mr. Kahlon that
 4    you have testified to thus far?
 5         A.    She with Joseph Kahlon?
 6         Q.    Let me rephrase the question.
 7    You've indicated that you had conversations
 8    with Mr. Kahlon, in which, he offered an
 9    interest in T.J. Management.  There were
10    discussions of dollars to be paid to obtain
11    an interest in T.J. Management.  Was your
12    wife a part of any of those discussions?
13         A.    In those conversations, I
14    communicated, forwarded to her the whole
15    knowledge.  Knowledge information.
16         Q.    But she was not present during
17    those conversations between you and
18    Mr. Kahlon; is that fair to say?
19         A.    Yes.
20         Q.    You've indicated you're familiar
21    with this document attached to the Complaint
22    entitled Assignment of Membership Interest;
23    is that correct?
24         A.    Yes.
25         Q.    Do you know who prepared this
```

Page 16

```
1                    A.  YEHUDA
2   document?
3         A.    Who wrote it (in English)?
4         Q.    Yes.
5             MR. HAFFNER:  I'm sorry, court
6       reporter.  Can you repeat the question?
7             (Whereupon, the referred-to
8       question was read back by the
9       reporter.)
10            MR. HAFFNER:  Okay, thank you.
11            MR. NAIDICH:  I think he's not
12      sure about the word prepared.
13        A.    I don't understand.
14        Q.    This is a typed document.  Did you
15  prepare this document?
16        A.    No.
17        Q.    Do you know who did?
18        A.    Joseph Kahlon.
19        Q.    Do you have the original of this
20  document?
21        A.    Yes.
22        Q.    How did you obtain that original?
23        A.    From Mr. Kahlon.
24        Q.    Was it mailed to you or delivered
25  in person when you were the states?
```

Page 17

```
 1                    A.  YEHUDA
 2        A.    It was delivered personally.
 3        Q.    While you were in the United
 4   States?
 5        A.    Yes.
 6        Q.    Who determined that the assignment
 7   would be to Sigalit rather than yourself?
 8        A.    It was between me and my wife.   I
 9   suggested to Kahlon that it would be to my
10   wife and he agreed.
11        Q.    What was your understanding of
12   what the rights and obligations would be in
13   connection with this membership interest?
14        A.    50 percent.
15        Q.    50 percent of any profits made?
16        A.    Yes.
17        Q.    Fifty of percent of any of the
18   obligations of the company?
19        A.    Yes.
20        Q.    Are you familiar with the
21   complaint in this case?
22        A.    Yes.
23        Q.    You've read the complaint; is that
24   correct?
25        A.    Yes.
```

1                    A.  YEHUDA

2         Q.    Who provided your attorney with

3    the information set forth in the complaint?

4         A.    Myself.

5         Q.    There is a section of the

6    complaint that's entitled, Facts Applicable

7    to Relief Requested.  Are you familiar with

8    that portion of the complaint?

9              INTERPRETER:  Can you -- it's

10        relief requested --

11             MR.  NAIDICH:   It's Facts

12        Applicable to Relief Requested.

13        A.    Yes, I see it.  I have it in my

14   hand.

15        Q.    Am I correct that paragraph 7 on

16   page 2 reads as follows:  In and about 2007,

17   the company acquired titled to a parcel of

18   land in Dallas, Texas, known as 3450 East

19   Ledbetter Drive, Dallas Texas.  Did I fairly

20   read that portion of the complaint?

21        A.    Yes.

22        Q.    You provided that information to

23   your counsel?

24        A.    Yes.

25        Q.    Then I refer you to paragraph 9 of

```
 1                   A. YEHUDA
 2   the Complaint and I will read it in the
 3   record while you read it yourself.  And I
 4   quote, about eighteen months ago, Sigalit
 5   learned Kahlon had sold the property to
 6   Project Verte, V-E-R-T-E, Inc.  Did I
 7   correctly read that provision?
 8        A.   Yes.
 9        Q.   What was the basis for the belief
10   that Kahlon had sold the property to Project
11   Verte?
12        A.   I got a phone call from Amir
13   Halutz (sic).  He is a partner of Kahlon in
14   a Project Verte and he told me he purchased
15   the land from Joseph Kahlon.
16        Q.   Sitting here today, do you
17   continue to believe that, that allegation in
18   the Complaint is accurate?
19        A.   My lawyer has checked with the
20   attorney from Project Verte and we believe
21   that this is what happened, what has taken
22   place.
23        Q.   This lawsuit was started by
24   Sigalit against Mr. Kahlon?
25        A.   Yes, I know.
```

Page 20

1                    A. YEHUDA

2          Q.    By a Complaint dated October 30,

3     2021; is that not correct?  You can look at

4     the Complaint.

5          A.    I'm not sure about the date.

6          Q.    I'm asking you to please look at

7     page 4 of the Complaint in the lower left,

8     there's a date, is there not?

9          A.    Yes, now I can see.

10          Q.    That date is October 30, 2021; is

11    that correct?

12          A.    Yes.

13          Q.    I see a letter that I'm holding

14    which I hope you have a copy of from Gordon

15    Haffner dated April 23, 2020.  Prior to the

16    commencement of this lawsuit addressed to

17    Jordan Weiss Esquire.  Do you have a copy of

18    that document?

19              INTERPRETER:  I'm sorry.  Can you

20         read it again and break it down.

21          A.    Yes.

22              INTERPRETER:  Oh, no, no, I don't.

23          Q.    Have you ever seen that letter?

24          A.    I don't know about what letter

25    he's talking.

Page 21

```
 1                    A. YEHUDA
 2       Q.    This is a letter addressed to
 3   Jordan Weiss regarding Zuchaer and Zuchaer,
 4   LLC to Project Verte.
 5            INTERPRETER:  And what next?
 6            (Whereupon, the referred-to
 7        question was read back by the
 8        reporter.)
 9       A.    Can you show me a letter.
10            MR. NAIDICH:  Well, let me read to
11        you the letter, if that's okay with
12        Mr. Haffner. And I will do my best to
13        read it faithfully, Mr. Haffner.
14            MR. HAFFNER:  That's okay.
15       Q.    The letter goes as follows:  We
16   represent Avi Yehuda.  Mr. Yehuda has
17   advised you represent Amir Halutz (sic), a
18   principal of Project Verte.
19            INTERPRETER:  I'm sorry,
20        advised --
21       Q.    Mr. Yehuda has advised you
22   represent Amir Halutz (sic), a principal of
23   Project Verte.  I understand Project Verte
24   believes it acquired from Zuchaer and
25   Zuchaer a 100 percent interest in
```

Page 22

1                    A. YEHUDA

2    Flowerdale, LLC and further, that Flowerdale

3    owns three tracts of land situated in Dallas

4    County, Texas.

5            I'm going to skip a portion of the

6    letter and read another paragraph contained

7    in the letter.  It reads as follows.

8    Second, Flowerdale owns two, not three,

9    tracts of land in Dallas County.  Namely,

10   two tracks of land known as 3200 Stag Road.

11           INTERPRETER:  Stag what?

12           COURT REPORTER:  Stag Road.

13           MR. NAIDICH:  S-T-A-G, Road.

14       Q.   The third tract, Project Verte,

15   may believe it acquired known as 3450 East

16   Ledbetter Drive, Dallas, Texas is owned by

17   T.J. Management Group, LLC  A company, in

18   which, Mr. Yehuda owns has a fifty

19   membership interest.  Finally, as an equal

20   co-owner of that company, any conveyance of

21   the third parcel would require Mr. Yehuda's

22   written consent, which has not been given.

23   Had you read this letter prior to today?

24       A.   I got a letter from my lawyer to

25   Sigalit Yehuda and not I as the owner of the

Page 23

```
 1                    A.  YEHUDA
 2   stocks.
 3              INTERPRETER:  He corrected it
 4       himself.
 5       Q.   From the portions I read to you,
 6   it appears that in 2020, prior to the time
 7   that this lawsuit against Kahlon was
 8   commenced, that your lawyer represented that
 9   the 3450 Ledbetter Drive, Dallas, Texas
10   property was owned by T.J. Management and
11   thus was not included in the sale by Zuchaer
12   and Zuchaer to Project Verte.  Can you
13   explain how you, in the lawsuit against
14   Mr. Kahlon --
15              MR. HAFFNER:  I'm sorry. I was
16       muted.  Are you still reading from the
17       letter?
18              MR. NAIDICH:  No.
19              MR. HAFFNER:  Oh, because you're
20       looking at a document --
21              MR. NAIDICH:  No, I'm not.
22              MR. HAFFNER:  I want the witness
23       to understand that, that last was your
24       question not anything that the letter
25       was stated.
```

```
1                    A. YEHUDA
2              MR. NAIDICH:  That -- that's
3         correct.
4              MR. HAFFNER:  Okay.
5              MR. NAIDICH:  I withdraw the last
6         question and let me ask another
7         question.
8         Q.   In 2020, in the letter from Gordon
9    Haffner, your attorneys were advising -- the
10   attorneys for Zuchaer and Zuchaer that the
11   Ledbetter property was not included in the
12   sale by Zuchaer and Zuchaer to Project
13   Verte; isn't that correct?
14             MR. HAFFNER:  Objection.
15        Objection.  I believe you intended Rick
16        was advising the attorney from Project
17        Verte.  Not Zuchaer and Zuchaer.
18             MR. NAIDICH:  I'm sorry. Same
19        questions but for Project Verte.  I'll
20        withdraw it and start it again.
21        Q.   Isn't it a correct statement that
22   in April of 2020, your attorneys were
23   advising the attorney for Project Verte that
24   the Ledbetter property was owned by T.J.
25   Management and not included in the transfer
```

1              A. YEHUDA

2    of Flowerdale from Zuchaer and Zuchaer to

3    Project Verte?

4          MR. HAFFNER:  Objection to the

5          question and thus, was not included.

6          That was not part of the advice

7          reflected by this letter.  But if the

8          witness knows that -- if the witness

9          thinks I may have advised Project Verte

10         and his attorney outside of this

11         letter, he can say what he wants.

12         MR. NAIDICH:  Mr. Haffner, this is

13         my examination.  It's clear in your

14         letter that you're advising these

15         attorneys for Project Verte that the

16         Ledbetter property is owned by T.J.

17         Management and not included in the sale

18         from Zuchaer to Zuchaer to Project

19         Verte.  Any other way you want to

20         consider that language, you're free to

21         do so.

22         MR. HAFFNER:  You're reading from

23         my letter and you're representing what

24         my advice was and you've --

25         MR. NAIDICH:  That's correct.

Page 26

1                    A. YEHUDA

2              MR. HAFFNER:  This examination to

3       my letter.  So, let's stay faithful to

4       my letter.  Nowhere in this letter,

5       Rick, can you say, and thus was not

6       included in the sale.  Okay.

7         Q.    It says here -- I vigorously

8    dispute that.  It says here, Flowerdale owns

9    two, not three, tracts.  Namely, two tracts

10   known as 1200 Stag Road.  The third tract,

11   Project Verte may believe it acquired in

12   Ledbetter is owned by T.J. Management.  Were

13   you aware of that language at the time,

14   Mr. Yehuda?

15        A.    Can you read it in English, so I

16   didn't understand.

17        Q.    Did you have any conversations

18   with your attorney, in which, you discussed

19   the ownership of Ledbetter in 2020?

20              MR. HAFFNER:  Objection.  I'm

21       instructing him not to answer.

22        Q.    Were you aware in April of 2020

23   that Ledbetter, at that time, was owned by

24   T.J. Management?

25        A.    I always knew that it was in the

Page 27

```
 1                    A. YEHUDA
 2    ownership of T.J. Management.
 3        Q.    On what basis did you determine
 4    that T.J. Management sold that property or
 5    conveyed that property to Project Verte as
 6    indicated in the Complaint?
 7        A.    I think I answered that question.
 8    But I'll answer again.
 9        Q.    What is that answer?
10        A.    I got this information from the
11    partner of Joseph Kahlon, Amir Halutz (sic).
12        Q.    When was that?
13        A.    Around April of 2020.
14        Q.    How do you know Amir Halutz (sic)?
15        A.    We were partners.  Each from
16    different side in a project in Long Island.
17        Q.    Have you discussed the facts of
18    this case with Mr. Halutz (sic)?
19              INTERPRETER:  Did you discuss the
20        --
21              COURT REPORTER:  Facts.
22              MR. NAIDICH:  Yes, details.
23        A.    No.
24        Q.    What caused you to ask Mr. Halutz
25    (sic) whether Project Verte had acquired the
```

Page 28

```
1                    A.  YEHUDA
2    Ledbetter property?
3         A.    I didn't ask.   He contacted me.
4         Q.    What were the circumstances that
5    caused him to contact you?
6         A.    I don't know.
7         Q.    What did he say to you in the
8    conversation when he contacted you?
9         A.    That he bought all the properties
10   in Dallas.
11        Q.    Have you become aware of a dispute
12   between Project Verte and Zuchaer and
13   Zuchaer?
14        A.    Yes.
15        Q.    When did you first become aware
16   that Zuchaer and Zuchaer had an interest in
17   obtaining any of the property in Dallas?
18        A.    Right after this phone
19   conversation.
20        Q.    You are aware that Zuchaer and
21   Zuchaer acquired Flowerdale, which owned
22   property in Texas; is that correct?
23        A.    Yes.
24        Q.    That Zuchaer and Zuchaer
25   subsequently assigned their interest in
```

Page 29

```
 1                    A. YEHUDA
 2   Flowerdale to Project Verte; is that
 3   correct?
 4        A.    According to what Amir Halutz
 5   (sic) told me.
 6        Q.    You have claimed that you have an
 7   interest in whatever was paid by Project
 8   Verte to Zuchaer and Zuchaer for the
 9   assignment of Flowerdale to Zuchaer and
10   Zuchaer; is that not right?
11             INTERPRETER:  I'm sorry.  Can you
12        please -- you said you have --
13             (Whereupon, the referred-to
14        question was read back by the
15        reporter.)
16        A.    Yes.
17        Q.    What percentage of whatever was to
18   be paid by Project Verte to Zuchaer and
19   Zuchaer were you to be entitled to?
20        A.    33 percent.
21        Q.    What was the basis for your
22   sharing in whatever monies were paid by
23   Project Verte to Zuchaer and Zuchaer?
24        A.    I don't want to use the name
25   Zuchaer and Zuchaer.  But I would rather use
```

Page 30

```
 1                    A. YEHUDA

 2    the name of the person because Zuchaer and

 3    Zuchaer is the owner of two companies.

 4         Q.    What person would you like --

 5         A.    And they have a very familiar

 6    name.

 7         Q.    What person would you like to use

 8    the name of?

 9         A.    Moisha (sic) Zuchaer.

10         Q.    Is that the person with whom you

11    agreed that you were entitled to 33 and a

12    third percent of whatever was paid by

13    Project Verte for the assignment?

14         A.    My agreement with Moisha Zuchaer

15    was from 2009.  Not necessarily for the sale

16    to Project Verte.

17         Q.    What was your involvement that

18    was --

19              MR. NAIDICH:  Withdrawn.

20         Q.    What were you to have gotten 33

21    and a third percent for?

22         A.    That's the agreement that Joseph

23    had with Moisha that we will assign to

24    Flowerdale.

25         Q.    Are you saying that Mr. Kahlon was
```

Page 31

                    A. YEHUDA

1

2   going to participate in that 33 and a third

3   percent?

4        A.    Yes.

5        Q.    To what extent?

6        A.    It was not agreed how much, but he

7   was supposed to get something out of the

8   money if there will be a profit in the deal.

9        Q.    You are aware that Zuchaer and

10  Zuchaer entered an agreement with Project

11  Verte where it assigned its interest in

12  Flowerdale to Project Verte; are you not?

13       A.    According to the version of the

14  buyer, I was under the impression that he

15  bought from him the land.

16       Q.    Have you ever seen a document

17  entitled, Assignment of Membership Interest

18  in Flowerdale, LLC?

19            INTERPRETER:  Assignment of a

20       partnership of Flowerdale --

21            MR. NAIDICH:  Of membership

22       interest.

23            INTERPRETER:  In Flowerdale.

24       A.    Of whom?

25

```
1                    A. YEHUDA
2         Q.    An Assignment of a Member Interest
3    in Flowerdale from Zuchaer and Zuchaer
4    Consulting, LLC to Project Verte?
5         A.    I remember seeing it, but I didn't
6    get into the details of it.
7         Q.    Were you aware that there was an
8    assignment from Zuchaer and Zuchaer
9    Consulting, LLC of its interest in
10   Flowerdale to Project Verte?
11        A.    Yes.
12        Q.    Do you know what Project Verte
13   paid to Zuchaer and Zuchaer Consulting, LLC
14   for that assignment?
15        A.    To the extent I know of, four
16   million dollars.
17        Q.    Am I not correct that the four
18   million dollars was represented by a note
19   rather than cash payment?
20        A.    Note and money is the same, no?(in
21   English).  I saw a commitment from Project
22   Verte for the land of four million dollars.
23        Q.    Were you aware that Project Verte
24   gave Zuchaer and Zuchaer Consulting, LLC a
25   note for four million dollars?
```

Page 33

1                      A. YEHUDA

2        A.    I saw it in the document of the

3    Court.

4        Q.    Are you aware that Project Verte

5    did not pay the four million dollars to

6    Zuchaer and Zuchaer?

7        A.    No.

8        Q.    Are you aware that Zuchaer and

9    Zuchaer has sued Project Verte for the four

10   million dollars?

11           INTERPRETER:   Zuchaer and Zuchaer

12       sued Project Verte or visa versa?

13       Q.    That Zuchaer and Zuchaer sued

14   Project Verte for the four million dollars

15   represented by the note?

16       A.    Yes.

17       Q.    If that note had been paid the

18   four million dollars, you claim you would of

19   been entitled to one third of that money; is

20   that correct?

21       A.    Less expense.  Less expense that

22   he had spent.

23       Q.    Less expenses who had spent?

24       A.    Moisha Zuchaer.

25       Q.    So, you have an interest in that

Page 34

```
1                    A.  YEHUDA
2   dispute, do you not?
3        A.   No.
4        Q.   Well, you would like to see that
5   the money is paid by Project Verte to
6   Zuchaer and Zuchaer?
7        A.   Yes.
8        Q.   Do you know why Project Verte has
9   refused to pay that four million dollars?
10       A.   No.
11       Q.   Are you aware that one of the
12  reasons they've refused to pay is because
13  they did not obtain ownership of the
14  property at Ledbetter?
15       A.   No.
16       Q.   Have you read any of the
17  litigation papers in the dispute between
18  Project Verte and Zuchaer and Zuchaer?
19       A.   No.
20       Q.   Have you ever done any
21  investigation through a title company or
22  otherwise to determine who, at this time,
23  owns Ledbetter?
24       A.   When?
25       Q.   At any time?
```

Page 35

A. YEHUDA

1

2    A.   No.

3    Q.   You've relied solely on what

4 Mr. Halutz (sic) has said to you?

5    A.   What Halutz (sic) told me and what

6 Mr. Halutz's (sic) attorney told my

7 attorney.

8    Q.   Did you ever ask Mr. Kahlon

9 whether T.J. Management owned Ledbetter?

10    A.   That's the way he always presented

11 it.

12    Q.   I don't understand the answer.

13 Could you be clear?

14    A.   That's the way Joseph Kahlon has

15 always presented it.  That T.J. was always

16 the owner of Ledbetter.

17    Q.   T.J. Management was not part of

18 the agreement between Zuchaer and Zuchaer

19 and Project Verte, that assignment that we

20 discussed earlier, was it?

21    A.   I didn't see that document.

22    Q.   Are you aware of any document by

23 which T.J. Management ever conveyed

24 Ledbetter to anyone, whether it be to

25 Project Verte or Zuchaer and Zuchaer?

Page 36

A. YEHUDA

1

2    A.    All the documents are with him.

3         MR. NAIDICH:  I'm going to take a

4    break for ten minutes.

5         MR. HAFFNER:  Sure.

6         (Whereupon, a short recess was

7    taken.)

8         MR. NAIDICH:  Can you hear me, Mr.

9    Haffner?

10        MR. HAFFNER:  Yes.

11   Q.    Looking at the Complaint again.

12   It appears that it was your belief that Mr.

13   Kahlon was paid ten million dollars for the

14   sale of the property at Ledbetter to Project

15   Verte; is that correct?

16   A.    In what clause do you see this.

17   Q.    In paragraph 8, it says that -- in

18   paragraph 7.  It says that T.J. Management

19   acquired Ledbetter in 2007; is that not

20   correct?

21   A.    Yes.

22   Q.    In paragraph 9, it says that

23   Sigalit learned that Kahlon had sold the

24   property, meaning Ledbetter, to Project

25   Verte; is that right?

```
1                    A.  YEHUDA
2        A.    Yes.
3        Q.    The next paragraph, paragraph 10,
4    says that Kahlon, through his corporation
5    T&J, received for the property, meaning
6    Ledbetter, ten million dollars; is that
7    right?
8              MR.  HAFFNER:   Objection.
9        Objection.  The clause that you're
10       reading states, on information and
11       belief, Kahlon, through his
12       corporations T&J Holdings, Inc.,
13       received through for the property in
14       consideration in the amount of ten
15       million dollars.
16       Q.    So you believe that he got
17   consideration, that is Kahlon, through his
18   corporation T&J, of ten million dollars
19   through the sale of that property; is that
20   right?
21       A.    Yes (in English).
22       Q.    Do you acknowledge that if the
23   property was not sold to Project Verte that
24   whatever Mr. Kahlon received from Project
25   Verte as consideration was not for the sale
```

Page 38

```
 1                    A. YEHUDA
 2   of the property?
 3            INTERPRETER:  I don't know what
 4        consideration is even in English.  I'm
 5        sorry.  I don't know what consideration
 6        means in English.
 7            MR. NAIDICH:  Let me rephrase
 8        that.
 9        Q.   If Project Verte did not acquire
10   Ledbetter, then what relationship would
11   there be to any monies or obligations that
12   Project Verte has to Kahlon?
13            MR. HAFFNER:  Objection.  Calls
14        for -- Interpreter, please.  You have
15        to wait for my objection.
16            MR. NAIDICH:  She was just putting
17        in the question.
18            MR. HAFFNER:  Oh, okay.  I'm
19        sorry.
20            MR. NAIDICH:  So, that the record
21        is clear, let me ask it another way and
22        I'll withdraw the last question.
23        Q.   Looking at Paragraphs 9 and 10 of
24   the Complaint, am I not correct that you
25   believe or Sigalit believes that there is
```

Page 39

1                    A. YEHUDA

2     some relationship between the sale of the

3     Ledbetter property to Project Verte and the

4     ten million dollars referred to in paragraph

5     10?

6              MR. HAFFNER:  Objection.  You can

7         answer, Avi.

8         A.    That's what I've learned from Mr.

9     Halutz (sic) that he paid ten million

10    dollars for the land.

11        Q.    If, in fact, the property at

12    Ledbetter was never sold to Project Verte,

13    would you agree that there would be no claim

14    by Sigalit for whatever Project Verte gave

15    to Kahlon?

16             MR. HAFFNER:  I'm objecting.

17        Wait.  I thought I was going to wait

18        for the interpreter to deliver your

19        question in Hebrew to the witness.

20             MR. NAIDICH:  That's what she's

21        doing, I think.

22             MR. HAFFNER:  Oh, okay.  Avi don't

23        answer.  I have an objection, but I'm

24        waiting for the interpreter.

25        Objection.  Calls for a legal

Page 40

A. YEHUDA

1

2      conclusion.  You can answer, Avi.

3          A.    To the extent I know, Kahlon was

4      involved in all of the sale to Mr. Halutz

5      (sic).

6          Q.    Would you agree that if the

7      property at Ledbetter was not sold, that

8      this whole case would be without foundation?

9              MR. HAFFNER:  Objection.  Asked

10          and answered and again, calls for a

11          legal conclusion.  You can answer this

12          time, Avi.

13              THE WITNESS:  Huh?

14              MR. HAFFNER:  Did you hear my

15          objection?

16              THE WITNESS:  Yes, but now I can

17          answer (in English)?

18              MR. HAFFNER:  Yes, you can answer.

19          Unless I instruct you not to answer,

20          you have to answer the question.  My

21          objection is redundant, asked and

22          answered and calls for a legal

23          conclusion.  But you can answer to the

24          extent that you can.

25          A.    I think there is an involvement of

Page 41

```
 1                    A. YEHUDA
 2  Mr. Kahlon in the sale.  It brought him ten
 3  million dollars in consideration.
 4        Q.    Your complaint in the case --
 5              MR. HAFFNER:  Could you read that
 6        back to me, my client's answer.
 7              (Whereupon, the referred-to answer
 8        was read back by the reporter.)
 9        Q.    The sale of the property of
10  Ledbetter, that's what you have in the
11  Complaint.  Is it not right?
12        A.    Yes.
13        Q.    You relied on what Mr. Halutz told
14  you, that he, that is Project Verte, had
15  bought the property at Ledbetter.  That's
16  the basis of this claim; right?
17        A.    He told me that he bought the
18  three properties for thirteen million
19  dollars -- ten million for the property of
20  Ledbetter and four million for the property
21  of Flowerdale.
22        Q.    Do you now today know, whether or
23  not, the property at Ledbetter was sold or
24  conveyed to Project Verte by T&J?
25              MR. HAFFNER:  Objection.  Are you
```

1              A. YEHUDA

2        asking sold or conveyed?

3              MR. NAIDICH:  Either one.

4        Q.   Do you know who today owns the

5    property at Ledbetter?

6        A.   No, I didn't do any research.

7        Q.   I want to go to a different area.

8    It's been your testimony, is it not, that

9    you were or your wife was entitled to 50

10   percent of the profits that T.J. Management

11   obtained, in connection with, the business

12   activities?

13       A.   My wife holds 50 percent ownership

14   in the rights to T.J. Management.

15       Q.   That entitled her to a share of

16   its profits?

17       A.   50 percent.

18       Q.   50 percent of its debts or

19   liabilities?

20       A.   Yes.

21       Q.   Your attorney has provided me with

22   copies of bank statements, each of which are

23   letterhead of Credit Swiss.  Are you

24   familiar with those bank statements?

25       A.   Yes.

Page 43

1                  A. YEHUDA

2        Q.    Those statements are all on an

3   account in your name, are they not?

4        A.    It's my account and my wife is

5   assigned to it.

6        Q.    Would you agree that the account

7   statements indicate the current account

8   number and it is in the name of Avraham

9   Yehuda?

10       A.    Yes (in English).

11       Q.    Your wife's name does not appear

12  on any of these statements.  Would you agree

13  to that?

14       A.    Yes.

15       Q.    Now, portions of these statements

16  are blacked out.  But that portion that is

17  not, indicates various payments to T.J.

18  Management wired to this account; is that

19  correct?

20       A.    Okay.

21       Q.    When you got these wires, did you

22  obtain any information from Mr. Kahlon as to

23  the source of these funds, that is, how T.J.

24  Management obtained these funds?

25       A.    I know what the business is and he

Page 44

1                          A.  YEHUDA

2    buys  and  sells  stocks  and  that  it  generated

3    a  profit.

4         Q.    Did  you  receive  from  Mr.  Kahlon

5    regular  information  about  the  prices  that

6    the  stocks  were  purchased  for  and  the  sale

7    and  therefore,  the  profit?

8              MR.  HAFFNER:   Objection  to  the

9         word  regular.   You  can  answer,  Avi.

10        A.    I  received  document  of  expenses,

11   expenses  and  profits.

12             INTERPRETER:   I'm  sorry.   Income

13        and  expenses.

14        Q.    How  often?

15        A.    Once  a  month.   It  depends  (in

16   English).

17        Q.    Depended  on  what?

18        A.    When  he  sent  it  to  me.   I  never

19   asked  (in  English).

20        Q.    Could  it  be  that  he  sent

21   information  on  the  purchase  and  sales  of

22   stock  on  a  more  regular  basis,  meaning

23   weekly?

24        A.    No.

25        Q.    How  did  you  receive  information

Page 45

```
 1                    A. YEHUDA
 2   concerning the purchase of sales of stocks
 3   by T.J. Management?
 4            MR. HAFFNER:  Objection -- I'm
 5        sorry.  I forgot.  Go ahead.
 6        Objection.  The question assumes the
 7        witness received information described,
 8        but you can answer, Avi.
 9        A.   I didn't get information about
10   specific stocks.
11            MR. NAIDICH:  I didn't what?
12            INTERPRETER:  I didn't get
13        information about specific stocks.
14        Q.   Please describe what information
15   you did get from T.J. Management concerning
16   it's business activities?
17            INTERPRETER:  What's the last two?
18            MR. NAIDICH:  It's business
19        activities.
20        A.   Revenues, pensions and expenses
21   (in English).
22        Q.   In what form did that take?
23        A.   It was not something steady or
24   permanent.
25        Q.   You testified you got such
```

Page 46

A. YEHUDA

1
2     information, approximately, once a month; is
3     that correct?
4          A.     Yes, more or less.
5          Q.     Was that information e-mailed to
6     you?
7          A.     Yes.
8               MR. NAIDICH:   I would call for the
9          production of all e-mails from T.J.
10         Management and/or Kahlon to Mr. or Ms.
11         Yehuda concerning the business
12         activities of the company.
13              MR. HAFFNER:   Okay.
14         Q.     Let me give you an example.   On
15    2/11/2006, there was a payment from T.J.
16    Management to your account in the amount of
17    $441,000.00.
18              INTERPRETER:   There was a payment
19         from T.J. Management to --
20         Q.     In your account in the amount of
21    $441,000.00.   Did you make any inquiry, at
22    that time, as to what caused T.J. Management
23    to send that amount to your account?
24         A.     No, it was a sole decision of Mr.
25    Kahlon what to send and when.

Page 47

                          A. YEHUDA
1

2          Q.    Well, did you make any inquiry

3    into what transaction generated that money?

4          A.    Not specifically.

5          Q.    You had no questions to ask him

6    about that transaction that resulted in

7    $441,000.00 coming into your account?

8          A.    It didn't come from a transection.

9    It didn't come from a transaction.  It came

10   from profits.  Total profits.

11         Q.    Did you inquire as to what

12   transactions caused that profit?

13         A.    No.

14         Q.    Without going through all of

15   these, for instance, some days later on the

16   same statement, there's $574,000.00 wired to

17   your account.  When those monies were

18   received, did you make any inquiry to Mr.

19   Kahlon about what business activities had

20   caused that profit to be sent to you?

21         A.    No, those sums were an amount of

22   total profits (in English).  These amounts

23   were a total profits for a periods, not for

24   this or any other transaction.

25         Q.    Did you request of Mr. Kahlon any

Page 48

A. YEHUDA

1

2  detail about the business activities of T.J.

3  Management that generated these profits?

4      A.    No, I counted 100 percent.

5      Q.    Did Mr. Kahlon ever refuse to give

6  you any information that you sought

7  regarding the activities of the T.J.

8  Management?

9      A.    I never asked for anything

10 specific.

11     Q.    So, is it true that he never

12 refused to give you any information that you

13 may have requested?

14         MR. HAFFNER:   Objection.   He

15         testified he never made any specific

16         requests, but go ahead.

17     A.    I didn't ask for something

18 specific.

19     Q.    Did you ask for anything from Mr.

20 Kahlon that he refused to give you?

21         MR. HAFFNER:   Are we talking about

22         business activities, specific

23         transactions or something --

24         MR. NAIDICH:   Let me rephrase it.

25     Q.    Did you ask for any information

Page 49

1              A. YEHUDA

2  recording the activities of T.J. Management,

3  at any time, that Mr. Kahlon failed to give

4  you?

5       A.   I never asked.  So, he had no

6  reason to refuse.

7       Q.   Because you never asked for

8  anything; is that correct?

9       A.   Yes.

10      Q.   Did there come a time when you

11  became aware that the Securities and

12  Exchange Commission was investigating

13  transactions by T.J. Management?

14      A.   Yes.

15      Q.   When was that?

16      A.   2009.

17      Q.   How did you become aware of that?

18      A.   From Mr. Kahlon.

19      Q.   What did he say to you at that

20  time about the investigation?

21      A.   Not much.  But they were asking

22  for documents.

23      Q.   At a later time, did you

24  understand that the SEC brought an action

25  against T.J. Management and Mr. Kahlon?

Page 50

                              A. YEHUDA

1

2        A.    Yes.

3        Q.    Did you understand that a portion

4   of that --

5             MR. NAIDICH:   Withdrawn.

6        Q.    Did you understand that the SEC

7   was seeking disgorgement return of profits

8   made by T.J. Management in stock

9   transactions?

10       A.    No, I understood that they want to

11  fine.

12       Q.    When the SEC brought a case

13  against T.J. Management and Mr. Kahlon, how

14  did you become aware of that case?

15       A.    From Mr. Kahlon (in English).

16       Q.    What did Mr. Kahlon say to you

17  about that case?

18       A.    That he thinks they have no case.

19       Q.    Did he send you a copy of any

20  paperwork that he had received from the SEC

21  concerning this lawsuit?

22       A.    He sent it to me once.

23       Q.    What he sent to you, was that a

24  copy of the Complaint by the SEC against

25  T.J. Management and Mr. Kahlon?

Page 51

A. YEHUDA

1

2      A.    I don't remember if it was the

3  Complaint or his reply to the SEC.   One of

4  the two.

5      Q.    Did you become aware that, at some

6  point in time, a Court determined that T.J.

7  Management and Mr. Kahlon as it's principal

8  owed money to the SEC?

9      A.    Yes.

10     Q.    Do you know, what amount the Court

11 determined was owed?

12     A.    I heard it here.  I know.

13     Q.    What amount is that?

14     A.    I know seven, he said ten and

15 yesterday he said three.  I don't know which

16 one and in the suit, it says, 2.3.  In which

17 one I'm supposed to believe, I don't know.

18     Q.    Do you know what disgorgement is?

19 Are you familiar with the term disgorgement?

20          INTERPRETER:  I'm not familiar

21     with the word disgorgement.

22          MR. NAIDICH:  I'm asking him

23     whether he's familiar with the word --

24     A.    Not really.  Not a hundred

25 percent, no (in English).

Page 52

```
 1                    A. YEHUDA
 2        Q.    If a portion of the monies that
 3   the Court awarded to the SEC was profits
 4   that had been made by T&J that had to be
 5   returned to the SEC, that is what
 6   disgorgement is.   Are you aware of any
 7   monies that the Court determined were
 8   profits to be returned to the SEC?
 9        A.    Now, I know (in English).   Now I
10   know from the counterclaim.
11        Q.    Those profits, were the monies in
12   part that you received by wire on these
13   various account statements that have been
14   produced?
15             MR. HAFFNER:   Objection.
16        Objection.   Is that a statement or a
17        question?
18             MR. NAIDICH:   Question.
19             MR. HAFFNER:   Go ahead.
20        A.    I don't know (in English).
21        Q.    Well, you know --
22             MR. NAIDICH:   Withdrawn.
23        Q.    The monies that were wired to your
24   account, were they from the purchase and
25   sale of stock?
```

Page 53

                           A. YEHUDA

1

2          A.    Yes.

3          Q.    When the SEC came after T.J.

4     Management and Mr. Kahlon, it was on the

5     basis that the SEC claimed that these

6     transactions were improper; is that right?

7               INTERPRETER:  The basis that these

8          profits were improper?

9               MR. HAFFNER:  Objection.  Are you

10          referring to all stock transactions of

11          T.J. Management or just the trades that

12          were subject to the SEC investigation

13          and the ultimate lawsuit?

14               MR. NAIDICH:  The latter.

15               MR. HAFFNER:  Go ahead, Avi.

16               INTERPRETER:  Can you reread the

17          question, because I don't remember --

18               MR. NAIDICH:  No, withdraw it.

19          Q.    If the monies that you received by

20     wire were profits from transactions that the

21     SEC sought to attack in their lawsuit --

22               MR. NAIDICH:  I'm going to

23          withdraw it again.

24          Q.    If the SEC obtained a judgment

25     against T.J. Management and Kahlon, amongst

Page 54

1                    A. YEHUDA

2    other things seeking and obtaining

3    disgorgement of profits from certain

4    transactions and if you got a share of those

5    profits, would you not agree it would only

6    be fair to you to suffer equally with

7    Mr. Kahlon the obligation to return those

8    profits to the SEC?

9              MR. HAFFNER:  Objection.  You can

10        answer.

11        A.    I don't know (in English).  I

12   don't know what they're accusing him for, so

13   I didn't see anything that (in English)-- I

14   don't know what they're accusing him or what

15   he has done.

16        Q.    Would it, in your view, be fair

17   that Mr. Kahlon return profits earned on

18   stock transactions to the SEC where you

19   received half of those profits?

20              INTERPRETER:  Can you please.  I'm

21        sorry.

22              MR. HAFFNER:  Objection.  You can

23        answer.

24              INTERPRETER:  I haven't translated

25        it, but okay.

Page 55

A. YEHUDA

1

2       A.    I think that he didn't pay back a

3   profit.  He paid ownership.  Inaccurate

4   ownership.  It was not about profit, but

5   inaccurate handling management.

6             INTERPRETER:  I don't know how to

7         translate.

8       Q.    Earlier, you testified that your

9   50 percent ownership or Sigalit's 50 percent

10  ownership of T.J. Management entitled her or

11  you to 50 percent of all profits of the

12  company; is that right?

13      A.    Yes.

14      Q.    You also testified that the 50

15  percent ownership also required that you pay

16  50 percent of the obligations of T.J.

17  Management.

18      A.    Correct, but not fines.

19      Q.    Other than fines, if T.J.

20  Management has an obligation to pay money,

21  then as a 50 percent owner, you would share

22  in that obligation, would you not?

23      A.    Expenses, yes.

24      Q.    Expenses other than fines?

25      A.    Working expenses, salary, losses,

Page 56

```
 1                    A. YEHUDA
 2   if there are losses that some transactions.
 3        Q.    Other than fines, you would be
 4   responsible, as a 50 percent owner, for
 5   liabilities of the company?
 6        A.    I didn't understand the question.
 7        Q.    If there was an obligation by T.J.
 8   Management to refund monies to the SEC for
 9   profits and not as a fine, would your 50
10   percent interest in the company require that
11   you repay your share of the profits that you
12   received?
13        A.    I don't know.
14        Q.    Did Mr. Kahlon ever request of you
15   that you return any of the monies that had
16   been wired from the company to you, as part
17   of, any payment that was due from T.J.
18   Management to the SEC?
19             INTERPRETER:  As part of the
20        payment that was sent by T.J.
21        Management?
22             COURT REPORTER:  That was due by
23        T.J. Management to the SEC.
24             INTERPRETER:  That was due by
25        whom?
```

```
1              A. YEHUDA
2         COURT REPORTER:  That was due by
3    T.J. Management to the SEC.
4         A.   He sent me once an e-mail in 2017
5   and among other things, he mentioned that.
6         Q.   What is your recollection of what
7   was in that e-mail?
8         A.   It concerned other transactions
9   that were among us, not related to.
10        Q.   I thought --
11        MR. HAFFNER:  I'm sorry, Rick.  At
12        this point, I want to say something.
13        Could the interpreter move just a
14        little closer to the camera or the
15        microphone and tilt her head towards
16        the camera when she speaks because I'm
17        having a hard time with her accent and
18        being that far and having her head
19        tilted down sometimes, I'm having
20        trouble hearing what my clients answer
21        is, okay.  Thank you.
22        INTERPRETER:  Where do you want me
23        to sit so you can hear me.
24        MR. NAIDICH:  You can move that
25        chair and sit in that chair.
```

```
 1                    A. YEHUDA
 2            INTERPRETER:  I'd have to sit in
 3       this chair.
 4            MR. HAFFNER:  That's fine.  Just
 5       try to speak a little more slowly and
 6       look at the camera.  Rick, she knows
 7       where the camera is right?
 8            MR. NAIDICH:  Yes.
 9            INTERPRETER:  Okay.  Let's see if
10       this makes a difference.  First time
11       someone complains about my accent in a
12       million and one years.
13            MR. HAFFNER:  It's a combination
14       of things, ma'am.  I'm not criticizing
15       your accent, it's just I need to
16       understand what my client is saying.
17       So, if I see your lips and I hear you
18       better and you're slower, the accent
19       won't be a problem.
20            INTERPRETER:  Okay, sure.  No
21       problem.
22       Q.    I thought that you indicated in
23  your testimony that a portion of that e-mail
24  that you referred to, related to
25  Mr. Kahlon's request that you participate in
```

Page 59

```
1                    A. YEHUDA
2    the monies due to the SEC, was that wrong?
3        A.    He told me that he is going to
4    have to deal with the SEC.  He didn't tell
5    me what the deal is about, what are the
6    conditions and I don't remember.
7        Q.    Did he ask you to repay any of the
8    money you had received from T&J to assist in
9    making any payment to the SEC?
10       A.    It was part of a general
11   accounting among us for many things.  When I
12   told him please bring an agreement that I
13   can look at it and then, we'll sit down and
14   we'll do the calculation.  He got nervous
15   and started cursing.
16       Q.    About what?
17            INTERPRETER:  He got nervous and
18       started cursing.
19       Q.    What was he nervous about?
20       A.    Because I didn't agree with him
21   about several things in the e-mail.
22       Q.    Was this a conversation that the
23   two of you had regarding the contents of
24   that e-mail?
25       A.    Yes.
```

Page 60

1                    A. YEHUDA

2        Q.    Was it clear to you in that

3    conversation, that Mr. Kahlon wanted you to

4    pay some money towards the obligation to the

5    SEC?

6              INTERPRETER:   What was the

7         beginning?

8              (Whereupon, the referred-to

9         question was read back by the

10        reporter.)

11             MR. HAFFNER:   Objection.   Are you

12        referring by obligation to the

13        judgment, at that point or to the

14        outcome of the settlement?

15             MR. NAIDICH:   To the obligation or

16        whatever it might be to the SEC, either

17        outcome of the litigation or any

18        subsequent settlement, was it clear to

19        your client, Mr. Yehuda, that

20        Mr. Kahlon was requesting that he

21        return any or all of the money that he

22        had received from T&J related to those

23        transactions.

24        Q.    Was Kahlon seeking money back from

25    you?

Page 61

1                    A. YEHUDA

2        A.    It was part of a settling or

3    calculating that was supposed to take place

4    and I told him that the moment there would

5    be an agreement, we can sit down together to

6    do the accounting to see what is due him and

7    what is due me.

8        Q.    Well, I understand that from your

9    answer he made it clear that he had a claim

10   against you for monies that had been paid to

11   the SEC; is that right?  That was at least

12   part of the calculation to come?

13           MR. HAFFNER:  Objection.  By

14       answer, are you intending reply to the

15       counterclaims, Rick?

16           MR. NAIDICH:  No, I'm trying to

17       understand from your client's

18       testimony, the full nature of what was

19       discussed and what accounting that they

20       were discussing, at that time.  What

21       were the components.  What was it that

22       Mr. Kahlon claimed to be owing back

23       from the Yehuda's and what the Yehuda's

24       think was due to them, at that time.

25       What were claims of each side that

Page 62

```
 1                    A.  YEHUDA
 2      required an accounting?
 3           MR.  HAFFNER:  Fine Rick, you've
 4      explained what you meant and now the
 5      the witness understands in your
 6      question what you meant by answer.  You
 7      intended Kahlon's reply during this
 8      telephone conversation, right.  His
 9      answer to what Mr. Yehuda's, right.
10      You're not referring to any pleading,
11      right?
12           MR.  NAIDICH:  No, I'm not.
13           MR.  HAFFNER:  Okay, that's all I
14      wanted to know.
15           MR.  NAIDICH:  Let me ask the
16      question in a different way.
17           MR.  HAFFNER:  Okay.
18      Q.   Mr. Yehuda, you indicate that
19   there was, during the discussion with
20   Mr. Kahlon, some contemplation of some
21   accounting between the two of you; is that
22   correct?
23      A.   Yes.
24      Q.   Part of that accounting, as I
25   understand it, was Mr. Kahlon claiming that
```

Page 63

```
 1                    A. YEHUDA
 2    some money was due from you and/or your wife
 3    in connection with the judgment or
 4    settlement with the SEC; is that right?
 5         A.   Yes, but he didn't come up with an
 6    agreement.  He didn't show me any agreement.
 7         Q.   I understand that.  But it was
 8    clear to you that he was seeking money back
 9    from you and/or your wife to assist in the
10    payment that was going to be made or had
11    been made to the SEC?
12         A.   Yes, but I didn't agree without
13    seeing the agreement and without doing an
14    accounting settlement of all the other
15    bills, the other transactions.
16         Q.   What other transactions were you
17    seeking an accounting for?
18         A.   There were accounts that were not
19    connected to the -- not all of them were
20    connected to T.J. Management.
21         Q.   Other than the claim in your
22    Complaint regarding some ten million dollars
23    transaction between Project Verte and
24    Mr. Kahlon or T&J, I believe it is, is there
25    some other transaction for which you're
```

Page 64

```
1                    A. YEHUDA
2   sought an accounting?
3        A.   Yes.
4        Q.   Are you aware of any activities by
5   T.J. Management in buying or selling stock
6   or any other investment subsequent to the
7   action brought against it by the SEC?
8        A.   After?
9        Q.   After.
10       A.   Besides the selling of a parcel?
11       Q.   Yes.
12       A.   I was asking for an accounting for
13  the period before it.  Preceding it.
14            MR. HAFFNER:  I'm sorry.  Can you
15       repeat that, Ms. Interpreter.  I was
16       asking for an accounting of what?
17            INTERPRETER:  The period preceding
18       it.  Before.
19       Q.   Before the SEC brought it's
20  action; is that correct?
21       A.   What is the question.  I didn't
22  understand the question.
23       Q.   Mr. Kahlon has testified that once
24  the SEC started it's investigation against
25  T.J. Management, that T.J. Management ceased
```

Page 65

```
 1                    A.  YEHUDA
 2   all business operations and, specifically,
 3   stopped buying or selling stock.  Do you
 4   have any reason to believe that that
 5   statement by Mr. Kahlon was not true?
 6        A.    I don't know.
 7        Q.    Are you aware of any transactions
 8   done by T.J. Management after the SEC
 9   commenced its investigations?
10            MR. HAFFNER:  Objection.  Do we
11        know, did Mr. Kahlon --
12            MR. NAIDICH:  Does he know of any
13        transactions?
14            MR. HAFFNER:  Did Mr. Kahlon
15        testify or do we know when the
16        investigations began?
17            MR. NAIDICH:  I believe he did,
18        but I don't have the transcript in
19        front of me.
20            MR. HAFFNER:  Well, if Avi knows.
21        But you can ask Avi.
22        A.    I don't know (in English).
23        Q.    When's the last transaction that
24   you're aware of, that T.J. Management was
25   involved in?
```

Page 66

```
 1              A. YEHUDA
 2         MR. HAFFNER:  Objection.
 3     Objection.  He's testified he was not
 4     aware of any specific transactions.
 5     But you know --
 6         Q.   He got statements, he indicated.
 7  When was the last time you got a statement
 8  from T.J. Management?
 9            MR. HAFFNER:  That's fine.
10         A.   What does it mean, a yearly
11  statement.
12         Q.   Any statements from T.J.
13  Management?
14         A.   I think it was the end of 2010 or
15  the beginning of 2011.
16         Q.   Did you make an inquiry of
17  Mr. Kahlon whether there was any continued
18  activity by T.J. Management after that date?
19         A.   If I asked?
20         Q.   Yes.
21         A.   I asked and he said no.
22         Q.   Did you accept that answer?
23         A.   I don't have a choice.  He runs a
24  business (in English).  I didn't have any
25  say.  I thought he should continue, but he
```

Page 67

1              A. YEHUDA

2    stopped.  I couldn't force him.

3         Q.   Well, you brought a lawsuit now,

4    didn't you?

5         A.   I don't understand.

6         Q.   Are you familiar with Irving

7    Strauss?

8         A.   Yes.

9         Q.   How do you know Mr. Strauss?

10        A.   Mr. Kahlon brought me to him (in

11   English).

12        Q.   Mr. Strauss was the accountant for

13   T.J. Management, was he not?

14        A.   Yes.

15        Q.   He was also your accountant?

16             MR. HAFFNER:   Objection.   For what

17        period of time?

18        Q.   As of November 2, 2018, was he

19   your accountant?

20        A.   No.

21        Q.   No, I looked into a letter dated

22   November 2, 2018, to you and T.J.

23   Management -- actually, I want to amend

24   that.  It's to, whom it may concern

25   regarding you and T.J. Management.  In that

1                    A. YEHUDA

2    letter, Mr. Strauss indicates that he has

3    been the accountant for T.J. Management from

4    the time that company was founded until

5    present, which in this case was November 2,

6    2018.  He indicates in the letter that he's

7    the personal accountant for Mr. Kahlon and

8    was the accountant for you, Mr. Yehuda, in

9    the U.S. in the years 2008, 2009 and 2010.

10   Is that, what I have read to you from his

11   letter, an accurate statement as to his

12   being your accountant for the years 2008,

13   2009, 2010?

14        A.    To about 2008, 2009, 2010 and it's

15   correct.  Also, for 2007 and 2006.

16        Q.    Did I understand you say, that it

17   is correct for 2008, 2009, 2010 but also for

18   2006 and 2007, as well; is that correct?

19        A.    Yes.

20        Q.    Mr. Strauss indicates in his

21   letter and I quote, "Avraham Yehuda has been

22   a partner in T.J. Management from 2008.  Do

23   you know where he would have gotten that

24   information other than you?

25        A.    No (in English).

Page 69

1              A. YEHUDA

2       Q.    It further indicates in the letter

3  and I quote, "per his request," referring to

4  yourself, "T.J. Management dealt with him on

5  a 1099 basis for reasons being his lack of

6  residency, dealt with him on a 1099 basis"

7  --

8              INTERPRETER:  Who?

9              MR. NAIDICH:  Him, being

10      Mr. Yehuda.

11      Q.    The reasons being his lack of

12 residency or working permit in this state

13 and to benefit from the treaty agreement?

14             INTERPRETER:  The what?

15             MR. NAIDICH:  The treaty

16      agreement, T-R-E-A-T-Y.

17      Q.    Between the U.S. and Israel?

18      A.    What's the question.

19      Q.    The question is, is that an

20 accurate statement by Mr. Strauss?

21      A.    No.

22      Q.    Can you tell me, whether or not,

23 you received as prepared by Mr. Strauss 1099

24 statements for 2008 and 2009 and 2010 from

25 T.J. Management?

Page 70

```
 1                    A. YEHUDA
 2       A.   I got it from T.J. Management.
 3  Not from Mr. Strauss.
 4       Q.   I understand.  When you received
 5  these 1099's which indicate that they are
 6  addressed by T.J. Management to yourself and
 7  not to Sigalit, how did you understand that
 8  you were involved and the recipient of the
 9  nonemployee compensation?
10            INTERPRETER:  I'm sorry.  I'm not
11       sure of the end of the question.
12            MR. HAFFNER:  Objection.  Only to
13       the term --
14            INTERPRETER:  I didn't finish the
15       question.
16            MR. HAFFNER:  Oh, I'm sorry.
17            MR. NAIDICH:  Let me withdraw the
18       question and go back.  Let me withdraw
19       the question.
20       Q.   If you were not an owner of T.J.
21  Management, not a member of T.J. Managing
22  Group, LLC, on what basis did these 1099's
23  go to you?
24            MR. HAFFNER:  Objection.  You can
25       answer, Avi.
```

Page 71

1                    A. YEHUDA

2        A.    Because my wife could not get a

3    Tax ID, the solution was that this form

4    would be sent to me.

5        Q.    Isn't the real reason you got

6    these is what's clear in Mr. Strauss'

7    letter.  That you had advised Mr. Strauss

8    that you were a partner in T.J. Management?

9        A.    No.

10           MR. HAFFNER:  Avi, you have to

11        wait.  Objection.  Argumentative.  You

12        can answer.

13        A.    No (in English).

14        Q.    Did you or did you not advise Mr.

15    Strauss that you were the owner, an owner,

16    of T.J. Management?

17        A.    No(in English).

18        Q.    Have you represented yourself to

19    be a 50 percent owner of T.J. Management to

20    any third party at any time?

21           INTERPRETER:  Can you read it

22        back?  I'm sorry.

23           (Whereupon, the referred-to

24        question was read back by the

25        reporter.)

Page 72

A. YEHUDA

1

2      A.    What does it mean, third-party?

3      Q.    Have you ever made a

4  representation to anyone that you are an

5  owner of T.J. Management?

6      A.    No.

7      Q.    Not to Mr. Strauss, not in any

8  Court proceeding, not to any attorney or

9  anyone else?

10      A.    I don't understand the question.

11      Q.    Have you ever claimed to anyone

12  verbally or in writing that you are an owner

13  of T.J. Management?

14      A.    I don't remember.

15      Q.    Does that mean you could have made

16  such a claim to anyone?

17      A.    I don't know.  I don't remember

18  such a thing.

19          MR. NAIDICH:  I'm going to take a

20      break for ten minutes.  I'm almost

21      done.

22          (Whereupon, a short recess was

23      taken.)

24      Q.    You understand, do you not, that

25  the case brought by the SEC was a civil and

Page 73

1                    A. YEHUDA
2    not a criminal case?
3        A.    I don't know.
4        Q.    You don't know whether the
5    proceeding brought by the SEC was criminal
6    or civil?
7            MR. KAYLAN:   He doesn't know the
8        difference.  He doesn't know the
9        difference, he said.
10       A.    I don't know the difference.
11       Q.    Is there some reason why you
12   believe that if the SEC was seeking a return
13   of profits made from certain transactions
14   that you would be responsible for a portion
15   of those monies but not for civil penalties,
16   which you I think, referred to earlier as
17   fines?
18           MR. HAFFNER:   Objection.
19           INTERPRETER:   Can you read it
20       back?  I'm sorry.
21           (Whereupon, the referred-to
22       question was read back by the
23       reporter.)
24           MR. HAFFNER:   Objection.
25           MR. NAIDICH:   She hasn't finished

1                    A.  YEHUDA

2         the question.  She hasn't finished the

3         translation.

4             MR.  HAFFNER:  Oh, I'm sorry.

5             MR.  KAYLAN:  No, she didn't

6         finish.

7             MR.  HAFFNER:  I'll object.  Go

8         ahead, Avi.

9         A.   I don't understand the question.

10        Q.    Is there some reason why you

11   believe that the obligation to the SEC for

12   what you call fines, but which the SEC calls

13   civil penalties, should not be shared

14   equally by yourself and Mr. Kahlon?

15             MR.  HAFFNER:  Objection.  Asked

16        and answered.  Go ahead.  You can

17        answer Avi.

18        A.   No -- no, I don't know in what he

19   was accused.

20             MR.  KAYLAN:  He's not familiar

21        with --

22        A.   In what he received the fine.

23        Q.   So you distinguish between a fine

24   and merely return of profits to the SEC?

25             MR.  HAFFNER:  Objection.  Go

Page 75

                          A. YEHUDA

1
2      ahead.
3      A.    I don't know on which transactions
4  the SEC is referring to.
5      Q.    Whatever transactions the SEC
6  brought a proceeding about, if you got
7  profits from those transactions, should you
8  not be equally responsible with Mr. Kahlon
9  for the those payments to the SEC?
10         MR. HAFFNER:  Objection.  Asked
11     and answered.  Go ahead.
12     A.    I don't know (in English).  I
13 don't know.  I have no idea (in English).
14     Q.    You were 50 percent -- or your
15 wife was owner of T.J. Management.  If T.J.
16 Management owed money, for whatever reason,
17 to the SEC while you were a 50 percent
18 owner, would you not be responsible to repay
19 the same amount as Mr. Kahlon, 50/50?
20         MR. HAFFNER:  Objection.  Asked
21     and answered and I repeat the basis for
22     my earlier objection to the same
23     question.  It calls, to some extent,
24     for a legal opinions and conclusions --
25         MR. NAIDICH:  I disagree.  I don't

Page 76

```
 1              A. YEHUDA
 2     think it has anything to with legal
 3     opinions.
 4          MR. HAFFNER:  I'm not going to
 5     litigate this with you.  One more time,
 6     Avi, you can answer the question.  One
 7     more time.
 8          INTERPRETER:  If I remember
 9     correctly -- I'm not sure I'm
10     translating because I'm remembering it.
11     Do you want to read it.
12          MR. KAYLAN:  It's fine.
13          MR. NAIDICH:  What is the answer?
14          MR. KAYLAN:  He refused to answer.
15     A.    I didn't conduct any transaction.
16  I don't know what to answer.
17     Q.    I'll move on.  You've indicated
18  that you got some statements from T.J.
19  Management, possibly as frequently as once a
20  month; is that correct?
21     A.    I received a statement.  I don't
22  remember if it was every month or three
23  weeks or five weeks, but I received a
24  statement.
25     Q.    I have been advised by my client
```

Page 77

```
 1                    A.  YEHUDA
 2    that you received daily reports, at least
 3    twice a day, from Anthony Reynaldi (sic),
 4    the controller of T.J. Management and I
 5    remind you, you're under oath.  Did you
 6    receive daily reports or did you not receive
 7    daily reports?
 8              INTERPRETER:  Anthony what?
 9              MR. NAIDICH:  Anthony Reynaldi
10        (sic).
11        A.    Every day, twice a day, no.
12        Q.    Did you receive daily reports from
13    Mr. Reynaldi?
14        A.    No.
15        Q.    You received no daily reports?
16        A.    No.
17        Q.    Those reports, did they not state
18    the open positions, close positions and
19    profit and loss, in connection with, trades
20    that were made by T.J. Management?
21        A.    All the reports showed profits and
22    loss.
23        Q.    Only once a month or is that your
24    continued testimony, that you got daily
25    reports?
```

Page 78

```
 1                A. YEHUDA
 2          MR. HAFFNER:  Objection.
 3     Objection.  Asked and answered.  Answer
 4     one more time, Avi.
 5          A.   No, I haven't received a daily
 6  report.
 7          MR. NAIDICH:  I would ask for,
 8          again, the production and I'll do so
 9          with a document request.  But I ask for
10          production any and all e-mails that
11          Mr. Yehuda received from T.J.
12          Management including any and all
13          e-mails from Anthony Reynaldi (sic) as
14          the controller of the company.
15          MR. HAFFNER:  I can think of no
16          objection to that request.  What I'm
17          about to say relates to the procedure.
18          We have a mediation.  Maybe rather than
19          doing the supplemental document request
20          or post mediation document request
21          about via deposition, you know, how the
22          court reporter at the end requests it
23          at the end.  Rather than do it that
24          way, why don't we just agree to submit
25          a second notice to produce and whatever
```

Page 79

```
 1                    A. YEHUDA
 2        other discovery we need post mediation
 3        so we have don't have to look at the
 4        transcript and say, I owe this document
 5        and that document.  If you have any
 6        objection --
 7              MR. NAIDICH:  I absolutely agree
 8        with that suggestion.
 9        Q.    One last item.  We were speaking
10   some time ago about whether you had or had
11   not ever represented that you were an owner
12   of T.J. Management.  Have you ever testified
13   in any proceeding in Israel that you are an
14   owner of T.J. Management?
15        A.    In Israel?
16              MR. NAIDICH:  What was the answer?
17              MR. KAYLAN:  He said in Israel.
18              INTERPRETER:  In Israel.
19        Q.    In Israel.
20              INTERPRETER:  That's his answer.
21   In Israel.
22        Q.    In Israel, you have --
23              INTERPRETER:  He said in Israel.
24        He said one word and every time and the
25        next, I have a problem.
```

Page 80

1           A. YEHUDA

2           MR. KAYLAN:  So, let's concentrate

3       so you can concentrate.  Try to speak a

4       little slower.

5           INTERPRETER:  It's not because he

6       talks so fast.  It's a mumble.

7       A.   In Israel, it's possible that I

8   have noted that I hold together with my wife

9   in T.J. Management.

10      Q.   If you so testified in Israel,

11  would that testimony have been true and

12  accurate?

13      A.   Me and my wife and the same

14  entity, it's one account we report and do

15  everything together.

16      Q.   I don't know what that means, sir.

17  Did you or did you not testify in Israel

18  that you are an owner of an interest in T.J.

19  Management?  Yes or no?

20          MR. HAFFNER:  Objection.

21      Objection.  It was asked and answered.

22      The witness responded possibly.  If you

23      want to change that answer, Avi, I'll

24      let you answer it one more time.

25          MR. NAIDICH:  He certainly knows

```
 1                A. YEHUDA
 2      whether so he testified or not and my
 3      question is very simple.  Did he
 4      testify in Israel that he is the owner,
 5      an interest, in T.J. Management.  It
 6      only requires a yes or no.
 7          MR. HAFFNER:  But it's redundant.
 8          MR. NAIDICH:  It's not redundant.
 9      I haven't gotten an answer.
10          MR. HAFFNER:  Go ahead, Avi.
11      A.   I didn't have any reason in a
12  Court to testify that --
13          MR. NAIDICH:  He's not answering
14      the question, Mr. Haffner.  Either he
15      did or didn't testify.  With all due
16      respect to you saying it's been asked
17      and answered, it's been asked three
18      times and it hasn't been answered once.
19      Either he did or did not testify in
20      Israel that he is the owner of an
21      interest in T.J. Management.  That only
22      calls for --
23          MR. HAFFNER:  Why is the answer
24      possibly not answer to your question.
25          MR. NAIDICH:  It's because he's
```

1              A. YEHUDA

2      obfuscating and I'm going to continue

3      to ask it until I get an answer.

4          MR. HAFFNER:  This is not an

5      interrogation.  You asked the question

6      and you got possibly.  Avi, answer it

7      again and let's move on.  We're not

8      going to ask the court reporter to

9      repeat -- to state for the record your

10     prior question.  I think it was

11     identical, but that's okay.  Answer it

12     again, Avi, or answer it for the first

13     time, Avi.  I don't care.

14     A.    I said -- I'm saying that I had no

15 disagreement with him in Israel about the

16 ownership of T.J. Management.

17         MR. NAIDICH:  Again, that's not an

18     answer to the question, Mr. Haffner.

19     The fact that he did or didn't have a

20     reason to do so is not the question.

21     The question is, did he make that

22     statement under oath in a proceeding in

23     Israel.

24         MR. HAFFNER:  Why are we wasting

25     your transcript pages arguing over

```
 1                    A. YEHUDA
 2        this.  Frankly, there are no prior
 3        question -- listen to me.  He said
 4        possibly.  It's the question where he
 5        answered, possibly.  But it's
 6        irrelevant, because he's going to
 7        answer whether it's again or the first
 8        time because he's going to answer right
 9        now.  Mr. Kahlon, my apologies and to
10        you, as well, Avi as to why the
11        litigation is so expensive.  This is
12        not material.  Let him just answer the
13        question.  Save the transcript pages
14        which I'm not paying for.  Go ahead,
15        answer the question.  Who cares if it
16        was asked before.  That was my opinion.
17        Go ahead.
18             THE WITNESS:  Possibly, I said me
19        and my wife have interest in T.J.
20        Management (in English).
21        Q.   If you had said that under oath in
22   Israel, would it have been an accurate
23   statement?
24        A.   For me and my wife are the same
25   thing.  We are one entity.
```

Page 84

1              A. YEHUDA

2         MR. NAIDICH:   Okay.   I have no

3    further questions.

4         (Whereupon, at 1:49 P.M., the

5    Examination of this witness was

6    concluded.)

7

8                   o         o         o         o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 85

1                    A. YEHUDA
2              D E C L A R A T I O N
3

4        I hereby certify that having been first
5    duly sworn to testify to the truth, I gave
6    the above testimony.
7

8        I FURTHER CERTIFY that the foregoing
9    transcript is a true and correct transcript
10    of the testimony given by me at the time and
11    place specified hereinbefore.
12
13
14

15    _____
          AVRAHAM YEHUDA
16
17

18    Subscribed and sworn to before me
19    this _____ day of _____ 20____.
20
21

22    _____
          NOTARY PUBLIC
23
24
25

Page 86

1                    A. YEHUDA

2                E X H I B I T S

3

4   DEFENDANT'S EXHIBITS:

5

6   EXHIBIT    EXHIBIT

7   LETTER      DESCRIPTION                    PAGE

8   (None)

9

10                    I N D E X

11

12  EXAMINATION BY                             PAGE

13  MR. NAIDICH                                5

14

15

16       INFORMATION AND/OR DOCUMENTS REQUESTED

17  INFORMATION AND/OR DOCUMENTS              PAGE

18  Production of e-mails                      46

19  All e-mails to Mr. Yehuda from             78

20  T.J. Management

21

22           QUESTIONS MARKED FOR RULINGS

23  PAGE LINE QUESTION

24  (None)

25

1                          A. YEHUDA
2                  C E R T I F I C A T E
3
4    STATE OF NEW YORK              )
                                    :  SS.:
5    COUNTY OF SUFFOLK              )
6
7        I, KARYNE FEDERBUSH, a Notary Public
8    for and within the State of New York, do
9    hereby certify:
10       That the witness whose examination is
11   hereinbefore set forth was duly sworn and
12   that such examination is a true record of
13   the testimony given by that witness.
14       I further certify that I am not related
15   to any of the parties to this action by
16   blood or by marriage and that I am in no way
17   interested in the outcome of this matter.
18       IN WITNESS WHEREOF, I have hereunto set
19   my hand this 21st day of November, 2022.
20
21
22   _____
                KARYNE FEDERBUSH
23
24
25

Page 88

1                              ERRATA SHEET
                        VERITEXT/NEW YORK REPORTING, LLC
2

3      CASE NAME: Sigalit, Yehuda, Et Al.  v. Kahlon, Jossef, Et Al.
       DATE OF DEPOSITION: 11/2/2022
       WITNESSES' NAME: Avraham Yehuda
4
5         PAGE    LINE (S)        CHANGE                REASON
          ____|_____|_____|_____
6
          ____|_____|_____|_____
7
          ____|_____|_____|_____
8
          ____|_____|_____|_____
9
          ____|_____|_____|_____
10
          ____|_____|_____|_____
11
          ____|_____|_____|_____
12
          ____|_____|_____|_____
13
          ____|_____|_____|_____
14
          ____|_____|_____|_____
15
          ____|_____|_____|_____
16
          ____|_____|_____|_____
17
          ____|_____|_____|_____
18
          ____|_____|_____|_____
19
          ____|_____|_____|_____
20
21                                   _____
                                     Avraham Yehuda
22     SUBSCRIBED AND SWORN TO BEFORE ME
       THIS _____ DAY OF _____, 20__.
23
24

25     _____        _____
       (NOTARY PUBLIC)                 MY COMMISSION EXPIRES:

[& - advised]

Page 1

| & |
|---|
| **&** 1:18 2:3,7 3:16 |

| 0 |
|---|
| **08921** 1:6 |

| 1 |
|---|
| **1** 3:16 |
| **10** 37:3 38:23 39:5 |
| **100** 21:25 48:4 |
| **10528** 2:5 |
| **1099** 69:5,6,23 |
| **1099's** 70:5,22 |
| **10:00** 1:11 |
| **11/2/2022** 88:3 |
| **11021** 1:20 2:9 |
| **111** 1:19 2:9 |
| **1200** 26:10 |
| **150,000** 14:24 |
| **18** 4:16 |
| **1991** 7:7 |
| **1992** 7:7 |
| **1994** 7:15 |
| **1996** 7:25 8:6 |
| **1:21** 1:6 |
| **1:49** 84:4 |

| 2 |
|---|
| **2** 1:10 18:16 67:18,22 68:5 |
| **2.3.** 51:16 |
| **2/11/2006** 46:15 |
| **20** 85:19 88:22 |
| **200,000** 14:14 |
| **2000** 12:12 |
| **2006** 68:15,18 |

**2007** 18:16 36:19 68:15,18
**2008** 68:9,12,14 68:17,22 69:24
**2009** 30:15 49:16 68:9,13,14,17 69:24
**2010** 66:14 68:9 68:13,14,17 69:24
**2011** 66:15
**2017** 57:4
**2018** 67:18,22 68:6
**2020** 20:15 23:6 24:8,22 26:19,22 27:13
**2021** 20:3,10
**2022** 1:10 87:19
**214** 1:19 2:9
**21st** 87:19
**23** 20:15
**24629** 87:21

| 3 |
|---|
| **30** 3:15 20:2,10 |
| **3200** 22:10 |
| **33** 29:20 30:11 30:20 31:2 |
| **3450** 18:18 22:15 23:9 |
| **350,000** 14:25 |

| 4 |
|---|
| **4** 20:7 |
| **441,000.00** 47:7 |
| **441,000.00.** 46:17,21 |

| 46 | 86:18 |
|---|---|
| **480** | 2:5 |

| 5 |
|---|
| **5** 86:13 |
| **50** 14:14 17:14 17:15 42:9,13,17 42:18 55:9,9,11 55:14,16,21 56:4 56:9 71:19 75:14,17 |
| **50/50** 75:19 |
| **574,000.00** 47:16 |

| 6 |
|---|
| **69412653** 4:17 |

| 7 |
|---|
| **7** 18:15 36:18 |
| **78** 86:19 |

| 8 |
|---|
| **8** 36:17 |

| 9 |
|---|
| **9** 18:25 36:22 38:23 |

| a |
|---|
| **a.m.** 1:11 |
| **abilities** 5:2 |
| **ability** 5:6 |
| **absolutely** 79:7 |
| **accent** 57:17 58:11,15,18 |
| **accept** 66:22 |
| **account** 43:3,4,6 43:7,18 46:16,20 46:23 47:7,17 52:13,24 80:14 |

**accountant** 67:12,15,19 68:3 68:7,8,12
**accounting** 59:11 61:6,19 62:2,21,24 63:14 63:17 64:2,12,16
**accounts** 63:18
**accurate** 19:18 68:11 69:20 80:12 83:22
**accused** 74:19
**accusing** 54:12 54:14
**acknowledge** 37:22
**acquire** 38:9
**acquired** 18:17 21:24 22:15 26:11 27:25 28:21 36:19
**action** 49:24 64:7,20 87:15
**activities** 42:12 45:16,19 46:12 47:19 48:2,7,22 49:2 64:4
**activity** 7:4 66:18
**addressed** 20:16 21:2 70:6
**administer** 3:10
**advice** 25:6,24
**advise** 71:14
**advised** 21:17,20 21:21 25:9 71:7 76:25

**advising**  24:9,16
  24:23 25:14
**ago**  19:4 79:10
**agree**  39:13 40:6
  43:6,12 54:5
  59:20 63:12
  78:24 79:7
**agreed**  3:4,19
  14:22 17:10
  30:11 31:6
**agreement**  14:20
  30:14,22 31:10
  35:18 59:12
  61:5 63:6,6,13
  69:13,16
**ahead**  45:5
  48:16 52:19
  53:15 74:8,16
  75:2,11 81:10
  83:14,17
**al**  1:3,7 2:8 88:2
  88:2
**allegation**  19:17
**amend**  67:23
**amir**  19:12
  21:17,22 27:11
  27:14 29:4
**amount**  14:5,8
  14:15,21 37:14
  46:16,20,23
  47:21 51:10,13
  75:19
**amounts**  47:22
**answer**  4:22
  8:11 26:21 27:8
  27:9 35:12 39:7
  39:23 40:2,11,17
  40:18,19,20,23

41:6,7 44:9 45:8
  54:10,23 57:20
  61:9,14 62:6,9
  66:22 70:25
  71:12 74:17
  76:6,13,14,16
  78:3 79:16,20
  80:23,24 81:9,23
  81:24 82:3,6,11
  82:12,18 83:7,8
  83:12,15
**answered**  27:7
  40:10,22 74:16
  75:11,21 78:3
  80:21 81:17,18
  83:5
**answering**  81:13
**answers**  4:4
**anthony**  77:3,8,9
  78:13
**anybody**  9:2
**apologies**  83:9
**appear**  43:11
**appears**  12:3
  23:6 36:12
**applicable**  18:6
  18:12
**approximately**
  10:19 46:2
**april**  20:15
  24:22 26:22
  27:13
**area**  42:7
**arguing**  82:25
**argumentative**
  71:11
**army**  6:10

**arrangements**
  10:25
**asked**  40:9,21
  44:19 48:9 49:5
  49:7 66:19,21
  74:15 75:10,20
  78:3 80:21
  81:16,17 82:5
  83:16
**asking**  20:6 42:2
  49:21 51:22
  64:12,16
**assign**  30:23
**assigned**  28:25
  31:11 43:5
**assignment**  12:4
  12:9 15:22 17:6
  29:9 30:13
  31:17,19 32:2,8
  32:14 35:19
**assist**  59:8 63:9
**assumes**  45:6
**attached**  12:3
  15:21
**attack**  53:21
**attorney**  18:2
  19:20 24:16,23
  25:10 26:18
  35:6,7 42:21
  72:8
**attorneys**  2:4,8
  24:9,10,22 25:15
**authorized**  3:10
**avi**  21:16 39:7
  39:22 40:2,12
  44:9 45:8 53:15
  65:20,21 70:25
  71:10 74:8,17

76:6 78:4 80:23
  81:10 82:6,12,13
  83:10
**aviv**  4:16
**avraham**  1:15
  2:4 4:14 43:8
  68:21 85:15
  88:3,21
**awarded**  52:3
**aware**  12:2
  26:13,22 28:11
  28:15,20 31:9
  32:7,23 33:4,8
  34:11 35:22
  49:11,17 50:14
  51:5 52:6 64:4
  65:7,24 66:4

**b**

**b**  86:2
**back**  13:15 16:8
  21:7 29:14 41:6
  41:8 55:2 60:9
  60:24 61:22
  63:8 70:18
  71:22,24 73:20
  73:22
**bank**  42:22,24
**basis**  19:9 27:3
  29:21 41:16
  44:22 53:5,7
  69:5,6 70:22
  75:21
**began**  65:16
**beginning**  10:3
  11:6 14:13 60:7
  66:15

[belief - complaint]                                                         Page 3

belief  19:9 36:12
  37:11
believe  11:21
  19:17,20 22:15
  24:15 26:11
  37:16 38:25
  51:17 63:24
  65:4,17 73:12
  74:11
believes  21:24
  38:25
benefit  69:13
best  21:12
better  5:4 58:18
bills  63:15
birnbaum  1:18
  2:7
blacked  43:16
blood  87:16
bought  28:9
  31:15 41:15,17
break  5:11 20:20
  36:4 72:20
bring  59:12
brother  8:13
  10:2
brought  41:2
  49:24 50:12
  64:7,19 67:3,10
  72:25 73:5 75:6
building  7:18
buildings  7:2
business  7:19,21
  7:24 10:10,25
  11:8,11,18,24
  12:15,15,22,24
  13:3 42:11
  43:25 45:16,18

46:11 47:19
  48:2,22 65:2
  66:24
businesses  9:11
buyer  31:14
buying  64:5 65:3
buys  44:2

**c**

c  2:2 85:2 87:2,2
calculating  61:3
calculation
  59:14 61:12
call  9:18 19:12
  46:8 74:12
called  4:6
calls  38:13 39:25
  40:10,22 74:12
  75:23 81:22
camera  57:14,16
  58:6,7
car  11:21
care  82:13
cares  83:15
case  1:5 17:21
  27:18 40:8 41:4
  50:12,14,17,18
  68:5 72:25 73:2
  88:2
cash  32:19
caused  27:24
  28:5 46:22
  47:12,20
ceased  64:25
certain  54:3
  73:13
certainly  80:25

certification  3:7
certify  85:4,8
  87:9,14
chair  57:25,25
  58:3
change  14:15
  80:23 88:5
checked  19:19
choice  66:23
circumstance
  12:8
circumstances
  28:4
civil  1:17 72:25
  73:6,15 74:13
claim  33:18
  39:13 41:16
  61:9 63:21
  72:16
claimed  29:6
  53:5 61:22
  72:11
claiming  62:25
claims  61:25
clause  36:16
  37:9
clear  25:13
  35:13 38:21
  60:2,18 61:9
  63:8 71:6
client  58:16
  60:19 76:25
client's  41:6
  61:17
clients  57:20
close  77:18
closer  57:14

clothing  7:12
collection  8:15
combination
  58:13
come  8:4 9:24
  10:24 11:7,15
  14:7 47:8,9
  49:10 61:12
  63:5
coming  47:7
commenced  23:8
  65:9
commencement
  20:16
commission
  49:12 88:25
commitment
  32:21
communicated
  15:14
companies  13:3
  30:3
company  14:25
  17:18 18:17
  22:17,20 34:21
  46:12 55:12
  56:5,10,16 68:4
  78:14
compensation
  70:9
complains  58:11
complaint  12:3
  15:21 17:21,23
  18:3,6,8,20 19:2
  19:18 20:2,4,7
  27:6 36:11
  38:24 41:4,11
  50:24 51:3

[complaint - determined]                                          Page 4

63:22
**components**
  61:21
**concentrate** 80:2
  80:3
**concern** 67:24
**concerned** 57:8
**concerning** 45:2
  45:15 46:11
  50:21
**concluded** 84:6
**conclusion** 40:2
  40:11,23
**conclusions**
  75:24
**conditions** 59:6
**conduct** 76:15
**connected** 63:19
  63:20
**connection**
  17:13 42:11
  63:3 77:19
**consent** 22:22
**consider** 25:20
**consideration**
  37:14,17,25 38:4
  38:5 41:3
**construction**
  6:22,24
**consulting** 32:4
  32:9,13,24
**contact** 28:5
**contacted** 28:3,8
**contained** 22:6
**contemplation**
  62:20
**contents** 59:23

**continue** 7:8
  10:12 19:17
  66:25 82:2
**continued** 66:17
  77:24
**controller** 77:4
  78:14
**conversation**
  28:8,19 59:22
  60:3 62:8
**conversations**
  15:7,13,17 26:17
**conveyance**
  22:20
**conveyed** 27:5
  35:23 41:24
  42:2
**copies** 42:22
**copy** 3:13,16
  20:14,17 50:19
  50:24
**corporation** 37:4
  37:18
**corporations**
  37:12
**correct** 13:23
  15:23 17:24
  18:15 20:3,11
  24:3,13,21 25:25
  28:22 29:3
  32:17 33:20
  36:15,20 38:24
  43:19 46:3 49:8
  55:18 62:22
  64:20 68:15,17
  68:18 76:20
  85:9

**corrected** 23:3
**correctly** 19:7
  76:9
**counsel** 3:5,16
  18:23
**counted** 48:4
**counterclaim**
  52:10
**counterclaims**
  61:15
**county** 22:4,9
  87:5
**court** 1:2 3:12
  16:5 22:12
  27:21 33:3 51:6
  51:10 52:3,7
  56:22 57:2 72:8
  78:22 81:12
  82:8
**courtside** 2:13
**credit** 42:23
**criminal** 73:2,5
**criticizing** 58:14
**current** 43:7
**cursing** 59:15,18
**cv** 1:6

**d**

**d** 3:2 4:6 10:5
  85:2 86:10
**daily** 77:2,6,7,12
  77:15,24 78:5
**dallas** 18:18,19
  22:3,9,16 23:9
  28:10,17
**danny** 10:5
**date** 1:10 14:16
  20:5,8,10 66:18

88:3
**dated** 20:2,15
  67:21
**day** 77:3,11,11
  85:19 87:19
  88:22
**days** 3:15 47:15
**deal** 14:23 31:8
  59:4,5
**dealer** 11:21
**deals** 9:2,3
**dealt** 69:4,6
**debts** 42:18
**decision** 46:24
**defendant** 1:8,16
  2:8
**defendant's** 86:4
**deliver** 39:18
**delivered** 16:24
  17:2
**depended** 44:17
**depends** 44:15
**deposition** 1:14
  3:7,8,13 78:21
  88:3
**describe** 5:2,22
  6:8 45:14
**described** 45:7
**description** 86:7
**detail** 48:2
**details** 27:22
  32:6
**deteriorated** 5:7
**determine** 27:3
  34:22
**determined** 17:6
  51:6,11 52:7

[diamonds - fair]                                                          Page 5

diamonds  9:5,6
  9:7
difference  58:10
  73:8,9,10
different  27:16
  42:7 62:16
difficult  5:19
disagree  75:25
disagreement
  82:15
discovery  79:2
discuss  11:23
  13:9 27:19
discussed  10:25
  11:8,16 14:8
  26:18 27:17
  35:20 61:19
discussing  61:20
discussion  13:18
  62:19
discussions  15:3
  15:10,12
disgorgement
  50:7 51:18,19,21
  52:6 54:3
dispute  26:8
  28:11 34:2,17
distinguish
  74:23
district  1:2,2
document  12:2
  15:21 16:2,14,15
  16:20 20:18
  23:20 31:16
  33:2 35:21,22
  44:10 78:9,19,20
  79:4,5

documents  36:2
  49:22 86:16,17
doing  7:6 8:14
  39:21 63:13
  78:19
dollar  14:4
dollars  15:10
  32:16,18,22,25
  33:5,10,14,18
  34:9 36:13 37:6
  37:15,18 39:4,10
  41:3,19 63:22
drive  18:19
  22:16 23:9
drugs  5:17
due  56:17,22,24
  57:2 59:2 61:6,7
  61:24 63:2
  81:15
duly  4:2,7 85:5
  87:11

### e

e  2:2,2 3:2,2 4:6
  19:6,6 46:5,9
  57:4,7 58:23
  59:21,24 69:16
  78:10,13 85:2
  86:2,10,18,19
  87:2,2
earlier  35:20
  55:8 73:16
  75:22
earned  54:17
east  18:18 22:15
education  5:23
  6:2

effect  3:11,14
eighteen  19:4
either  42:3 60:16
  81:14,19
employed  6:5,17
  8:7,24,25
employment
  6:19 7:9
employments
  6:8
engage  7:3
engaging  12:25
english  4:3,5,24
  5:3,14 12:7
  14:14 16:3
  26:15 32:21
  37:21 38:4,6
  40:17 43:10
  44:16,19 45:21
  47:22 50:15
  51:25 52:9,20
  54:11,13 65:22
  66:24 67:11
  68:25 71:13,17
  75:12,13 83:20
entered  31:10
entitled  15:22
  18:6 29:19
  30:11 31:17
  33:19 42:9,15
  55:10
entity  80:14
  83:25
equal  22:19
equally  54:6
  74:14 75:8
errata  88:1

esq  2:6,10
esquire  20:17
estate  9:4
et  1:3,7 2:8 88:2
  88:2
examination
  4:10 25:13 26:2
  84:5 86:12
  87:10,12
examined  4:8
example  46:14
exchange  14:4
  49:12
exhibit  86:6,6
exhibits  86:4
expense  33:21
  33:21
expenses  33:23
  44:10,11,13
  45:20 55:23,24
  55:25
expensive  83:11
expires  88:25
explain  12:8
  23:13
explained  62:4
extent  31:5
  32:15 40:3,24
  75:23

### f

f  3:2 87:2
fact  39:11 82:19
facts  18:6,11
  27:17,21
failed  49:3
fair  9:10 15:18
  54:6,16

**fairly**  18:19
**faithful**  26:3
**faithfully**  21:13
**familiar**  9:13
  15:20 17:20
  18:7 30:5 42:24
  51:19,20,23 67:6
  74:20
**far**  15:4 57:18
**fast**  80:6
**federal**  1:17
**federbush**  1:21
  87:7,22
**fifty**  17:17 22:18
**filing**  3:6
**finally**  22:19
**finance**  13:3
**financial**  12:16
**fine**  50:11 56:9
  58:4 62:3 66:9
  74:22,23 76:12
**fines**  55:18,19,24
  56:3 73:17
  74:12
**finish**  70:14 74:6
**finished**  73:25
  74:2
**first**  9:21 10:9
  11:8 28:15
  58:10 82:12
  83:7 85:4
**five**  5:10 76:23
**flowerdale**  22:2
  22:2,8 25:2 26:8
  28:21 29:2,9
  30:24 31:12,18
  31:20,23 32:3,10
  41:21

**follows**  4:9 18:16
  21:15 22:7
**force**  3:14 67:2
**foregoing**  85:8
**forgot**  8:10,12
  45:5
**form**  3:20 45:22
  71:3
**formal**  6:2
**forth**  18:3 87:11
**forwarded**  15:14
**foundation**  40:8
**founded**  68:4
**four**  32:15,17,22
  32:25 33:5,9,14
  33:18 34:9
  41:20
**frankly**  83:2
**free**  25:20
**frequently**  76:19
**friend**  9:25 10:3
**friends**  11:5
**front**  65:19
**full**  61:18
**funds**  43:23,24
**further**  3:19
  22:2 69:2 84:3
  85:8 87:14

**g**

**g**  22:13
**gainfully**  8:24
**general**  59:10
**generated**  44:2
  47:3 48:3
**give**  46:14 48:5
  48:12,20 49:3

**given**  22:22
  85:10 87:13
**go**  12:14 42:7
  45:5 48:16
  52:19 53:15
  70:18,23 74:7,16
  74:25 75:11
  81:10 83:14,17
**goes**  21:15
**going**  4:20 22:5
  31:2 36:3 39:17
  47:14 53:22
  59:3 63:10
  72:19 76:4 82:2
  82:8 83:6,8
**good**  5:15
**gordon**  2:3
  20:14 24:8
**gotten**  30:20
  68:23 81:9
**great**  1:19,20 2:9
  2:9
**group**  12:5
  22:17 70:22

**h**

**h**  4:6,6 86:2
**haffner**  2:3,6
  16:5,10 20:15
  21:12,13,14
  23:15,19,22 24:4
  24:9,14 25:4,12
  25:22 26:2,20
  36:5,9,10 37:8
  38:13,18 39:6,16
  39:22 40:9,14,18
  41:5,25 44:8
  45:4 46:13

48:14,21 52:15
52:19 53:9,15
54:9,22 57:11
58:4,13 60:11
61:13 62:3,13,17
64:14 65:10,14
65:20 66:2,9
67:16 70:12,16
70:24 71:10
73:18,24 74:4,7
74:15,25 75:10
75:20 76:4 78:2
78:15 80:20
81:7,10,14,23
82:4,18,24
**half**  54:19
**halutz**  19:13
  21:17,22 27:11
  27:14,18,24 29:4
  35:4,5 39:9 40:4
  41:13
**halutz's**  35:6
**hand**  18:14
  87:19
**handling**  55:5
**happened**  19:21
**hard**  57:17
**harrison**  2:5
**head**  57:15,18
**hear**  36:8 40:14
  57:23 58:17
**heard**  51:12
**hearing**  57:20
**hebrew**  4:4,4
  9:18 39:19
**held**  1:17
**hereinbefore**
  85:11 87:11

**hereunto** 87:18
**high** 5:23,25 6:3
  6:7,9
**hold** 80:8
**holding** 20:13
**holdings** 37:12
**holds** 42:13
**hope** 20:14
**huh** 40:13
**hundred** 51:24

### i

**idea** 75:13
**identical** 82:11
**impairment** 5:18
**impossible** 5:19
**impression**
  31:14
**improper** 53:6,8
**inaccurate** 55:3
  55:5
**included** 23:11
  24:11,25 25:5,17
  26:6
**including** 78:12
**income** 44:12
**indicate** 43:7
  62:18 70:5
**indicated** 15:7
  15:20 27:6
  58:22 66:6
  76:17
**indicates** 43:17
  68:2,6,20 69:2
**information**
  15:15 18:3,22
  27:10 37:10
  43:22 44:5,21,25

45:7,9,13,14
46:2,5 48:6,12
48:25 68:24
86:16,17
**inquire** 47:11
**inquiry** 46:21
  47:2,18 66:16
**install** 6:25
**instance** 47:15
**instruct** 40:19
**instructing**
  26:21
**intended** 24:15
  62:7
**intending** 61:14
**interacting**
  11:13
**interest** 12:4,10
  13:19 14:9 15:9
  15:11,22 17:13
  21:25 22:19
  28:16,25 29:7
  31:11,17,22 32:2
  32:9 33:25
  56:10 80:18
  81:5,21 83:19
**interested** 87:17
**interpret** 4:3
  5:13
**interpreter** 4:9
  5:8 8:9,12 9:7
  9:14,18 13:12
  18:9 20:19,22
  21:5,19 22:11
  23:3 27:19
  29:11 31:19,23
  33:11 38:3,14
  39:18,24 44:12

45:12,17 46:18
51:20 53:7,16
54:20,24 55:6
56:19,24 57:13
57:22 58:2,9,20
59:17 60:6
64:15,17 69:8,14
70:10,14 71:21
73:19 76:8 77:8
79:18,20,23 80:5
**interpreting**
  2:13
**interrogation**
  82:5
**invested** 14:25
**investigating**
  49:12
**investigation**
  13:5 34:21
  49:20 53:12
  64:24
**investigations**
  65:9,16
**investment**
  13:22 64:6
**investor** 9:11
**involved** 12:15
  15:2 40:4 65:25
  70:8
**involvement**
  30:17 40:25
**irrelevant** 83:6
**irving** 67:6
**island** 27:16
**israel** 8:21,23
  69:17 79:13,15
  79:17,18,19,21
  79:22,23 80:7,10

80:17 81:4,20
82:15,23 83:22
**item** 79:9

### j

**jordan** 20:17
  21:3
**joseph** 9:16 12:5
  15:5 16:18
  19:15 27:11
  30:22 35:14
**jossef** 1:7 2:8,12
  88:2
**judge** 3:12
**judgment** 53:24
  60:13 63:3

### k

**k** 4:2
**kahlon** 1:7 2:8
  2:12 4:19 9:13
  9:16,17,22 10:7
  10:21 11:2,9,12
  11:16,19,23 12:5
  12:18 13:10
  14:2 15:3,5,8,18
  16:18,23 17:9
  19:5,10,13,15,24
  23:7,14 27:11
  30:25 35:8,14
  36:13,23 37:4,11
  37:17,24 38:12
  39:15 40:3 41:2
  43:22 44:4
  46:10,25 47:19
  47:25 48:5,20
  49:3,18,25 50:13
  50:15,16,25 51:7
  53:4,25 54:7,17

[kahlon - management]    Page 8

56:14 60:3,20,24
61:22 62:20,25
63:24 64:23
65:5,11,14 66:17
67:10 68:7
74:14 75:8,19
83:9 88:2
**kahlon's** 58:25
62:7
**kalone** 9:14
**kaplan** 2:13
**karyne** 1:20 87:7
87:22
**kaylan** 73:7 74:5
74:20 76:12,14
79:17 80:2
**knew** 26:25
**know** 11:11
12:24 15:25
16:17 19:25
20:24 27:14
28:6 32:12,15
34:8 38:3,5 40:3
41:22 42:4
43:25 51:10,12
51:14,15,17,18
52:9,10,20,21
54:11,12,14 55:6
56:13 62:14
65:6,11,12,15,22
66:5 67:9 68:23
72:17 73:3,4,7,8
73:10 74:18
75:3,12,13 76:16
78:21 80:16
**knowledge** 15:15
15:15

**known** 18:18
22:10,15 26:10
**knows** 25:8 58:6
65:20 80:25

**l**

**l** 3:2,2 4:2 85:2
**lack** 69:5,11
**land** 18:18 19:15
22:3,9,10 31:15
32:22 39:10
**language** 25:20
26:13
**law** 8:13 10:2
**lawsuit** 19:23
20:16 23:7,13
50:21 53:13,21
67:3
**lawyer** 19:19
22:24 23:8
**learn** 6:25
**learned** 19:5
36:23 39:8
**ledbetter** 18:19
22:16 23:9
24:11,24 25:16
26:12,19,23 28:2
34:14,23 35:9,16
35:24 36:14,19
36:24 37:6
38:10 39:3,12
40:7 41:10,15,20
41:23 42:5
**left** 12:11 20:7
**legal** 39:25 40:11
40:22 75:24
76:2

**letter** 20:13,23
20:24 21:2,9,11
21:15 22:6,7,23
22:24 23:17,24
24:8 25:7,11,14
25:23 26:3,4,4
67:21 68:2,6,11
68:21 69:2 71:7
86:7
**letterhead** 42:23
**level** 5:16
**liabilities** 42:19
56:5
**line** 86:23 88:5
**lips** 58:17
**listen** 83:3
**litigate** 76:5
**litigation** 4:19
34:17 60:17
83:11
**little** 57:14 58:5
80:4
**living** 5:5
**llc** 12:5 21:4
22:2,17 31:18
32:4,9,13,24
70:22 88:1
**llp** 1:19 2:3,7
**location** 13:4
**long** 5:12 7:8,20
8:17 27:16
**look** 20:3,6 58:6
59:13 79:3
**looked** 67:21
**looking** 23:20
36:11 38:23
**loss** 77:19,22

**losses** 55:25 56:2
**lot** 5:6 10:23
**lower** 20:7

**m**

**m** 4:2,2,6
**ma'am** 58:14
**machines** 8:16
**maday** 1:19 2:7
**mail** 57:4,7
58:23 59:21,24
**mailed** 16:24
46:5
**mails** 46:9 78:10
78:13 86:18,19
**making** 9:2 59:9
**mamaroneck** 2:5
**management**
11:24 12:5,22
13:7,10,20 14:4
14:9 15:9,11
22:17 23:10
24:25 25:17
26:12,24 27:2,4
35:9,17,23 36:18
42:10,14 43:18
43:24 45:3,15
46:10,16,19,22
48:3,8 49:2,13
49:25 50:8,13,25
51:7 53:4,11,25
55:5,10,17,20
56:8,18,21,23
57:3 63:20 64:5
64:25,25 65:8,24
66:8,13,18 67:13
67:23,25 68:3,22
69:4,25 70:2,6

[management - objection]                                    Page 9

70:21 71:8,16,19
72:5,13 75:15,16
76:19 77:4,20
78:12 79:12,14
80:9,19 81:5,21
82:16 83:20
86:20
**managing**  70:21
**marked**  86:22
**market**  12:16
**marriage**  87:16
**material**  83:12
**matter**  87:17
**mean**  6:23 9:14
66:10 72:2,15
**meaning**  36:24
37:5 44:22
**means**  38:6
80:16
**meant**  62:4,6
**mediation**  78:18
78:20 79:2
**meet**  9:22,24
10:12,21
**meeting**  10:9
13:17
**member**  32:2
70:21
**membership**
12:4,10 15:22
17:13 22:19
31:17,21
**mental**  5:18
**mentioned**  57:5
**merely**  74:24
**met**  10:6,23
**microphone**
57:15

**million**  32:16,18
32:22,25 33:5,10
33:14,18 34:9
36:13 37:6,15,18
39:4,9 41:3,18
41:19,20 58:12
63:22
**minute**  5:9
**minutes**  36:4
72:20
**miriam**  2:13
**moisha**  30:9,14
30:23 33:24
**moment**  61:4
**money**  31:8
32:20 33:19
34:5 47:3 51:8
55:20 59:8 60:4
60:21,24 63:2,8
75:16
**monies**  13:6
29:22 38:11
47:17 52:2,7,11
52:23 53:19
56:8,15 59:2
61:10 73:15
**month**  44:15
46:2 76:20,22
77:23
**months**  14:19
19:4
**move**  57:13,24
76:17 82:7
**mumble**  80:6
**muted**  23:16
**mutual**  9:25

| n |
| --- |

**n**  2:2 3:2 4:2
10:5,5 85:2
86:10
**naidich**  1:18 2:7
2:10 4:11,18 9:6
9:16 11:17
13:24 16:11
18:11 21:10
22:13 23:18,21
24:2,5,18 25:12
25:25 27:22
30:19 31:21
36:3,8 38:7,16
38:20 39:20
42:3 45:11,18
46:8 48:24 50:5
51:22 52:18,22
53:14,18,22
57:24 58:8
60:15 61:16
62:12,15 65:12
65:17 69:9,15
70:17 72:19
73:25 75:25
76:13 77:9 78:7
79:7,16 80:25
81:8,13,25 82:17
84:2 86:13
**name**  4:12,18
10:4 29:24 30:2
30:6,8 43:3,8,11
88:2,3
**nature**  61:18
**necessarily**
30:15
**neck**  1:19,20 2:9
2:9

**need**  58:15 79:2
**needed**  14:24
**nervous**  59:14
59:17,19
**never**  39:12
44:18 48:9,11,15
49:5,7
**new**  1:2,20,22
2:5,9 5:5 9:23
10:7 87:4,8 88:1
**non**  1:14
**nonemployee**
70:9
**notary**  1:21 4:7
85:22 87:7
88:25
**note**  32:18,20,25
33:15,17
**noted**  80:8
**notice**  1:16
78:25
**november**  1:10
67:18,22 68:5
87:19
**number**  10:22
43:8

| o |
| --- |

**o**  3:2 10:5,5 85:2
**oath**  3:11 4:21
77:5 82:22
83:21
**obfuscating**  82:2
**object**  74:7
**objecting**  39:16
**objection**  24:14
24:15 25:4
26:20 37:8,9

Diamond Reporting
A Veritext Company

[objection - percent]                                      Page 10

38:13,15 39:6,23
39:25 40:9,15,21
41:25 44:8 45:4
45:6 48:14
52:15,16 53:9
54:9,22 60:11
61:13 65:10
66:2,3 67:16
70:12,24 71:11
73:18,24 74:15
74:25 75:10,20
75:22 78:2,3,16
79:6 80:20,21
**objections**  3:20
**obligation**  54:7
55:20,22 56:7
60:4,12,15 74:11
**obligations**
17:12,18 38:11
55:16
**obtain**  15:10
16:22 34:13
43:22
**obtained**  42:11
43:24 53:24
**obtaining**  28:17
54:2
**october**  20:2,10
**offered**  12:14,18
12:20 13:10
15:8
**offering**  14:2
**offices**  1:18
**oh**  8:9 20:22
23:19 38:18
39:22 70:16
74:4

**okay**  16:10
21:11,14 24:4
26:6 38:18
39:22 43:20
46:13 54:25
57:21 58:9,20
62:13,17 82:11
84:2
**once**  12:12,13
44:15 46:2
50:22 57:4
64:23 76:19
77:23 81:18
**onward**  5:24
**open**  77:18
**opened**  7:12
**operated**  8:16
**operations**  65:2
**opinion**  83:16
**opinions**  75:24
76:3
**opportunity**
12:18,19 13:2
**original**  3:8,16
16:19,22
**outcome**  60:14
60:17 87:17
**outside**  25:10
**owe**  79:4
**owed**  51:8,11
75:16
**owing**  61:22
**owned**  22:16
23:10 24:24
25:16 26:12,23
28:21 35:9
**owner**  7:16,17
7:18,18 22:20,25

30:3 35:16
55:21 56:4
70:20 71:15,15
71:19 72:5,12
75:15,18 79:11
79:14 80:18
81:4,20
**ownership**  7:24
14:3 26:19 27:2
34:13 42:13
55:3,4,9,10,15
82:16
**owns**  22:3,8,18
26:8 34:23 42:4

**p**

**p**  2:2,2 3:2 4:2
**p.m.**  84:4
**page**  18:16 20:7
86:7,12,17,23
88:5
**pages**  82:25
83:13
**paid**  14:5 15:10
29:7,18,22 30:12
32:13 33:17
34:5 36:13 39:9
55:3 61:10
**papers**  34:17
**paperwork**
50:20
**paragraph**  18:15
18:25 22:6
36:17,18,22 37:3
37:3 39:4
**paragraphs**
38:23

**parcel**  18:17
22:21 64:10
**part**  15:12 25:6
35:17 52:12
56:16,19 59:10
61:2,12 62:24
**participate**  31:2
58:25
**parties**  3:6 87:15
**partner**  19:13
27:11 68:22
71:8
**partners**  27:15
**partnership**
31:20
**party**  1:14 71:20
72:2
**pause**  5:8
**pay**  33:5 34:9,12
55:2,15,20 60:4
**paying**  13:19
83:14
**payment**  13:21
32:19 46:15,18
56:17,20 59:9
63:10
**payments**  43:17
75:9
**penalties**  73:15
74:13
**pensions**  45:20
**percent**  14:14
17:14,15,17
21:25 29:20
30:12,21 31:3
42:10,13,17,18
48:4 51:25 55:9
55:9,11,15,16,21

56:4,10 71:19
75:14,17
**percentage** 13:9
14:3 29:17
**period** 6:16
10:20 64:13,17
67:17
**periods** 47:23
**permanent**
45:24
**permit** 69:12
**person** 16:25
30:2,4,7,10
**person's** 10:4
**personal** 68:7
**personally** 17:2
**phone** 8:12
19:12 28:18
**physical** 5:18
**place** 19:22 61:3
85:11
**plaintiff** 1:4 2:4
**pleading** 62:10
**please** 4:12 5:3
5:22 6:7 20:6
29:12 38:14
45:14 54:20
59:12
**point** 51:6 57:12
60:13
**portion** 18:8,20
22:5 43:16 50:3
52:2 58:23
73:14
**portions** 23:5
43:15
**positions** 77:18
77:18

**possible** 80:7
**possibly** 76:19
80:22 81:24
82:6 83:4,5,18
**post** 78:20 79:2
**preceding** 64:13
64:17
**prepare** 16:15
**prepared** 15:25
16:12 69:23
**present** 2:12
15:16 68:5
**presented** 35:10
35:15
**presently** 6:5
**prices** 44:5
**principal** 21:18
21:22 51:7
**prior** 20:15
22:23 23:6
82:10 83:2
**problem** 58:19
58:21 79:25
**procedure** 1:17
78:17
**proceeding** 72:8
73:5 75:6 79:13
82:22
**produce** 78:25
**produced** 52:14
**production** 46:9
78:8,10 86:18
**profit** 31:8 44:3
44:7 47:12,20
55:3,4 77:19
**profits** 13:6
17:15 42:10,16
44:11 47:10,10

47:22,23 48:3
50:7 52:3,8,11
53:8,20 54:3,5,8
54:17,19 55:11
56:9,11 73:13
74:24 75:7
77:21
**project** 19:6,10
19:14,20 21:4,18
21:23,23 22:14
23:12 24:12,16
24:19,23 25:3,9
25:15,18 26:11
27:5,16,25 28:12
29:2,7,18,23
30:13,16 31:10
31:12 32:4,10,12
32:21,23 33:4,9
33:12,14 34:5,8
34:18 35:19,25
36:14,24 37:23
37:24 38:9,12
39:3,12,14 41:14
41:24 63:23
**properties** 28:9
41:18
**property** 19:5,10
23:10 24:11,24
25:16 27:4,5
28:2,17,22 34:14
36:14,24 37:5,13
37:19,23 38:2
39:3,11 40:7
41:9,15,19,20,23
42:5
**provided** 18:2
18:22 42:21

**provision** 19:7
**public** 1:21 4:8
85:22 87:7
88:25
**purchase** 44:21
45:2 52:24
**purchased** 19:14
44:6
**purposes** 10:10
**pursuant** 1:16
**put** 10:22
**putting** 38:16

**q**

**question** 13:15
15:6 16:6,8 21:7
23:24 24:6,7
25:5 27:7 29:14
38:17,22 39:19
40:20 45:6
52:17,18 53:17
56:6 60:9 62:6
62:16 64:21,22
69:18,19 70:11
70:15,18,19
71:24 72:10
73:22 74:2,9
75:23 76:6 81:3
81:14,24 82:5,10
82:18,20,21 83:3
83:4,13,15 86:23
**questions** 4:3,20
24:19 47:5 84:3
86:22
**quite** 10:23
**quote** 19:4 68:21
69:3

**[r - returned]**                                                        Page 12

| r | | | |
|---|---|---|---|
| **r** 2:2 3:2 4:2,6 10:5,5 19:6 69:16 85:2 87:2 | 78:5,11 **recess** 36:6 72:22 **recipient** 70:8 | **relied** 35:3 41:13 **relief** 18:7,10,12 **remember** 10:6 11:10 32:5 51:2 | 71:18 79:11 **representing** 25:23 **request** 47:25 |

**r**  2:2 3:2 4:2,6
  10:5,5 19:6
  69:16 85:2 87:2
**read**  5:14,15,15
  13:15 16:8
  17:23 18:20
  19:2,3,7 20:20
  21:7,10,13 22:6
  22:23 23:5
  26:15 29:14
  34:16 41:5,8
  60:9 68:10
  71:21,24 73:19
  73:22 76:11
**reading**  23:16
  25:22 37:10
**reads**  18:16 22:7
**real**  9:4 71:5
**really**  51:24
**reason**  49:6 65:4
  71:5 73:11
  74:10 75:16
  81:11 82:20
  88:5
**reasons**  34:12
  69:5,11
**receive**  44:4,25
  77:6,6,12
**received**  37:5,13
  37:24 44:10
  45:7 47:18
  50:20 52:12
  53:19 54:19
  56:12 59:8
  60:22 69:23
  70:4 74:22
  76:21,23 77:2,15

78:5,11
**recess**  36:6
  72:22
**recipient**  70:8
**recognize**  4:21
**recollection**  57:6
**record**  4:13 19:3
  38:20 82:9
  87:12
**recording**  49:2
**redundant**  40:21
  81:7,8
**refer**  18:25
**referred**  13:14
  16:7 21:6 29:13
  39:4 41:7 58:24
  60:8 71:23
  73:16,21
**referring**  53:10
  60:12 62:10
  69:3 75:4
**reflected**  25:7
**refund**  56:8
**refuse**  48:5 49:6
**refused**  34:9,12
  48:12,20 76:14
**regarding**  21:3
  48:7 59:23
  63:22 67:25
**regular**  44:5,9
  44:22
**related**  57:9
  58:24 60:22
  87:14
**relates**  78:17
**relationship**
  38:10 39:2

**relied**  35:3 41:13
**relief**  18:7,10,12
**remember**  10:6
  11:10 32:5 51:2
  53:17 59:6
  72:14,17 76:8,22
**remembering**
  76:10
**remind**  77:5
**repay**  56:11 59:7
  75:18
**repeat**  8:11 16:6
  64:15 75:21
  82:9
**rephrase**  15:6
  38:7 48:24
**reply**  51:3 61:14
  62:7
**report**  78:6
  80:14
**reporter**  13:16
  16:6,9 21:8
  22:12 27:21
  29:15 41:8
  56:22 57:2
  60:10 71:25
  73:23 78:22
  82:8
**reporting**  88:1
**reports**  77:2,6,7
  77:12,15,17,21
  77:25
**represent**  4:19
  21:16,17,22
**representation**
  72:4
**represented**  23:8
  32:18 33:15

71:18 79:11
**representing**
  25:23
**request**  47:25
  56:14 58:25
  69:3 78:9,16,19
  78:20
**requested**  18:7
  18:10,12 48:13
  86:16
**requesting**  60:20
**requests**  48:16
  78:22
**require**  22:21
  56:10
**required**  4:22
  55:15 62:2
**requires**  81:6
**reread**  13:12
  53:16
**research**  42:6
**reserved**  3:21
**reside**  4:15
**residency**  69:6
  69:12
**respect**  81:16
**respective**  3:5
**responded**  80:22
**responsible**  56:4
  73:14 75:8,18
**resulted**  47:6
**return**  50:7 54:7
  54:17 56:15
  60:21 73:12
  74:24
**returned**  8:20,23
  52:5,8

[reuven - speak]

| | | | |
|---|---|---|---|
| **reuven** 4:16 | **save** 83:13 | **seen** 20:23 31:16 | **sigalit's** 55:9 |
| **revenues** 45:20 | **saw** 32:21 33:2 | **self** 8:25 | **signature** 87:21 |
| **reynaldi** 77:3,9 | **saying** 30:25 | **selling** 6:13,17 | **signed** 3:9,11,14 |
| 77:13 78:13 | 58:16 81:16 | 64:5,10 65:3 | 14:20 |
| **richard** 2:10 | 82:14 | **sells** 44:2 | **simple** 81:3 |
| 4:18 | **says** 26:7,8 | **send** 46:23,25 | **sir** 80:16 |
| **rick** 24:15 26:5 | 36:17,18,22 37:4 | 50:19 | **sit** 57:23,25 58:2 |
| 57:11 58:6 | 51:16 | **sent** 44:18,20 | 59:13 61:5 |
| 61:15 62:3 | **school** 5:23,25 | 47:20 50:22,23 | **sitting** 19:16 |
| **right** 28:18 | 6:3,7,9 | 56:20 57:4 71:4 | **situated** 22:3 |
| 29:10 36:25 | **sealing** 3:6 | **sentences** 5:10 | **skip** 22:5 |
| 37:7,20 41:11,16 | **sec** 49:24 50:6 | 5:11 | **slower** 58:18 |
| 53:6 55:12 58:7 | 50:12,20,24 51:3 | **service** 3:15 | 80:4 |
| 61:11 62:8,9,11 | 51:8 52:3,5,8 | **set** 18:3 87:11,18 | **slowly** 58:5 |
| 63:4 83:8 | 53:3,5,12,21,24 | **settlement** 60:14 | **social** 10:9,11 |
| **rights** 17:12 | 54:8,18 56:8,18 | 60:18 63:4,14 | **sold** 19:5,10 27:4 |
| 42:14 | 56:23 57:3 59:2 | **settling** 61:2 | 36:23 37:23 |
| **rise** 12:9 | 59:4,9 60:5,16 | **seven** 5:10 51:14 | 39:12 40:7 |
| **road** 1:19 2:5,9 | 61:11 63:4,11 | **share** 42:15 54:4 | 41:23 42:2 |
| 22:10,12,13 | 64:7,19,24 65:8 | 55:21 56:11 | **sole** 46:24 |
| 26:10 | 72:25 73:5,12 | **shared** 74:13 | **solely** 35:3 |
| **rubin** 4:16 | 74:11,12,24 75:4 | **sharing** 29:22 | **solution** 71:3 |
| **rules** 1:17 | 75:5,9,17 | **sheet** 88:1 | **sorry** 8:9 13:13 |
| **rulings** 86:22 | **second** 22:8 | **short** 36:6 72:22 | 16:5 20:19 |
| **runs** 66:23 | 78:25 | **show** 21:9 63:6 | 21:19 23:15 |
| | **section** 18:5 | **showed** 77:21 | 24:18 29:11 |
| **s** | **securities** 49:11 | **sic** 9:15 19:13 | 38:5,19 44:12 |
| **s** 2:2 3:2,2 22:13 | **see** 13:6 18:13 | 21:17,22 27:11 | 45:5 54:21 |
| 86:2 88:5 | 20:9,13 34:4 | 27:14,18,25 29:5 | 57:11 64:14 |
| **salary** 55:25 | 35:21 36:16 | 30:9 35:4,5,6 | 70:10,16 71:22 |
| **sale** 23:11 24:12 | 54:13 58:9,17 | 39:9 40:5 77:3 | 73:20 74:4 |
| 25:17 26:6 | 61:6 | 77:10 78:13 | **sought** 48:6 |
| 30:15 36:14 | **seeing** 32:5 | **side** 27:16 61:25 | 53:21 64:2 |
| 37:19,25 39:2 | 63:13 | **sigalit** 1:3 12:6 | **source** 43:23 |
| 40:4 41:2,9 44:6 | **seek** 12:19 | 15:2 17:7 19:4 | **southern** 1:2 |
| 52:25 | **seeking** 14:11 | 19:24 22:25 | **speak** 4:24 5:2,5 |
| **sales** 44:21 45:2 | 50:7 54:2 60:24 | 36:23 38:25 | 5:9 58:5 80:3 |
| | 63:8,17 73:12 | 39:14 70:7 88:2 | |

[speaking - testimony]    Page 14

speaking 5:4
79:9
speaks 57:16
specific 45:10,13
48:10,15,18,22
66:4
specifically 47:4
65:2
specified 85:11
spent 33:22,23
ss 87:4
stag 22:10,11,12
26:10
stairs 6:25
start 7:6 24:20
started 6:12
12:25 19:23
59:15,18 64:24
starting 6:7
state 1:21 4:12
69:12 77:17
82:9 87:4,8
stated 23:25
statement 24:21
47:16 52:16
65:5 66:7,11
68:11 69:20
76:21,24 82:22
83:23
statements 42:22
42:24 43:2,7,12
43:15 52:13
66:6,12 69:24
76:18
states 1:2 8:3,5,8
8:18 10:14,16,21
11:20,23 12:11
16:25 17:4

37:10
stay 26:3
steady 45:23
steven 2:6
stipulated 3:4,19
stock 44:22 50:8
52:25 53:10
54:18 64:5 65:3
stocks 12:16
13:4 23:2 44:2,6
45:2,10,13
stopped 65:3
67:2
store 7:13,16,17
strauss 67:7,9,12
68:2,20 69:20,23
70:3 71:6,7,15
72:7
study 6:21,23
subject 53:12
submit 78:24
subscribed
85:18 88:22
subsequent
60:18 64:6
subsequently
28:25
sued 33:9,12,13
suffer 54:6
suffolk 87:5
suggested 17:9
suggestion 79:8
suit 51:16
suite 1:19 2:9
sums 47:21
supplemental
78:19

supposed 31:7
51:17 61:3
sure 5:12 16:12
20:5 36:5 58:20
70:11 76:9
swiss 42:23
sworn 3:9 4:2,7
85:5,18 87:11
88:22

**t**

t 3:2,2 19:6
22:13 69:16,16
85:2 86:2 87:2,2
t&j 37:5,12,18
41:24 52:4 59:8
60:22 63:24
t.j. 11:24 12:5,22
13:6,10,19 14:3
14:9 15:9,11
22:17 23:10
24:24 25:16
26:12,24 27:2,4
35:9,15,17,23
36:18 42:10,14
43:17,23 45:3,15
46:9,15,19,22
48:2,7 49:2,13
49:25 50:8,13,25
51:6 53:3,11,25
55:10,16,19 56:7
56:17,20,23 57:3
63:20 64:5,25,25
65:8,24 66:8,12
66:18 67:13,22
67:25 68:3,22
69:4,25 70:2,6
70:20,21 71:8,16

71:19 72:5,13
75:15,15 76:18
77:4,20 78:11
79:12,14 80:9,18
81:5,21 82:16
83:19 86:20
take 36:3 45:22
61:3 72:19
taken 1:15 19:21
36:7 72:23
talk 5:6
talked 14:13
talking 20:25
48:21
talks 80:6
tax 71:3
tel 4:16
telephone 62:8
tell 5:9 12:21,23
59:4 69:22
ten 36:4,13 37:6
37:14,18 39:4,9
41:2,19 51:14
63:22 72:20
term 51:19
70:13
testified 4:8 15:4
45:25 48:15
55:8,14 64:23
66:3 79:12
80:10 81:2
testify 5:20
65:15 80:17
81:4,12,15,19
85:5
testimony 12:17
42:8 58:23
61:18 77:24

[testimony - verbatim]                                                    Page 15

80:11 85:6,10
87:13
**texas**  18:18,19
22:4,16 23:9
28:22
**thank**  16:10
57:21
**thing**  72:18
83:25
**things**  54:2 57:5
58:14 59:11,21
**think**  16:11 27:7
39:21 40:25
55:2 61:24
66:14 73:16
76:2 78:15
82:10
**thinks**  25:9
50:18
**third**  22:14,21
26:10 30:12,21
31:2 33:19
71:20 72:2
**thirteen**  41:18
**thought**  39:17
57:10 58:22
66:25
**three**  22:3,8 26:9
41:18 51:15
76:22 81:17
**tilt**  57:15
**tilted**  57:19
**time**  1:11 3:21
6:16 9:4,4,21
10:13,15,24 11:3
11:7,12,15,19,22
12:21 13:7 14:7
14:12 23:6

26:13,23 34:22
34:25 40:12
46:22 49:3,10,20
49:23 51:6
57:17 58:10
61:20,24 66:7
67:17 68:4
71:20 76:5,7
78:4 79:10,24
80:24 82:13
83:8 85:10
**times**  10:19,23
12:14 81:18
**title**  34:21
**titled**  18:17
**today**  5:17 19:16
22:23 41:22
42:4
**told**  5:11 19:14
29:5 35:5,6
41:13,17 59:3,12
61:4
**total**  14:24 47:10
47:22,23
**tracks**  22:10
**tract**  22:14
26:10
**tracts**  22:3,9
26:9,9
**trades**  53:11
77:19
**transaction**  47:3
47:6,9,24 63:23
63:25 65:23
76:15
**transactions**
47:12 48:23
49:13 50:9 53:6

53:10,20 54:4,18
56:2 57:8 60:23
63:15,16 65:7,13
66:4 73:13 75:3
75:5,7
**transcript**  65:18
79:4 82:25
83:13 85:9,9
**transection**  47:8
**transfer**  24:25
**translate**  5:12
55:7
**translated**  54:24
**translating**
76:10
**translation**  74:3
**treaty**  69:13,15
**trial**  3:21
**trouble**  57:20
**true**  48:11 65:5
80:11 85:9
87:12
**truth**  85:5
**truthfully**  4:22
5:20
**try**  58:5 80:3
**trying**  61:16
**turn**  8:10,12
**twice**  12:13 77:3
77:11
**two**  7:10,22,22
22:8,10 26:9,9
30:3 45:17 51:4
59:23 62:21
**type**  9:3
**typed**  16:14

| **u** |
|---|
| **u**  3:2 4:6 |
| **u.s**  12:13 |
| **u.s.**  68:9 69:17 |
| **ultimate**  53:13 |
| **ultimately**  7:3 |
| **understand** |
| 11:18 13:25 |
| 16:13 21:23 |
| 23:23 26:16 |
| 35:12 49:24 |
| 50:3,6 56:6 |
| 58:16 61:8,17 |
| 62:25 63:7 |
| 64:22 67:5 |
| 68:16 70:4,7 |
| 72:10,24 74:9 |
| **understanding** |
| 17:11 |
| **understands** |
| 62:5 |
| **understood** |
| 50:10 |
| **united**  1:2 8:3,5 |
| 8:8,17 10:13,16 |
| 10:21 11:20,23 |
| 12:11 17:3 |
| **unsigned**  3:13 |
| **use**  29:24,25 |
| 30:7 |

| **v** |
|---|
| **v**  4:6 19:6 88:2 |
| **various**  6:8 |
| 43:17 52:13 |
| **verbally**  72:12 |
| **verbatim**  5:13 |

[veritext - zuchaer]                                                         Page 16

veritext  88:1
versa  33:12
version  31:13
verte  19:6,11,14
   19:20 21:4,18,23
   21:23 22:14
   23:12 24:13,17
   24:19,23 25:3,9
   25:15,19 26:11
   27:5,25 28:12
   29:2,8,18,23
   30:13,16 31:11
   31:12 32:4,10,12
   32:22,23 33:4,9
   33:12,14 34:5,8
   34:18 35:19,25
   36:15,25 37:23
   37:25 38:9,12
   39:3,12,14 41:14
   41:24 63:23
video  8:15
view  54:16
vigorously  26:7
virtual  1:14
visa  33:12

w

wait  38:15 39:17
   39:17 71:11
waiting  39:24
waived  3:8
want  23:22
   25:19 29:24
   42:7 50:10
   57:12,22 67:23
   76:11 80:23
wanted  14:8
   60:3 62:14

wants  25:11
wasting  82:24
watches  6:13,15
   6:17
way  25:19 35:10
   35:14 38:21
   62:16 78:24
   87:16
weekly  44:23
weeks  76:23,23
weiss  20:17 21:3
went  6:9,21
when's  65:23
whereof  87:18
wife  12:6 15:2
   15:12 17:8,10
   42:9,13 43:4
   63:2,9 71:2
   75:15 80:8,13
   83:19,24
wife's  43:11
wire  52:12 53:20
wired  43:18
   47:16 52:23
   56:16
wires  43:21
withdraw  24:5
   24:20 38:22
   53:18,23 70:17
   70:18
withdrawn
   11:17 13:24
   30:19 50:5
   52:22
witness  1:15 3:9
   3:15,17 4:7
   23:22 25:8,8
   39:19 40:13,16

45:7 62:5 80:22
   83:18 84:5
   87:10,13,18
witnesses'  88:3
word  16:12 44:9
   51:21,23 79:24
worked  8:13
working  6:12
   8:25 12:25
   55:25 69:12
wristwatches
   6:14
writing  72:12
written  22:22
wrong  59:2
wrote  16:3
wurman  1:18
   2:7

x

x  1:3,8 86:2,10

y

y  4:6 10:5,5
   69:16
year  6:18 7:14
   7:23 8:4,19
   12:12,13,13
yearly  66:10
years  7:10,22,22
   58:12 68:9,12
yehuda  1:3,15
   2:4 4:1,14 5:1
   5:14 6:1 7:1 8:1
   9:1 10:1 11:1
   12:1,6 13:1 14:1
   15:1 16:1 17:1
   18:1 19:1 20:1
   21:1,16,16,21

22:1,18,25 23:1
   24:1 25:1 26:1
   26:14 27:1 28:1
   29:1 30:1 31:1
   32:1 33:1 34:1
   35:1 36:1 37:1
   38:1 39:1 40:1
   41:1 42:1 43:1,9
   44:1 45:1 46:1
   46:11 47:1 48:1
   49:1 50:1 51:1
   52:1 53:1 54:1
   55:1 56:1 57:1
   58:1 59:1 60:1
   60:19 61:1 62:1
   62:18 63:1 64:1
   65:1 66:1 67:1
   68:1,8,21 69:1
   69:10 70:1 71:1
   72:1 73:1 74:1
   75:1 76:1 77:1
   78:1,11 79:1
   80:1 81:1 82:1
   83:1 84:1 85:1
   85:15 86:1,19
   87:1 88:2,3,21
yehuda's  22:21
   61:23,23 62:9
yesterday  51:15
york  1:2,20,22
   2:5,9 5:5 9:23
   10:7 87:4,8 88:1

z

zuchaer  21:3,3
   21:24,25 23:11
   23:12 24:10,10
   24:12,12,17,17

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.