UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

| | |
|---|---|
| SIGALIT YEHUDA | : |
| Plaintiff, | : |
| v. | : 21-cv-08921 (AT) |
| JOSSEF KAHLON, | : **DECLARATION OF JOSSEF** |
| | : **KAHLON IN SUPPORT OF MOTION** |
| Defendant/Counterclaim Plaintiff | : **FOR SUMMARY JUDGMENT** |
| v. | : |
| AVRAHAM YEHUDA | : |
| Counterclaim Defendant | : |

------------------------------------x

YOSSEF KAHLON hereby declares pursuant to 28 U.S.C. § 1746 that:

    1.    I am a citizen of the State of New York.  I operate TJ Management, LLC ("TJM").  I have operated TJM at all relevant times.  TJM is a New York LLC.

    2.    In this case, Sigalit Yehuda ("Sigalit") claims a 50% interest in TJM.  However, I have only discussed TJM business with her husband, Avraham Yehuda ("Avi"), not Sigalit.  I have distributed TJM profits to Avi, not Sigalit.

    3.    In approximately 2005, TJM began functioning as a private equity group after being funded in part by $200,000 received by Avi.  In exchange, at or around that time Avi received a 50% interest in TJM.  Neither Avi nor Sigalit have ever contributed any monies towards TJM, other than Avi's initial, $200,000 investment.  Neither Avi nor Sigalit has earned any compensation for services rendered to TJM.  All monies Avi received from TJM were due to his membership interest.

    4.    From approximately 2005 to 2010, TJM purchased and sold shares of public

1

companies . TJM was to a considerable extent successful.  TJM made a significant profit consistent with its business model and operation.  TJM also purchased certain vacant real property near downtown Dallas, Texas ("3500 S Ledbetter") and facilitated maintenance and repairs on that property.

5. TJM's profits from stock transactions were consistently and promptly shared with Avi.  From 2008 to 2010, TJM dealt with Avi and his profits, at Avi's request, by issuing him form 1099's.  A true and correct copy of TJM's form 1099's issued to Avi and the IRS for calendar years 2008, 2009, and 2010 are attached hereto as Exhibit A.  The Form 1099's were issued at the behest of Irving Strauss, who is TJM's accountant, and who, at relevant times, was also Avi's accountant.  A letter I received from Irving Strauss explaining why Avi received Form 1099's and confirming that TJM paid taxes for Avi is attached hereto as Exhibit B.  Mr. Strauss's letter also shows that TJM paid Avi's taxes to the IRS, and that Mr. Strauss was able to get the IRS to pay Avi the money TJM paid into the IRS. Collectively, under the US and Israel agreement, the attached form 1099's and Mr. Strauss's letter  show that Avi received $6,599,190 from TJM for those three years alone.  Moreover, bank records produced by Avi in this case show that $2,695,000 were received by Avi from TJM for 2006 and 2007.  The bank records showing this are attached hereto as Exhibit C.  All told, from 2006-2010, the numbers reflected in these Exhibits show that Avi received at least $10,466,300 from TJM from 2006-2010.  This is a pretty good return on a $200,000 investment.

6. Certain TJM transactions between 2008 and July of 2010 became the subject of a Securities and Exchange Commission ("SEC") inquiry.  In these transactions, generally speaking TJM purchased stocks from eleven public companies and then sold the stocks in  the public market.  These transactions were profitable at the time, and those profits were shared with Avi,

2

consistent with his interest in TJM (notwithstanding that it is now his wife, Sigalit, who claims that interest).

7.  While doing the transactions, TJM and I believed we were operating lawfully because we had a valid exemption to registration based on Rule 504 of Regulation D.

8.  In 2010, the SEC took the position that TJM was not entitled to use the exemption we were relying on, and that therefore the purchase and resale of the stocks in question was not permissible, and that any revenues received from such sales by TJM or its members should be disgorged to the SEC. At the time the SEC took this position, considerable monies from the challenged transactions had already been distributed to Avi.

9.  On behalf of myself and TJM, I retained counsel to help defend against these allegations. I demanded repeatedly that Avi contribute to the costs of counsel. I understand the case presented a number of novel issues; it was ultimately resolved by a 2-1 decision of the United States Court of Appeals, Fifth Circuit. Counsel ended up costing TJM and myself more than $1,000,000.

10.  By Memorandum and Order dated September 30, 2016, the United States District Court for the Eastern District of Texas granted the SEC's motion for summary judgment in an action entitled "United States Securities and Exchange Commission v. Yossef Kahlon and TJ Management Group LLC." This Memorandum and Order is attached hereto as Exhibit D.

11.  Again with the assistance of counsel, TJM and I appealed to the United States Court of Appeals, Fifth Circuit. In a 2-1 decision, the Court of Appeals affirmed the District Court's Memorandum and Order, holding both TJM and myself liable based on a "technical strict liability" violation for which no proof of scienter was required. *SEC v. Kahlon*, 873 F.3d 500, 511-12 (5th Cir. 2017). The majority based its decision on both strict liability and the

discretion owed to the trial court, but without disputing the dissenting judge's observations that there was "no fraudulent injury" and "no proof of fraud" against me or TJM. *Id.*

12. At all times relevant, I caused TJM and myself to be represented vigorously, with competent counsel in a good faith effort to defeat the claims of the SEC, or alternatively to at least mitigate the claims of the SEC.

13. Avi and, on information and belief, Sigalit, were on notice of the claims of the SEC and the existence of the litigation, yet took no steps to participate in the defense nor contribute to the cost of the defense.

14. Throughout my efforts at trading securities on behalf of TJM, and thereafter while defending against the SEC's lawsuit, Avi received daily updates and had access to TJM's banking records, brokerage records, and other financial records. During the lawsuit, Avi had access to retained counsel as well

15. Due to my good faith efforts, TJM and I were able to settle with the SEC after judgment, and reduce the total obligation from over $9,000,000 to $2,200,000 to be paid with an initial lump sum of $800,000 by November 1, 2018 followed by annual payments of $200,000 per year for seven years for a total disgorgement of $2,200,000 (plus 6% interest in the event of any delinquent payment).

16. I have complied with the terms and provisions of the settlement with the SEC and made all payments required to date. This has benefitted TJM and its members because it has reduced a liability of TJM. To my surprise Avi ignored all of my requests that Avi contribute payments towards TJM's liability to the SEC.

17. Avi received profits from TJM, including what we prematurely believed were profits from the transactions which later were the subject of an SEC challenge. Avi's share, however, has been reduced by the SEC settlement and the legal fees associated with the litigation, and Avi has ignored my repeated requests that he return some of this money.

18. I ceased all trading activity on behalf of TJM in approximately 2010, when the SEC challenged the aforementioned transactions. Avi requested that I continue at the time, and I refused in light of the SEC challenge. TJM no longer employs a bookkeeper. Since 2011, TJM's only business has been litigating against, negotiating with, and ultimately paying the SEC consistent with the settlement I have outlined above. TJM incurred an approximately $1,000,000 loss due to unrealized stock investments it owned at the time which could not be sold due to the Court order. Share certificates reflecting these untradable stocks are attached at Exhibit F. Moreover, TJM continues to own 3500 S Ledbetter, and has paid $115,649.00 in real estate taxes in addition to certain maintenance costs associated with 3500 S Ledbetter.

19. 3500 S Ledbetter has never been sold to Project Verte, Inc. It is the property of TJM. No entity other than TJM has any interest in it. Documents reflecting TJM's ownership are attached hereto as Exhibit E. TJM has not owned other real estate in Texas.

20. For the last 12 years Neither Avi nor Sigalit have contributed any monies towards the aforementioned real estate taxes or any of the other expenses TJM has incurred in connection with owning the 3500 S Ledbetter real estate. Avi has ignored his obligations, refusing my demands and offering no reason to why he will not contribute his share.

21. Since Avi's initial $200,000 investment, neither Avi nor Sigalit have contributed any monies towards TJM. Neither Avi nor Sigalit demanded an accounting at any time prior to April 29, 2021. And as already discussed above, Avi had broad access to financial documents

including banking records and brokerage records during the period in which TJM was operating a trading business.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 28, 2023

_____
Yossef Kahlon