AMERICAN ARBITRATION ASOCIATION
Commercial Arbitration Tribunal

| | |
|---|---|
| In the Matter of an Arbitration between: ) | |
| ) | |
| ) | |
| TNJ HOLDINGS, INC., individually and ) | |
| on behalf of PROJECT VERTE, INC., ) | Case No. 01-20-0005-2765 |
| ) | |
| Claimant and Counterclaim-Respondent, ) | |
| ) | Arbitrators: |
| -against- ) | George Gluck (Chair) |
| ) | William B. Chandler III |
| JANE GOL, AMIR CHALUTS, JG GROUP ) | Susan W. Waesco |
| HOLDINGS LLC, PGFT LLC, JGFT LLC, ) | |
| AC GROUP HOLDINGS LLC, and ) | Case Manager |
| CHALUTS TRUST, ) | Jeffrey Zaino |
| ) | |
| ) | |
| Respondents and Counterclaimants. ) | |

## INTERIM AWARD OF ARBITRATORS

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance

with the arbitration agreements entered into among Claimant TNJ HOLDINGS, INC., and

Respondents JANE GOL, AMIR CHALUTS, JG GROUP HOLDINGS LLC, PGFT LLC, JGFT

LLC, AC GROUP HOLDINGS LLC, and CHALUTS TRUST;  having been duly sworn, and

having duly heard the proofs and allegations of the Parties, do hereby find, conclude and issue

this INTERIM AWARD OF ARBITRATORS.

This arbitration involves claims and disputes among the stockholders of Project Verte,

Inc., a Delaware corporation ("Project Verte", "PV" or the "Company"), Claimant TNJ

HOLDINGS, INC. ("Claimant"  or "TNJ"), and JANE GOL, AMIR CHALUTS, JG GROUP

HOLDINGS LLC, PGFT LLC, JGFT LLC, AC GROUP HOLDINGS LLC, and CHALUTS

TRUST (collectively "Respondents" or the "AJ Group"). Effective as of August 17, 2018, TNJ

and the AJ Group entered into the Initial Stockholders' Agreement ("ISA"), amended by the

Amended and Restated Stockholders' Agreement effective as of May 16, 2019 ("ARSA").  (J-

001 at AJGROUP_AAA_0015729-68.)[1] The parties further entered into the Share Forfeiture and

Note Transfer Agreement effective as of March 1, 2019 ("SFNTA").  (J-001 at

AJGROUP_AAA_0016061-75.)

Section 8.12 of the ISA and Section 8.12 of the ARSA, identical in all pertinent respects,

provide:

> (a) ...any dispute, controversy or claim arising out of, relating to, or in
> connection with, this Agreement or any breach, termination or validity
> thereof (a "Dispute") shall be finally settled by arbitration.  The
> arbitration shall be conducted in accordance with the Commercial
> Arbitration Rules of the American Arbitration Association in effect at
> the time of the arbitration, except as they may be modified herein or by
> mutual agreement of the parties.  The seat of the arbitration shall be New
> York, New York.
>
> (b) The arbitration shall be conducted by three arbitrators...
>
> (c) The arbitration award shall be in writing and shall be final and
> binding on the parties.  The award may include an award of costs,
> including reasonable attorney's fees and disbursements.  Judgment upon
> award may be entered by any court having jurisdiction thereof or having
> jurisdiction over the parties or their assets.

(J-001 at AJGROUP_AAA_0016220, AJGROUP_AAA_0015753.)

Section 9.9 of the SFNTA provides:

> Any unresolved controversy or claim arising out of or relating to this
> Agreement, except as (i) otherwise provided in this Agreement, or (ii)
> any such controversies or claims arising out of either party's intellectual
> property rights for which a provisional remedy or equitable relief is

---

[1] The parties' exhibits are referenced as follows: Claimant (C-X); Respondents (R-X); and Joint (J-X).

> sought, shall be submitted to arbitration by one arbitrator mutually
> agreed upon by the parties, and if no agreement can be reached within
> thirty (30) days after names of potential arbitrators have been proposed
> by the American Arbitration Association (the "AAA"), then by one
> arbitrator having reasonable experience in corporate finance transactions
> of the type provided for in this Agreement and who is chosen by the
> AAA. The arbitration shall take place in the State of New York, County
> of New York, in accordance with the AAA rules then in effect, and
> judgment upon any award rendered in such arbitration will be binding
> and may be entered in any court having jurisdiction thereof.

(J-001 at AJGROUP_AAA_0016069.)

Disputes within the scope of the ISA, ARSA and SFNTA arose among the parties. In brief, this case involves a contentious dispute among the parties in which Claimant asserts that: (1) Respondents, and in particular Jane Gol, have dominated Project Verte's governance and operations; (2) Respondents have used their power to manipulate the books of Project Verte to reflect that they have loaned Project Verte more money than they have; (3) as members of the Board of Directors of Project Verte, Respondents used their positions to approve the issuance of convertible notes to themselves that were on terms not entirely fair to the Company and its shareholders; and (4) Respondents generally maneuvered to squeeze Claimant out of Project Verte.

TNJ, along with its principal Jossef Kahlon and his son Julian Kahlon, filed a Statement of Claim with the American Arbitration Association (AAA") on May 15, 2020, and an Amended Statement of Claim on August 13, 2020. On August 15, 2020, the New York State Supreme Court removed Jossef and Julian Kahlon as Claimants in this arbitration because they were not signatories to the parties' arbitration agreement. On October 14, 2020, Respondents filed their Statement of Answer, Affirmative Defenses, and Counterclaims.

## THE ARBITRATION HEARING

The undersigned arbitrators (hereinafter referred to as the "Tribunal") were appointed and sworn to hear this dispute in accordance with the requirements of the parties' arbitration agreements and the Commercial Arbitration Rules ("Rules") of the AAA.

### A.     The Tribunal's Pre- and Post-Hearing Orders

Prior to the arbitration hearing, the Tribunal entered Pre-Hearing Orders Nos. 1-15 establishing procedures for the arbitration, and resolving certain discovery and procedural disputes; and Post-Hearing Order 16 permitting "friends and family" financing of Project Verte, provided certain conditions were met. Among other things, Pre-Hearing Order No. 1 denied Claimant's application for a *status quo* order. Order No. 2 confirmed a stipulation by the parties that this arbitration would proceed in accordance with the Rules and the AAA's Optional Procedures for Large, Complex Commercial Disputes ("LCCP"). Pre-Hearing Order No. 2 also set a pre-hearing schedule and the dates for the arbitration hearing, all of which were agreed to by the parties, and confirmed the agreement of the parties that the form of award to be issued in this matter would be a reasoned award.

Subsequently, the Tribunal advised the parties that submissions and the award on issues related to claims for attorney's fees and expenses would be reserved until after the Tribunal's issuance of an Interim Award resolving all of the other issues in dispute. Pre-Hearing Order No. 7 accepted the parties' stipulation for Jossef Kahlon to have a non-speaking observer status at Project Verte's Board of Director meetings; and that Respondents could not, without the Tribunal's consent and subject to certain exceptions, further dilute Claimant's interest in PV.

Pre-Hearing Order No. 10 resolved a dispute over the delivery by Project Verte of a certain governmental agency document subpoena issued in respect of Jossef Kahlon's files. Pre-

Hearing Order No. 11 resolved a complex dispute concerning discovery of attorney-client privileged communications involving Sara Rubenstein, General Counsel of one of Respondents' operating companies, culminating in the *in camera* review by the Tribunal of nearly 200 documents out of 1,296 documents in dispute.  Pursuant to Pre-Hearing Order No. 14 the Tribunal ordered the release of Mr. Kahlon's personal filing cabinet.

## B.      The Hearing

Due to the COVID-19 pandemic, the parties and the Tribunal agreed that a prudent course of action under the circumstances was to hold the arbitration hearing via Zoom videoconference. Pursuant to notice, the hearing was held on August 9-13, 2021 and was deemed to have been held in New York, New York. Claimant was represented by its counsel, David Slarskey, Renee Bea, and Elena Roberts of Slarskey LLC. Respondents were represented by Jordan D. Weiss, Christine Sama, Allison Eisenson, Zoe Bellars and Jenny Morris of Goodwin Procter LLP.

At the arbitration hearing, the parties presented opening statements, submitted voluminous documentary exhibits and called witnesses to give testimony.[2]

At the conclusion of the presentation of expert testimony on August 13, 2021, the Tribunal inquired of counsel, in accordance with R-39 of the Rules, whether given the 17 and one-half hour agreed upon time limitation, they had the opportunity to produce all of the evidence and witnesses they needed or wanted to produce.  Counsel for each party replied to this inquiry in the affirmative. (Tr. 1721-22.)  Accordingly, the Tribunal finds that all evidence

---

[2] The parties engaged Registered Professional Reporters to make a transcript of the hearing. Sylvia P. Wage recorded the first three hearing days and Michele Moskowitz recorded the last two hearing days. References to this transcript herein are designated "Tr. [page number]".  A number of other Reporters were engaged to transcribe Trial Depositions and other Depositions. References to transcripts generated from such Depositions are herein designated "Surname, (page number)".

pertinent and material to the substantive issues in dispute in this controversy that the parties wished to offer was received into evidence and heard at the arbitration hearing, and that the parties so stipulated at the conclusion of the hearing.

## C.  Post-Hearing Briefing

Post-hearing briefs were timely submitted on September 30, 2021.  The Tribunal advised the parties that the Tribunal's determination of the parties' claims for attorney's fees, costs and expenses would be reserved until after the issuance of this Interim Award. A schedule for submissions relating to attorney' fees, costs and expenses is set forth below. For this reason, the record in this arbitration has not been declared closed. (See Rules, R-39.)  The parties will be notified in due course when the record is closed, following the Tribunal's receipt of any such additional submissions.

*    *    *

Having heard the witnesses; having reviewed the exhibits, proofs, written submissions, and legal authorities offered by the parties; having heard the arguments of counsel; and otherwise having considered all of the evidence and other submissions offered, our Interim Award is as follows:

## I.    BACKGROUND

This arbitration concerns a dispute over the ownership and control of Project Verte, a start-up business that offers technology and fulfillment solutions for retail and e-commerce business and hoped to compete with industry giant Amazon. (Tr. 52.) The Company was founded by two groups of investors: Claimant TNJ, *de facto* controlled by Jossef Kahlon

("Jossef")[3] and Respondents, Jane Gol ("Gol") and Amir Chaluts ("Chaluts") through their holding companies: JG Group Holdings LLC, PGFT LLC and JGFT LLC (the "Gol Group") and AC Group Holdings LLC, and Chaluts Trust (the "Chaluts Group"). Respondents collectively are referred to as the "Respondents" or the "AJ Group".

Claimant was owned from its inception by Jossef's son, Julian Kahlon ("Julian") until December 20, 2019 when Julian transferred his ownership interests in TNJ to his father Jossef. (C-282)

Gol and Chaluts are partners of Continental Ventures, a successful real estate development company headquartered in New York City.

## A.     The Parties' Initial Agreement to Fund PV, as Reflected in the ISA

The genesis for the venture started in late 2016 or early 2017 when Jossef and Chaluts met to discuss the formation of a warehouse fulfillment business utilizing a Dallas, Texas property owned by Jossef. It was ultimately decided to build the first site outside of Atlanta, Georgia because the land in Dallas was zoned as residential and would need to be rezoned for commercial use before it could be developed.

The agreement among Gol, Chaluts and Jossef to start and fund the venture in 2017 was at first undocumented. They initially agreed that the venture would be funded and controlled fifty percent (50%) by Jossef and fifty percent (50%) collectively by Gol and Chaluts. It took approximately one year, until Project Verte was founded on August 17, 2018, for the parties to enter into the ISA which documented, among other things, the funding arrangement.  In the intervening period before the ISA was signed, Gol and Chaluts suggested that the parties split the equity and funding obligations for Project Verte evenly in thirds, since Jossef was falling behind

---

[3] For clarity, Jossef Kahlon and his son Julian Kahlon are referred to in this Interim Award by their given names. No disrespect is intended.

in his payment obligations. Jossef refused the offer and insisted instead that his entity, TNJ, own

half of Project Verte, and agreed to be obligated to fund half of Project Verte. (Tr. 1012-14.)[4]

The ISA provided that the business and affairs of the Company were to be managed through a

Board consisting of two directors. Each of TNJ and the AJ Group had the right to designate one

director: TNJ designated Julian and the AJ Group designated Gol. (J-001 at

AJGROUP_AAA_0016201 (ISA), § 2.01(a).).

   The ISA provided that PV's funding needs would be satisfied through stockholder loans

and not through capital contributions. Under Sec. 4.01 of the ISA, the stockholders committed to

lend to the Company an aggregate of an additional $25,000,000 in cash in exchange for a

convertible note and a promissory note. The ISA further provided that if a stockholder failed to

timely fund the Company, then the other stockholders had the right to advance the delinquent

stockholder's funding obligation ("Deficiency Loan") secured by a one-year promissory note

executed by the non-participating stockholder. (Sec. 401(e)).  The Rider to the ISA also gave the

funding stockholder the ability to cause PV to issue additional shares of common stock in

satisfaction of the Promissory Note. (J-001 at AJGROUP_AAA_0016230 (ISA Rider), ¶ 4.)

   TNJ did not fulfill its funding obligations and Gol and Chaluts made the requested

advances on TNJ's behalf.[5]  By October 2018, Gol and Chaluts had already advanced

$9,673,445.47 on TNJ's behalf which was memorialized in the October 31, 2018 Amendment to

---

[4] By the time the ISA was signed, Gol and Chaluts had already advanced $6,823,445.47 on behalf of TNJ for which TNJ gave the AJ Group a promissory note guaranteed by Jossef and his son Julian. (J-001 at AJGROUP_AAA_0016230 (ISA Rider), ¶ 4.)

[5] R-032, October 31, 2018 email from Julian to Shoshana Isakov ("AJ is covering for the capital call."); R-038, November 14, 2018 emails between Jossef and Shoshana Isakov (Shoshana Isakov to Jossef: "[S]o are we doing our weekly capital call?  If so, will it be funded by your end, this week?"  Jossef responded: "no I can't find [*sic*] it yet"); R-103, February 14, 2019 email from Gol to Shoshana Isakov and Chaluts ("For now the AJ group will fund 100%"); R-115, March 13, 2019 email from Julian to Shoshana Isakov ("AG [*sic*] Group to loan the funds").)

Rider to the ISA. (J-001 at AJGROUP_AAA_0016240-45.) Thus, the AJ Group was lending money to TNJ which was used by TNJ to invest in PV. PV in turn would owe the advanced funds back to TNJ. (Tr. 476.)

TNJ continued to fail to meet its funding obligations and by November 27, 2018, TNJ's indebtedness had increased to $12,518,926.92 (J-001 at AJGROUP_AAA_0016246-50 (Second Amendment to Rider to ISA dated November 27, 2018).) Because Jossef represented TNJ's financial constraints to be temporary, the related Promissory Notes were set to come due shortly after they were issued, namely on December 30, 2018.

By January 29, 2019, the AJ Group had funded PV with $39,039,211.95.[6] Together with TNJ, PV had been funded in the total amount of $51,050,226.67[7] Under the ISA, TNJ was supposed to have funded half that amount or $25,525,113.34, but even by TNJ's accounting, it funded only $12,011,014.72 (including the Texas Land).[8] (J-027.) Thus, TNJ's deficiency loan or total indebtedness to the AJ Group as of January 29, 2019 was $13,514,098.62 ($25,525,113.34 minus $12,011,014.72).[9]

---

[6] J-027, TNJAAA_0023838 (Project Verte Funding Schedule as of January 29, 2019); R-010 and R-033 (AJ Group Bank Statements).

[7] J-027, TNJAAA_0023838 (Project Verte Funding Schedule as of January 29, 2019, Sheet "summary" at cell 9Z).

[8] $4,011,014.72 of that largely took the form of payments TNJ says it made to third parties on Project Verte's behalf which is contested by Respondents. The remaining $8 million took the form of credit as payment for the Texas Land (at that time, the $2 million balance of the $10 million Texas Land purchase price having been allocated to the AJ Group by TNJ).

[9] J-010 (Yachnik Report), ¶ 23; J-027; J-006 (Sheets Report), ¶ 94. The Expert Reports of Mr. Yachnik and Mr. Sheets are defined below. *See infra* §§ I.C & I.E.

**B.     The Share Forfeiture and Note Transfer Agreement ("SFNTA")**

At the end of December 2018, Jossef made a proposal to Chaluts that would allow for the reduction of TNJ's debt to the AJ Group and reset PV's equity such that TNJ would have 1/3 equity and only 1/3 funding obligation going forward.  (Tr. 1024-1025.)  The AJ Group agreed to this proposal and in January 2019 the parties decided the agreement would go into effect at the end of January.  (Tr. 1026, 481-82.)  In an August 9, 2019 email to Gol, Jossef wrote: "January 21" is "the point where we retired the shears [*sic*] to get to 33.33% all around and balanced the books".  (R-238.))[10]

The parties continued to negotiate the debt/equity swap agreement over the next several months, ultimately memorialized as the Share Forfeiture and Note Transfer Agreement ("SFNTA"). The SFNTA was signed on March 14, 2019, effective as of March 1, 2019.

The SFNTA was entered into for the express purpose of relieving the TNJ "Funding Failure."  (J-001 at AJGROUP_AAA_0016061 (SFNTA), Recital D.)  The agreement recites that: TNJ owned 12,500,000 shares of PV (*id.*, Recital A); TNJ held a Credit Line Promissory Note in the principal sum of up to $25,525,113.34 (*id.*, Recital B); the AJ Group advanced on behalf of TNJ $11,514,098.62 (*id.*, Recital C); TNJ had previously agreed to provide capital to PV in the full amount of the Note and repay the amounts advanced by the AJ Group but failed to do so ("Funding Failure") (*id.*, Recital D); that TNJ agreed to forfeit and transfer to PV 6,250,000 shares to align ownership in PV in light of the Funding Failure (*id.*, Recital E); and upon completion of the Note transfer, TNJ would own a Credit Line Promissory Note in the aggregate principal amount of $14,011,014.72 (*id.*, Recital H).

---

[10] Although Jossef said it was as of January 21 (R-238, Tr. 262-65, it is clear from the other evidence produced in this case that the intended date was January 31.

Upon consummation of the SFNTA, the stock ownership percentage of the PV was as follows[11]:

| Stockholder | Project Verte Ownership % |
|---|---|
| Jane Gol | 16.67% |
| JGFT LLC | 8.33% |
| PGFT LLC | 8.33% |
| Amir Chaluts | 16.67% |
| Chaluts Family Trust | 16.67% |
| TNJ Holdings Inc. | 33.33% |
| **Total:** | 100% |

Pursuant to Article 8 of the SFNTA, PV, TNJ and the members of the AJ Group fully released one another "... from any and all actions, causes of action, causes of action, claims, suits, covenants, contracts, controversies, agreements, promises, indemnities, damages, judgments, remedies, demands and liabilities, of any nature whatsoever, known or unknown, fixed or contingent, in law, at equity or otherwise... whether direct, derivative or otherwise..."). J-001 at AJGROUP_AAA_0016066-68 (SFNTA), § 8.)

As part of the SFNTA closing documents, the parties executed a complex set of loan agreements documenting the parties' relationship as creditors of PV including the Line of Credit Agreement.[12]  This agreement provided a line of credit through December 31, 2019 by PV's

---

[11] J-001 at AJGROUP_AAA_0016074 (SFNTA), Schedule 1.

[12] The Line of Credit Agreement and the Intercreditor Agreement were backdated to September 27, 2017 because Section 3.01 of the SFNTA deleted in its entirety Section 4.01 of ISA dealing with stockholder commitments for additional funding.

Initial Stockholders proportional to the respective entity's stock ownership up to an aggregate total of $100 million.  Under its Line of Credit Agreement which expired on December 31, 2019, TNJ promised to lend up to $33,333,333.30 (or one-third of $100 million) to PV.

In addition, the parties entered into an Intercreditor Agreement documenting the parties' creditor relationship. This agreement was subsequently amended and restated on June 18, 2019. The Intercreditor Agreement and later, the Amended and Restated Stockholders' Agreement ("ARSA"), permitted an Initial Stockholder to fund on behalf of a non-funding Initial Stockholder in the event PV needed Survival Expenses or Additional Funding, and also permitted the funding stockholder to take a note from the non-funding stockholder, as was previously contemplated under Section 4.01 of the ISA.

### C.      The GreyOrange Investment

In the fall of 2018, PV made a $10 million investment in GreyOrange, a technology-based company which provides AI-enabled software that integrates robots into warehouse fulfillment systems.  The GreyOrange investment was funded by PV in two $5 million payments on July 6, 2018, and August 16, 2018 using funds invested by the AJ Group, on behalf of itself and TNJ.  At the time, the AJ Group received a $5 million note from TNJ for its fifty percent (50%) of the funding, which amount was included in TNJ's overall indebtedness to the AJ Group of $13,514,098.62 as of January 28, 2019.  (Tr. 1029-1031, 1042-1043; J-015, J-016; J-006 (June 9, 2021 Expert Witness Report of Glenn C. Sheets ("Sheets Report"), ¶¶ 24-25.)

### D.      The Amended and Restated Stockholders' Agreement

On or about June 25, 2019, the ISA was amended and restated as the ARSA and made effective as of May 16, 2019 among the Initial Stockholders.  (J-001 at

AJGROUP_AAA_0015729-63 (ARSA).)  The ARSA reincorporated the funding mechanisms of Section 4.01 of the ISA.

Section 2.01 of the ARSA, reiterated by the First Amendment to the ARSA, provided that in the event TNJ or the AJ Group ceased to own at least 10% of the issued and outstanding Common Stock of PV, it would lose its right to designate any Directors.  (Previously, the ISA had a 20% threshold requirement.)

Initially, the parties agreed to the continuation of a two-member Board (Julian and Gol). However, on July 21, 2019, the ARSA was amended by the "First Amendment to the ARSA", increasing the size of the Board from two to three members (two of whom were TNJ appointees—Julian and Ms. Lev-Aretz).  The AJ Group appointed Gol as its Board member but was given the right to designate one additional member.

As with the SFNTA, Julian executed the ARSA and the First Amendment to the ARSA as TNJ's authorized signatory.  He also executed a Unanimous Written Consent of the Directors ratifying the ARSA and approving its First Amendment, as well as a Written Consent of the Stockholders confirming and approving Ms. Lev-Aretz's appointment to the Board.  (R-223 (June 21, 2019 Unanimous Written Consent of Directors in Lieu of Meeting and June 21, 2019 Written Consent of Stockholders).)

On January 30, 2020, Julian, TNJ's first Board appointee, resigned from the Board and TNJ replaced him with Jossef.  On February 11, 2020, Respondents exercised their right under the ARSA to appoint a fourth member to the Board and appointed Chaluts to that position.  (R-381.)  With Ms. Lev-Aretz as TNJ's second appointee, the new Board was composed of TNJ appointees Jossef and Ms. Lev-Aretz, and AJ Group appointees Gol and Chaluts.  In or about January 2020, Julian transferred all of his equity interest in TNJ to Jossef.  (C-282.)

**E.     PV's Financial Position in Early 2020**

Between March 15, 2019 and December 31, 2019, following the execution of the SFNTA, Respondents funded PV with $12,487,513.00 under the Line of Credit Agreements to pay for operating expenses.  (J-010 (Rebuttal Expert Report of Michael J Yachnik ("Yachnik Report"), Appendix 3.)  Although TNJ was contractually obligated to eventually fund up to $33 million, TNJ did not make any contribution during that time period.  (*Id.* at Appendix 4.)

 PV had always been funded on a "pay as you go" basis and had little to no cash reserves at the end of 2019.  Following the expiration of the Credit Agreements on December 31, 2019, which was PV's only debt facility, and without access to outside capital, PV faced immediate bankruptcy.  (Tr. 1528-1529.)  Ms. Gol testified at the hearing that the AJ Group even discussed bankruptcy options with their attorneys, Goodwin Procter. (Tr. 798.)

By early 2020, despite the fact that the Company had been funded with more than $50 million, the Company owed more than $6.7 million in aged accounts payable, had a recurring burn rate well over $1,200,000 per month for rent, payroll (USA and Israel) and other immediately due expenses, had virtually no revenue, cash, or cash-like assets and had no access to any independent investors or lending facilities.  (R-398 (February 24, 2020 Board Meeting Minutes).) To understand how this state of affairs had come to pass, it is necessary to consider the manner in which the Company was operated.

The ISA formally outlined the parties' obligations to each other as stockholders and, in addition, addressed management and operation of the Company.  It was also agreed among the parties that Julian would act as PV's Chief Executive Officer, a title that he held since September 1, 2018 until his termination for cause on March 5, 2020.  Credible evidence was presented that it was Julian's father, Jossef, who exercised real control over daily operations of the Company.

(Tr. 1511-14.)  During the first two and a half years of PV's existence, Julian and Jossef controlled nearly every aspect of the company's operations.

In addition to management control, until PV's Bylaws ("Initial Bylaws") were amended in July 2019, only Julian had the ability to call meetings of the Board of PV.  He only called one Board meeting which he cancelled because he became frustrated at an informal meeting of the shareholders that occurred the day before.  Julian opposed any effort by Gol to discharge her duties as a Board member of Project Verte.

By the fall of 2019, the Company lacked any revenue, clients or basic business organization documents like budgets and business plans.  Mr. Klunk, PV's Chief Operating Officer, whom the Tribunal found to be a credible witness, testified that it was Jossef's intent to sell a "concept" to prospective investors in the Company based on an outfitted warehouse with all the "trappings" of a real business, but without any actual revenue, customers, or functional operations. (Tr. 1651-57.)  It was Jossef's view that the Company's value should be based on a concept, and that the Company should not have revenue because then EBITDA and revenue would potentially lower the valuation. (Tr. 1653.)

Mr. Klunk also testified about PV's "marketplace," which he described as being similar to Amazon in concept.  (Tr. 1660.)  When Mr. Klunk was hired, he was told the marketplace had 100 sellers that he could convert into warehouse customers.  But in actuality, the marketplace had very few customers, none of which were making sales.  Furthermore, potential customers did not know about the marketplace, and Mr. Klunk estimated it would take tens of millions of dollars in marketing to fix that problem and make the marketplace viable.  (Tr. 1665-67.)

On or about January 22, 2020, the AJ Group made efforts to fund the Company with debt though Additional Funding or Survival Expenses under Section 4.01 of the ARSA, which

required TNJ to provide the AJ Group with promissory notes for its deficiency loans. (J-001 at AJGROUP_AAA_0015746 (ARSA), § 4.01(e)-(g).) TNJ at first agreed and then refused. (R-359.)

In February 2020, PV's bank accounts were showing negative balances. The financials presented at PV's February 24, 2020 Board Meeting demonstrated that without the monthly cash infusion any remaining available funds would be depleted and PV would be without the means to pay payroll, rent and other expenses. At the February 25, 2020 Board Meeting, in response to Jossef's objection to the monthly capital call and the proposed Emergency Bridge Financing, Chaluts asked Jossef how the Company would pay the urgent expenses, *i.e.*, payment of the two payrolls (USA and Israel) and two rents (office and warehouse). Jossef responded: "I don't care." (R-402.)

By this time, the AJ Group was no longer willing to fund PV alone, especially since TNJ refused to sign the promissory notes required by the ARSA for Survival Expenses. (Tr. 620-22.) With no funding available from TNJ, outside investors, or the AJ Group, Pepper Hamilton, PV's counsel, suggested an alternative funding proposal which was for the AJ Group to fund PV going forward utilizing convertible notes which would give the AJ Group the ability to dilute TNJ if TNJ did not invest as well. (J-094.) After discussing the terms with counsel, the AJ Group decided to offer to fund PV with convertible notes on a going forward basis. During a series of Board meetings which took place at the end of February and in March 2020, the Board issued convertible notes in exchange for funds contributed to PV by Respondents (discussed in detail below).

On or about September 15, 2020, Respondents exercised their right to convert certain of the debt issued to them by the Company into equity, thereby diluting TNJ from 33.3% equity in

PV to 6.7%. On September 16, 2020, Respondents informed Claimant that pursuant to paragraph 2 of the First Amendment to the ARSA, TNJ no longer had the right to Board appointees and was required to resign its Board appointees at Respondents' request as TNJ now held less than 10% equity in the Company.

On May 15, 2020, Claimant commenced this arbitration seeking redress for, among other issues, its dilution in PV.

On April 9, 2021, at Claimant's request, the Tribunal issued a *status quo* Order prohibiting Respondents from taking "any action that would pledge, dilute, transfer, encumber, or otherwise affect their or TNJ's current shareholdings in Project Verte and percentage of shareholdings of Project Verte...during the pendency of this proceeding without TNJ's prior consent or, if such consent is not provided, without the Tribunal's prior approval...." (Tribunal's Procedural Order No. 7, ¶ 2.) In addition, since TNJ's stock ownership was reduced below 10% and it lost Board representation, the Tribunal granted Jossef observer status on PV's Board during the pendency of this proceeding. (*Id.* ¶ 1.)


## II.    RELIEF SOUGHT BY THE PARTIES

Claimant contends that TNJ should be restored as a 50% stockholder in PV. The asserted justification for this relief is that (a) the SFNTA and other governance changes, including the ARSA and Amended and Restated Bylaws ("A& R Bylaws") were procured by false, misleading and/or grossly negligent fiduciary representations and practices and should be declared void; and (b) the convertible notes issued following the late February/ March 2020 Board meetings should be declared void because they were the product of fiduciary breaches and did not meet the entire fairness standard. Claimant also seeks to have Respondents pay off, on behalf of PV,

$14,011,000 based on amounts funded by TNJ because of Respondents' alleged bad faith in attempting to reduce TNJ's note balance.

In addition, Claimant seeks an accounting of PV's expense and capital accounts, including an upward adjustment of the amount credited to Claimant following redemption of a $10 million investment in GreyOrange, a technology-based company which provides AI-enabled software that integrates robots into warehouse fulfillment systems. TNJ further seeks an award of $9 million in damages for Jossef's "uncompensated sweat equity" in building PV as well as attorney's fees, costs and expenses associated with the arbitration.

Respondents seek an Order: (i) dismissing the Amended Statement of Claims in its entirety, and (ii) granting Respondents' Counterclaims in their entirety, including: (a) a Declaration that the transfers of stock from Gol and Chaluts to JG Group Holdings LLC and AC Group Holdings LLC, respectively are valid; (b) a Declaration that the SFNTA, ARSA, First Amendment to the ARSA, and the A&R Bylaws are valid, binding and enforceable; (c) that $2,090,614.72 currently credited to TNJ as having been lent to Project Verte be removed from Project Verte's books and records; (d) a Declaration that TNJ's current stock ownership of Project Verte is 6.7%; (e) a Declaration that Project Verte's Amended and Restated Certificate of Incorporation, all certificates of amendment thereto, Shareholder Consents concerning the amendments and authorizations of Company shares, Preferred Share Designations, and the AJ Group's conversion of their debt into equity are valid; and (f) an Order directing TNJ to pay Respondents the costs, fees (including reasonable attorney's fees) and expenses incurred in connection with this proceeding as permitted by Section 8.12(c) of the ISA and ARSA, Section 9.9 of the SFNTA, and AAA Rule-47.

## III.    ANALYSIS

## A.    The GreyOrange Redemption

Soon after the GreyOrange investment was made in 2018, it became clear that it was not a good use of PV's money and Gol and Chaluts asked Jossef to negotiate a share redemption. Those negotiations were successful, and the funds for the GreyOrange Redemption were received by PV on or about February 1, 2019.  (Tr. 1154-55; R-269 at row 1565 (Project Verte General Ledger).)

TNJ now claims that it should have received in cash or credit 50% or $5,000,000 of the GreyOrange redemption instead of the $1.3 million that it received.  TNJ's position on the redemption is as follows: the redemption was received by PV on February 1, 2019 when TNJ owned 50% of the common stock of PV; the effective date of the SFNTA that reduced TNJ's interest in PV to 33.34% was March 1, 2019.  Hence, any PV distributions from PV to its stockholders should have been made on a 50/50 basis.

The problem with this argument is that uncontroverted evidence presented to the Tribunal conclusively shows that the parties intended that the GreyOrange redemption be calculated on a one-third/two-third basis.

Testimony was presented that shortly after PV received the redemption, during the period that the parties were negotiating the SFNTA, Jossef approached Gol and Chaluts and requested that his 1/3 share of the redemption (given that the parties were in the midst of negotiating the SFNTA on a one third, one third, one third basis consistent with the equity reset the parties agreed would be effective as of January 31, 2019) be distributed out of PV directly to TNJ so

19

that Jossef could use those funds to "settle" with the Securities and Exchange Commission ("SEC").[13]  (Tr. 488-89, 1033-34, 1035-37.)

Respondents were not prepared for TNJ to take the full $3,340,000, representing its one-third interest in the GreyOrange redemption, in cash.  Instead, respondents proposed the following distribution: (i) $1,670,000 in cash and (ii) $1,670,000 in credit reducing the amount TNJ owed the AJ Group as of January 31, 2019.  (Tr. 489-91.)

Subsequently,  Chaluts and Jossef agreed that $322,310 of the $1,670,000 cash portion of Jossef 's distribution would be applied to satisfy TNJ's one-third contribution to the January 30, 2019 capital call.  As a result, the final agreed distribution to TNJ was: (1) $1,347,690 in cash to settle with the SEC; and (2) $1,992,310 in debt reduction credit (comprised of the original $1,670,000 plus a $322,310 credit balance earmarked to cover TNJ's one-third share of the last capital call of $965,000.  (Tr. 491-92, 493-94, 1036-38; R-095 (February 10, 2019 email from Gol to Jossef); J-010 (Yachnik Report), ¶¶ 90-100.)

The $1,347,690 in cash distribution plus the $1,992,310 in credit equaled $3,340,000, or one-third of the Redemption as reflected in the parties' February 10, 2019 email correspondence (R-095), excerpted below:

| Name | Amount | Cash | Note |
|---|---|---|---|
| TNJ Holdings LLC (share 33.34%) | $3,340,000.00 | $1,670,000.00 | $1,670,000.00 |
|  |  | - $322,310.00 | + $322,310.00 |
|  |  | **$1,347,690.00** | **$1,992,310.00** |

Gol testified that Jossef agreed to the cash and credit distribution amounts, and the breakdown, which were discussed and were the foundation for the amount of TNJ's debt in the

---

[13] This was in connection with a civil enforcement proceeding before the SEC.  In an email dated February 10, 2019, Jossef asked Gol: "Can you send me the money tomorrow so I will be able to settle with the SEC this week."  (R-093.)  Gol forwarded a calculation of TNJ's share of the redemption the same day.  (R-094.)  The following day, Jossef sent an email confirming the calculation on the one-third basis.  (R-099.)

SFNTA.  (Tr. 493-502; J-032; R-097.)  On February 10, 2019 and February 11, 2019, TNJ and the AJ Group agreed by email that Project Verte would wire $1,347,690 to TNJ, and $8,652,310 to the AJ Group in connection with the GreyOrange Redemption, which it did shortly thereafter. (J-036; R-100.)

Having reviewed the evidence, the Tribunal rules that the parties agreed that only one-third (33.34%) of the GreyOrange redemption would be credited to TNJ.

## B.       The SFNTA

While Claimant made no reference to any improprieties relating to the SFNTA in its Amended Statement of Claims, during the arbitration proceeding it sought "...rescission of the SFNTA based upon the falsely represented note balances reflected in that agreement, which constituted the consideration for TNJ ceding 17% of Verte's equity, and the false accounting practices engineered by Gol in connection with that transaction, by which she denied TNJ any benefit from the GreyOrange Redemption, and thereafter sought to reduce TNJ's overall note balances due from Verte", in breach of Respondents' fiduciary duty to Claimant.  (Claimant's Proposed Findings of Fact and Conclusions of Law, § II.A.)

This claim is based upon Claimant's contention that there was an alleged shortfall of the amount given/credited to TNJ as part of the GreyOrange Redemption, which the Tribunal has determined to be without merit.  *See supra* § III.A.  Moreover,  Claimant's argument that the SFNTA is not enforceable fails under the doctrine of judicial estoppel under which "...a party may be precluded from asserting in a legal proceeding, a position inconsistent with a position previously taken by him in the same or in an earlier legal proceeding."  *Steinman v. Levine*, 2002 WL 31761252, at *11 (Del. Ch. Nov. 27, 2002)

In 2020, in a lawsuit in the Supreme Court of New York between certain of Respondents and Jossef, in which he sought to compel arbitration or stay the suit, Jossef referred to the ISA and SFNTA as "...both admittedly valid agreements...." (R-452 (*JG Group Holdings LLC et al. v. Jossef Kahlon*, Index No. 652196/2020, Reply Memorandum of Law in Further Support of Defendant's Motion to Compel Arbitration or to Stay Pending Arbitration).) For the purposes of this arbitration, Claimant's request to void the SFNTA can be denied on that basis alone.

In addition, with respect to Claimant's assertion that there was a breach of fiduciary duty by Respondents in connection with the negotiation and execution of the SNFTA, Claimant was represented by counsel and the negotiation of the SNFTA was conducted as an arms-length transaction between sophisticated parties about their interests in PV. Under Delaware law, parties do not owe each other fiduciary duties in the context where they are "negotiat[ing] about their respective interests . . . at arm's length, with the benefit of independent counsel, and in the knowledge of who they were and what they were doing." *Kaplan v. Centex Corp.*, 284 A.2d 119, 123 (Del. Ch. 1971); *see also S. Megga Telecomms. Ltd. v. Lucent Techs., Inc.*, 1997 WL 86413, at *9 (D. Del. Feb. 14, 1997) *Danza v. Fidelity Mgmt. Trust Co.*, 533 F.App'x 120, 124 (3d Cir. 2013). Similarly, "[i]t is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim. In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous." *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010).

Claimant also argues that the SFNTA should be rescinded because "...the parties apparently never agreed on a key, critical term: the consideration to TNJ." (Claimant's Proposed Findings of Fact and Conclusions of Law at 60.) However, the SFNTA plainly states at Recital I

that, in exchange for completion of the SFNTA, the AJ Group would "surrender potential claims related to the Funding Failure" which related to the Additional Funding Amount of $11,514,098.62 that TNJ promised to repay the AJ Group but did not. (J-001 at AJGROUP_AAA_0016061.) Additionally, Section 1.3 of the SFNTA, entitled "Consideration" specifies that "[f]or the Transferor to repay to the Transferee the Additional Funding Amount and secure the releases from the Transferor and the Company contemplated by this Agreement, Transferor hereby agrees to the Share Forfeiture and Note Transfer . . . ." (*Id.* at [pin cite], § 1.3.) This is adequate consideration. *Southeastern Chester County Refuse Auth. v. BFI Waste Servs. of Pa., LLC*, 2017 WL 2799160, at *8 (Del. Super. June 27, 2017) ("Generally, an agreement to forbear a lawsuit constitutes adequate consideration."); *Moscowitz v. Theory Ent. LLC*, 2020 WL 6304899, at *12 (Del. Ch. Oct. 28, 2020) ("Delaware law does not 'assume[ ] that parties to a contract must explicitly detail the precise consideration they are exchanging' and 'makes no such requirement,' but a recital in a written agreement that a stated consideration has been given facially supports a finding that the agreement is supported by consideration, absent facts suggesting that no such consideration was actually given or expected.") (internal citations omitted).

For the reasons stated above, the Tribunal declines to declare the SFNTA void or rescinded and rules that it is a valid and binding agreement among the parties.

## C. The Amended and Restated Stockholders Agreement and Amended and Restated Bylaws

Claimant argued that the Amended and Restated Stockholders Agreement ("ARSA") and the Amended and Restated Bylaws ("A&R Bylaws") "...should be declared void or rescinded for similar reasons that the SFNTA should be rescinded: these were follow-on transactions, contemplated by the redistribution of equity in connection with the SFNTA, which would not

have been entered into by the parties *but for* the restructuring of the equity." (Claimant's Proposed Findings of Fact and Conclusions of Law at 62 (emphasis in original).) To the extent Claimant relies on the arguments made in support of voiding or rescinding the SFNTA, the Tribunal rejects the claim that the ARSA and A&R Bylaws be voided or rescinded for the reasons stated in the preceding section of this Award.

Claimant presented two additional reasons why the ARSA should be voided. *First*, Claimant argued that Section 8.10 of the ISA provided that it could not be amended except if made in writing and "signed by the Initial Stockholders," and the ARSA was not signed by Gol and Chaluts. But Gol and Chaluts transferred their interests in the Loan Documents and their shares in PV to their respective affiliates, JG Group Holdings LLC and AC Group Holdings LLC, respectively, pursuant to Stock and Note Transfer Agreements dated as of April 3, 2019. In connection with these transfers, JG Group Holdings LLC, and AC Group Holdings LLC each executed a Joinder to the ISA, countersigned by Julian as a Director of PV, which provided that each of those entities "shall be considered an 'Initial Stockholder' and a 'Stockholder' for all purposes of the [ISA]." (J-001 at AJGROUP_AAA_0016086-89; AJGROUP_AAA_0016100-03.) JG Group Holdings LLC and AC Group Holdings LLC are successors in interest to Gol and Chaluts and all parties agreed that the entities would be deemed "Initial Stockholders." As such, neither Gol nor Chaluts was a necessary signatory to the ARSA.

Finally, Claimant argued that the ARSA is not effective because "Julian's signature was applied to the signature page without his authorization..." (Amended Statement of Claims at 38.) Claimant presented no evidence of this purported fraudulent behavior by Respondents. On the contrary, in addition to signing the ARSA, Julian executed a Unanimous Written Consent of the Directors ratifying the ARSA and approving its First Amendment, as well as a Written Consent

of the Stockholders confirming and approving Ms. Lev-Aretz's appointment to the Board. (R-223.). Having offered no evidence to contradict the consents, Claimant's final challenge to the ARSA fails for lack of proof.

For reasons cited above, the Tribunal declines to rescind the ARSA and the A&R Bylaws.

**D.**     **Accounting Issues**

    (i)    <u>General</u>

In its Amended Statement of Claims, TNJ stated that at Gol's direction, Continental Ventures' in-house financial team "...maintained opaque and irreconcilable accounting records, which contain persistent irregularities, the nature of which indicates fraudulent intent." (Amended Statement of Claims at 22.) In justifying TNJ's failure to fund PV, Claimant asserted in its Post-Hearing Brief that "[i]t was well within reason that TNJ would not voluntarily advance funds into an opaque accounting structure, which Gol had refused to reconcile or explain..." (Petitioners' Proposed Findings of Fact and Conclusions of Law at 13.) In support of its position, Claimant submitted an expert report prepared by Glen Sheets of Stout Dispute Consulting. (J-006.)

Respondents' expert, Michael Yachnik of the StoneTurn Group (New York) LLC stated that the Sheets Report "...includes a number of general assertions regarding the state of Project Verte's accounting records. (J-010 (Yachnik Report), ¶ 53.) However, his only specific opinion regards the single contested contract dispute between the Stockholders regarding the GreyOrange redemption funds allocation." (*Id*. at 17.)

A significant portion of the Sheets Report was devoted to describing the alleged existence of "two sets of books" – referred to as the "$8 million Credit Record" and the "$10 million

Credit Record". (J-006, ¶ 53.) However, as the Yachnik Report states, "Mr. Sheets conflates documents prepared by the Stockholders with records of PV." (J-010 (Yachnik Report), § V.B.ii.) Mr. Yachnik stated: "There are no accounting standards that apply to the Stockholders' preparation of private documentation, nor would one expect to see a single unchanged document that represents the Stockholders' personal records. Documents prepared by Stockholders relating to Stockholder agreements are not company accounting records, and they are not required to be prepared in accordance with generally accepted accounting principles (or any accounting principles at all). Again, I have never in my career seen documents generated by Stockholders regarding an agreement between Stockholders referred to as company accounting books." (*Id*. at 19.)

With respect to the GreyOrange transaction, any confusion emanated from the suggestion made on or about February 15, 2019 by Gol to Jossef that instead of a $1,992,310 credit transfer, the AJ Group would transfer an even $2 million credit to TNJ, and that it would do so by transferring back to TNJ $2 million of funding credit that TNJ had previously allocated to the AJ Group in connection with the Texas Land transaction. (Tr. 504-06, 1037-39; J-193 (Gol Dep. Tr. at 95-97); R-106.) Although the change was effectively meaningless in the sense that it did not matter whether TNJ received a $1.992 million credit transfer or a $2 million credit (in the form of a funding credit), the change had meaning to Ms. Gol who was never comfortable with the Texas Land credit. (Tr. 504-05, 1038; J-193 (Gol Dep. Tr. at 99-100.) The only financial effect of this change was that the AJ Group transferred $7,690 <u>more</u> than what it had previously agreed to transfer to TNJ (the difference between $2 million and $1,992,310). (J-010 at 11-12.)

Gol memorialized the change in a funding schedule—labeled "NEW" in all capital letters—that reflected a credit of $10 million to TNJ for the Texas Land and no credit for the AJ

Group for the Texas Land. (Tr. 504-07; R-106.) On February 15, 2019, Ms. Gol sent the schedule to Jossef by email with a request that Jossef "look at this and call me please" to discuss. (*Id*.). Ms. Gol also discussed the revised schedule with Jossef. (Tr. 508; J-193 (Gol Dep. Tr. at 99-100.) The SFNTA and the schedules supporting it are consistent with the funding schedule that was sent to PV's counsel on February 15, 2019 that includes the $2 million Texas Land credit transfer to TNJ. As a result of the $2 million Texas Land credit moving from the AJ Group's ledger onto TNJ's, TNJ's funding credit increased from $12,011,014.72 to $14,011,014.72 and its indebtedness to the AJ Group was reduced from $13,514,098.62 to $11,514,098.62 as of January 31, 2019. (J-010, ¶¶ 45; 46.)

However, the Yachnik Report conceded that Mr. Sheets was correct that as of June 11, 2019, PV's QuickBooks records showed TNJ having received a credit of $1,992,000 for the GreyOrange Redemption and not a credit of $2,000,000 in the form of the transferred Texas Land credit. (J-010 (Yachnik Report), ¶ 72.) The Yachnik Report did not agree with Mr. Sheet's suggestion that the fact that the parties' agreement to apply the $2 million land credit instead of the $1,992,000 credit was apparently updated in the Company's books and records after June 2019 proved that TNJ did not get any credit for the GreyOrange Redemption; and that all of Project Verte's accounting was so unreliable that "an investor would not continue to contribute funds into a venture exhibiting a high degree of uncertainty as it relates to the propriety of its accounting records." (J-010 (Yachnik Report), ¶¶ 72-73 (quoting J-006 (Sheets Report), ¶ 134.)

As Mr. Yachnik opined: "[T]he existence of errors in a company's accounting records is expected and, as such, companies implement procedures to identify and correct for errors discovered during the normal course of business. For instance, monthly reconciliations of general

ledger accounts (e.g., cash account reconciliations to banks statements), review of transactions exceeding a certain dollar threshold, and internal review of monthly financial statements can assist in identifying errors in the recording of transactions in the general ledger. The mere existence of errors in accounting records alone—or the fact that the recording of a single transaction was updated and corrected— does not undermine the financial integrity of a company." (J-010, ¶ 73.)

Having reviewed the Sheets Report and the Yachnik Report, the Tribunal finds no accounting "fraud" or significant accounting irregularity to support Claimant's assertions.

(ii)    <u>TNJ's Demand for an Accounting</u>

In its Statement of Claims, Claimant seeks an accounting of PV. An accounting would serve no useful purpose in this case where Claimant's concerns revolve around the alleged accounting improprieties in the GreyOrange transaction which have been determined to be without merit by the Tribunal.

Furthermore, TNJ has received tens of thousands of documents in this case, including PV's financial statements and the AJ Group's bank account statements. Delaware courts have rejected efforts by plaintiffs to obtain an accounting where, "[a]s the result of extensive discovery…the records, such as they are, have been produced" and "[n]o additional discovery was sought by Plaintiffs and no additional motion to compel was filed by Plaintiffs," noting that even if "[t]here are gaps in the records, some perhaps of significance…ordering an accounting would not cure this shortcoming.  To order an accounting that will not, and cannot, be complete or helpful serves no discernible purpose."  *Stone v. Stant*, 2010 WL 4926580, at *2 (Del. Ch. Nov. 30, 2010); *see Bus. Funding Group., Inc. v. Architectural Renovators, Inc.*, 1993 WL 104611, at *2 (Del. Ch. Mar. 31, 1993).

(iii)  TNJ Expenses

In Respondents' Statement of Answer, Affirmative Defenses, and Counterclaims, "Respondents seek a declaration that TNJ is not entitled to credit on Project Verte's books and records for unsubstantiated and undocumented expenses claimed to have been made by Claimant, and that any such undocumented expenses shall be removed as credit to TNJ on Project Verte's books and records." (Respondents' Statement of Answer, Affirmative Defenses, and Counterclaims at 33.)

Respondents' expert Mr. Yachnik reviewed $3,611,015 credit for expenses claimed to have been paid by TNJ on behalf of PV. He concluded that based on review of "...documentation (e.g. invoices, contracts) supporting the expenses that have been produced in this matter....I have identified supporting documentation that an expense was incurred and proof that the expense was paid for only $1,520,400.00 of the $3,611,015 (approximately 42%)....I have been unable to substantiate payment for $2,090,614.72 (3,611,014.72 – 1,520,400.00) that TNJ claimed to have funded into Project Verte." (J-010, ¶¶ 107, 110.)

 In their Post-Hearing Brief, Respondents point to Mr. Yachnik's review of documents "produced in the litigation" and alleged discrepancies between back-up documents and TNJ expense claims.  Accordingly, Respondents seek the following ruling from this Tribunal: "Because the $2,090,614.72 in claimed contributions by TNJ cannot be verified as having been legitimately paid to third parties on behalf of Project Verte as contracted expenses, they should be removed as credit by TNJ from Project Verte's books and records." (Respondents' Post-Hearing Brief, Proposed Findings of Fact, ¶ 297.)

Both Mr. Yachnik and Respondents refer to documents produced in this case.  However, Respondents have not directed the Tribunal's attention to the specific documents referred to by

Mr. Yachnik or suggested that those documents are included in the voluminous grouping of exhibits delivered to the Tribunal. Notably, Mr. Yachnik did not conduct an independent audit of the books and records of PV and based his opinion only on documents "produced" in the litigation.

Moreover, Mr. Yachnik's report does not assert that the information and details which he found to be lacking were ever requested from TNJ. Finally, Mr. Yachnik is notably circumspect in opining about whether the invoices he is questioning represent "bona-fide" expenses of PV, suggesting only that the missing information and details "would allow me to understand the nature of the expenses and ultimately gain comfort that the invoice represents a bona-fide expense of Project Verte." (J-010, ¶ 108.)

Under the circumstances, Respondents' have failed to provide sufficient evidence that TNJ's $2,090,614.72 of claimed contributions were not contributed to PV. Accordingly, the Tribunal declines to issue the Declaration requested by Respondents.

**(E) Respondents' Request for An Order Confirming the Validity of the May 29, 2020 Amendment to PV's Certificate of Incorporation**

In Respondents' Statement of Answer, Affirmative Defenses, and Counterclaims, Respondents seek a declaration that the May 29, 2020 Certificate of Amendment to the Amended and Restated Certificate of Incorporation of PV (the "Charter"), purporting to increase the number of authorized shares of the Company's stock to 1,050,000,000 (600,000,000 authorized shares of Common Stock and 450,000,000 authorized shares of Preferred Stock), is valid and binding.

At a meeting of the PV Board of Directors held on May 26, 2020, the proposed amendment to PV's Charter was approved.  (AJGROUP_AAA_00180760.)[14]  A written consent of the Company's stockholders in which more than 68% of the stockholders approved the proposed amendment and directed the appropriate officers to execute and file the amendment with the Secretary of State of the State of Delaware was, however, filed as an exhibit in this arbitration.  (R-447.)  On June 2, 2020, PV filed the Certificate of Amendment to the Certificate of Incorporation of PV with the Secretary of State.  The Certificate was delivered to Claimant in discovery but was not produced as an exhibit.  (AJGROUP_AAA_0018278.)

In its Pre-Hearing Brief, Respondents state: "Each of the actions taken above were performed in accordance with Delaware law.  *See* 8 *Del. C.* §§ 103, 151.  The amended certificate of incorporation explicitly granted Project Verte the authority to issue new shares (8 *Del. C.* § 151(a)), it was ratified by the Board (8 *Del. C.* § 157(a)), Project Verte filed a certificate of designation with the secretary of state with required signatures in accordance with 8 *Del. C.* § 103 (8 *Del. C.* §§ 103(a), 151(g)), and the amended [Charter] set forth the number and class of new shares (8 *Del. C.* §§ 102(a)(4))."  (Respondents' Pre-Hearing Brief at 72.)

Because there was limited evidence in the record regarding the corporate actions taken in connection with the Charter amendment, the Tribunal requested copies of the documents that Respondents were asking this Tribunal to validate and permitted Claimant to submit a response.  On November 16, 2021, Respondents provided documentation in support of its contention that PV's charter was validly amended on May 26, 2020.  In its email to the Tribunal dated November 17, 2021, Claimant objected to the Tribunal validating the May 26, 2020 amendment to PV's Charter, as well as other PV corporate documents, because there was no live testimony

---

[14] The Directors' resolution was not filed as an exhibit but was produced as part of the parties' document discovery process.

regarding the adoption and execution of these documents at the hearing even though the Company's Corporate Secretary testified live.

Based on the documents in the record that were submitted to the Tribunal, each of the Certificate of Amendment, the Written Consent of the Stockholders, and the Designation of Proffered Shares appear to be valid Board actions taken in accordance with Delaware law. However, given the absence of any testimony regarding the preparation and execution of these documents, the Tribunal is unable to say that the Charter amendment is presumptively valid. Further, because such a finding is not critical to the issues being decided in this Interim Award, the Tribunal declines to make a finding of presumptive validity.

**(F)     Dilution of TNJ's Interest in PV**

(i)     <u>Events Leading Up to Issuance of Convertible Notes</u>

By the fall of 2019, a rift between the PV stockholders had developed, much of which centered around accounting issues relating to the GreyOrange Redemption and governance issues emanating from the SFNTA. GoI characterized one of the accounting issues raised by Jossef as "another stupid exercise by Jossef". (C-500.) Jossef blamed accounting errors as the reason why PV was not able to attract outside financing. But more importantly, Jossef used the purported accounting discrepancies as a justification for not funding PV.

In late September and early October of 2019, Jossef sought a business divorce between the parties. Jossef offered a reciprocal buy/sell option—AJ Group could either buy out TNJ or sell its shares to TNJ. (J-67; CX-401.) The parties were unable to agree on buyout terms.

As stated above, the Credit Agreement negotiated in conjunction with the SFNTA expired on December 31, 2019. PV operated throughout its existence on a "pay as you go" concern and PV had limited funds available for operational purposes. The AJ Group proposed

funding PV with debt though Additional Funding or Survival Expenses under the ARSA which required TNJ to provide the AJ Group with promissory notes for its deficiency. In addition, the AJ Group asked Jossef to sign a personal guaranty and provide security of his TNJ shares, which Jossef refused to do. (Tr. 596-604.)

(ii)   The "Global Solution"
- **Type I Notes**

On February 25, 2020, Company counsel Andrew Hulsh of Pepper Hamilton, referencing the Jossef buy/sell offer wrote in an email to Gol and Chaluts: "I should point out that there is a clear alternative to accepting Jossef's offer and demand. Specifically, you can continue to fund the company, on fair and reasonable terms (currently as contemplates [*sic*] by the convertible notes), dilute TNJ's equity interests...." (J-094.) The plan solved the funding problem. Gol denied that the dilution of TNJ was an equally important objective in issuing the convertible notes. (Tr. 1078.)

Andrew Hulsh counseled PV's Board to ensure the fairness of the proposed convertible notes. According to the notes of the Company's Secretary, Sara Rubenstein, at the February 20, 2020 Board meeting Mr. Hulsh stated that "companies will normally get a fairness opinion to determine fairness of transaction." (J-089a.) And on February 24, 2020, in an email to Mr. Hulsh and Gol, Ms. Rubenstein recounted a conversation she had with AJ Group's outside counsel on the structure of the proposed notes. She noted that outside counsel advised that "...if challenged we cannot predict how a court would rule in terms of an entire fairness test." (C-427.)

Since PV was facing its monthly cash crisis, Gol insisted on proceeding with the approval of the convertible note. During the February 20, 2020 Board meeting where the terms of the proposed note were submitted for the first time to the Board members for consideration, Mr.

Hulsh advised the Board that he had "...found someone who could provide an opinion in 1 week for $10,000." (J-089a). When Claimant's counsel asked Gol at the hearing why she did not extend funding for a week or two to get an independent fairness opinion recommended by Company counsel, she said: "We felt that we were not prepared. We were not obligated and we had no interest in continuing the extortion of Jossef Kahlon. He had defaulted on every single agreement. Every rider he had defaulted on. Everything in the SFNTA he had defaulted on. The credit line agreements he had defaulted on...He told employees to stop speaking to me. He has lied about the payroll records and it was enough...if he wanted to participate, we were very glad. And if he didn't, there would be consequences, of course." (Tr. 778-79.)

The proposed 24-month convertible note carried a simple 8% interest rate and was automatically converted at the lesser of 80% of the cash price paid by an outside investor or $50 million. In addition, the convertible note could be converted at the election of the holder at any time prior to maturity at a $50 million valuation of the Company. Notes could be issued up to a maximum aggregate of $5 million. (J-092d.)

At this time, PV was planning to issue a $1 million tranche of the convertible notes. During the February 25, 2020 Board meeting, Chaluts offered TNJ the opportunity to fund the entire capital call (J-093) but Jossef did not take Chaluts up on the offer. (Tr. 1236.)

The $50 million conversion price was suggested by Gol based on her analysis of the financial condition of the Company, including $50 million of investor debt and outside investors' reluctance to invest in PV at the time. (Tr. 536-7.) In addition, she was influenced by a report she received from Mr. Hulsh about a meeting that he had on September 25, 2019 with Bank of America Merrill Lynch ("BAML") about their interest in raising capital for PV. Mr. Hulsh reported that BAML would be able to market PV to investors at the $30 million-$40 million

range if PV could raise capacity in its Atlanta warehouse to 50%; and a higher range if a substantial portion of capacity was utilized. ( J-086; Tr. 537). At the time, according to Gol's estimate, the Atlanta warehouse utilization was half a percent. (Tr. 538.)

On Friday, February 21, 2020, Company Secretary Ms. Rubenstein sent a Notice of Board Meeting for Monday, February 24, 2020 "to discuss the urgent capital needs of the company" and noticed an additional meeting for the next day Tuesday, February 25, 2020.  (C-414.)  Gol worked over the weekend with Mr. Hulsh to prepare the Note for presentation and vote at the Monday Board meeting.  Gol suggested circulating the Note before the Board meeting on Monday.  Mr. Hulsh emailed Gol on February 23: "I think the idea was to vote tomorrow, but this can wait until Tuesday's meeting.  I suggest coordinating with Yafit [Lev-Aretz] to see if she's willing to approve tomorrow."  (C-423.)  Gol responded: "I explained the note and what the vote is about. She seems totally on board to vote but I think she will want to wait on the vote because Yossi didn't hear about the terms." Ms. Rubenstein responded that evening: "Good. Hopefully she will vote tomorrow, despite what Yossi might say."  (*Id.*)

Jossef did not attend the scheduled February 24, 2020 meeting.  He had previously advised that he was travelling and would not be available for a telephonic Board meeting.  (Tr. 787.)  Gol then proceeded to discuss with the Board the terms of the Note.  Board meeting notes taken by Ms. Rubenstein stated that Ms. Lev-Aretz, the TNJ Board nominee, "thinks a fairness opinion is not necessary given the urgent timing the money is needed and that these are better terms than market terms. She is very comfortable with the terms of this convertible note, without the fairness opinion."  (C-433a.)  Ultimately Ms. Lev-Aretz requested that the resolution wait until the next day because Jossef was not present at the meeting. The Board agreed to wait until the next day's meeting to vote on the Note. (C-433a; J-91f (Board minutes).)

Discussions continued on the Notes at the Board meeting on February 25, 2020 (J-93), attended by Jossef.  Ultimately, the $5 million Emergency Bridge Financing Note (hereafter "Type I Notes") was passed by the Board at its meeting on February 26, 2020 which was also attended by Jossef.  (J-95.)

Although the Board approved the $5 million financing package through January 15, 2021, only $937,001.60 in Type I Notes were issued.  (R.469.) This was because, according to Gol, the "purpose of the Type I Notes" was "to enable the company to pay immediately urgent expenses such as payroll, rent and other expenses for the company to continue," as well as to engage a valuation company.  (Tr. 439-40.)

Gol testified that "...once we understood what the valuation of the outside valuation of [*sic*] the company would be," PV would issue a new type of convertible note based on the valuation (hereafter "Type II Notes").  (Tr. 440.)

- **Type II Notes**

No evidence was presented to the Tribunal on internal discussions that occurred between Respondents, namely Gol, and PV's external counsel or for that matter AJ Group's outside counsel on the structure of the Type II Notes.  Evidence shows that a meeting of the PV Board occurred on March 16, 2020 at which time an aggregate of $1 million Type II Notes were approved by three out of the four Directors of PV, namely: Chaluts, Gol and Lev-Aretz. Jossef attended the meeting but abstained from voting.  (J-107c.)

David Slarskey of Slarskey LLC, TNJ's counsel, was also in attendance.  According to the minutes of the meeting, he was told "to refrain from participating in the meeting, but that he was welcome to be on the call as an observer."  However, later in the meeting, Mr. Slarskey said that the financing transaction would be "...subject to the entire fairness standard."  Mr. Hulsh

responded, stating that "the board has been advised of the legal standards by which the board will be evaluated for an affiliated transaction." (*Id.*)

In its Post-Hearing Brief, Claimant states: "...the terms of the March issuance were not discussed in advance with Lev-Aretz or Jossef, and were presented to the Board on the same day they were approved: March 16, 2020." (Claimant's Proposed Findings of Fact and Conclusions of Law, ¶ 259.) No evidence was presented to the Tribunal to the contrary.

Subsequent to the March 16, 2020 $1 million aggregate Note authorization, the PV Board authorized the approval of additional Type II Notes resulting in the issuance of $15,351,267.11 Type II Notes through January 21, 2021. (R-469; CX-122a.)

In the absence of any financing, the Type II Notes were convertible by their holders at the lesser of (i) 75% of the price per share paid by investors, (ii) the equity value of the Company, as determined by an independent financial advisor or investment bank selected by the Company's legal counsel and (iii) a $50 million valuation cap. (J-107c, Schedule A.)

The significant difference between the Type I Notes and the Type II Notes is that the Type I Notes are convertible into equity in the absence of third-party investment at a $50 million valuation, while the Type II Notes are convertible at the lower of (i) the equity value as determined by an independent financial advisor or investment bank, or (ii) $50 million. In addition, the Type I Notes are convertible at 80% of the price paid by an investor while the Type II Notes are convertible at 75%. Both sets of notes carry an 8% per annum interest rate.

Empire Valuation Consultants ("Empire") was hired by the Company's outside counsel Pepper Hamilton on March 23, 2020 to provide a valuation for the Company. (Tr. 560; C-496b.) In its April 30, 2020 Valuation Report valuing the Company as of March 31, 2020, (hereafter "April 2020 Empire Report") (R-436), Empire certified that over the last three years it had

provided no services to PV.  Gol testified that Empire had no affiliation with either PV or the AJ Group.  (Tr. 560-61.)

In the April 2020 Empire Report, Empire valued PV at $1.1 million.  (R-346.)  On April 28, 2021, Empire issued an updated valuation of PV valuing the Company as of September 30, 2020 ("April 2021 Empire Report") and concluded that PV's value had increased to $2 million. (J-111.)

The AJ Group converted its Type II Notes on or about September 15, 2020 based on the $1.1 million valuation of the Company contained in the April 2020 Empire Report.  (CX-122a.)

(iii)    Empire's DCF Valuation

Empire used the discounted cash flow method ("DCF") to analyze PV's value.  (J-111 (April 2020 Empire Report) at 15.)

 "DCF involves projecting operating cash flows for a determined period, setting a terminal value at the end of the projected period, and then discounting those values at a set rate to determine the net present value of a company's shares."  *Doft & Co. v Travelocity.com Inc.*, 2004 WL 1152338, at *5 (Del. Ch. May 20, 2004).

In *Doft* , Vice Chancellor Lamb noted : "The utility of a DCF analysis, however, depends on the validity and reasonableness of the data relied upon. As this court has recognized, 'methods of valuation, including a discounted cash flow analysis, are only as good as the inputs to the model.'"  *Id.*, at *5.

On March 19, 2020, Project Verte's CFO, Milton Barbarosh, wrote to Mr. Hulsh and Gol, attaching a set of preliminary financial projections and a valuation model stating that, "[o]bviously the company value won't be negative as it shows now - $41 million, it will be zero."  (CX-607.)  In the following days, Barbarosh corresponded with Gol concerning financial

disclosures that were ultimately sent to Empire.  (C-498; C-498a; CX-608; CX- 608a; CX-609; CX609a; CX-612; CX-612a; CX-605; CX-605a; R-439-01.)

 The projections of PV's management were reduced by Empire. Scott Nammacher, Empire's Managing Director, wrote in his April 2020 Empire Report that "[m]anagement's forecast showed EBITDA margins improving from -145.4% in 2022 to 37.7% in 2024. ... Empire believed that EBITDA margins above 20% were out of reach. Consequently, Management's projected EBITDA margins were reduced to 20.0% for the remainder of the forecast."  (R-436 at 17.)  According to the report of Claimant's expert, Harris Antoniades of Stout Dispute Consulting, the reduction in EBITDA margins "resulted in a significantly lower valuation conclusion." (J-005 (Expert Witness Report of Harris Antoniades ("Antoniades Report"), ¶ 19.)

Mr. Nammacher testified at the hearing that an argument could be made that they should not have adjusted management's projections.  But, he continued, if a valuation expert believes that the projections are excessive and leaves the projections untouched, he or she would make the necessary adjustment by changing the discount rate[15] to reflect the associated risk.  At the end of the day "it becomes an argument over a discount rate, what do you discount it at."  (Tr. at 1636.)

In support of the Empire valuations, Respondents retained Daniel Beaulne of Houlihan Lokey Financial Advisers, Inc. to review the Empire Reports.  In Mr. Beaulne's Expert Report dated June 9, 2021 ("Beaulne Report"), he concluded that the "Empire Reports present credible valuation conclusions...[utilizing] generally accepted valuation methodology consistent with professional standards....[I]t is reasonable and appropriate for Project Verte Board of Directors to rely on the Empire Reports for determining the conversion price of convertible notes."  (J-004, ¶

---

[15] "Discount rate" refers to the interest rate used in a discounted cash flow (DCF) analysis in order to determine the present value of future cash flows.  (The higher the interest rate, the lower the present value of future cash flows.  A lower discount rate leads to a higher present value.)

22.)  Beaulne noted in his Rebuttal Report dated July 19, 2021 ("Beaulne Rebuttal Report") that Mr. Barbarosh and PV's Chief Operating Officer, Mr. Klunk, approved the forecast utilized by Empire.  (J-009, ¶ 31.)

Claimant's expert, Mr. Antoniades, concluded that the Empire Reports "are not a reliable indication of the Fair Market Value of the 100% Controlling Interest of Project Verte, Inc. as of their respective valuation dates."  (J-005, ¶ 65.)  The Antoniades Report did not provide an alternative valuation of PV but instead demonstrated through a number of scenarios that by using the same approach as Empire but inserting different inputs he could radically increase the value of Project Verte anywhere between $35.2 million to $291.8 million (J-005 (Antoniades Report), ¶¶ 44-57.)

In his Rebuttal Report, Mr. Beaulne responded to each of the points raised by Mr. Antoniades and concluded: "Antoniades performs no independent analysis and provides no basis for his opinions....[he] simply increases EBITDA margins and lowers the discount rate which results in a materially higher value of Project Verte as compared to the value determined by Empire using a thorough, well documented methodology and analysis." (J-009, ¶ 80.)

Mr. Antoniades also submitted a Rebuttal Expert Report dated July 19, 2021 in which he took issue with Empire's adjustment of PV management's forecasts as "...inconsistent with how valuation experts typically work, and suggests that the valuation was targeting a specific outcome (*i.e.*, a low valuation), rather than attempting to determine a valuation, given management's projections."  (J-008 (Rebuttal Report of Harris Antoniades ("Antoniades Rebuttal Report"), ¶ 5(a).)  He further noted that Mr. Beaulne should not have credited Empire's

unlevered DCF analysis[16] concluding that PV had $0 value: "If the company truly had no value, then investors would not continue to fund it."  (*Id.*, ¶ 5(b).)

Evidence was presented of other valuations of PV which yielded much higher valuations than the April 2020 and April 2021 Empire Reports.[17]  In addition, Claimant's Counsel noted in its Post-Hearing Brief that "[b]efore working with Barbarosh on the Company's projections for purposes of the Empire valuation, Gol had worked with Barbarosh over several months to prepare a model using the same valuation model template prepared by Barbarosh to value Project Verte at $850 million.  (CX-120 (Gol recounting conversation with Barbarosh regarding financing that "raises our valuation"); CX-112; CX-112a; CX- 113; CX-114; CX-114a (showing Gol's changes to the model highlighted); CX-115; CX- 115a; CX-116; CX-116a (at "Presentation" Tab)).)"  (Claimant's Proposed Findings of Fact and Conclusions of Law, ¶ 293.)

(iv)    <u>Delaware Entire Fairness Standard</u>

We now turn to the question of whether the issuance of the Type I and Type II Convertible Notes and the conversion of the Type II Notes in September 2020 comported with Delaware's rigorous entire fairness standard.

Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness.  The business judgment rule is the default standard of review.  It presumes that "in making a business decision the directors of a

---

[16] Levered DCF Method refers to the discounted cash flow analysis (levered cash flows (after debt payments)). The Unlevered DCF Method refers to the discounted cash flow analysis (unlevered cash flows (before debt payments)). The April 2020 Empire Report concluded that the value of the Company was $1.1 million calculated by weighting 50% of Levered DCF ($2.3 million) and 50% of the Unlevered DCF (($0.0). (J-004 (Beaulne Report), ¶ 53.)

[17] One example is R-235 (409A valuation of PV, as of January 1, 2019, completed at Julian's request by Daszkal Bolton Accountants and Advisors ("Daszkal Bolton Report").)  The Daszkal Bolton Report concluded that "...the fair market value [of] a 1 share [*sic*]  in the common stock of Project Verte, Inc., as of January 1, 2019, on a non-controlling, non-marketable basis was…$3.10," for a total value of $327 million. (R-235 at TNJAAA_0010505, TNJAAA_0051306.)  Another example is R-078, a January 2019 valuation of PV at between $42 and $46.79 million calculated by Preferred Return at the request of Julian and Jossef.

corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). "[W]here the business judgment [rule] presumptions are applicable, the board's decision will be upheld unless it cannot be attributed to any rational purpose." *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006) (internal quotation marks omitted).

Enhanced scrutiny is Delaware's intermediate standard of review. Framed generally, it requires that the defendant fiduciaries "bear the burden of persuasion to show that their motivations were proper and not selfish" and that "their actions were reasonable in relation to their legitimate objective." *Mercier v. Inter–Tel (Del.), Inc.*, 929 A.2d 786, 810 (Del. Ch. 2007). Enhanced scrutiny applies when the realities of the decision-making context can subtly undermine the decisions of even independent and disinterested directors.

Entire fairness is Delaware's most onerous standard. This highest standard of review applies where "(1) properly reviewable facts reveal that the propriety of a board decision is in doubt because the majority of the directors who approved it were grossly negligent, acting in bad faith, or tainted by conflicts of interest; or (2) the plaintiff presents facts supporting a reasonable inference that a transaction involved a controlling stockholder." *Flannery v. Genomic Health, Inc.*, 2021 WL 2615540, at *11 (Del. Ch. Aug. 16, 2021) (citing *Larkin v. Shah*, 2016 WL 4485447, at *8 (Del. Ch. Aug. 25, 2016).

When a party challenging a board's decision alleges and later proves facts sufficient to overcome the business judgment rule, "the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders." *Walt Disney,* 906 A.2d at 52. Once entire fairness applies, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and*

fair price." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (internal quotation marks omitted; emphasis in original).

- **Business Judgment Rule**

In their Answer, Respondents asserted as an affirmative defense that Gol's and Chaluts' decision in 2020 to approve lending to the Company through convertible notes was protected by the business judgment rule. (Respondents' Statement of Answer, Affirmative Defenses, and Counterclaims at 27.)

In *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989), the Delaware Supreme Court describes the business judgment rule as "...a presumption that in making a business decision, the directors of a corporation acted on an informed basis [i.e., with due care], in good faith and in the honest belief that the action taken was in the best interest of the company." An application of the traditional business judgment rule places the burden on the party challenging the board's decision to establish facts rebutting the presumption. *Watchmark Corp. v. ArgoGlobal Capital, LLC*, 2004 WL 2694894, at *5 (Del. Ch. Nov. 4, 2004).

If the presumption is rebutted, the burden shifts to defendants, the proponents of the challenged transaction, to prove to the trier of fact the "entire fairness" of the transaction to the plaintiff. *Citron v. Fairchild Camera & Instrument Corp.*, 663 A.2d 1156 1162 (Del. Sup. 1995). At that point, the challenged transaction "...must be reviewed for entire fairness." *Zimmerman v. Crothall*, 2012 WL 707238, at *20 (Del. Ch. March 27, 2012).

PV is controlled by the AJ Group. Prior to the convertible note transactions discussed below, Respondents owned 66.7% of PV's equity, and Claimant owned 33.3%. *See supra* § I.B. Moreover, Respondents Gol and Chaluts, acting in their capacity as Directors of PV, approved a method of financing the Company through the issuance of convertible notes issued to the AJ

Group which benefitted themselves, in that it could (and ultimately did) result in TNJ's equity share in the Company being significantly diluted and the AJ Group's equity being correspondingly increased. The Tribunal finds that in these circumstances, the business judgment rule's presumption is rebutted and the burden therefore shifts to Respondents to prove the "entire fairness" of the issuance of the Type I and Type II convertible notes and the conversion of the Type II Notes in September 2020.

- **Entire Fairness Standard**

In *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983), the Delaware Supreme Court articulated the elements of Delaware's entire fairness standard: "The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.... However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness."[18]

As observed by the courts, "the entire fairness standard does not 'lend itself to bright line precision or rigid doctrine' and in evaluating the fairness of a transaction, courts make a unitary fairness conclusion based upon the totality of the circumstances." *Emerald Partners v. Berlin*, 2003 WL 21003437, at *22 (Del. Ch. Apr. 28, 2003) (citations omitted), *aff'd*, 840 A.2d 641 (Del. 2003).

---

[18] *See also Cinerama, Inc v. Technicolor, Inc.*, 663 A.2d at 1162-63 (Del. 1995).

(A)    Type I Notes

The terms of these Notes were discussed at three Board meetings on February 24, February 25, and February 26, 2020.  (J-091f; J-091a; J-091b.)  One of TNJ's directors, Ms. Lev-Aretz, attended the February 24th meeting.  (Tr. 1531.)  The meetings on February 25th and 26th were attended by both Ms. Lev-Aretz and Jossef.  (Tr. 1536.)  Ms. Lev-Aretz was briefed prior to the meetings and in fact agreed that it was not necessary to obtain a fairness opinion.  (C-433a.)  In addition, TNJ was given the opportunity to take up the whole $1 million issuance of the Type I convertible notes. (J-091a at AJGROUP_AAA_0009184.)

The Type I Notes were convertible (in the absence of third-party investment) at a valuation of $50 million.  This is a higher value than the $46 million value implied by the arm's length SFNTA transaction, in which TNJ and Respondents converted debt for equity.[19]  It was also within the range suggested by Bank of America Merrill Lynch, who advised PV's counsel that it would be able to market PV to investors at the $30 million-$40 million range if PV could raise capacity in its Atlanta warehouse to 50%.  The $50 million valuation was also aligned with the amount of investor debt.

Having reviewed the circumstances under which the Type I Notes were approved and issued, as well as their substance, the Tribunal determines that the Type I Notes were fairly issued in accordance with the Delaware fairness standard and are binding in all respects.

---

[19] As reflected in the SFNTA (J-001 at AJGROUP_AAA_0016061, Recitals C & E), TNJ exchanged 6,250,000 shares in the Company for $11,514,099 in Company debt.  The value per share exchanged is $11,514,099/6,250,000, or approximately $1.84 per share.  The total number of PV shares outstanding at the SFNTA closing was 25,000,000 shares.  (*Id.* at AJGROUP_AAA_0016074 (SFNTA), Schedule 1 (18,750,000 shares held by stockholders post-SFNTA + 6,250,000 transferred to the Company.)  Thus, the implied valuation of PV at the time of the SFNTA was approximately $46 million (25,000,000 shares x $1.84 per share).

(B)     Type II Notes

The Tribunal observes that the lead-up to the Board's approval of the issuance of Type II Notes on March 16, 2020 raises a question of fairness in terms of whether TNJ had adequate time or opportunity to meaningfully comment or object.  As noted earlier, no evidence was presented to the Tribunal on internal discussions that may have occurred between and among any of the parties or their respective counsel concerning the terms of the Type II Notes prior to the March 16, 2020 meeting at which they were approved.  However, both of TNJ's directors were present at the meeting as was TNJ's attorney, Mr. Slarskey, who commented on the need for the transaction to meet the "entire fairness standard".

As discussed above, the $50 million valuation which was the basis for convertibility of the Type I Notes (in the absence of third-party investment) comports with the Delaware fairness standard.  This $50 million valuation was included in the Type II Notes with the important difference that the Type II Notes provided for convertibility at the lower of PV's equity value as determined by an independent financial advisor or investment bank or $50 million.  On their face, these terms are not unfair, assuming that a proper valuation is performed.  Therefore, the Tribunal concludes that the approval and issuance of the Type II Notes was, in principle, valid.  However, the Tribunal is not persuaded that Respondents have discharged their burden of establishing "entire fairness" with respect to the Empire valuation which was used as the basis for converting the Type II Notes in September 2020.

The Empire valuation discounted PV management projections, a decision which even Mr. Nammacher of Empire acknowledged could be questioned.  Delaware courts prefer to rely on management projections.  *See Doft & Co. v Travelocity.com Inc.*, CIV.A. 19734, 2004 WL 1152338, at *6 (Del. Ch. May 20, 2004).  The discount rate utilized by Empire as well as the

unlevered cash flow analysis it utilized were criticized by Claimant's expert, Mr. Antoniades. A company's valuation must comport with common sense; and, as Claimant's expert suggested, the Empire valuations do not. (J-005 (Antoniades Report), ¶¶ 65-68.)

Empire valued the Company as of March 31, 2020 at $1.1 million and as of September 30, 2020 at $2 million. Under these circumstances, as noted by Mr. Antoniades, one would have expected "management to cease operations and liquidate the company." (J-005, ¶ 66.) But PV did not cease operations. Despite the low valuation, the AJ Group continued to pour many millions of dollars into the Company. While an argument can be made, as Jossef reminded Respondents on more than one occasion, that they had to continue funding in hope of one day recouping their investment, it does not explain why, during the course of this arbitration, Respondents made an application to the Tribunal for permission to issue up to $10 million of convertible notes to "friends and family". *See* Tribunal Order 16, dated October 7, 2021 conditionally approving the "friends and family financing."

The Empire valuation was never meant to be an opinion on fair value. The Empire Engagement Letter dated March 23, 2020 addressed to Pepper Hamilton states: "We understand that the valuation and any requested valuation consulting services will be used to assist you in providing legal advice to your Client related to issuing convertible debt for your Client. **This engagement is in no way to be construed as any kind of opinion of fairness or solvency related to any actions contemplated or taken by the Client or the issuance of debt to raise capital for [PV].**" (C-496b (emphasis added).)

There is a qualitative difference between a "valuation" and an "opinion of fairness". A valuation informs the transaction price while a fairness opinion considers the reasonableness of

such price and the general terms of the transaction. Despite the recommendation of counsel, PV chose not to obtain a fairness opinion with respect to the Empire valuation.

The meaning of entire fairness was definitively set out by the Delaware Supreme Court in *Weinberger v. UOP, Inc.* discussed above (*supra* p. 44), in which the court outlined the two aspects of the entire fairness standard: fair dealing and fair price. As noted in *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006): "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *See Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 455-58 (Del. Ch. 2011).

The Tribunal does not find the Empire valuation to be credible and is not persuaded that the conversion of the Type II Notes, which was based upon the Empire valuation, comported with Delaware's "entire fairness" standard, either as to fair price or fair process. Among other things, the record reflects that: the Empire Valuation of $1.1 million is significantly lower than any other valuation (formal or informal) utilized by the Company at other points in time both before and after the issuance of the Type II Notes, and that the valuation was based on changes Empire made to PV's management projections. Accordingly, in the exercise of the Tribunal's equitable jurisdiction, Respondents are directed to cause PV to return the $15,351,267.11 Type II Notes converted to date to the previous holders of such Notes in exchange for the PV stock previously delivered when the Notes were converted.

**INTERIM AWARD**

For the foregoing reasons, the Tribunal hereby grants and orders the following:

1.      The Share Forfeiture and Note Transfer Agreement (SFNTA) is valid and binding and enforceable in accordance with its terms.

2.      The Amended and Restated Stockholders' Agreement (ARSA), including the First Amendment to the ARSA, are valid and binding agreements enforceable in accordance with their terms.

3.      Based on the documents in the record that were submitted to the Tribunal, each of the Certificate of Amendment, the Written Consent of the Stockholders, and the Designation of Proffered Shares appear to be valid Board actions taken in accordance with Delaware law. However, given the absence of any testimony regarding the preparation and execution of these documents, the Tribunal is unable to declare that the Charter amendment is presumptively valid.

4.      The GreyOrange Redemption on the books and records of PV showing a TNJ credit of $3,340,000, representing 33.34% of the $10 million redemption, is a correct allocation.

5.      Claimant's assertions of accounting fraud and irregularities in PV's books and records are rejected.  The Tribunal expresses no view on whether PV's books and records are in compliance with generally accepted accounting standards.

6.      The Tribunal declines to issue the Declaration requested by Respondents that $2,090,614.72 in claimed expenses by TNJ be removed from the books and records of PV.  The Tribunal expresses no opinion as to the validity of the expenses.

7.      The February 26, 2020 Board of Directors' authorization of the issuance of an aggregate of $5 million Type I Notes is in compliance with Delaware's "fairness standard" and

any and all Type I Notes issued thereunder are valid and binding obligations of PV enforceable in accordance with their terms in all material respects.

8.      The Type II Notes were validly issued.  However, the conversion of the $15,351,267.11 Type II Notes by the holders of such notes at a $1.1 million valuation violated Delaware's entire fairness standard.  Effective as of the date of this Interim Award, all conversions of Type II Notes are rescinded.  As expeditiously as possible but in no event no later than ten (10) days from the date of this Interim Award: (i) any Project Verte equity received by holders of the converted Type II Notes are to be returned to the Company; (ii) the Company shall return the Notes associated with such equity to the former holders of such Notes and (iii)  Project Verte's stock ledger shall be accordingly adjusted to reflect that TNJ is a 33.33% owner of PV and that the AJ Group is a 66.67% owner of PV.  Interest prescribed in the Type II Notes shall be deemed to have accrued from the date of original issuance, will continue to accrue until such time as they are converted in accordance with the terms of the Type II Notes, and will be payable to the holder of such notes.  Because TNJ now owns more than 10% of TNJ, Respondents shall make room on PV's Board for TNJ, in accordance with the First Amended and Restated Stockholders' Agreement, by causing the resignation of two of the Directors appointed by Respondents and voting its PV stock to elect two TNJ designated Directors in their place.  This Order does not affect the right of holders of Type II Notes to exercise their conversion rights at a future date in accordance with the terms of the Type II Notes.

**APPLICATION FOR AN AWARD OF ATTORNEY'S FEES AND COSTS**

The record of this arbitration is hereby held open for the sole and limited purpose of receiving the written submissions specified in this paragraph. Any party that believes it is entitled to an award of attorney's fees and expenses, and costs of litigation in its favor by reason of this Interim Award of Arbitrators may file an application for such an award on or before February 10, 2022.[20] Any application for the award of attorney's fees, expenses and costs of litigation shall be exclusive of AAA charges and the arbitrators' compensation. The allocation of those items will be based on the AAA financial records concerning such expenses; it will help to avoid confusion if all such expenses are excluded from the applicant's cost application.

Any such application shall brief the Tribunal's authority to make the requested award and shall append detailed day-by-day billing statements or contemporaneous time records documenting the detail of the amounts claimed, and shall include copies of receipts for expenses greater than $500.

Separately (and not related to the determination of whether to apply generally for an award of attorney's fees and costs), Respondents may submit an application for legal fees and out-of-pocket expenses associated with Claimant's challenge to Respondents' assertion of the attorney-client privilege over certain documents and communications that reflected the legal advice of Sara Rubenstein, PV's Corporate Secretary and counsel. The relevant period for those fees shall be from January 13, 2021 (the date of the Tribunal's Pre-Hearing Order No. 4, which permitted Claimant to challenge Respondents' assertion of privilege over documents involving

---

[20] In determining whether to make an application for attorney's fees, expenses and costs, the Tribunal strongly urges the parties to consider the mixed nature of the remedy awarded in this Interim Award. No party prevailed or lost on the entirety of its claims in this dispute. The decidedly mixed outcome, in our opinion, casts doubt on the wisdom of incurring further expenditures of time and money in an effort to persuade the Tribunal to allocate equitably fees and costs.

Ms. Rubenstein) through July 8, 2021 (the date of the Tribunal's Pre-Hearing Order No 15 denying Claimant's motion for reargument of Pre-Hearing Order No. 11).  In addition, Respondents may provide separate detailed time and costs associated with work performed in connection with the withdrawal of TNJ's legal counsel during the arbitration hearing on Wednesday, August 11 (at the end of day three of the hearing) and counsel's re-engagement on Thursday, August 12 (the beginning of day four of the hearing).

After service of any such application, counsel for the parties shall meet and confer telephonically to explore whether agreement can be reached concerning all or parts of the application.  Any such agreement shall be reported to the Tribunal promptly.  Absent such agreement, the opposing party may file an opposition to the application, on or before February 24, 2022.  A reply in support of the application may be filed on or before March 3, 2022.  This schedule may be varied by agreement of counsel; any such agreement shall be reported promptly to the Tribunal.  Following receipt of such submissions, the fees and costs issues will be decided without further oral arguments in the Final Award.

The Final Award will incorporate the substantive award made above in this Interim Award and will allocate the expenses of the arbitration related to AAA charges and arbitrators' compensation.  Since the Final Award has not yet been issued, it is not intended that this Interim Award be regarded as final and subject to review pursuant to 9 U.S.C. Secs. 9-10 or any judicial proceedings in connection therewith.  This Interim Award of Arbitrators shall remain in full force and effect until such time as a Final Award is rendered by this Tribunal.

All other claims not specifically addressed herein are denied.

We hereby certify that this Interim Award shall be deemed to have been made in New York, New York.

This Interim Award may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument.

Dated: January 11, 2022

George Gluck
Arbitrator and Tribunal Chair

I, George Gluck, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the Interim Award of the Tribunal.

Dated: January 11, 2022

George Gluck

Dated: January 11, 2022

William B. Chandler III, Arbitrator

I, William B. Chandler III, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the Interim Award of the Tribunal.

Dated: January 11, 2022

William B. Chandler III
Dated: January 11, 2022

Susan W. Waesco, Arbitrator

I, Susan W. Waesco, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the Interim Award of the Tribunal.

Dated: January 11, 2022

Susan W. Waesco

54