UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

SIGALIT YEHUDA,

                                                21-cv-08921 (AT)

                Plaintiff,

        v.

JOSSEF KAHLON

                Defendant/Counterclaim Plaintiff,

        v.

AVRAHAM YEHUDA,

                Counterclaim Defendant.

_____

**PLAINTIFF'S AND COUNTERCLAIM DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT AND COUNTERCLAIM PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT FOR AN INTERLOCUTORY JUDGMENT OF ACCOUNTING**

**GORDON & HAFFNER, LLP**
*Attorneys for Plaintiff and Counter Defendant*
480 Mamaroneck Avenue
Harrison, New York 10528
(718) 631-5678

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... 2

TABLE OF AUTHORITIES ............................................................................................. 4

PRELIMINARY STATEMENT ........................................................................................ 6

COUNTERSTATEMENT OF FACTS ........................................................................... 111

ARGUMENT ................................................................................................................... 17

POINT I:  THE PARTIES' CONFIDENTIAL AND FIDUCIARY RELATIONSHIP, ARISING AS A MATTER OF LAW FROM THEIR STATUS AS CO-MEMBERS OF TJM, WARRANTS GRANTING PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT AND ENTRY OF AN INTERLOCUTORY JUDGMENT DIRECTING KAHLON TO PROVIDE A VERIFIED STATEMENT OF ACCOUNT OF HIS DEALINGS WITH TJM AND ITS PROPERTY AND ASSETS. ........................................................................ 177

    A.   It Is Well Documented That The Sale Of Tract 3 Took Place And That Kahlon Received Its Proceeds. ..................................................... 188

    B.   Sigalit's Right To Inspect TJM's Books Is Independent Of Her Right to Demand An Accounting From Kahlon, Its Managing Member. .................................................................................................... 20

    C.   Sigalit's Claim For An Accounting Is Neither Time Barred Nor Forfeited; According to Kahlon, TJM's Last Documented Activity Occurred In Or After 2017............................................................................. 22

POINT II:  KAHLON DOES NOT SPECIFY WHICH COUNTERCLAIMS ARE THE SUBJECT OF HIS MOTION ..................................................................... 22

POINT III:  KAHLON'S FRAUD ON THE SEC OPERATED TO BAR HIS FIRST AND FIFTH COUNTERCLAIMS UNDER THE DOCTRINES OF EQUITABLE AND JUDICIAL ESTOPPEL ................................................... 23

POINT IV:  THE FIRST AND FIFTH COUNTERCLAIMS SHOULD BE DISMISSED BECAUSE SIGALIT (AND/OR AVI) IS NOT LIABLE FOR CLAIMS ARISING FROM TJM'S STATUS AS CODEFENDANT IN THE SEC LITIGATION........................................................................................... 24

POINT V:  THE FIRST AND FIFTH COUNTERCLAIMS SHOULD BE DISMISSED BECAUSE KAHLON LACKS STANDING TO PROSECUTE EITHER ...................................................................................... 25

POINT VI:  THE FIRST AND FIFTH COUNTERCLAIMS FAIL BECAUSE NO CAPITAL CALL PROVISION IS ALLEGED OR PROVEN.................................. 26

POINT VII:  THE FIRST AND FIFTH COUNTERCLAIMS FAIL BECAUSE
NO LOSS TO THE COMPANY IS ALLEGED OR PROVEN. .................................... 27

POINT VIII:  THE FIRST AND FIFTH COUNTERCLAIMS SHOULD BE
DISMISSED BECAUSE THEY ARE PRECLUDED BY THE EQUITABLE
DOCTRINE OF *IN PARI DELICTO*............................................................................... 30

POINT IX:  SUMMARY JUDGMENT ON KAHLON'S FIRST AND FIFTH
COUNTERCLAIMS, AND HIS REQUEST FOR AN INQUEST, SHOULD BE
DENIED BECAUSE AN ACCOUNTING MUST FIRST BE HAD TO
DETERMINE AND TRUE-UP THE MEMBERS' CAPITAL ACCOUNTS................ 32

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*CBI Cap, LLC v. Mullen*,
  19-civ-5219-AT, 2020 WL 4016018 (S.D.N.Y., July 16, 2022) ........................ 16

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................... 28

*Baccash v. Sayegh*,
  53 A.D.3d 636 (2nd Dep't 2008) ........................................................... 26

*Brach v. Levine*,
  36 Misc. 3d 1213, 2012 WL 2899021 (Sup. Ct. N.Y. Co. 2012) ........................ 25

*Dodge v. Richmond*,
  10 A.D.2d 4 (1st Dep't 1960) .............................................................. 30

*Ederer v Gursky*,
  9 N.Y.3d 514 (2007) ......................................................................... 20

*Gerber Fin.*,
  333 F. Supp. 3d 307 (S.D.N.Y. 2018) ..................................................... 16

*ImagePoint, Inc. v. JPMorgan Chase Bank, Nat. Ass'n*,
  27 F. Supp. 3d 494 (S.D.N.Y. 2014) ...................................................... 31

*Kirschner v. KPMG LLP*,
  15 N.Y.3d 446, 938 N.E.2d 941 (2010) ................................................... 30

*Koppel v. Wein, Lane & Malkin*,
  125 A.D.2d 230 (1st Dept. 1986) ........................................................... 21

*Mahoney-Buntzman v. Buntzman*,
  12 N.Y. 3d 415 (2009) ....................................................................... 23

*New Castle Siding Co., Inc. v. Wolfson*,
  97 A.D.2d 501 (2nd Dep't 1983) ........................................................... 26

*Retropolis, Inc. v. 14th St. Dev. LLC*,
  17 A.D.3d 209, 797 N.Y.S.2d 1 (1st Dep't 2005) ......................................... 24

*Scholastic, Inc. v. Harris*,
  259 D.3d 73 (2d Cir. 2001) ................................................................. 20

*Sealy v. Clifton, LLC*,
  68 AD3d 846 (2nd Dep't 2009) ............................................................ 26

*SEC v. Kahlon,*
  873 F.3d 500 (5th Cir. 1987)...................................................................... 12, 23, 32

*Stone v. Freeman,*
  298 N.Y. 268, 82 N.E.2d 571 (1948).................................................................. 30

## Statutes

NY LLC Law § 502 ......................................................................................... 26

NY LLC Law § 503 ......................................................................................... 28

NY LLC Law § 504 ......................................................................................... 28

NY LLC Law § 601 ......................................................................................... 25

NY LLC Law § 609(a)................................................................................... 7, 24

NY LLC Law § 610 ......................................................................................... 24

## Rules

Fed. R. Civ. P. 56(a)....................................................................................... 28

# PRELIMINARY STATEMENT[1]

The Plaintiff in Counterclaim, Jossef Kahlon ("Kahlon"), fails to identify the counterclaims under which he is moving for summary judgment. His general theory appears to be based on his status as co-defendant with TJ Management, LLC (the "Company" or "TJM") in an SEC action. After a joint and several judgment issued against Kahlon and the Company, Kahlon settled the judgment debt and made payment arrangements with the SEC. Kahlon hints (although he never actually alleges) that he paid the settlement amount out of his own pocket, and now claims he is entitled to a "contribution" from Plaintiff Sigalit Yehuda ("Sigalit"), his co-member in TJM, and from her husband, Counterclaim Defendant Avraham Yehuda ("Avi") (Sigalit and Avi, collectively, the "Yehudas") because they allegedly benefitted indirectly from his settlement arrangements.

---

[1] Plaintiff requests leave to submit this Memorandum of law two days late. Unforeseen last Friday when I requested and the Court granted Plaintiff a two-day extension from Monday to Wednesday, we had a snow emergency (3' of snow) Wednesday at our Western MA home, which prevented a heating oil delivery that day. Aggravating matters, our utility also notified me that morning of a power outage. Because power was out and the house very low on fuel, I had to drive early Wednesday from Glastonbury, CT (our current residence) to Worthington, MA in order to pour five gallons of diesel from a storage can into the fill pipe. Despite this emergency, I still hoped to file motion papers by Wednesday midnight, the reason I did not write to the Court Wednesday. While I was able to file papers by midnight Wednesday, unfortunately this MOL was incomplete. Though I expected to file Thursday, I underestimated how exhausted I would be Thursday after being up for 20 hours Wednesday trying to complete these papers, avoid burst pipes, and participate in a last-minute effort to settle a case scheduled for a weeklong trial Monday, involving a virtual court settlement conference. Communications with the court and further settlement negotiations with opposing counsel Thursday further interfered with my filing this MOL yesterday. At least we managed to settle the case and avoid the trial. I apologize for any inconvenience to the Court and opposing counsel and will of course consent to an extension of Defendant's reply time.

Kahlon's "contribution" counterclaims face two insurmountable hurdles. First, the doctrines of judicial and equitable estoppel prevent Kahlon from taking a position in this litigation contrary to the position he has already taken in his prior legal proceedings with the SEC, in which he represented that he was TJM's sole owner, officer and employee. Having obtained advantageous determinations in the SEC litigation from this representation, it operates as a complete bar to his contribution claims, which are premised on his present conflicting assertion that Sigalit is a co-owner of TJM. Further, Kahlon's misrepresentations to the SEC at least give rise to a fair inference that he falsely reported on TNJ's tax returns that he was its sole owner. If true, the related doctrine of tax estoppel would also apply to bar his flatly contradictory factual position taken in this case.

Second, the entire claim is predicated on the unstated assumption that a passive shareholder, such as Sigalit Yehuda, has a legal duty to indemnify or make contribution to an actively culpable shareholder, like Kahlon, for the personal consequences of his misconduct. This wildly misapprehends New York's limited liability company laws. *See* NY LLC Law § 609(a) ("[No] member of a limited liability company. . . is liable for any debts, obligations or liabilities of the limited liability company or each other, whether arising in tort, contract or otherwise, solely by reason of being such member[.]")

Kahlon now contends that, if he paid a settlement debt to the SEC out of his own pocket, the silent members of his LLC are required by law to reimburse him. The proposition is facially absurd. The entire structure of the LLC is built around *limiting* the liability of its members. If the Company experiences a loss, even a catastrophic one, a member's own personal assets remain safe, and cannot be tapped to reimburse the company. A member's liability is limited to past contributions. This limitation on personal liability is the entire point of the limited liability structure.

If Kahlon indeed settled the SEC judgment with his own personal assets, and if he believes that he should be reimbursed for some portion of that payment, he should seek contribution directly from the Company as an entity, his co-defendant in the SEC action. Kahlon's dual status, as member of the Company and as a co-defendant in the SEC action in his own right, gives him no right to pierce TJM's corporate veil and drain the personal assets of other members.

Moreover, Kahlon never even discloses the source of the money paid under the settlement – i.e., whether he paid out of the Company's retained earnings or out of his own personal assets. To the extent that a legally cognizable claim might otherwise lie for contribution of sums Kahlon allegedly paid out in settlement, Kahlon's motion for summary judgment on the claim must be denied for his failure to allege he used personal assets to pay the settlement, an essential part of his burden as movant for summary judgment on such a claim.

Further, as Kahlon and Sigalit Yehuda are members of an LLC, neither can have a claim for damages against the other, directly or indirectly, until the Company winds up or there is an accounting. Ironically, by demanding a "contribution" from Sigalit and her husband, Kahlon is indirectly requesting an accounting -- the very remedy his co-member, Sigalit, is seeking, and which he purports to oppose. Kahlon appears to recognize this, as he has alleged he will become entitled to payments or contributions only after an accounting related to TJM's real estate transaction: "[f]ollowing such an accounting[2], Kahlon is entitled to an order adjudicating his objections to such accounting and to final judgment in his favor for the amount of receipts of income or property by Avi and Sigalit, their share of which was disgorged by Kahlon to the SEC[.]" (*Id*.).

In his Sixth Counterclaim, Kahlon *affirmatively and directly* demands the very accounting relief for which Sigalit has sued. In it, he alleges all the elements required for an accounting (other than a prior demand, a requirement Sigalit met). Most significantly, his allegation that, "as co-owners of the Company, Sigalit and Avi were and remain in a confidential or fiduciary relationship with Kahlon" (DE # 23, Kahlon Answer ¶ 98) establishes the privity necessary for Sigalit's accounting claim.

---

[2] Kahlon's opposition to Sigalit's accounting claim, as concerning only the Ledbetter property (*i.e.*, the consideration Kahlon received from Project Verte, Inc. ("PVI") based on his, as yet unperformed promise to convey that property to PVI) blatantly misrepresents the Complaint and Sigalit's pre-suit demand (Haffner Decl., Ex. E) upon Kahlon for an accounting.

In spite of his admissions, the unequivocal record, and the impossibility of squaring dismissal of Sigalit's accounting claim with his own counterclaim for the same relief, Kahlon has the temerity to argue in his motion that he has no obligation to account to Sigalit. Kahlon's simultaneous demand for and objection to an accounting are dizzying, and only create obstacles to coherent and efficient adjudication of the parties rights and obligations *inter se*. Fortunately, all of his arguments against an accounting lack merit. First, Kahlon argues that the real estate transaction with PVI never occurred and that the transaction is the sole justiciable basis for the accounting. Both arguments are controverted by the record and fail to pass the laugh test. Second, he argues that Sigalit is not entitled to an accounting from him because she had the right to inspect TJM's books. This misstates the law, which provides a right to an accounting of a fiduciary partner's transactions separate and apart from any right to review existing documents already in the possession of their company. Third, Kahlon argues that Sigalit's request is time-barred because TJM has been inactive since 2011. This argument is defeated by clear evidence in the record demonstrating that Kahlon caused TJM to contribute its real estate to PVI in or after 2017[3].

---

[3] Avi Decl. ¶ 7; Haffner Decl. Exh. A, Related SDNY Case, Answer of PVI at 8-9; Exh. B, Related SDNY Case, Answer of Jossef Kahlon at 9, ¶¶ 101-103; Exh. D, Related SDNY Case, Decision and Order at 2-4.)

## COUNTERSTATEMENT OF FACTS

In 2004, Defendant/Counterclaim Plaintiff Kahlon asked Counterclaim Defendant Avi to invest in a stock trading business, TJ Management LLC ("TJM"), for which Kahlon needed funds. Kahlon and Avi agreed that, in exchange for a $350,000 contribution from Avi, Avi's wife, Sigalit Yehuda ("Sigalit"), would receive a 50% interest in TJM. (Declaration of Avi Yehuda, dated March 15, 2023 ("Avi Decl.") ¶ 2.)[4] On or about November 15, 2004, the $350,000 contribution having been made, Kahlon assigned 50% of TJM to Sigalit. (DE #1 at 6, Compl. Ex. A.) The agreement assigning Sigalit her interest in TJM lacked any provision under which Sigalit or Avi agreed to be subject to capital calls by TJM. (*Id.*). Nor does Kahlon report the existence of any operating agreement or other agreement obligating either member of TJM to contribute personal funds to pay TJM's losses, expenses, or liabilities. (*See generally* DE # 64, Kahlon Decl.).

Between 2004 and 2011, TJM's activities primarily involved the purchase and resale for profit of the shares of small companies. (Avi Decl. ¶¶ 10, 17). Following the Yehudas' $350,000.00 investment in 2004, the volume of TJM's trades exploded. For example, during the period May 2008 through 2010 alone, TJM

---

[4] Avi and Sigalit used marital assets to make the contribution, and they agreed that, although Sigalit would own the interest in TJM, Avi would deal with Kahlon and generally oversee the investment on Sigalit's behalf. (Avi Decl. ¶ 3.)

purchased and sold over 18 billion shares for gains of almost eight-million dollars ($8,000,000.00). (Avi Decl. ¶ 11).

Although Kahlon initially required only $350,000.00 to begin trading,[5] a few years later, TJM needed to retain substantial earnings to fund the exploding volume of its purchase of shares for trades. (Avi Decl., ¶ 12.) Kahlon did not disclose to Avi the exact amount of the earnings TJM retained to fund these ongoing investment activities and operations during this or any other period. (*Id.*) However, based on conversations with Kahlon, and on the volume of trading in which TJM was engaged by 2008, Avi reasonably believed TJM was retaining well over a million dollars for that purpose. (*Id.*)

In 2009, Kahlon notified Avi that the SEC was investigating TJM's trading practices and that, therefore, distributions would be reduced to fund the defense and possible settlement of any SEC charges. (Avi Dec., ¶ 14.)

In 2010, the SEC took the position that some of the stock trades Kahlon was making with TJM assets were illegal.[6] (Kahlon Decl., ¶ 8). In 2011, Kahlon ceased trading on behalf of TJM. (Avi Decl. ¶ 15.) The SEC filed suit in the United States District Court for the Eastern District of Texas, resulting in a judgment of more than

---

[5] It is unknown whether Kahlon contributed any start-up capital for trading.

[6] *SEC v. Kahlon*, 873 F.3d 500, 503, 508 (5th Cir. 1987) (Rule 504 transactions). (Avi Decl., fn2 at p. 3).

$9 million against TJM and Kahlon. (Kahlon Decl. ¶ 15.) A panel of the Fifth Circuit upheld the judgment on appeal, opining that Kahlon's misconduct consisted of "reckless and quite likely knowing violations" of the law and, further, that "[w]e see no innocent straying across hidden limits but instead a well-planned march beyond the boundaries that were sufficiently marked for investors." *SEC v. Kahlon*, *supra*, 873 F.3d at 508. Avi and Sigalit were not named in the lawsuit or in the judgment[7] (*see* DE #64-4, Opinion of the United States District Court for the Eastern District of Texas) and did not participate in the suit's defense (DE #64, Kahlon Decl. ¶¶ 13 and 15).

Kahlon now asserts that, after the judgment became final, he negotiated with the SEC, ultimately executing a Memorandum of Settlement ("MOS"). (Kahlon Decl. ¶ 15.) According to Kahlon, under the MOS, the SEC reduced the judgment to $2.2 million, which *someone* (not identified by Kahlon) was obligated to pay the SEC over a period of seven years. (DE # 64, Kahlon Decl. ¶ 15.)

It is not clear from the record whether the obligation to make payments under the MOS fell on Kahlon, TJM, or on them both jointly and severally. Kahlon has not bothered to include the MOS in the record, and Kahlon's Declaration does not identify a specific obligor. (*Id.*) However, Kahlon has testified that the settlement

---

[7] Kahlon evidently represented to the SEC that he was "the sole owner, officer, and employee of TJ Management Group ("TJM")[.]" *SEC v. Kahlon*, *supra*, 873 F.3d at 503.

amount was determined solely based on his personal ability to pay (DE #63-1, Kahlon Deposition at 9), suggesting that the MOS imposes obligations solely on Kahlon and not on TJM.

It is also not clear from the record who in fact made payments to the SEC -- whether Kahlon or TJM or both. Again, for reasons not disclosed, Kahlon has failed to include any payment documentation in the record. Kahlon has asserted, however, that he personally "complied with the terms and provisions of the settlement and made all payments required" (DE #64, Kahlon Decl. ¶ 16).

Kahlon stopped trading on TJM's behalf in May 2011. (Avi Decl. ¶ 15). However, at least eight months earlier, TJM ceased making further distributions of earnings to Avi or Sigalit. The last distribution received by Avi or Sigalit was made October 27, 2010, in the amount of $350,000.00. (Avi Decl. ¶ 15).

Despite Kahlon's having terminated TJM's trading operations, TJM never made any final or other distribution to Sigalit or to Avi, either from its substantial retained earnings or from any profits earned by TJM between the October 27, 2010 distribution and May 2011. (Avi Decl. ¶ 16.) Nor did TJM ever provide an accounting or even documentation showing the amount of TJM's profits and retained earnings after the period covered by the October 27. 2010 distribution (*Id.*).

In or about 2017, Kahlon asked Avi to contribute to the costs of the defense of the SEC action. (Avi Decl. ¶ 18.) Avi rejected the request for, among other

reasons, Kahlon's refusals to disclose what he was alleged to have done, the reason the SEC was pursuing only TJM and him, and the amount of TJM's retained earnings and other assets. (*Id*.) Kahlon neither invited Avi or Sigalit to participate in the defense nor consulted with either concerning any aspect of the SEC action, including his decision to enter into the MOS. (*Id*.; DE # 64, Kahlon Decl. ¶¶ 13, 16.).

Avi did know that one of TJM's assets in 2017 was real property known as 3450 East Ledbetter Drive, Dallas Texas ("Tract 3"). The history of TJM's acquisition of Tract 3 is as follows.  In or about 2007, TJM acquired three parcels of Texas real estate from a borrower in satisfaction of the loan TJM had made to the borrower. (Avi Decl. ¶ 5.) The three parcels were held in a company named Flowerdale, LLC. (*Id.*) The borrower assigned Flowerdale to TJM. (*Id.*) Tract 3 was one of the three parcels. (*Id.*) Kahlon then caused Flowerdale to convey Tract 3 directly to TJM. (*Id.* ¶ 6.) This left TJM holding two tracts of land indirectly, through its ownership of Flowerdale, and Tract 3 directly. (*Id.* ¶¶ 5-6.)

On and after April 16, 2020, Avi learned from a third party that Project Verte LLC ("PVI") had purchased the three Texas parcels for fourteen million ($14,000,000.00) dollars: ten million ($10,000,000.00) dollars for Tract 3, and four million ($4,000,000.00) dollars for the remaining two Texas parcels. (Avi Decl. ¶¶ 7-9.) This was the first Avi had learned of the sale. (*Id.* ¶ 10.) At the time, Kahlon owned 50% of PVI through his separate corporation, TNJ Holdings, Inc. ("TNJH").

(DE #63-1, Deposition of Kahlon at 130-133; DE #50-2, Interim Award of Arbitrators at 7-8.)

It later came to light that, on or after 2017, Kahlon had offered to sell, and PVI had agreed to purchase, Tract 3 for $10,000,000.00, and, further, that PVI performed its obligations under that contract by issuing, at Kahlon's direction, a $10,000,000.00 credit to Kahlon's corporation TNJH. (Avi Decl. ¶ 7; Haffner Decl. Ex. A, Related SDNY Case, Answer of PVI at 8-9; Ex. B, Related SDNY Case, Answer of Jossef Kahlon at 9, ¶¶ 101-103; Ex. D, Related SDNY Case, Decision and Order at 2-3.)

By letter dated April 29, 2021, Sigalit demanded Kahlon provide a verified statement of account of all of Kahlon's dealings with TJM, and its property and earnings during the period November 15, 2004, to the present. (Haffner Decl., Ex. E; Avi Decl. ℙ 19). Kahlon rejected Sigalit's demand and, as a result, she filed the Complaint herein, asserting a claim against Kahlon for an accounting and a judgment to follow that accounting. (Complaint ℙ 15.)

## ARGUMENT

## POINT I:

## THE PARTIES' CONFIDENTIAL AND FIDUCIARY RELATIONSHIP, ARISING AS A MATTER OF LAW FROM THEIR STATUS AS CO-MEMBERS OF TJM, WARRANTS GRANTING PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT AND ENTRY OF AN INTERLOCUTORY JUDGMENT DIRECTING KAHLON TO PROVIDE A VERIFIED STATEMENT OF ACCOUNT OF HIS DEALINGS WITH TJM AND ITS PROPERTY AND ASSETS.

Sigalit is entitled to an accounting under a legion of New York authority. As this Court recently recognized,[8] under New York law, the elements of a cause of action for an equitable accounting are: (1) a fiduciary relationship; (2) entrustment of money or property; (3) the absence of other remedy; and (4) refusal of a demand for an accounting. The first and third elements are conceded by Kahlon, who affirmatively asserts the fiduciary relationship (DE #23, Kahlon's Answer ¶ 98.) and admits that only after an accounting could he be entitled to "the value of benefits received or accrued by Avi and/or Sigalit." (*id.* at ¶ 101.") The fourth element is incontrovertible. And the second element, though denied by Kahlon[9], is conclusively established by the record. To the extent that Kahlon opposes the accounting, his arguments are incoherent.

---

[8] *CBI Cap. LLC v. Mullen*, 19 civ.-5219 (AT), 2020 WL 4016018, *7 (S.D.N.Y., July 16, 2022), app. dism. (Aug. 30, 2021) (quoting *Fuller Landau Advis. Servs. v. Gerber Fin.*, 333 F. Supp. 3d 307, 315 (S.D.N.Y. 2018).

[9] Kahlon grossly misrepresents at ¶ 99 of his Answer (DE # #23): "That at all relevant times Avi has been the primary actor in the conduct and activities of the Company …."

A.   **IT IS WELL DOCUMENTED THAT THE SALE OF TRACT 3 TOOK PLACE AND THAT KAHLON RECEIVED ITS PROCEEDS.**

Kahlon attempts to avoid the accounting due Sigalit, as his co-member, by arguing that "the purported sale which is the entire alleged premise for the accounting claim *did not happen* … [because] TJM continues to own the property at issue" and "Sigalit cannot ask Kahlon to account for the proceeds of a sale that never happened." (DE #65, Kahlon's MOL, at 5-6, emphasis in original). This argument relies, first, on Kahlon's gross misrepresentation that the Complaint has requested an accounting only of TJM's real estate transactions. Belying however Kahlon's assertion the "entire alleged premise for the accounting claim" … are "proceeds of a sale that never happened" (*Id*.), the Complaint expressly demands a much broader basis and scope for the accounting:

> Sigalit demands that Kahlon provide a verified statement of account of Kahlon's dealings with the Company and its property and earnings during the period November 15, 2004 to date the demanded accounting is furnished, including, but not limited to, the Company's: (1) assets; (2) income, receipts and revenue received or accrued; (3) expenses paid or incurred; (4) distributions, dividends, salary, compensation or other monies taken or received by Kahlon (or by anyone at his direction); and, (5) all payments by the Company to third parties for services rendered to, or benefits received by, Kahlon (or to anyone at his direction).

(DE #1, Complaint, ¶ 1.) (See also Declaration of Avraham Yehuda's ("Avi Decl.") ¶¶ 12-17.

Falsity aside,  this argument is also defeated by its lack of any legal foundation. Kahlon argues that, because TJM still holds the deed to Tract 3, no transaction has occurred. This is claptrap, as it disregards (i) Kahlon's promise to convey, and PVI's agreement to purchase, Tract 3 for $10,000,000, (ii) PVI's performance of its obligations under that agreement by issuing Kahlon, at his request, a $10,000,000 credit in favor of Kahlon's company, TNJH,[10] and (iii) Kahlon's successful prosecution of TNJH's claims, *inter alia*, to enforce the $10,000,000 credit in an AAA Commercial Arbitration Kahlon brought on TNJH's behalf against Kahlon's co-shareholders in PVI.[11]

Kahlon's assertion "Sigalit cannot ask Kahlon to account for the proceeds of a sale that never happened [,]" (DE # 65, MOL at 6) artfully sidesteps what is, for Kahlon, the difficult fact that Sigalit seeks an accounting of, *inter alia,* the *consideration* Kahlon (or his company, TNJH) received for his promise to convey Tract 3 to PVI. Kahlon cannot reasonably or credibly argue that no consideration was received for that property, merely because TJM has thus far avoided delivering a deed to PVI. Indeed, the argument is absurd, as it is of no moment either to the existence of the sale agreement or of PVI's payment of the consideration for Tract 3

---

[10]  Haffner Decl., Ex. A (PVI Counterclaims), ¶ 1 (at p. 8); Ex. B (Kahlon Amended Answer) ¶¶ 101-102; Ex. D (Judge Marrero Decision), pp. 2-4; Ex. G (AAA Interim Award), p. 9, fn 8.

[11]  Haffner Decl., Ex. C (Kahlon attorney Daniel L. Abrams, Esq.'s letter to the Hon. Judge Marrero), p. 2; and, Ex. G (AAA Interim Award), p. 9, fn 8.

to Kahlon's company, that the obligation Kahlon incurred on behalf of TJM, *i.e.*, delivery of a deed to PVI, remains executory.

Evidently cognizant that his receipt of PVI's consideration is fatal to his defense, and truth not being the highest star in his constellation, Kahlon has gone so far as to claim the $10,000,000 credit he undeniably received from PVI was "for brokering the land, not selling the land."[12] Factual implausibility aside, this jaw dropping assertion is contradicted in Kahlon's own answer in related SDNY litigation, in which he asserts that his company, TNJH, "contributed the Texas Property to [PVI] as part of its initial capital contribution to [PVI,]" that "[t]he parties agreed to a $10 million valuation of the Texas Property," and that TNJH, in exchange for the property and an additional cash contribution of $4 million, received "shares of stock representing 50% ownership of PVI." (Haffner Decl., Ex. B, Related SDNY Case, Answer of Jossef Kahlon at 9, ¶¶ 101-103).

### B.   SIGALIT'S RIGHT TO INSPECT TJM'S BOOKS IS INDEPENDENT OF HER RIGHT TO DEMAND AN ACCOUNTING FROM KAHLON, ITS MANAGING MEMBER.

Kahlon's *second* argument (Dft.'s MOL, pp. 6-7), that Sigalit's alleged right to inspect TMJ's books defeats her right to an accounting, also lacks merit. The Second Circuit in *Scholastic, Inc. v. Harris*, 259 D.3d 73, 90 (2d Cir. 2001) squarely rejected the same argument. Reaching its decision the court held, "[e]ven if

---

[12] *See* Kahlon deposition transcript (DE #63-1) Tr. 137:5- 8.

Scholastic already possesses detailed financial information regarding the joint venture, there is nevertheless still an 'absolute right to an accounting'" (quoting *Koppel v. Wein, Lane & Malkin*, 125 A.D.2d 230, 234 (1st Dept. 1986).

Leaving aside Kahlon's disregard of controlling authority, his argument also ignores the plain fact that an accounting is entirely different from an inspection of company books, and the two are not mutually exclusive.  Rather, an accounting requires the fiduciary in control of the company to prepare a detailed and verified statement, supported by schedules of income and expenses over a defined period, followed by the plaintiff's filing of objections to the accounting, and proceedings, often before a court-appointed referee, to hear and recommend or determine the accounting.  Once complete, "the plaintiff gets an order directing payment of the sum of money found due." *Ederer v Gursky*, 9 N.Y.3d 514, 525 (2007).

Accordingly, a member's or shareholder's exercise of her rights to inspect company records, which does not entail the fiduciary's sworn and documented statement, objections, and resolution upon a hearing, will not defeat her right to an accounting. The only exception to this rule, not applicable here, are decisions denying an accounting where the party seeking it has engaged in substantial discovery in the action.  In any event, assuming *arguendo* that access to TJM's books and records could bar the accounting Sigalit seeks, Kahlon's allegation that he

provided the Yehudas with such access presents, at best, a triable issue, defeating Kahlon's motion for summary judgment dismissing Sigalit's claim.

### C. SIGALIT'S CLAIM FOR AN ACCOUNTING IS NEITHER TIME BARRED NOR FORFEITED; ACCORDING TO KAHLON, TJM'S LAST DOCUMENTED ACTIVITY OCCURRED IN OR AFTER 2017

Kahlon's *third* argument (Dft.'s MOL, pp. 7-8), that Sigalit's accounting claim is time barred because "Sigalit has not claimed any breach of fiduciary duty at any time at all, much less in the six years prior to this Complaint," is also unavailing. Contradicting Kahlon's bald misrepresentation that TJM had engaged in no business after 2011, the Complaint, in fact, specifically identified a later transaction of consequence, namely, PVI's issuance and TNJH's receipt in 2017, of a $10,000,000.00 credit in exchange for Kahlon's promise to convey Tract 3 to PVI. (Haffner Decl., Ex. B, Related SDNY Case, Answer of Jossef Kahlon at 9, ¶¶ 101-103.)[13]

### POINT II:

### KAHLON DOES NOT SPECIFY WHICH COUNTERCLAIMS ARE THE SUBJECT OF HIS MOTION

Kahlon seeks summary judgment with respect to "his Counterclaim seeking contribution against Sigalit and Avi [Yehuda]" (DE #45, Memorandum of Law at

---

[13] Likewise unavailing is Kahlon's *fourth* argument asserting laches (Dft.'s MOL, p. 8). The argument is makeweight on summary judgment, inasmuch as the defense is fact and credibility driven, necessarily raising triable issues inappropriate for resolution on summary judgment.

8). Kahlon asserts ten counterclaims, numbered but untitled. Because they are untitled, there is no way to determine which is the "Counterclaim seeking contribution." The First Counterclaim demands "$1,150,000, plus interest, pursuant to the doctrine of equitable contribution."[14] (DE #23, Answer and Counterclaims ¶ 83.) The Fifth Counterclaim demands $375,000 "by way of contribution" in legal fees that "Kahlon and the Company paid or expended" in the course of the SEC proceeding. (*Id.*, ¶¶ 95-96.) These are the only counterclaims that refer to "contribution," and presumably Kahlon seeks summary judgment with respect to one of these. Both are addressed in this opposition. His request for "an inquest, whereby he asserts the Court can assess and fix the amount of damages" (DE #45, at 11), is addressed separately.

## POINT III:

## KAHLON'S FRAUD ON THE SEC OPERATED TO BAR HIS FIRST AND FIFTH COUNTERCLAIMS UNDER THE DOCTRINES OF EQUITABLE AND JUDICIAL ESTOPPEL

Under the doctrines of equitable and judicial estoppel, Kahlon's fraud against the SEC, accomplished by misrepresenting to it that he was TJM's sole owner, officer and employee, estops him from now claiming otherwise. The doctrines prevent Kahlon from taking a position in this litigation contrary to the position he had previously taken in his prior legal proceedings with the SEC, wherein he

---

[14] Kahlon nowhere either explains what he means by "equitable contribution" or cites any cases that refer to this doctrine. His Memorandum of Law refers only to "contribution."

represented he was the sole owner, officer, and employee of TJM.[15] *SEC v. Kahlon*,

873 F3d 500, 502 (5th Cir. 2017).

## POINT IV:

## THE FIRST AND FIFTH COUNTERCLAIMS SHOULD BE DISMISSED BECAUSE SIGALIT (AND/OR AVI) IS NOT LIABLE FOR CLAIMS ARISING FROM TJM'S STATUS AS CODEFENDANT IN THE SEC LITIGATION

The First and Fifth Counterclaims should be dismissed because Kahlon's

claim for contribution to settlement, which he makes in his capacity as co-defendant

in the SEC litigation, is a claim against TJM. The TJM members are not liable. "[No]

member of a limited liability company. . . is liable for any debts, obligations or

liabilities of the limited liability company or each other, whether arising in tort,

contract or otherwise, solely by reason of being such member[.]" NY LLC Law §

609(a). "A member of a limited liability company is not a proper party to

proceedings by or against a limited liability company[.]" NY LLC Law § 610.

A claim for contribution against TJM as co-defendant does not implicate

TJM's members because Kahlon does not allege or offer evidence that would permit

him to pierce the corporate veil. To pierce the veil, Kahlon would have to allege or

---

[15] Plaintiff and Avi Yehuda have not yet received TMJ's and Kahlon's tax returns, which they expect will be produced as part of the accounting proceedings. However, Kahlon's representations to the SEC at least give rise to a fair inference that Kahlon represented on those returns that he was the sole owner of TJM. If this is true, the related doctrine of tax estoppel would also apply to bar claims based on Kahlon's flatly contradictory factual position taken in this case. *See, e.g. Mahoney-Buntzman v. Buntzman*, 12 N.Y. 3d 415, 422 (2009) ("A party to litigation may not take a position contrary to a position taken in an income tax return.").

prove that Sigalit (or Avi) personally dominated TJM with respect to its dealings with the SEC, resulting in fraud or wrongful consequences suffered by Kahlon. *See Retropolis, Inc. v. 14th St. Dev. LLC*, 17 A.D.3d 209, 210, 797 N.Y.S.2d 1, 2 (1st Dep't 2005) (asserting requirements for piercing veil of LLC).

## POINT V:

## THE FIRST AND FIFTH COUNTERCLAIMS SHOULD BE DISMISSED BECAUSE KAHLON LACKS STANDING TO PROSECUTE EITHER

The First and Fifth Counterclaims should be dismissed for Kahlon's lack of standing or lack of capacity, as the right to contribution, if any, belongs to the Company, not to Kahlon.

Even assuming *arguendo* Sigalit or Avi had some legal obligation to make an additional capital or other contribution to the Company, the right to such a payment would belong to the Company, a juridical entity existing separate and apart from its owners. Sigalit would have no obligation to make any such payment to Kahlon personally, as he is claiming. *See* NY LLC Law § 601 ("A member has no interest in specific property of the limited liability company."). Kahlon cites neither legal authority nor any operating agreement provision for the implicit premise on which his counterclaim rests – *i.e.*, that individual LLC members may sue a co-member for contributions needed by their company or for reimbursement of all or part of a contribution the individual member decided to make to or on behalf of the company. *See Brach v. Levine,* 36 Misc. 3d 1213, 2012 WL 2899021 at *5 (Sup. Ct. N.Y. Co.

2012) (members of LLC lacked standing to sue in their personal capacities for fraudulent encumbrance of property because "While such property may have been owned by a limited liability company wholly owned and controlled by [plaintiff members of the LLC], the limited liability company has a separate legal existence from its members") (citing *Baccash v. Sayegh*, 53 A.D.3d 636, 639 (2nd Dep't 2008); *New Castle Siding Co., Inc. v. Wolfson*, 97 A.D.2d 501, 502 (2nd Dep't 1983); and *Sealy v. Clifton, LLC*, 68 AD3d 846, 847 (2nd Dep't 2009)).

## POINT VI:

## THE FIRST AND FIFTH COUNTERCLAIMS FAIL BECAUSE NO CAPITAL CALL PROVISION IS ALLEGED OR PROVEN

Even assuming *arguendo* that Kahlon were suing on behalf of the Company (he is not), his claims for contribution would fail because Kahlon's Counterclaims do not allege, and Kahlon offers no evidence on this Motion, that the Company was entitled to make mandatory capital calls on its members. Under New York LLC law, an LLC member "is obligated to the limited liability company to perform any promise to contribute cash or property," NY LLC Law § 502. But there is no default statutory imposition of a mandatory capital-call provision. Kahlon does not allege that a capital-call agreement exists, and no such agreement is in evidence. Hence, even if the Company sustained a loss, some part of which was allocable to Sigalit, there would still be no lawful basis to compel a contribution from her. Absent a capital-call or similar provision in an operating or other agreement between or

among members of a New York LLC, allocable losses are simply deducted from future distributions or accounted for at winding up. They cannot trigger a mandatory contribution.

## POINT VII:

## THE FIRST AND FIFTH COUNTERCLAIMS FAIL BECAUSE NO LOSS TO THE COMPANY IS ALLEGED OR PROVEN.

Even assuming *arguendo* both that Kahlon were suing on behalf of the Company and that the operating agreement had a capital-call provision enforceable through direct suits against members, the First and Fifth Counterclaims would nonetheless fail because neither alleges, and Kahlon offers no evidence, that his payment to the SEC caused any loss to the Company. It rather appears that Kahlon's payments were a *benefit* he incidentally bestowed on the Company in paying a judgment debt for which he, individually, and the Company were jointly and severally liable.

Kahlon does not allege that the Company in fact experienced any loss as a result of his payments to the SEC. Rather, he alleges that he, in his individual capacity, was joint and severally liable with TJM for a judgment, which he settled and paid. (DE #23, Answer and Counterclaims ¶ 81.) He does *not* allege that he paid the SEC *on behalf of the Company*, much less that he made the payment *with Company funds*. Because Kahlon does not allege that he used Company funds or

acted as the Company's agent when he paid the SEC, his allegations fail to establish that his payments resulted in any loss to the Company.

The failure to allege a payment *by the Company* is fatal to the First Counterclaim. Without a payment by the Company, there is no "loss" to allocate among the Members and hence no basis for any hypothetical capital call for contribution. Kahlon tries to finesse the requirement of a company loss by citing New York LLC Law §§ 503 and 504 for the general proposition that "members in a New York LLC share losses as well as profits." But the cited sections only apply to losses and profits *of the company*, not to any losses and profits of a company's individual members. Members of a New York LLC are not required to reimburse each other for *personal* losses. And, in any event, these NY LLC Law provisions do not impose upon members personal liability to third parties for losses the company is unable to pay.

Nor has Kahlon come forward with sufficient evidence to carry his burden as the moving party to eliminate the question of a Company loss as a genuine dispute of fact. See Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Kahlon offers *no* evidence that he was in fact acting as the Company's agent, rather than on his own behalf as an individual, when he made payments to the SEC. Kahlon asserts that his settlement was governed by  the MOS (DE # 23, Answer and Counterclaims ¶ 80.), but he has not condescended to submit the MOS

to the court. Nor has he provided any sworn testimony or other admissible evidence that the Company was a party to the MOS. Nor has he provided any admissible evidence of any payments made in the Company's name or on the Company's behalf.[16] Nor has he offered any showing eliminating a triable issue that the legal expenses and settlement of the SEC litigation were paid with TJM's retained earnings or other funds. (*See* Avi Decl. ¶¶ 13, 16.) Incredibly, he has not even provided a document proving the payments were made at all.

Moreover, it is clear from Kahlon's deposition testimony that he was always and originally the sole contemplated payor under the MOS. The SEC determined the settlement amount entirely with respect to Kahlon's personal assets, without reference to the financial health of the Company as a whole or the financial means of Sigalit Yehuda as a Member. Explaining the settlement, which reduced a $10 million dollar judgment to a $2.2 million dollar stipulated debt, Kahlon testified as follows: "I showed them all the assets I had and we negotiate – actually it was very easy. I didn't have to pay the whole 10 million. I showed them what I have, and they asked me how much I can pay without changing my lifestyle, that's what happened."

---

[16] Kahlon's attorney, in the Rule 56.1 statement summarizing Kahlon's Declaration, asserts that payments were "made by TJM to the SEC" (Doc. 62 ¶ 16), that the losses resulting from the payment were "suffered by TJ Management LLC" (*id.* ¶ 17), and that Kahlon made his payment to the SEC "on behalf of TJ Management LLC" (*id.* ¶ 20). However, the Kahlon Declaration is not consistent with this summary. Nowhere does it refer to payments made "on behalf of TJM" or to "losses suffered by TJM" or to obligations of TJM under the settlement with the SEC. (*See* DE # 64, Kahlon Decl. ¶¶ 15-21.) The Rule 56.1 statement is thus unreliable, at least in this respect.

(DE #63-1, Kahlon Deposition at p. 9, lines 10-17.) These admissions are fatal to any claim by Kahlon that the Company was a party to, or was otherwise liable under, the MOS or that Kahlon made payments to the SEC on behalf of anyone but himself.

In short, Kahlon has not eliminated triable issues of fact as to whether TJM experienced a loss as a result of Kahlon's payments to the SEC.

**POINT VIII:**

**THE FIRST AND FIFTH COUNTERCLAIMS SHOULD BE DISMISSED BECAUSE THEY ARE PRECLUDED BY THE EQUITABLE DOCTRINE OF *IN PARI DELICTO*.**

Assuming for the sake of argument that Kahlon is contending Sigalit and Avi share some wrongdoing in connection with the SEC claims, any recovery by him under the First and Fifth Counterclaims would be barred by the equitable doctrine of *in pari delicto*. The doctrine holds that "the courts will not intercede to resolve a dispute between two wrongdoers," *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464, 938 N.E.2d 941, 950 (2010), because "no court should be required to serve as paymaster of the wages of crime, or referee between thieves." *Stone v. Freeman*, 298 N.Y. 268, 271, 82 N.E.2d 571 (1948).

Kahlon misconceives the doctrine as applying only where one wrongdoer seeks to enforce an "illegal or immoral contract" against the other, a proposition for which Kahlon has failed to offer any controlling legal authority, and the cases offered by Kahlon in support are inapposite.

*Dodge v. Richmond*, 10 A.D.2d 4, 14 (1ˢᵗ Dep't 1960), *aff'd* 8 N.T.2d 829 (1960), Kahlon's first cited case, did not adjudicate a defense of *in pari delicto*.

Kahlon's second case, *ImagePoint, Inc. v. JPMorgan Chase Bank, Nat. Ass'n*, 27 F. Supp. 3d 494 (S.D.N.Y. 2014), was not a dispute among wrongdoers over the distribution of the fruits of their offenses. Rather, the underlying debt in *ImagePoint* had been assigned to the plaintiff, who sued to collect. The defendant challenged the assignment as improper self-dealing by the plaintiff and raised *in pari delicto* as a defense. The defense failed because the plaintiff and the defendant were not in privity with respect to the alleged self-dealing, and the debt at issue was independent of it as well. Here, by contrast, the First Counterclaim alleges that both Plaintiff and Defendant are jointly enjoying the profits of the illegal penny-stock trades, and it asks the court to intervene directly in the allocation of those profits.[17]

Kahlon further argues that the doctrine does not apply to his case because the rule only applies to claimants who commit "fraud or other intentional misconduct, not mere negligence." (Mem. at 9.) The argument fails because the judgment against Kahlon was not founded on mere negligence, but instead involved claims of at least reckless wrongdoing. A panel of the Fifth Circuit expressly affirmed the district court's finding that "TJM would purchase large blocks of shares at a discount, while

---

[17] Moreover, *Imagepoint* is an opinion of the Southern District, which is unusual given the extensive amount of dispositive state law appellate authority on this time-honored equitable defense.

signing subscription agreements that provided the purchases were for 'investment purposes and not with a view towards distribution[.]' . . . Notwithstanding its representation to the issuer, TJM would then sell the stocks on the open market as soon as possible to generate a profit. For all but one of the 11 companies TJM invested in, resales of stock began within five days of its first purchase." *United States Sec. & Exch. Comm'n v. Kahlon*, 873 F.3d 500, 503 (5th Cir. 2017). In addition, reviewing the evidence before the district court, the panel opined that Kahlon's misconduct consisted of "reckless and quite likely knowing violations" of the law and, further, that "[w]e see no innocent straying across hidden limits but instead a well-planned march beyond the boundaries that were sufficiently marked for investors." *Id.*, 873 F.3d at 508. Although Kahlon was not adjudicated guilty of fraud, this is a clear case of intentional wrongdoing and not mere negligence.[18]

### POINT IX:

### SUMMARY JUDGMENT ON KAHLON'S FIRST AND FIFTH COUNTERCLAIMS, AND HIS REQUEST FOR AN INQUEST, SHOULD BE DENIED BECAUSE AN ACCOUNTING MUST FIRST BE HAD TO DETERMINE AND TRUE-UP THE MEMBERS' CAPITAL ACCOUNTS.

Without an accounting, it is impossible to determine whether the Company owes money to any member or is owed money by any member. Nor, without an

---

[18] Kahlon cites his appellate rescript for the factual proposition that he "did not engage in any fraud or other intentional misconduct." (Mem. at 9.) This is not an accurate representation of the panels' findings regarding his conduct. The citation is to the *dissent*.

accounting, is it possible to determine entitlements of the parties to distributions *inter se*. Plaintiff Sigalit Yehuda has alleged she is owed a distribution.[19] (DE #1, Complaint ¶¶ 10-11; Avi Decl. ¶ 1). Kahlon claims he is due a distribution from the Company, for which Plaintiff and/or her husband must contribute. (DE #23, Answer and Counterclaims ¶¶ 81-82.)

At the risk of pointing out the obvious, entry of an accurate judgment in this case requires resolution of these battling and diametrically opposed claims. Such dispute is properly resolved by an accounting, in which the parties' various credits and debits are assessed, as requested by Plaintiff in her complaint, rather than upon bare and as yet undocumented assertions as to who owes what to whom, followed by some sort of post-judgment "inquest."

## Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied in its entirety and Plaintiff's Cross Motion granted in its entirety and an interlocutory judgment directing Defendant to account for his dealings with TJ Management, LLC issued and entered.

Dated:  March 17, 2023

---

[19] Contrary to Kahlon's gross misrepresentation of the Complaint, Sigalit's demand and claim for an accounting (the only claim appearing in the Complaint) is not limited to Tract 3, but instead for an accounting by Kahlon, the party entrusted with and in control of all of the Company's assets, to "provide a verified statement of account of all of Kahlon's dealings with TJM, and its property and earnings during the period November 15, 2004 to the present." (Avi Decl. ¶ 1).

**GORDON & HAFFNER, LLP**
*Attorneys for Plaintiff Sigalit*
*Yehuda and Counterclaim*
*Defendant Avraham Yehuda*
480 Mamaroneck Avenue
Harrison, New York 10528
(718) 631-5678

/s/  *Steven R. Haffner*
        Steven R. Haffner