P2P3SIGC

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   SIGALIT,
4                 Plaintiff,              New York, N.Y.
5           v.                            21 CV 8921 (MMG)
6   KAHLON,
7                 Defendant.
8   ------------------------------x       Conference
9                                         February 25, 2025
                                          11:00 a.m.
10  Before:
11                  HON. MARGARET M. GARNETT,
12                                         District Judge
13
14                      APPEARANCES
15
16
    GORDON & HAFFNER, LLP
17       Attorneys for Plaintiff
    BY:  STEVEN R. HAFFNER
18
19  DARROW EVERETT, LLP
         Attorneys for Defendant
20  BY:  DAVID H. HAFT
21
22
23
24
25
```

P2P3SIGC

1          THE DEPUTY CLERK:  In the matter of Sigalit v. Kahlon,

2    case number 21 CV 8921.

3          Counsel, please state your appearances for the record.

4          MR. HAFFNER:  Good morning, your Honor.  Steven

5    Haffner, attorney for plaintiff Sigalit Yehuda and counterclaim

6    defendant, her husband Avraham Yehuda.

7          THE COURT:  Good morning.

8          MR. HAFT:  Good morning, your Honor.  David Haft from

9    Darrow Everett LLP on behalf of Joseph Kahlon.

10         THE COURT:  Mr. Haffner, you can be seated.

11         Mr. Haft, what is the need for all these electronic

12    devices and why did you not get permission before today?

13         MR. HAFT:  So, if I can answer that in part each, your

14    Honor.  I did initially obtain permission from your Honor to

15    bring these to the originally scheduled February 12 hearing.  I

16    take ownership over the fact that once that was postponed, I

17    didn't look at this order again.  I put it back in my briefcase

18    to ensure I had it with me when I came back today.  But I

19    previously had already obtained the Court's permission to bring

20    them initially.

21         I travel up from Florida, so in an abundance of

22    caution, whether they get used or not, I want to make sure I

23    have access to them.  And that's the reason for the electronic

24    devices.

25         THE COURT:  Okay.  Well, why don't we get started, and

P2P3SIGC

```
 1   if we get to a situation where something that's on your phone
 2   or whatever device that you have with you can't address my
 3   questions or doesn't enable you to participate fully, then
 4   we'll take a brief break so you can get whatever else is
 5   downstairs.
 6            MR. HAFT:  It's here, your Honor.  I just need to plug
 7   this in and I'm good to go without interruption.
 8            THE COURT:  Okay.  It needs to be plugged in?  I'm
 9   sorry.  I'm not following.
10            MR. HAFT:  The laptop charger.  I don't actually need
11   it charged right now.  It's already charged.  But the laptop is
12   right here.  It's not on for the moment.  If your Honor gives
13   me permission, I'd gladly use it.
14            THE COURT:  It seems like we're all set.
15            So, also, Mr. Haft, I know my law clerk reached out to
16   you about this, but we never received the missing page.  There
17   was a page missing from your client's declaration, the
18   second-to-last page.
19            I don't know, Mr. Haffner, if you received the entire
20   thing.
21            MR. HAFFNER:  I did.  I can provide it if you want.
22            THE COURT:  If anyone has a copy of that missing page,
23   I'd appreciate it.
24            MR. HAFFNER:  I may need it back from you.  But I
25   don't think so.
```

P2P3SIGC

1         THE COURT:  Mr. Haft, I am going to direct you to

2   refile the affidavit, the second-to-last-page is missing, the

3   one that has paragraphs 22 and 23 on it.

4         MR. HAFFNER:  I'm sorry, your Honor, I misspoke.  I

5   came from Connecticut and I thought I had it.  Well, maybe I

6   do.

7         THE COURT:  Mr.  Haft, do you have a printed copy of

8   that?

9         MR. HAFT:  I don't, your Honor.  And your Honor, I

10  wasn't contacted by anyone.  If I would have been told before

11  that there was a missing page, which I wasn't aware of, I would

12  have gladly refiled beforehand.  But I will take care of that

13  today.

14        MR. HAFFNER:  I misspoke.  I think the affidavit is on

15  my printer in Connecticut.  I wanted to print a copy and bring

16  it.

17        THE COURT:  It's not your responsibility, Mr. Haffner.

18        MR. HAFFNER:  Okay.

19        THE COURT:  I know I saw the e-mail, Mr. Haft, so I

20  don't know if because of your change in firm it didn't make its

21  way to you, which is another administrative matter.  Your

22  appearance on ECF still has your old firm and old phone number

23  and e-mail, so that also needs to be updated.

24        Okay.  Well, I guess it's more important, Mr. Haffner,

25  that you've seen the complete affidavit.  So, why don't we

P2P3SIGC

1    begin there with your view about where we are on the document

2    discovery and Mr. Kahlon's affidavit.

3         MR. HAFFNER:  Sure, your Honor.  Okay.  It's been

4    almost a year and a half since Judge Torres' order directing

5    the defendant to provide -- sorry.

6         THE COURT:  I'm not sure why that's happening.

7         MR. HAFFNER:  Back up a little bit.  Is that good?

8         THE COURT:  I can always hear you.  What matters is

9    that Rebecca can hear you.

10        MR. HAFFNER:  To provide a verified statement of

11   account.  That was unequivocal.  Practitioners know what a

12   verified statement of account is in litigation.  It's very

13   similar to a trustee's account, a fiduciary's account.  It

14   requires a verified statement of account.  That means a

15   statement verified with backup documents from the party where

16   you have an LLC.  They're called the accounting party.  That's

17   Mr. Kahlon.  There is no dispute about that.

18        For the accounting to proceed, the accounting party --

19   here Mr. Kahlon -- must provide a verified statement of

20   account, setting forth his or his accountants' view of the

21   company's income for the years covered by the accounting,

22   income, expenses, etc.

23        At the last conference, counsel promised your Honor

24   his client would, quote, fully comply.  Unfortunately, on

25   December -- February 10, the date set by your Honor at the last

P2P3SIGC

1    conference, in the evening, we did not receive a statement, a

2    verified statement of account or any statement of account.

3         What we received was a document, a bunch of documents

4    entitled "supplemental production."  That, even as a

5    supplemental production, what we received was insufficient to

6    back up, had we had a verified statement of account, to back up

7    the defendant's statement of what the income of the company was

8    for the various years covered by the accountant.

9         Most critical of the documents that were not included

10   in the supplemental production were, as your Honor may recall,

11   this is the company, the subject company was a private equity

12   firm that traded in penny stocks.  Most critical, if we were

13   talking about backup documents, had we received a verified

14   statement of account, would be the brokerage money market

15   account statements and trading statements.  And brokerage

16   houses usually generate at the end of the calendar year other

17   documents to the client, including wash sales, etc., etc.

18        If anyone or the Court were to try to do an

19   accounting, these would be necessary to back up the verified

20   statement of accounting which we did not receive.

21        We did receive a Schedule C, but it's not audited.  It

22   provides for 2010, $6.6 million.  According to counsel's

23   representation, that was the taxable income of Mr. Kahlon only.

24   It does not -- and then it report expenses of over $4 million.

25   Those expenses are not broken down at all.  And remember, it's

P2P3SIGC

1    unaudited.

2              But leaving that aside, another entry in this 2010

3    Schedule C are expenses, and it's not broken down, but there is

4    a figure, $200,000.

5              So, I mean, I've shown this to my accountant, and

6    first of all, there is no verified statement of account, but

7    even if they were, these are critical documents that a year and

8    a half later, backup documents that we don't even have.  Even

9    assuming this were litigation and this were a Rule 20 demand

10   that had been overdue, God knows how many months or years, it

11   is inadequate.

12             Penny stocks are not marginable.  There was an

13   enormous amount of trading of these penny stocks to generate in

14   2010 $6 million in prior years.  By the way, we don't have

15   2005, 6, 7, or 8.  We don't even have the Schedule Cs for those

16   years.  Mr. Kahlon claims he stopped trading in or around 2011.

17   We have 2011, '12, '13 and '14, but they're not really

18   relevant.

19             So, the last distribution, and this is

20   incontrovertible.  In the summary judgment, it was in the

21   statement of undisputed material facts.  My client's last

22   distribution I think was in mid-2010, and I think the period

23   this distribution covered was even before that.  Even accepting

24   what the Schedule Cs, the ones after 2010 are showing, that

25   there was no trading income after 2010, okay, there would have

P2P3SIGC

1   been a substantial amount of trading capital in the brokerage

2   accounts Mr. Kahlon and the company used.

3           So that's another reason why, for example, the

4   brokerage statements are very critical.  There are no bank

5   account statements, there are no, I mean, I have from my

6   accountant, if I may read just one sentence here.  "The

7   documents provided do not provide any of the verification

8   materials necessary to ascertain the veracity of what is being

9   represented, not one bank statement, credit card statement, or

10  brokerage statement was provided, nor any summary,

11  reconciliation reports, profit and loss statements, balance

12  sheets or ledgers produced that could be utilized to verify

13  even the numbers on this one Schedule C that was included in

14  the supplemental production."

15          So, you know, at this point I don't know what else

16  there is to do, other than make a motion, of course subject to

17  your Honor's recommendations.

18          THE COURT:  Okay.  Thank you, Mr. Haffner.  What about

19  the documents that were to be produced to explain the source

20  and dissipation of this $10 million related to the property?

21  Were any documents produced to you regarding that?

22          MR. HAFFNER:  Yes.  Among documents included in the

23  supplemental production are Texas, Dallas County real estate

24  records showing the expenses Mr. Kahlon paid on behalf of the

25  company, going back to 2006.

P2P3SIGC

1              There was a story here about, as I've heard and you've

2       heard at previous conferences, oh, seven years, these are not

3       available.  He manages to keep 1099s for not -- 1099s for

4       earlier years.  He manages, in whatever file he looked at,

5       which his affidavit is supposed to clearly detail, as your

6       Honor knows, whatever effort he made to find these things.

7       There is nothing.  There is no allegation "I called my broker,

8       I called my attorney, I did anything."  In New York we'd call

9       it a Jackson affidavit.  Any supreme court judge in any county

10      would have thrown that out.

11             Yes, these real estate records, we do receive from

12      2004, maybe even earlier, Dallas County expenses.

13             I'm not sure I'm answering your Honor's question.

14             THE COURT:  Well, it may be that I'm getting some

15      facts wrong.  But, when we last were together in January, we

16      discussed the fact that no documents had been produced, despite

17      Judge Torres' order, to explain and justify and provide support

18      for Mr. Kahlon's claim that the $10 million he received for

19      whatever -- there is a shifting series of explanations about

20      what the 10 million, the source of the $10 million was, but the

21      $10 million received in some way connected to a real estate

22      transaction.  And he was ordered by Judge Torres to provide an

23      accounting as to the source and disposition of that

24      $10 million.

25             And when we spoke in January, at the last conference,

P2P3SIGC

1    it was clear that none of that material or backup documentation

2    had been provided.  And I directed Mr. Haft that, among the

3    things to be provided, was whatever -- Mr. Haft in fact asked

4    me, well, what exactly should we provide to satisfy Judge

5    Torres' order.  And I said, well, I don't know what the

6    documents are, so I can't tell you specifically what to

7    provide.  But Mr. Kahlon and Mr. Haft are bearing the risk of

8    not complying.  Whatever documents exist that can demonstrate

9    what the source and disposition of that money was, to the

10   satisfaction of the plaintiffs and/or the Court, that's what

11   needed to be produced.

12          And what I'm hearing from you, Mr. Haffner, is that no

13   such documents were provided.

14          MR. HAFFNER:  Yes.  I missed that part of your

15   question, your Honor.  Yes, no such documents were produced.

16   That was explored on the summary judgment papers.  He claimed

17   it was a brokerage commission, but there have been no documents

18   verifying, supporting his account, which, frankly, Judge Torres

19   did not regard as credible, that this 10 million was a

20   brokerage.  We don't have any documents like that on

21   February 10.

22          THE COURT:  Okay.  Mr. Haft.

23          MR. HAFT:  Yes.

24          THE COURT:  Why is Mr. Kahlon not here, given that

25   among the orders that I issued in January was that if all

P2P3SIGC

1    documents had not been produced, and Mr. Kahlon had not

2    satisfactorily explained in a sworn affidavit under penalty of

3    perjury why the documents either didn't exist, when was the

4    last time they existed, if they once existed how were they

5    destroyed and why, that he was to be here personally.  And I

6    see that he is not here.  And it's also clear from my own

7    review of the affidavit, even setting aside the missing page,

8    as well as Mr. Haffner's recitation of where we are, that he

9    has not complied with those directives.

10          MR. HAFT:  Your Honor, if I may.  While I may

11   respectfully disagree as to the extent this affidavit or

12   declaration can be relied upon, up until about 7 o'clock this

13   morning Mr. Kahlon did intend to be here.  Just like he

14   intended to be here and was ready to be here on the 12th.

15   Unfortunately, he called me this morning, he has a 102 fever,

16   cannot get out of bed, and I believe is going to the hospital

17   right now for IV potentially, he thinks it's the flu or

18   norovirus.  His children just came back from a European ski

19   trip and he is unable to get out of bed at the moment.  Up

20   until he contacted me this morning, he was intending to be

21   here.

22          Obviously your Honor is not -- your Honor can take

23   that into consideration.  I will make that representation

24   that's what was communicated to me this morning.

25          THE COURT:  I want a sworn affidavit by Mr. Kahlon by

P2P3SIGC

1   the end of the week as to why he is in disregard of a court

2   order that he be present here today.

3          MR. HAFT:  Certainly, your Honor.

4          THE COURT:  With whatever documents is necessary to

5   support whatever explanation is necessary in that affidavit.

6          MR. HAFT:  Absolutely, your Honor.

7          Your Honor, if I could respond to the substantive

8   claims that counsel just made here, as far as what was provided

9   and what it indicates and what it reflects.

10          So, if your Honor will indulge me, I want to take this

11   piece by piece because there is a lot of different things at

12   play here, starting with the Texas land, the 3500 Ledbetter

13   property, which has been I guess at issue in this case since

14   the beginning, which is the parcel of land that has

15   continuously been owned by TJ Management, which is the subject

16   company that we've been discussing in this case.

17          What was provided to counsel not only was the property

18   tax records showing that Mr. Kahlon was responsible for paying

19   the property taxes on this parcel on behalf of TJ Management,

20   but showing the land records and the title ownership records,

21   since TJ Management acquired it in the early 2000s, and its

22   continuous ownership throughout.

23          So, when counsel suggests that that doesn't somehow

24   explain this issue of the $10 million, as I mentioned at the

25   last hearing, the issue of the $10 million had no relationship

P2P3SIGC

1    to this parcel.

2              THE COURT:  Okay.  But here's where we are going off

3    the rails already, Mr. Haft.  Because Judge Torres rejected

4    that explanation, and I know you disagree with that.  But she

5    found that that was -- she was not willing to accept the

6    assertion that it has nothing to do with this company or with

7    the arrangements between the plaintiffs and the defendant.

8              And when we spoke about this in January, I made very

9    clear that part of what needs to be provided is documentation

10   about what the $10 million was for.  How your client got it,

11   what happened to it, and that it was not sufficient, you were

12   proceeding at your own risk if you persisted with a position

13   that has been rejected by Judge Torres.  Maybe it will turn out

14   that she was mistaken.  But your own personal belief or

15   Mr. Kahlon's personal belief that the $10 million has nothing

16   to do with this other jointly owned property or his

17   relationship with the Yehudas is of no moment.  Because there

18   is no evidence for that position.

19             And so, until there is some counterevidence, I am

20   bound, and you more importantly and your client are bound, to

21   Judge Torres' finding already in this case, which is law of the

22   case, that the $10 million is related to the affairs of TJM and

23   to the financial relationship between the plaintiffs and your

24   client.

25             So, whatever was produced in this latest round about

P2P3SIGC

1  the Ledbetter property still does not comply with -- now we're

2  going on multiple court orders to provide documentation that

3  satisfactorily explains the source of the $10 million payment,

4  and what happened to it.

5       And it appears to me now that no documentation

6  regarding that question was produced in the last month.  It's

7  not in Mr. Kahlon's affidavit.  No explanation of it is in his

8  affidavit.  And I'm mystified.

9       MR. HAFT:  Well, your Honor, if I may here.  As it

10  relates to what was produced versus not, and as it relates to

11  the $10 million, I'm pulling up Judge Torres' order so I can

12  speak competently with respect to your Honor's inquiry here.

13  The $10 million issue, and not to belabor the point.  We

14  produced the records related to this land, so that should

15  resolve whether or not this parcel was part of that

16  transaction.

17       I don't disagree with your Honor, I will happily have

18  Mr. Kahlon likewise amend his declaration which will provide

19  that the $10 million that we're talking about, one, wasn't

20  actually any type of payment.  It was a credit related to a

21  separate and independent business venture, having nothing to do

22  with TJM or Mr. Yehuda in any way, shape or form.

23       THE COURT:  Mr. Haft, this is now like the third

24  explanation for what this $10 million is for, and I don't envy

25  your position because you appear to be doing your best to

P2P3SIGC

1    represent your client's interest, but this is now the third, by

2    my count, at least the third explanation for what the

3    $10 million is for, where it came from, and what its

4    relationship is to the financial relationship between these

5    plaintiffs and this defendant.

6          And it's all well and good for you to say, oh, I'll

7    have my client amend the affidavit, but I could not possibly

8    have been clearer in January, and my directive in January came,

9    as Mr. Haffner has pointed out, a year and a half after Judge

10   Torres also was very clear in directing that an accounting of

11   the $10 million, where it came from and what happened to it be

12   provided.

13         So the time for, like, "if I just had another week or

14   two, I could fix it" is over.  Because, I mean, I have only

15   been involved in the case for a year, and I am already out of

16   patience, which takes a lot for me to run out of patience with

17   lawyers who appear to be doing their best with difficult

18   clients.  But my involvement in the case came after many, many

19   months and years of the case's pendency before Judge Torres.

20         So, I think we need to figure out a path forward that

21   is a path that does not involve this seemingly endless series

22   of directives that are ignored or not complied with, and then

23   we meet again, and more promises are made about what is going

24   to be done or can be done.  I mean, the case is now going on

25   three-and-a-half years.  And it seems to me very little

P2P3SIGC

progress has been made.  And Mr. Kahlon's conduct is entirely

inconsistent with a litigant who is interested in complying

with court orders or seeing this litigation come to an

appropriate conclusion.

Mr. Haffner, I'm certainly open to and would welcome a

contempt motion on your part, as well as whatever other motion

in terms of proceeding to some kind of judgment in this matter

based on the entirely insufficient participation of the

defendant and repeated violation of both Judge Torres' and my

orders.

So I don't know if you need some time to think about

what that motion looks like or if you have a proposal today.

MR. HAFFNER:  Your Honor, I have an idea what that

motion would look like, although I tried to avoid it.  I know

the Court, your court is very busy and so am I.  Unfortunately,

I'm very busy the next month.  I have an idea what the motion

will look like.  It's obviously going to be for contempt.

That's one branch.  That shouldn't take too long.  30 days

would be enough for that.  But I have to also explore, because

I don't want to do piecemeal motions, I have to explore also

possibly, given everything I've seen so far, spoliation,

adverse inferences, and dismissal of the counterclaims, which

Judge Torres really would have done had we just -- so or

judgment on the pleadings, whatever it is.  And maybe at the

same time I should subpoena the SEC, I don't know, but of

P2P3SIGC

```
 1    course if my motions work out, I might not need it.

 2           But I think I should to move this case along because,

 3    frankly, I don't trust, I mean, we're a paranoid cynical

 4    profession so we're not supposed to trust if we want to avoid

 5    malpractice, but in this case I believe trust everybody but cut

 6    the deck, and I would not be surprised if Mr. Kahlon right now

 7    is -- he's got homes in Florida, is moving assets.  And New

 8    York just, New York just amended I think about a year ago its

 9    debtor creditor law fraudulent conveyance is only 4 years.

10           I'm starting to get concerned, given this conduct,

11    that -- and the liability that I see just from his 2010

12    Schedule C, which I won't get into right now, and what Judge

13    Torres found, even on reargument, it doesn't matter, the

14    10 million doesn't matter.  Even on reargument she doubled down

15    on that finding.

16           So under the circumstances, I would like to expedite

17    this.  But unfortunately, given the extent of the motions, I

18    would need probably about 40 days, 45 days if that's okay.

19           THE COURT:  No, that seems fine to me, Mr. Haffner.  I

20    agree with you that to the extent all of these issues are

21    interconnected in terms of the contempt and repeated violation

22    of court order issues and the substantive issues that it seems

23    to me you're well positioned to raise in terms of getting --

24    whether we characterize it as a judgment on the pleading or

25    summary judgment or dismissal of the counterclaims, for a
```

P2P3SIGC

1   complete failure to prosecute the matter and participate in

2   discovery in good faith, as far as I can tell.  Again, not

3   prejudging the outcome of the motion.  But just I think that

4   those circumstances certainly provide you with the basis to

5   make a motion of that type.

6           And I agree, I think it's most efficient to deal with

7   all of these matters together and they really are

8   interconnected both factually and legally.  So, let's see.  40

9   days from today.

10          MR. HAFFNER:  Also my daughter was hospitalized for a

11  week, so maybe we could move it out maybe 60 days if that's

12  okay.

13          THE COURT:  Sure, that's fine.  Because the 40 day-ish

14  mark is right around the Passover holiday and Easter, and I

15  don't know what holidays you're celebrating, but that's always

16  a challenging time for folks.  So Friday, April 25 is 60 days,

17  a little over 60 days from today.

18          MR. HAFFNER:  That's fine.

19          THE COURT:  That's a full week past the Passover and

20  Easter holiday.  So, whatever motion, however you end up

21  deciding to style the motion, Mr. Haffner, that will be due on

22  April 25.

23          Mr. Haft, anticipating the scope of the motion, I'll

24  give you four weeks until May 23 to respond.  And then June 6

25  for reply.

P2P3SIGC

1              MR. HAFFNER:  I'm sorry.  June 6 for reply?

2              THE COURT:  Yes.  Two weeks.

3              MR. HAFFNER:  Thank you.

4              THE COURT:  And Mr. Haft, I expect that affidavit from

5     Mr. Kahlon by Friday, or I'll begin my own contempt proceedings

6     for his failure to appear today as directed.

7              MR. HAFT:  Absolutely.

8              THE COURT:  Given the state of affairs, I don't think

9     there is any point to discussing this matter further.

10    Certainly, Mr. Haft, if your client wishes to take a different

11    approach to this matter, he has 60 days to do it before

12    Mr. Haffner files his motion.  Which, based on the record in

13    this case, I expect to have a very good chance of success.

14    I'll wait for papers or for word that Mr. Kahlon has decided to

15    take his responsibilities seriously and that you've managed to

16    resolve the matter amicably.

17             Mr. Haffner, anything further that you'd like to raise

18    while we're all here together?

19             MR. HAFFNER:  I think you've covered it.

20             THE COURT:  Mr. Haft?

21             MR. HAFT:  Yes, your Honor.  I just want the record to

22    be clear as to if the last remaining issue is --

23             THE COURT:  If what?

24             MR. HAFT:  If the last remaining issue that we're

25    discussing here is counsel saying he's satisfied with the

P2P3SIGC

1  remaining documents that were provided, I'd like to obviously

2  move this along as your Honor would.

3      THE COURT:  Oh no, I don't think they're satisfied.

4  The entire point of our conversation thus far today has been in

5  connection with Mr. Kahlon's repeated failure to provide a

6  verified statement of accounting.  It's also clear that he,

7  even without the missing page, it's clear to the Court from

8  reading the affidavit and hearing Mr. Haffner's explanation of

9  what in his view is missing, either from the document

10 production or from the affidavit, the affidavit for the many

11 categories of documents that are missing, the affidavit doesn't

12 even begin to cover the things that I directed you to cover in

13 January.  Like to the extent documents once existed but no

14 longer exist, an explanation for how they came to be destroyed

15 and when they were destroyed and what happened.

16      So, no.  If your takeaway, Mr. Haft, is that

17 Mr. Haffner is satisfied with the document production, then I

18 think we are -- the parties are so far apart and so far removed

19 from the Court's perception of the conduct of this matter that

20 there is nothing, there is nothing further to discuss on that.

21      I think order the transcript, you will be able to read

22 and share with your client Mr. Haffner's thorough recitation of

23 the many ways in which your client has failed to comply with

24 Judge Torres' order and with my orders.  So, no.  Mr. Haffner

25 is not satisfied with the production.  And based on my review

P2P3SIGC

1   of the affidavit and our discussion here today and in January,

2   I think he's well entitled to be not satisfied with the

3   production.  Okay?

4              MR. HAFFNER:  Thank you, your Honor.

5              THE COURT:  We are adjourned.

6              (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25