UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
YEHUDA SIGALIT,

   Plaintiff,

  v.

JOSSEF KAHLON,

   Defendant.
----------------------------------------------------------------x

Civil Action No.: 1:21-cv-08921

Judge: Hon. Margaret M. Garnett

# DECLARATION OF MR. KAHLON IN SUPPORT OF
# RULE 60(B) MOTION

1. I, Jossef Kahlon, declare as follows based upon my personal knowledge.

2. I am the Defendant in this action. I submit this declaration in support of Defendant's motion pursuant to Fed. R. Civ. P. 60(b)(1) and 60(b)(6).

3. I was represented in this case by attorney David H. Haft, Esq. starting April 25, 2024. In addition to this matter, Mr. Haft also represented me in other proceedings, including matters in New York State Court and bankruptcy-related matters.

## Discovery Production Efforts and Reassurances from Mr. Haft

4. I did not refuse to provide discovery in this case. I repeatedly asked Mr. Haft what he needed from me and whether there were additional documents I should gather or produce.

5. In December 2024, I provided Mr. Haft with access to my company email account so that he could review and collect communications and records responsive to discovery requests, including communications with accountant and the company's comptroller. A

true and correct copy of communications reflecting this access and my cooperation is attached as Exhibit 01.

6. In the communications, I specifically directed Mr. Haft to look at the the Consolidated Profit & Loss Statements (CPLs), and specifically said "[j]ust so you know if anything I want to give him all the accounting" and did not direct Mr. Haft to withhold any documents. A true and correct copy of communications is attached as Exhibit 02.

7. Among the documents I provided to Mr. Haft (or made available through my email and files) were Consolidated Profit & Loss Statements for TJ Management Group, LLC ("TJM") for the years 2007 through 2012. These spreadsheets list profits and losses for the relevant years. A true and correct copy of exemplar versions of these Profit & Loss Statements is attached as Exhibit 03.

8. Mr. Haft told me that "everything looks good from access" and that he would be "going through it later today" and I said "Okay good." A true and correct copy of these communications is attached as Exhibit 04.

9. I do not know what Mr. Haft actually produced to Plaintiff in this case, and if he followed my instructions to him to provide everything. I was not advised that any specific categories of documents remained outstanding or that additional steps were required of me beyond what I had already provided.

10. But I have directed my *new* counsel, Jacob Chen of DGW Kramer LLP, to immediately provide a copy of these documents to Plaintiff in the event that Mr. Haft never provided these as I had instructed Mr. Haft to.

11. On January 6, 2025, I followed up and asked Mr. Haft for updates. On January 8, 2025, I messaged Mr. Haft again, writing "David?" A true and correct copy of these communications is attached as Exhibit 05.

12. Mr. Haft responded to me and on January 9 and told me for the first time, "If you're able to, whatever sec related emails would be great."

13. I immediately wrote back within an hour and told Mr. Haft that all the SEC related emails were in the TJM email account that I had given him access to back in December 2024.

14. I followed up by asking Mr. Haft if he needed "more clarity" and a second follow up asking him if he understood my text. Eventually, Mr. Haft responded back "Yes, all good" several days later on January 14, 2025. A true and correct copy of these communications is attached as Exhibit 06.

15. I understand that there was a conference that was held on January 10, 2025.

16. After the hearing, for multiple days from January 10, 2025 to January 14, 2025, I received no messages from Mr. Haft until I reached out on January 14, 2025 asking if he'd been receiving my messages, to which he finally responded. A true and correct copy of these communications is attached as Exhibit 07.

17. On January 16, 2025, I asked Mr. Haft whether I needed to do anything for this case, and he responded, "Internal for me." On January 21, 2025, I again specifically asked him to let me know if he needed me to do anything on my side. I in fact asked him that on January 21, 2025 *twice*. A true and correct copy of these messages is attached as Exhibit 08.

18. Mr. Haft said he was "waiting on the transcript" and that he would let me know exactly what else he needed from me later on, but then never communicated anything to me afterwards about needing any additional documents or documentation. A true and correct copy of these messages is attached as Exhibit 09.

19. On January 23, 2025, I asked if we were going to be "late on anything" and specifically mentioned this case to make sure that any and all deadlines were being followed. A true and correct copy of these messages is attached as Exhibit 10.

20. Mr. Haft responded to me telling me that we were in fact actually "ahead of schedule," reassuring me that I was in fact giving the Court and Mr. Haffner all of the documents and information that were required of me. *Id.*

21. Specifically I told Mr. Haft on January 23, 2025, that "I'm not looking to delay anything" and wanted to make sure that we were not late on anything. *Id.*

22. Mr. Haft told me "We are good on everything right now," that he appreciated my faith to rely on him on all of my matters, that I was "betting on a good horse" and that he would talk to me again in a few days. *Id.*

23. Mr. Haft did not once ever explain to me that I needed a verified statement of account of my dealings with TJM and its property and earnings during the period from November 15, 2004. He did not explain to me what I needed to provide, or what statements I needed to prepare to address documents that were no longer in my possession.

24. On February 10, 2025, Mr. Haft sent me a declaration regarding the financial records of TJM. I reviewed and signed the declaration immediately on the same day. A true and

correct copy of these messages is attached as Exhibit 11. Mr. Haft never sent me a declaration to review and sign regarding the financial records before that day.

25. On February 25, 2025, despite my fever and illness, I reached out to Mr. Haft to ask for an update as to how the conference went.

26. He responded, "Not terrible, just long" and did not mention that the Court had ordered me to file a sworn affidavit regarding my illness by February 28, 2025. A true and correct copy of these messages is attached as Exhibit 12.

27. On March 4, 2025, I expressed my concerns to Mr. Haft about this case and asked him what the $500 sanctions were about, and noted to him that this was the first time I heard anything about it. Mr. Haft apologized, acknowledging it was his fault. But he said "I got it, no bullshit" and assured me everything was under control. A true and correct copy of these messages is attached as Exhibit 13.

28. On March 5, 2025 I asked Mr. Haft specifically "Are we on track to make us strong again." He responded, "You know we are" and that he was "[w]orking on finishing up [my] affidavit." I asked him an hour later if he was going to send me the affidavit "soon" and he said that he would. A true and correct copy of these messages is attached as Exhibit 14.

29. Before March 4, 2025, Mr. Haft never told me that the Court ordered an affidavit to be produced concerning my illness and being unable to make the February 25, 2025 conference.

30. On March 12, 2025, I told Mr. Haft to file documents with the Court discussing and explaining the $10 million issue and asked him if he needed me to send anything to him. I followed up with Mr. Haft about it again a second time on March 14, 2025.

31. He promised me that he would get out the documents "next week for sure at the latest." I told him "Ok sounds good." A true and correct copy of the relevant messages is attached as Exhibit 15.

32. On March 29, 2025 Mr. Haft reached out to me, claiming that he "never heard back" from me about the revised letter in re: this case concerning the $10 million consideration. I told him that I never received anything. Mr. Haft then apologized claiming that there was an IT issue saying "Again, my bad. I should have thought about this being a possible issue" and resent the letter. A true and correct copy of the relevant messages is attached as Exhibit 16.

33. I reviewed it and then called him. On March 31, 2025, I texted him asking if it was done or if he needed more days. A true and correct copy of the relevant messages is attached as Exhibit 17.

34. On April 2, 2025, Mr. Haft said that he would have this wrapped up that morning. A true and correct copy of the relevant messages is attached as Exhibit 18.

35. On April 6, 2025, I asked him again if he sent me the final draft for my approval. Mr. Haft claimed that he did and I told him that I did not get it and he promised to resend it. A true and correct copy of the relevant messages is attached as Exhibit 19.

36. On April 10, 2025, I followed up by text and asked if he filed the documents with the Court. He said it was "[b]eing finalized by my office for formatting and should be uploaded this afternoon." A true and correct copy of the relevant messages is attached as Exhibit 20.

37. On May 2, 2025, I asked Mr. Haft to confirm if he gave the Court the documents. When he did not respond, I asked him again. He eventually responded saying that his

paralegal "has it" and that he "will be filing Monday" and that he would keep me posted. I followed up with him again on May 5, 2025 and also again on May 7, 2025 at which point he indicated that the papers had been filed. A true and correct copy of the relevant messages is attached as Exhibit 21.

**Mr. Haft Never Informed Me About Plaintiff's Motion for Discovery Sanctions**

38. I understand *now* that on May 13, 2025, Ms. Yehuda filed a motion for contempt and discovery sanctions against me.

39. Mr. Haft did not message me May 13, 2025 to tell me about the motion.

40. In fact, for the <u>entire period of time</u> from May 13, 2025 to June 10, 2025, although I had several text message exchanges and calls with Mr. Haft, Mr. Haft did not *once* mention to me that Ms. Yehuda had filed a motion or that responses were due, ask me to participate in responding to the motion, or make me aware of any outstanding discovery.

41. For example, on May 19, 2025, after I requested a call, Mr. Haft responded that he was at the doctor "getting a bunch of test run all morning," later stating he was on his way to the ER, and then stating he was being discharged and would call the next morning. A true and correct copy of the relevant messages is attached as Exhibit 22.

42. On June 10, 2025 (the Court-ordered deadline), a message was sent from Mr. Haft's phone stating that Mr. Haft was in the emergency room and did not have his phone. A true and correct copy of the relevant message is attached as Exhibit 23.

43. I did not get any messages from Mr. Haft about this motion *after* June 10, 2025 either.

44. On June 11, 2025, I reached out to Mr. Haft to discuss another matter on which he was representing me. In response, he indicated that he was still undergoing treatment and

that he would call at a later time. A true and correct copy of the relevant messages is attached as Exhibit 24.

45. On June 15, 2025, I expressed misgivings about the general status of my matters to Mr. Haft. In response, Mr. Haft told me, "No way, you and I just made a plan the other day, we're sticking to it and making it happen. …I got you like always either way." A true and correct copy of the relevant messages is attached as Exhibit 25.

46. On both July 1, 2025 and July 2, 2025, I explicitly requested information pertaining to this matter from Mr. Haft. Mr. Haft repeatedly fail to acknowledge this request, and made no mention of Ms. Yehuda's motion. A true and correct copy of the relevant messages is attached as Exhibit 26.

47. On July 17, 2025, Mr. Haft and I discussed another case he represented me on. At no point did Mr. Haft make mention of Ms. Yehuda's motion or of the status of this matter in general. A true and correct copy of the relevant messages is attached as Exhibit 27.

48. On July 23, 2025, after issues arose in another matter Mr. Haft was representing me on, and I expressed general concerns again, Mr. Haft told me that he was "committed and completely dedicated to you and your matters." A true and correct copy of the relevant message is attached as Exhibit 28.

49. On July 28, 2025, Mr. Haft and I discussed another case. At no point did Mr. Haft make mention of Ms. Yehuda's motion or of the status of this matter in general. A true and correct copy of the relevant messages is attached as Exhibit 29.

50. On August 15, 2025, Mr. Haft and I met in person for a court appearance in connection with a different case. At no point throughout this encounter did Mr. Haft make mention

of Ms. Yehuda's motion or the status of this matter in general. A true and correct copy of the relevant messages is attached as Exhibit 30.

51. Mr. Haft repeatedly gave me assurances that everything was under control, and that he was committed and dedicated to me and my matters, but did not tell me even once about this motion or what was happening in this case.

## Efforts to Retain New Counsel

52. I understand that the Court has said that I've had 4 different lawyers withdraw their representation of me from this case.

53. I think it is important to share a little bit of context with the Court.

54. I retained Mr. Haft to represent me in this case, and he appeared on April 25, 2024. (ECF No. 97). At the time, he was an attorney at Lewis, Brisbois, Bisgaard & Smith LLP. With him also appeared Mr. Minyao Wang of the same firm. (ECF No. 96).

55. On June 15, 2025, I received a text message from Mr. Haft. He wrote "I evidently just found out from one of my best clients and a person I have the utmost respect for that my firm essentially dropped me without notice and even with my blood boiling and the embarrassment I feel I won't let that affect my day. Like I said, I got you and will take care of it no matter what." A true and correct copy of the relevant communications is attached as Exhibit 31.

56. Because Mr. Haft was fired (without notice), and based on his promise that he would take care of my case "no matter what," and because he had been the one working on my case, I had no choice but to go with Mr. Haft, while Mr. Wang and Lewis Brisbois withdrew their representation.

57. Even before I learned that the Court had granted Ms. Yehuda's motion and entered the October 6, 2025 Order, I had been working hard to find replacement counsel.

58. Because of the complex procedural and factual history of this action, it was difficult to find counsel willing to take my case on at this stage of litigation.

59. That process was made additionally challenging by the fact that Mr. Haft had been representing me simultaneously in multiple proceedings, requiring me to address overlapping representation and substitution issues.

60. For example, on or about September 4, 2025, I contacted Matthew Didora (Law Office of Matthew F. Didora, P.C.) regarding representation on multiple civil litigation matters, including this case. At the time, he told me that he could take on only one of my cases and I was forced to continue searching for new counsel. True and correct copies of the relevant communications are attached as Exhibits 32.

61. On September 28, 2025, I contacted Aaron Zerykier (Rivkin Radler), who declined to take my case because of the complicated procedural posture. A true and correct copy of the relevant communications is attached as Exhibit 33.

62. On November 21, 2025, I reached out to Matthew Didora a second time, having been unable to find new counsel, and asked him if he would reconsider. On November 24, he quoted me a high billable hourly rate and a large retainer that, given my need to concurrently pay multiple retainers for other counsels across additional matters, were financially difficult to afford at that time. True and correct copies of the relevant communications are attached as Exhibits 34.

63. Concurrently, I was engaged in a lengthy search for new counsel to represent me in a separate bankruptcy proceeding on which Mr. Haft had been representing me. After a

period of several months, I was finally able to contact and successfully retain bankruptcy counsel on December 3, 2025, but the search significantly limited my capacity to simultaneously search for new counsel in this matter.

64. The search was further complicated by the fact that I did not know which matter or matters Mr. Haft had filed to withdraw as counsel on.

65. Mr. Haft represented me in a number of different cases in addition to this case.

66. This includes Kahlon v. Yitzhak, Index No.: 601659/2016 in the Nassau County Supreme Court, the related matters in re: the bankruptcy petition of Erica Itzhak, Civil Action No.: 24-bk-10669, Itzhak v. Kahlon, 25-ap-01029 and Kahlon v. Itzhak, 25-ap-01042 before the United States Bankruptcy Court, Southern District of New York, Kahlon v. County of Nassau, et. al., Index No.: 603545/2024, and Kahlon v. Chaluts, et. al., Index No.: 655568/2024.

67. While Mr. Haft moved to withdraw his representation in *some* of these matters, there were others on which he never withdrew his representation. This includes Kahlon v. Yitzhak, Index No.: 601659/2016 in the Nassau County Supreme Court and the matter of Itzhak v. Kahlon, 25-ap-01029.

68. In the span of two-three months, I was forced to find new counsel on all of these matters simultaneously without knowing the current status as to these cases because I had entrusted them to Mr. Haft who stopped responding to my messages.

69. In fact, I asked Mr. Haft on September 10, 2025, inquiring when he was planning to withdraw his representation in this case, but I had not received any responses to my text messages to Mr. Haft since August 21, 2025. A true and correct copy of the relevant communications is attached as Exhibit 35.

70. Regarding this case, because of having to search for multiple attorneys on multiple cases, I also initially found it difficult to retain Mr. Chen's legal services. It was only after Mr. Chen agreed to a reduced retainer and also a reduced billable hourly rate that I was able to retain Mr. Chen and engage him and his firm to represent me.

**Counsel's Failure to Serve a Copy of the October 6, 2025 Opinion and Order**

71. As part of its October 6, 2025 Opinion and Order (Dkt. 146), the Court ordered Mr. Haft to serve me with a copy of the Opinion both electronically and by mail delivery service.

72. This did not happen, in spite of Mr. Haft's October 23, 2025 Certificate of Service (Dkt. 150) claiming otherwise. A true and correct copy of the email inbox used to correspond with Mr. Haft, demonstrating the lack of emails during the time surrounding the alleged service, is attached as Exhibit 36.

73. This would not be the first time that Mr. Haft had misled the Court on this case. I believe now that he had repeatedly misled the Court on all different matters while acting as my attorney, and that any opinion the Court may have developed about me through this case was the product of Mr. Haft's malpractice.

74. As mentioned, Mr. Haft has not responded to me since August 21, 2025.

**Disgorgement Judgment of TJM's Profits**

75. In 2004, Mr Avraham ("Avi") Yehuda and Ms. Segalit Yehuda made a $200,000 investment in TJM.

76. Ms. Yehuda was paid $1.176 million in distributions in 2008. She received $1.7 million in distributions in 2009. She received $2.2 million in distributions in 2010. (ECF No. 64-1).

77. All of these profits were from trading performed by TJM.

78. Ms. Yehuda has asserted that she is entitled to 50% of the profits generated by TJM.

79. TJM was investigated by the SEC in connection with the legality of the trades that TJM was conducting. I told Ms. Yehuda about this and that because of the SEC investigation we had to shut down trading.

80. In August 14, 2012, the SEC filed a lawsuit against TJM related to the trades performed, in an action bearing Civil Action No. 4:12-cv-517.

81. The lawsuit sought the disgorgement of all profits generated from trading by TJM.

82. On July 21, 2014, the SEC filed a motion for summary judgment, in which they alleged that TJM generated $7.7 million in profits through the sales of stock in violation of Section 5(a) and 5(c) of the Securities Act of 1933.

83. The SEC Staff Accountant determined that the total profits generated by TJM through its stock sales was $7.758 million for 2008 through 2010. A copy of that declaration is attached as Exhibit 37.

84. In the lawsuit, I disputed as to whether or not the trades in question were permitted through the seed capital exemption under SEC Rule 504 which allows for unregistered purchase and resale of stock from a non-reporting company. There was no dispute as to the profits generated or the transactions themselves.

85. On September 30, 2016, the judge in the SEC case ordered the "disgorgement of $7,758,178, representing profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $1,522,895". A copy of that judgment is attached as Exhibit 38.

86. With the assistance of counsel, we were able to negotiate the disgorgement amount down to approximately $2.3 million. True and correct copies of documents reflecting that resolution, including settlement and/or payment records, are attached as Exhibit 39.

87. The total legal fees incurred in defense and in response to the SEC litigation was $40,000 that was paid to Lynn Pinker Cox & Hurst LLP and $300,000 that was paid to Covington & Burling LLP. Copies of the invoices are attached as Exhibit 40.

88. Ms. Yehuda has to date not disgorged any of the profits that she received from TJM in connection with the SEC case.

89. None of the distributions Ms. Yehuda received in 2008, 2009, or 2010 were ever returned to TJM in connection with the Court's order, and in fact, Ms. Yehuda ghosted me upon learning about the SEC investigation and that Court's order of disgorgement.

90. It was only after the case was settled with the SEC that Ms. Yehuda suddenly emerged out of nowhere to bring this action against me in 2021.

91. This was 10 years after TJM had ceased trading, and 7 years after the summary judgment motion by the SEC in the SEC action.

## Ms. Yehuda Already Has a Copy of TJM's Financial Records

92. I understand that Ms. Yehuda has claimed that she has had no financial records from TJM during the time TJM was in operations.

93. TJM operated from the middle of 2006 to early 2011.

94. In 2007, TJM hired Mr. Anthony Rinaldi to serve as the company's controller and office manager.

95. After Rinaldi joined the company, he began generating regular reports and records that he regularly sent to Mr. Avraham ("Avi") Yehuda (the husband of Ms. Sigalit Yehuda and the real party in interest).

96. During that time, Ms. Yehuda received, by email, the weekly CPLs I referenced earlier which contained detailed information as to TJM's revenues and expenses. These CPLs were all emailed to Ms. Yehuda (in care of Avi Yehuda) at aviyehuda69@hotmail.com. Altogether, there have been 148 emails with 148 attachments. A copy of one of these emails as an exemplar showing that Ms. Yehuda (in care of Avi Yehuda) is copied is attached as Exhibit 41.

97. Also during that time, Ms. Yehuda received, by email (in care of Avi Yehuda), the daily trading reports which listed all of the trades being performed by TJM. These daily trading reports were all emailed to Ms. Yehuda at aviyehuda69@hotmail.com. There are 610 of these emails, most of which carry two attachments – an excel spreadsheet labeled "Daily Position" and one labeled "Open Position." A copy of one of these emails as an exemplar showing that Ms. Yehuda (in care of Avi Yehuda) is copied is attached as Exhibit 42.

98. These business records were maintained in the ordinary course of business by TJM and preserved electronically. I had directed my counsel to provide all of these documents to Mr. Haffner even though Ms. Yehuda already had these documents since they were emailed to him regularly. A copy of my email to Mr. Haft, dated October 14, 2024, in which I told him exactly how to find all of the CPLs is attached as Exhibit 43.

## Conclusion

99. I hope that with this declaration I have provided the Court with a more complete history of both this case and also my interactions with Mr. David Haft who I entrusted to represent me in this lawsuit.

100. I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Dated: January 7, 2026

New York, New York

_____

Jossef Kahlon