UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
YEHUDA SIGALIT,                                  :
                                                 :
        Plaintiff,                               :
                                                 :   Civil Action No.: 1:21-cv-08921
        v.                                       :
                                                 :   Judge: Hon. Margaret M. Garnett
JOSSEF KAHLON,                                   :
                                                 :
        Defendant.                               :
                                                 :
------------------------------------------------------------x

**DECLARATION OF MR. KAHLON
WITH RESPECT TO A VERIFIED STATEMENT OF ACCOUNTING**

I, Yossef Kahlon (aka Jossef Kahlon), upon penalty of perjury, declares as follows:

    1.    I am the Defendant in this action. I submit this declaration in order to provide a verified statement of account of my dealings with TJ Management LLC ("TJM") and its property and earnings from the period of November 15, 2004 to the present day.

    2.    This verified statement of accounting and documentation will cover TJM's (1) assets, (2) income, receipts and revenue received or accrued, (3) expenses paid or incurred, (4) distributions, dividends, salary, compensation or other monies taken or received, and (5) all payments by TJM to third parties for services rendered to, or benefits received by.

    3.    To the extent that there existed any documentation but are no longer in my possession, this sworn declaration shall set out in detail what happened to the documents, when they were destroyed or lost to the extent that I know or recall the information, why I no longer have them or access to them.

    4.    In addition, I intend to lay out in this sworn declaration the steps taken by me and my counsel to obtain any documentation that are no longer in my possession.

**THE SEACH FOR RESPONSIVE DOCUMENTS**

5.  I have made diligent efforts through my counsel to obtain documents and records that were exchanged or produced during the SEC investigation of TJM.

6.  There was litigation that was brought against TJM by the Securities and Exchange Commission ("SEC"). During the SEC litigation, TJM made document productsion to the SEC which took place in 2006 (which was 20 years ago). I did not keep either a physical or digital copy of the documents that were produced.

7.  One of my attorneys, David Coale from Lynn Pinker Hurst & Schwegmann LLP has said that they have no documents and were not involved in any document production.

8.  One of my attorneys, Covington & Burling LLP has said that they were not involved in the document production, but did have some documents on file which they sent to my attorneys. My attorneys have indicated to me that they have reviewed those files and forwarded all of the documents that were produced to the SEC.

9.  One of my attorneys, John Fulco, represented me formerly as an attorney at Salon Marrow Dyckman Newman & Broudy LLP ("Salon Marrow"). He is now with Offit Kurman. My current attorneys have reached out to Mr. Fulco about a month ago. He indicated he would work on conducing the search but it will likely time due to the long passage of time and also because Salon Marrow does not have the staffing anymore who could carry out the search.

10. In his last communication dated Febraury 17, 2026, he indicated he was still working on the search for documents.

11. I have reached out to him several times both directly and through my attorney but he has not indicated if he has found any documents for me to give over to Plaintiff.

12. I have no physical copies of any documents that my attorneys provided to the SEC or that the SEC might have obtained on their own.

13. I have made a diligent effort to search for the bank account statements of TJ Management.

14. TJ Management maintained a bank account with HSBC. The company received physical copies of bank account statements. The physical copies used to be kept at the office at 210 5th Avenue while the company was operating. From 2014 to 2017, I recall a copy of the physical documents were kept at 1 Linden Place, Suite 411, Great Neck, NY 11201.

15. In May 2018, the SEC litigation was settled to the satisfaction of the SEC and a deal with reached. At that point, I no longer thought I needed to keep or preserve any of the SEC related documentation because the SEC litigation had been concluded. This action had not yet been started, nor had the Yehudas sent me any communication that would lead me to believe that they intended to file a lawsuit or seek any sort of accounting with respect to TJ Management for the years 2007 through 2011. I had no reason to believe that I needed to keep a copy of any documents or documentation about TJ Management's finances from over 7 years ago.

16. I do not recall if I brought over any physical copies of bank account statements or brokerage account statements from 1 Linden Place, Suite 411, to my home address.

17. I have searched my home for but have not found or seen any physical copies of HSBC bank statements. In February 2025, I did email a copy of some physical bank account statements of TJ Management to Mr. Haft. I do not know if Mr. Haft ever gave them to Yehuda's attorneys, but I have directed my current attorneys to do so. Other than an electronic copy of a few limited bank account statements, I do not have any other records in my possession. I have told my counsel to identify to Yehuda's counsel the account number for TJ Management's HSBC bank

account and to cooperate with them fully on my behalf in order to obtain any documents and records from HSBC bank.

18. TJ Management also maintained a bank account with Citibank from 2015 to 2017. This account was opened up so that I could deposit funds into that account and make payments to the attorneys who represented TJ Management in the SEC action.

19. I have searched my home for but have not found or seen any physical copies of Citibank bank statements either.

20. I have searched my home for but have not found or seen any physical copies of brokerage account statements for TJ Management. I know that there were physical copies of such brokerage account statements, at least back in 2008, 2009, 2010, and 2011. I recall having seen such physical copies, and any that I had were given both to my accountant for purposes of filing tax returns and also to my lawyers in connection with the SEC proceedings.

21. I presently have no physical copies of any such documents, and I do not recall the last time that I have seen any such copies of any such documents, but likely any physical copies that I had would have likely been discarded in 2018 after the SEC proceedings settled, and I had no reason to think that I would have needed those documents.

22. I attempted to obtain all of the brokerage records from the time when TJ Management conducted trades.

23. With respect to eTrade I attempted to log in to the company's eTrade account online but I was informed by eTrade that the account is no longer active and had expired and therefore I could not pull up any documents. I spent several hours with eTrade representatives on the phone and they informed me that the account could not be revived because there has been no activity for more than two years. When I spoke with someone from the legal department, I asked about their

record keeping policy and they advised that any documents that are more than two years old are transferred to a third-party data storage awhich, and will only be produced in response to a court order or subpoena.

24. I reached out to the main client families I used to work with. One firm, Hudson, didn't actually hold the accounts themselves—they used Goldman Sachs to handle the back-end work like holding the assets and processing trades. And the other firm, Vert (or Vertical), was not operating anymore.

25. I was told on the phone that they only had records going back to 9 years, that my online account had been deactivated, and that they did not have records from 15 years ago.

26. I have certain copies records from Goldman Sachs electronically, which I have compiled, given to my attorneys for production to Plaintiff. These documents however are all password protected. I do not recall the password and the "contact us" link provided by Goldman Sachs no longer works. My counsel reached out to Goldman Sachs to attempt to get the password to those files but they have not responded to him.

27. My counsel and I have both reached out to my accountant, Irving N. Straus Accounting. According to my attorneys, the secretary stated that they have almost no records dating from that time period when TJ Management was still active. All they could find were two schedule Cs and a year end sheet, which they produced to my attorneys which my attorneys produced to Plaintiff. According to the accountant, they only keep records for up to seven years because that is what was required of them by law.

## THE ASSETS OF TJM

28. As a general matter, it is difficult for me to provide an accounting of the "total assets of TJM" from the years 2006 to 2011. The reason is that TJM bought and sold shares of different

stock, and therefore its assets were constantly shifting every year. Although TJM was formed in 2004, it did not start transacting business until 2006, and therefore had no meaningful assets from 2004 to 2006. After 2011, TJM's assets consisted of ownership of stock that it has held since 2011 and ownership of real property which it acquired in 2007.

29.     To the best of my knowledge and recollection, TJM did not have any meaningful assets in 2004, I do not recall what assets TJM owned, or have a copy of any records remaining as to those assets.

30.     To the best of my knowledge and recollection, TJM did not have any meaningful assets in 2005, I do not recall what assets TJM owned, or have a copy of any records remaining as to those assets.

31.     To the best of my knowledge and recollection, TJM had assets in 2006, and those assets consisted of ownership of various stocks in different companies. However I do not recall the length of time for which TJM held those stocks, specifically which stocks TJM held that year, the value of those stocks during the time TJM held them, or what assets TJM continued to hold at the end of 2006.

32.     To the best of my knowledge and recollection, TJM had assets in 2007, and those assets consisted of ownership of various stocks in different companies and one real property in Texas. However I do not recall the length of time for which TJM held those stocks, specifically which stocks TJM held that year, the value of those stocks during the time TJM held them, or what assets TJM continued to hold at the end of 2007.

33.     To the best of my knowledge and recollection, TJM had assets in 2008, and those assets consisted of ownership of various stocks in different companies. However I do not recall the length of time for which TJM held those stocks, specifically which stocks TJM held that year,

the value of those stocks during the time TJM held them, or what assets TJM continued to hold at the end of 2008.

34. With that said, according to the records remaining, as of the end of 2008, TJM had assets in the form of ownership of shares of certain companies as follows:

| Company | Shares |
|---|---|
| GDHI | 1,258,196 |
| MVBY | 2,958,645 |
| TNRI | 30,189,268 |
| KSGT | 441,364 |
| MSITF | 29,679,775 |
| ISYX | 222,350,918 |

35. To the best of my knowledge and recollection, TJM had assets in 2009, and those assets consisted of ownership of various stocks in different companies. However I do not recall the length of time for which TJM held those stocks, specifically which stocks TJM held that year, the value of those stocks during the time TJM held them, or what assets TJM continued to hold at the end of 2009.

36. With that said, according to the records remaining, as of the end of 2009, TJM had assets in the form of ownership of shares of certain companies as follows:

| Company | Shares |
|---|---|
| ACLH | 243,544 |

| | |
|---|---|
| ATIG | 4,122,000 |
| FDMF | 770,458 |
| LCRE | 126,471,428 |
| OPSY | 1,292,779 |
| SSHS | 12,652,888 |
| MSITF | 9,728,536 |
| ISYX | 222,350,918 |
| KSGT | 441,364 |
| GLGT | 13,888,888 |

37. To the best of my knowledge and recollection, TJM had assets in 2010, and those assets consisted of ownership of various stocks in different companies. However I do not recall the length of time for which TJM held those stocks, specifically which stocks TJM held that year, the value of those stocks during the time TJM held them, or what assets TJM continued to hold at the end of 2010.

38. With that said, according to the records remaining, as of the end of 2009, TJM had assets in the form of ownership of shares of certain companies as follows:

| Company | Shares |
|---|---|
| APCX | 87,279,666 |

| | |
|---|---|
| ATIG | 22,727,272 |
| LCRED | 46,041,209 |
| NBVG | 405,062,665 |
| VIPR | 280,545,659 |
| SUGO | 1,976,284 |
| MSITF | 8,228,536 |
| ISYX | 222,350,918 |
| KSGT | 441,364 |

39. To the best of my knowledge and recollection, TJM had assets in 2011. According to records which I have reviewed and which was provided to Yehuda, TJM as of January 19, 2011 had 357,142,857 shares of Apptech Corp. (APCX), 261,088,030 shares of Blue Diamond Ventures (BLDV), 283,560,000 shares of CLDR, 11,376,317 shares of Green Star Energies, Inc. (GSRE), 277,777,777 shares of ICOA, Inc. (ICOA), 222,350,918 shares of In-Systcom, Inc. (ISYX), 151,515,151 shares of LIGATT Security International (LGTT), 263,937,538 shares of Nutripure Beverages, Inc. (NBVG), 24,137,931 shares of PRG Group, Inc. (PRGJ), 24,163,808 shares of Undersea Recovery Corporation (UNDR), 60,606,060 shares of Videolocity International, Inc. (VCTY), and 60,685,344 shares of VIPR Industries, Inc. (VIPR). These are documented in the share certificates that were issued by these companies to TJM from January through May 2011.

40. To the best of my knowledge and recollection, the assets of TJM in 2012 and onwards consisted of the stock certificates as mentioned in the prior paragraph which remains unchanged to date.

41. In addition, in 2007, TJM acquired 3500 S. Ledbetter Drive, in Dallas, Texas, and to date, remains the owner of that real property. The property was acquired as collection of a debt because it was secured collateral.

42. Documents reflecting the purchase and sale of TJM stock holdings, including Daily Position Sheets and Open Position Sheets. Copies of all the Daily Position and Open Position Statements have been provided to Plaintiff.

43. TJM also had two bank accounts, one with HSBC and one with Citibank. The HSBC bank account was used when TJM was an active company and had assets. However as previously mentioned, I do not have a copy of any of those records any more.

44. The Citibank bank account was used to pay the attorneys in the SEC action and never had any assets other than temporary funds deposited in order to pay legal fees.

## GROSS INCOME RECEIVED

45. To the best of my knowledge and recollection, the gross income received or accrued by TJM in 2004 is none as the company was not in business.

46. To the best of my knowledge and recollection, the the gross income received or accrued by TJM in 2005 was $711,494.

47. To the best of my knowledge and recollection, the the gross income received or accrued by TJM in 2006 was $2,365,225.

48. To the best of my knowledge and recollection, the the gross income received or accrued by TJM in 2007 was $1,590,155.

49. To the best of my knowledge and recollection, the the gross income received or accrued by TJM in 2008 was $2,203,712.

50. To the best of my knowledge and recollection, the the gross income received or accrued by TJM in 2009 is was $4,811,368.

51. To the best of my knowledge and recollection, the the gross income received or accrued by TJM in 2010 was $11,110,512

52. To the best of my knowledge and recollection, the the gross income received or accrued by TJM in 2011 was $494,369.

53. To the best of my knowledge and recollection, the the gross income received or accrued by TJM in 2012 and afterwards was $0.

54. For the period from 2008 to 2011, documents reflecting the income, receipts, and revenue received or accrued by TJM are reflected in the Consolidated Profit and Loss Statements (CPLs) which is the weekly spreadsheets documenting the income and expenses of the company, and the open position statements and the daily position sheets, all of which have been furnished to Plaintiff.

55. The reason those documents existed during that time period was because during that time period, TJM retained the services of Anthony Rinaldi to serve as the company's controller and office manager. One of Mr. Rinaldi's duties and responsibilities was to keep track of the company's finances and provide daily and weekly reports of finances, including all icome, receipts and revenue received or accrued by TJM to both Mr. Kahlon and Mr. Yehuda.

56. Avi Yehuda received the company's accounting contemporaneously as it occurred, as reflected in the email correspondence showing him as a direct recipient of all of these detailed documents showing the income and expenses of the company. The accounting produced more than fifteen (15) years ago is fully aligned with the tax returns submitted to the Court as part of the present accounting production. There is no discrepancy whatsoever between the figures produced

today and the figures provided to Yehuda fifteen years ago. At no time during that fifteen-year period did the Yehudas ever object to the accounting, income, or expenses, in any form, whether written, oral, formal or informal.

57. The year end CPLs, which was the same documents sent to the Yehudas, were also sent over to my accountants who used them to prepare tax returns.

58. For the years during which there were no CPLs, I believe I had sent over documents to my accountants and whatever financial records they requested, which they used to create the tax returns.

59. The gross income figure was pulled from my tax returns. The gross income figure is computed from the total income subtracting the cost of goods sold as computed by my accountant. The full tax returns have already been turned over to the other side with the full details of income received every year.

## EXPENSES PAID OR INCURRED

60. To the best of my knowledge the expenses paid or incurred by TJM in 2004 is diminuative as it was when the company was just formed but before it started engaging in any business.

61. To the best of my knowledge the expenses paid or incurred by TJM in 2005 is $359,630.

62. To the best of my knowledge the expenses paid or incurred by TJM in 2006 is $203,978.

63. To the best of my knowledge the expenses paid or incurred by TJM in 2007 is $302,683.

64. To the best of my knowledge the expenses paid or incurred by TJM in 2008 is $686,408.

65. To the best of my knowledge the expenses paid or incurred by TJM in 2009 is $276,291.

66. To the best of my knowledge the expenses paid or incurred by TJM in 2010 is $358,521.

67. To the best of my knowledge the expenses paid or incurred by TJM in 2011 is $441,224.

68. To the best of my knowledge the expenses paid or incurred by TJM in 2012 is $199,193.

69. To the best of my knowledge the expenses paid or incurred by TJM in 2013 is $107,564.

70. To the best of my knowledge the expenses paid or incurred by TJM in 2014 is $50,560.

71. To the best of my knowledge the expenses paid or incurred by TJM in 2014 is $17,991.

72. While the company was operating, TJM's operating expenses was detailed in the weekly CPLs and kept track of by Mr. Renaldi. However as mentioned, Mr. Renaldi no longer has any of the documents which he reviewed for the purposes of preparing the CPLs. The CPLs themselves however

73. After TJM ceased business operations, the company no longer had the financial resources to continue employing Mr. Renaldi.

74. For the period from 2004 to 2005, the company was not generating enough income which would have made it financially sound or possible to hire Mr. Renaldi and therefore there was no one available to put together the detailed financial income and expense statements that Mr. Renaldi put together.

75. After 2011, the primary expenses of TJM was in legal fees to the attorneys in SEC related litigation and was paid by me personally . Copies of those records have been furnished over to Plaintiff.

76. The Yehudas never made any contributions towards the SEC related expenses including any of the legal fees incurred. All payments towards SEC related expenses were borne by me personally. The Yehudas also nevermade any payments towards any property taxes due in connection with the maintenance of the property.

77. After 2010, there were no distributions, dividends, salary, compensation or other monies paid by TJM  to its members. That was because TJM ceased trading in 2011 and has had no profits to distribute.

78. Documents reflecting the the distributions, dividends, salary, compensation or other monies paid by TJM  to its members is captured in my personal tax returns and the 1099 statements that were issued to Yehuda.

79. Because I was the only member of TJM, TJM was treated as a pass through entity and therefore the income from both TJM and all other income that I generated from 2004 through 2011 was placed on the same income tax return.

80. My accountant who was charged with filing the tax returns of TJM was placed in charge of computing the income of TJM and issuing a 1099 to Yehuda accounting according to his share in  TJM in that year.

81. These expenses do not reflect the costs of goods sold. That information is on the tax returns that I previously sent over to Plaintiff. The documents produced to Plaintiff lists both the costs of goods sold and the expenses in separate boxes.

### ALL PAYMENTS BY TJM TO THIRD PARTIES FOR SERVICES RENDERED TO OR BENEFITS RECEIVED BY

82. TJM's sole business operations consisted of the purchasing and selling of stock.

83. For that reason, thare were no "benefits received by" TJM in its history of operations.

84. TJM did make payment to third parties for services rendered.

85. This includes commission paid to brokerages in connection with the purchase and sale of stock.

86. The total expenses incurred are detailed above in the section marked TJM's expenses.

87. The documents and records reflecting those expenses are detailed above as well.

88. TJM also made substantial payments in legal fees to its counsels in connection with its defense of actions before the SEC, both in SEC administrative proceedings and also in federal court.

89. The expenses incurred by TJM before the SEC are detailed above in the section marked TJM's expenses.

90. As mentioned, the Yehudas never made any contributions towards the SEC related expenses including any of the legal fees incurred. All payments towards SEC related expenses were borne by me personally.

91. I reached out to the Yehudas at the time about their contribution to expenses and informed them about the expenses being incurred by the company. Although they never

contributed to any of the expenses, they also never denied the existence of these obligations or objected to any of the expenses mentioned, or suggested that the expenses were improper. For that reason, I had no basis to believe that they would later on object to any of these expenses in the future.

## Conclusion

92.     This declaration constitutes a full and complete accounting of all of the finances of TJM from its formation until it ceased operating in 2011, with additional information provided as to and concerning additional expenditures after the business ceased operating.

93.     This declaration also discusses the whereabouts of any and all documents and records that were maintained by TJM to the best of my knowledge and recollection.

94.     I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Dated: March 4, 2026

_____
Yossef Kahlon